1  Joel B. Robbins, Esq. (011065)
2  Jesse M. Showalter, Esq. (026628)
   Lauren E. Channell, Esq. (033484)
3  **ROBBINS & CURTIN, p.l.l.c.**
   301 East Bethany Home Road, Suite B-100
4  Phoenix, Arizona 85012
   Tel: (602) 285-0100
5  Fax: (602) 265-0267
6  joel@robbinsandcurtin.com
   jesse@robbinsandcurtin.com
7  lauren@robbinsandcurtin.com
8  *Attorneys for Plaintiff Robert Johnson*

9              **UNITED STATES DISTRICT COURT**

10                  **DISTRICT OF ARIZONA**

11 | Robert Johnson, an individual, | No. 2:19-cv-02827-JAT-JZB |

12              Plaintiff,          **PLAINTIFF'S RESPONSE TO**
                                    **DEFENDANTS' GLOBAL STATEMENT**
13         vs.                      **OF FACTS AND**
                                    **PLAINTIFF'S CONTROVERTING**
14                                  **STATEMENT OF FACTS**
   City of Mesa, *et al.*,
15

16              Defendants.

17        Plaintiff Robert Johnson responds to Defendants' Global Statement of Facts (Dkt.

18 172) as follows:

19        **RESPONSE TO DEFENDANTS' GLOBAL STATEMENT OF FACTS**

20        1. On May 28, 2018, at 11:44 p.m., Carlos Diaz called 911, asking for officers
   to be "sent out immediately" to his girlfriend's apartment, on the third floor of
21 a large apartment complex. *See* Ex. 1, audio of 911 call, 000001.

22        **RESPONSE**: Dispute. The subject incident occurred on the evening of May 23,

23 2018. *See* CAD History, Plaintiff's Separate Statement of Facts in Support of Motion for

24 Partial Summary Judgment, Dkt. 178-1, p. 3. Plaintiff admits that Carlos Diaz called 911 at

25 11:44 p.m. on May 23, 2018 and initially asked for an officer to be sent to his girlfriend's

26 apartment because her ex-boyfriend had choked her a "couple days ago" and had used his

27 key to enter the apartment. *See* 911 Call Audio, Defendants' Global Statement of Facts, Dkt.

28

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

172, Ex. 1. Mr. Diaz then stated that the ex-boyfriend had recently tried to force open the door but had left the apartment about three minutes earlier. *See id.*

2. In the 911 call, Diaz recounted a history of domestic violence between Diaz' current girlfriend, Kimberly Luevano, and her ex-boyfriend, Erick Reyes. *Id.*

**RESPONSE**: Dispute. Plaintiff disputes that Diaz recounted a "history of domestic violence." Diaz alleged that Reyes had previously tried to choke Luevano and that he had tried to enter the apartment that night. *See* 911 Call Audio, Dkt. 172, Exh 1.

3. Diaz explained that Reyes choked and abused Luevano days before and had now returned to the apartment trying to physically force his way in. *Id.*

**RESPONSE**: Admit in part. Reyes was not at the apartment when Diaz placed the call to 911. Approximately six (6) minutes into the call, Diaz stated that Reyes was outside the apartment again and was trying to "force his way in." *See* 911 Call Audio at 6:00, Dkt. 172, Ex. 1.

4. Diaz explained that Reyes was both physically and verbally aggressive and, unfortunately, had keys to the apartment. *Id.*

**RESPONSE**: Dispute. When the dispatcher asked Diaz if the ex-boyfriend was being "verbal or physical," Diaz responded, "yeah, actually." *See* 911 Call Audio at 0:45, Dkt. 172, Ex. 1.

5. Three children were sleeping in the apartment and Diaz, armed with his gun, was becoming more agitated as the 911 call progressed: "I'm trying not to step out there because if I do, I probably will hurt him." *Id.*

**RESPONSE**: Admit in part. Plaintiff disputes that Diaz was "becoming more agitated." Diaz informed the dispatcher that his gun was on the kitchen counter; however, he and Luevano remained inside the apartment during the entire 911 call. *See* 911 Call Audio, Dkt. 172, Ex. 1.

6. In the initial encounter, Reyes threatened Diaz, warning that he was coming back with his "strap"—slang for a firearm. *Id.*

**RESPONSE**: Dispute. Diaz initially claimed that Reyes said he was going to come back with his "strap." *See* 911 Call Audio at 2:13, Dkt. 172, Ex. 1. Diaz then recanted that statement and told the dispatcher that Reyes had stated he was "lucky he *didn't* have his

strap." *See id.* at 2:36. Diaz confirmed several times during the call that he had not seen Reyes with a gun. *See e.g., id.* at 7:45.

7. During the thirteen-minute 911 call, Reyes left the area of the apartment, but then returned with another subject, "his friend," who was described as a black male (Plaintiff Robert Johnson). *Id.*

**RESPONSE**: Admit.

8. Diaz reported to the 911 operator that when Reyes returned again to the apartment, someone kicked the door and that Diaz was "about to go outside…I am getting frustrated now." *Id.*

**RESPONSE**: Admit.

9. He also reported that the black male "just kicked the door." *Id*. The 911 dispatcher pleaded with Diaz to stay in the apartment and to stay on the phone with 911 until officers made contact with him. *Id.*

**RESPONSE**: Dispute. Diaz stated that "he's kicking the door" and "he just kicked the door" but appeared to be referring to Reyes. *See* 911 Call Audio at 8:25-8:48, Dkt. 172, Ex. 1. Diaz told the dispatcher that an African American male was with Reyes but then stated he had not seen the man and could not describe what he looked like. *See id.* at 8:48-9:05.

10. The 911 call ended when Defendant Officer Jhonte Jones made contact with Diaz and Luevano. *Id.*; Ex. 2, Jones AXON video, 000022. During the interview, Luevano confirmed that Reyes came over, threatened her, came back with Plaintiff, there was an exchange of keys and a backpack, Luevano forcefully closed the door when it looked like Reyes and Johnson were advancing again, Reyes attempted to open the door, and Plaintiff kicked the door. *Id.*

**RESPONSE**: Object to relevance and dispute the inference that Defendant Jones made contact with Diaz and Luevano before the attack on Plaintiff occurred. By the time this interview occurred, Defendants Jones, Monarrez, and Calderon had already assaulted Plaintiff. *See* Jones Axon Video, Dkt. 172, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7.

11. During the course of the 911 call, the dispatcher relayed information to responding officers through the Computer Aided Dispatch ("CAD") system and also through radio transmissions, which included: (1) that Reyes was at the location and was verbal and physical; (2) Diaz identified as RP for reporting party, had his 422 (gun); (3) Reyes threatened Diaz by stating he "was lucky that he did not have his strap (gun);" (4) Reyes returned, had keys, was forcing his way in and it was unknown if he had a gun; (5) Reyes was kicking the door, it was unknown if he was armed, and days prior he had

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

choked Diaz' girlfriend; and (6) a black male was with Reyes. *See* Ex. 3, CAD, Mesa/Johnson 000010-17; Ex. 6, deposition of Officer Jones, pp. 38-44.

**RESPONSE**: Admit.

12. This information, with additional detail, was also broadcast on the radio, including an officer safety report that an unrelated female residing in apartment #106, near the area of that officers would be responding to, had previously threatened to kill Mesa PD if they apprehended her. Ex. 4, Audio Track 2- Radio Central, 000002.

**RESPONSE**: Dispute. There was no "additional detail" provided about Plaintiff over the radio. Plaintiff admits that the dispatcher broadcast a physical description of Reyes and what he was wearing and noted that a female who lived in the area had threatened to kill Mesa police "if they got her." *See* Radio Central, Dkt. 172, Ex. 4.

13. The dispatcher also reported that there was an Ileads watch from Detective Holtz, for Reyes, as he needed to be interviewed for a different incident occurring earlier in the year. *Id.*

**RESPONSE**: Admit, but object as irrelevant.

14. Officers Rudy Monarrez and Ernesto Calderon were dispatched to respond. Ex. 3, CAD.

**RESPONSE**: Admit.

15. As the 911 call progressed, at 11:50 p.m., the dispatcher upgraded the severity of the call due to Diaz' report that Reyes may be returning with a firearm. *Id.*; Ex. 5, HotTone Radio, 000003.

**RESPONSE**: Dispute. The dispatcher upgraded the severity of the call to "hot," but that was because Reyes had returned to the apartment and was allegedly "forcing his way in." The dispatcher stated that it was unknown whether Reyes had access to the "422" (gun)—in reference to Diaz's gun which was laying on the kitchen counter. *See* Radio Central at 4:40, Dkt. 172, Ex. 4. Over the HotTone Radio, the dispatcher confirmed that Reyes was outside the apartment, that the "422" was still on the kitchen counter, and that it was unknown whether Reyes had a weapon of his own. *See* HotTone Radio at 0:25-1:16, Dkt. 172, Ex. 5.

16. When the severity of the call was upgraded, Officers Jhonte Jones, Edward Bridges, Christina Wilcox, and Sgt. Gretchen Moore, were either dispatched and/or responded to provide additional support. Ex. 3, CAD.

**RESPONSE**: Admit.

17. Officer Calderon was the first officer to arrive on the third-floor balcony. Ex. 7, Calderon AXON video, 000019. As he exited the elevator, he contacted Reyes and Johnson—who were walking from the direction of the apartment together—and told them to "hang on." *Id.*

**RESPONSE**: Dispute. When Calderon saw Reyes and Plaintiff, he initially told Reyes to "hang on, man" and put his arm out to physically stop Reyes from leaving. It does not appear that this request was directed at Plaintiff. Calderon Axon Video, Dkt. 172, Ex. 7.

18. Reyes followed commands to stop and sat compliantly on the ground. *Id.*

**RESPONSE**: Admit.

19. Johnson did not immediately stop and walked to the elevator, stood against the wall, and pushed the button to summon it. *Id.*

**RESPONSE**: Admit. Plaintiff continued walking toward the elevator when Calderon stopped Reyes because Calderon's initial command to stop was not directed at Plaintiff. When Calderon told Plaintiff, "hang on dude, don't leave alright," Plaintiff immediately complied. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

20. As he walked past, Officer Calderon saw Johnson looking him up and down, as if sizing him up, which Officer Calderon interpreted as a threat. Ex. 17, Officer Calderon Interview, p. 6; Ex. 12, Calderon deposition, pp. 121-122 (verifying accuracy of interview under oath).

**RESPONSE**: Dispute. The entire encounter is captured on Calderon's body camera video. When Plaintiff walked past, he did not even so much as glance at Calderon and certainly did not look "him up and down." *See* Calderon Axon Video, Dkt. 172, Ex. 7. No reasonable person viewing this video would perceive a threat. *See Scott v. Harris*, 550 U.S. 372, 372 (2007) (noting that a court should not accept a party's version of events for the purpose of ruling on a motion for summary judgment when video evidence "blatantly contradicts" the party's position).

21. Officer Calderon, addressing Johnson, asked him to "hang on," "do [him] a favor and don't leave," and "grab a seat." Ex. 7, Calderon AXON video.

**RESPONSE**: Admit. Calderon also stated, "there are other people coming" and "grab a seat, if you don't mind." Calderon Axon Video, Dkt. 172, Ex. 7.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

22. As the only officer then on scene, Officer Calderon tried to put Reyes and Johnson at positions of disadvantage—sitting on the ground—so that if he was attacked, it would take longer for either man to get to a standing position. Ex. 17, Officer Calderon Interview, p. 9; Ex. 12, Calderon deposition, pp. 121-122.

**RESPONSE**: Admit in part. Plaintiff admits that Calderon told the Professional Standards Unit during his post-incident interview that he was trying to put Plaintiff and Reyes in a "position of disadvantage." *See* Defendants' Ex. 17, *Dkt. 172-2*, p. 179. However, Calderon did not claim that either Plaintiff or Reyes had made any attempt to attack him or that he ever believed they would. *See id.*

23. Johnson refused to sit on the ground in the position he had originally chosen while waiting for the elevator and retorted "for what?" and moved toward the balcony—leaning against the third-floor railing. Ex. 7, Calderon AXON video.

**RESPONSE**: Dispute. In particular, Plaintiff disputes the claims that he "refused to sit on the ground in the position he had originally chosen" and that he made any sort of "retort." The video shows that Calderon asked Plaintiff to "grab a seat, if you don't mind." While Plaintiff did not sit down on the ground, he did not "refuse" anything, either verbally or physically. He was not combative, threatening, or aggressive. He made no attempt to get on the elevator and immediately stood against the balcony railing and began using his cellphone. *See* Calderon Axon Video, Dkt. 172, Ex. 7; Security Video, Dkt. 178, Ex. 2. When Calderon told Plaintiff "don't leave, there are other people coming," Plaintiff calmly (and almost inaudibly) asked "for what?" *See* Calderon Axon Video at 0:23, Dkt. 172, Ex. 7. Notably, Calderon never told Plaintiff that he was under arrest or being detained or the reason why he was asked not to leave. *See id.*

24. Officer Calderon then spoke directly to Reyes asking questions related to the 911 call. *Id.*

**RESPONSE**: Admit.

25. Spontaneously, Johnson interrupted stating "he [Reyes] just needed his backpack," which verified to Officer Calderon that Johnson was the black male reported over radio through the CAD to have been present with Reyes (versus some unrelated bystander). *Id.*

**RESPONSE**: Admit.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

26. Officer Calderon responded "that's not what we are being told." *Id.* Johnson then again confirmed he had been present by stating "hey…hey…woah…whatever…all I came up here for was his backpack." *Id.*

**RESPONSE**: Admit.

27. Having now twice received confirmation that Johnson was with Reyes at the apartment retrieving the backpack, Officer Calderon asked Johnson to "do me a favor and just wait there in the corner." *Id.* Johnson verbally refused. *Id.*

**RESPONSE**: Dispute. Calderon never told Plaintiff that he was under arrest or being detained. Instead, he phrased his request as "a favor," to which Plaintiff stated, "I'm good." Plaintiff continued to stand next to the balcony railing and use his phone, and he made no attempt to leave. *See* Calderon Axon Video, Dkt. 172, Ex. 7; Security Video, Dkt. 178, Ex. 2.

28. Officer Calderon repeated "in the corner man." *Id.*

**RESPONSE**: Admit.

29. Johnson, still leaning up against the third-floor balcony railing, stated "I am in the corner." *Id.*

**RESPONSE**: Admit. Plaintiff was, in fact, close to the corner where the balcony railing met the wall. *See* Calderon Axon Video, Dkt. 172, Ex. 7; Security Video, Dkt. 178, Ex. 2.

30. Officer Calderon pointed to the corner—across from the balcony—stating "no, the corner is over there." *Id.*

**RESPONSE**: Admit.

31. Johnson defiantly stated "I'm in the corner." *Id.*

**RESPONSE**: Admit that Johnson stated, "I'm in the corner," but dispute that he said this "defiantly." *See* Calderon Axon Video, Dkt. 172, Ex. 7.

32. When Officer Calderon then reported his location to other responding officers, Johnson continued to lean against the railing and began to make challenging comments regarding the number of officers arriving, Calderon's supervisor arriving, signaling that he was going to remain non-complaint, and stating "your boys are showing up…What the fuck you been up to?" *Id.*

**RESPONSE**: Dispute. Plaintiff disputes that he made any "challenging comments," that he was ever "non-compliant," or that he did anything to "signal[] that he was going to remain non-compliant." *See* Calderon Axon Video, Dkt. 172, Ex. 7. At his deposition,

Defendant Calderon testified that he understood that Plaintiff was speaking to Mr. Reyes when he asked, "what the f*** you been up to?" *See* Calderon Dep. at 29:24-30:5, ***Ex. 1***. Moreover, Defendant Calderon testified that Plaintiff never threatened him, verbally or physically. *See* Calderon Dep. at 25:16-26:6, ***Ex. 1***.

33. Johnson then appeared to be talking to someone on the phone, laughing inappropriately for the context of the situation he was encountering and whistling several times. *Id*.

**RESPONSE**: Admit. As Plaintiff whistled, three more Mesa police officers—Jones, Monarrez, and Bridges—exited the elevator. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

34. Officer Calderon recognized the whistling as tactic known to be used to warn others that the police are present and to ask for assistance from the other residents. Ex. 17, Officer Calderon Interview, p. 10; Ex. 12, Calderon deposition, pp. 121-122.

**RESPONSE**: Admit that Calderon, in his interview with the Professional Standards Unit approximately three months after the incident, claimed that "when people are on the phone while they're being talked to by police or start whistling at people, they're either warning other people that the police are there or they're asking for asking for assistance while the police are there." *See* Defendants' Ex. 17, *Dkt. 172-2*, p. 180. However, it does not appear that Calderon actually believed Plaintiff was trying to call for help at the time. If he had actually believed that, Calderon could have simply asked Plaintiff to be quiet or stop using his phone, but he did not. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

35. Officer Bridges AXON video camera captures Johnson's loud comments and laughing from the ground floor of the apartment complex. Ex. 8, Bridges AXON video, 000020.

**RESPONSE**: Admit that Johnson's voice is briefly audible on Officer Bridges' body camera video, making an unintelligible comment and laughing, before the officers enter the elevator. *See* Bridges Axon Video, Dkt. 172, Ex. 8.

36. When Officers Jones, Monarrez, and Bridges arrived, Officer Calderon— looking at Johnson—stated "he was here with him" and directed his colleagues to address Johnson first. *Id*.

**RESPONSE**: Admit.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

37. Officer Jones had been to the apartment complex before and had personally investigated criminal incidents occurring there, including stabbings and also a murder/suicide that had facts similar to the initial radio call involving Reyes and Luevano. Ex. 6, deposition of Officer Jones, pp. 55-56.

**RESPONSE**: Admit, but object as irrelevant. Defendant Jones knew that Plaintiff had no connection to the previous "murder/suicide." He also completed a *Terry* search, to which Plaintiff consented, and had no reason to believe that Plaintiff was armed. Jones Dep. at 56:10-57:6, ***Ex. 2***. Jones had no information about Plaintiff other than he was a black male who had accompanied Erick Reyes to Luevano's apartment, and he had no reason to believe that Plaintiff had committed any crime. *See id.* at 43:17-44:5, 45:8-18, 46:11-16.

38. Officer Jones made contact with Johnson, who was talking on his cell phone and appeared to be purposefully non-attentive to Officer Jones' attempts to interact with him. Ex. 6, Jones deposition, at pp. 42-45, 47-48; Ex. 9, Jones police report (verified for accuracy under oath in deposition).

**RESPONSE**: Dispute. Officer Jones testified that he felt Plaintiff was not showing him "any importance or concern as to why [Jones] was there or what [he] had to say." Jones Dep. at 47:22-48:9, ***Ex. 2***. However, Plaintiff was immediately responsive and consented to Jones' request to search him, told Jones that he had a knife in his pocket, and did not hinder the search in any way. *See id.* at 47:8-21, 49:16-24, 53:5-25; Security Video, Dkt. 178, Ex. 2.

39. Officer Jones told Johnson "I'm going to pat you down real quick, if you don't mind," and Johnson noted that he might have a knife—although none was located. Ex. 8, Bridges AXON video.

**RESPONSE**: Admit.

40. Although no knife was located, Officer Jones did not consider that the potential for danger in the interaction with Mr. Johnson was resolved. Ex. 6, Jones deposition, at p. 50-52.

**RESPONSE**: Dispute. Jones had no reason to believe that Plaintiff was armed or that Plaintiff had committed a crime. Jones Dep. at 54:14-25, 61:3-9, 61:25-62:11, ***Ex. 2***. Plaintiff had not threatened anyone, was not aggressive or combative, and had not made any attempt to leave. *See* Calderon Axon Video, Dkt. 172, Ex. 7; Security Video, Dkt. 178, Ex. 2.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

41. For safety reasons, Officer Jones asked Mr. Johnson to have a seat by the wall opposite the third-floor railing—the same command given by Officer Calderon earlier, multiple times. Ex. 8, Bridges AXON video; Ex. 6, Jones deposition, p. 155-156.

**RESPONSE**: Admit only that Jones asked Plaintiff to have a seat by the wall. *See also* Plaintiff's Response to ¶¶ 19, 21, 27, *supra*.

42. As evidenced by video footage of events occurring earlier, this is the same spot that Johnson once voluntarily chose to stand in when he earlier summoned the elevator, but when now commanded to stand in the same location by police, refused to do so. Ex. 10, Apartment hallway surveillance video Channel 6_20180523234202 (has no sound).

**RESPONSE**: Dispute. When Jones asked Plaintiff to have a seat along the wall, Plaintiff immediately moved over to the wall. *See* Bridges Axon Video at 1:40, Dkt. 172, Ex. 8. Whether Plaintiff "once voluntarily chose to stand" in that spot is totally irrelevant.

43. Johnson asked "what do I need to sit in the corner for, sounds like a fucking two-year-old" while moving toward the wall, but not sitting down. Ex. 8, Bridges AXON video; Ex. 6, Jones deposition, p. 58.

**RESPONSE**: Admit.

44. Johnson remained engaged with and on his phone. Ex. 8, Bridges AXON video.

**RESPONSE**: Admit. None of the officers ever asked Plaintiff to put his phone away. *See* Bridges Axon Video, Dkt. 172, Ex. 8; Calderon Axon Video, Dkt. 172, Ex. 7.

45. Officer Monarrez, responding to Johnson, stated: "it makes us feel more comfortable." *Id.*

**RESPONSE**: Admit. None of the officers ever told Plaintiff that he was being detained or that he was under arrest. *See* Bridges Axon Video, Dkt. 172, Ex. 8; Calderon Axon Video, Dkt. 172, Ex. 7; Jones Dep. at 159:25-160:2, **Ex. 2**.

46. Johnson was again asked multiple times to sit down. *Id.*

**RESPONSE**: Admit that Jones quickly said, "have a seat, have a seat." *See* Bridges Axon Video at 1:52, Dkt. 172, Ex. 8.

47. Rather than complying, Johnson sized up Officer Monarrez—who was standing closest to him—using threatening language stating: "ah yeah, you are small…you are small." *Id.*

**RESPONSE**: Dispute. Plaintiff did not "size up" Monarrez or use any threatening language. *See* Bridges Axon Video at 1:54, Dkt. 172, Ex. 8. His comment that "you are small" appeared to be directed at Jones rather Monarrez, and Plaintiff later explained that the comment was in reference to the "mentalities that were there." *See id.*; *see also* Johnson Dep. at 130:15-131:9, ***Ex. 3***. Monarrez did not interpret the comment as a threat. *See* Monarrez Dep. at 27:18-28:11, ***Ex. 4***.

48. Johnson was 6'1" tall and weighed 190 pounds. Officer Monarrez weighed 165 pounds "soaking wet." Ex. 16, deposition of Officer Monarrez, pp. 22-24.

**RESPONSE**: Admit that Monarrez testified that he weighed 165 pounds and that he was six (6) feet tall. Monarrez Dep. at 69:11-15, ***Ex. 4***. There was not a considerable size difference between Plaintiff and Monarrez, as shown on the videos. *See* Bridges Axon Video, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2.

49. Visible defiance is observable in Johnson's demeanor, with his eyes moving up and down to assess Officer Monarrez' size as he points directly to him. Ex. 10, Apartment surveillance video at 23:47:11-16; Ex. 8, Bridges AXON video.

**RESPONSE**: Dispute. Again, Defendants' version of events is completely at odds with the video. *See Scott v. Harris*, 550 U.S. 372, 372 (2007). There was no "visible defiance," nor was Plaintiff assessing anyone's size. Plaintiff briefly glanced at Monarrez and then at Jones—the two officers who were interacting with him—before commenting "you are small… you are small." *See* Bridges Axon Video at 1:54, Dkt. 172, Ex. 8.

50. Johnson's after-the-fact explanation for this comment—that he was allegedly referring to all of the officers' small mindedness—is equally defiant and non-sensical. *See* Ex. 11, deposition of Johnson, pp. 306-309.

**RESPONSE**: Regardless of whether Plaintiff's comment was about Monarrez's physical size or the officers' collective small mindedness, neither interpretation of Plaintiff's verbal remark justified the Officer Defendants in striking Plaintiff repeatedly in the face and head. *See* McClure Dep. at 71:2-72:10, ***Ex. 5***.

51. In response to Johnson's confrontational and defiant body language, Officer Jones directed Johnson to sit down again, and that he would not be asked again to sit, as Officer Jones believed that obtaining Johnson's compliance with sitting would put Johnson at a disadvantage if Johnson was

to attack—in light of the violent nature of the call. Ex. 8, Bridges AXON video; Ex. 6, Jones deposition, pp. 59-60, 163-164.

**RESPONSE**: Dispute. Defendant Jones' account is completely at odds with the video and should be rejected. *See Scott v. Harris*, 550 U.S. 372, 372 (2007). No reasonable person viewing the videos would believe that Plaintiff's body language was "confrontational and defiant." *See* Security Video, Dkt. 178, Ex. 2; Bridges Axon Video, Dkt. 172, Ex. 8. Nor did Defendant Jones have any reason to believe that Plaintiff would become violent or try to attack anyone. *See* Jones Dep. at 96:21-98:11, 164:2-165:2, **Ex. 2**.

52. Johnson did not sit, but instead braced himself against the wall. Ex. 8, Bridges AXON video.

**RESPONSE**: Dispute that Plaintiff "braced himself against the wall." The videos clearly show that Plaintiff slouched back against the wall, appearing as though he was going to slide down the wall to a seated position, with his legs extended in front of his body. Plaintiff looked down at his cellphone as he leaned against the wall. *See* Security Video at 23:47:22, Dkt. 178, Ex. 2; Bridges Axon Video at 2:01, Dkt. 172, Ex. 8. Within seconds, the officers had surrounded Plaintiff and began to beat him. *See id.*

53. Officer Jones described Johnson's demeanor as follows:

> So his general demeanor, his stance the way he was standing with his back braced against the wall, his foot positioning, things of that sort, told me that, in my training and experience, told me that, hey, this—he's being—I'm not going to be say (sic) difficult, but being confrontational. In other words, his mind isn't on a, you know what, I didn't do anything. Let's just get out of here. Let them do their thing. I know I didn't do anything. His mind is more so was on disputing whatever or confronting whatever I'm asking him to do or any other officers on scene are asking him to do.

Ex. 6, Jones deposition, p. 63.

**RESPONSE**: Admit only that Defendant Jones made this statement in his deposition. Plaintiff denies that anything about his demeanor was confrontational and denies that Defendant Jones' perception of his body language was reasonable. The Court is not required to accept Jones' version of the event which is blatantly contradicted by the video evidence. *See Scott*, 550 U.S. at 372 (2007).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Jones also testified in his deposition that he decided to use force against Plaintiff "to prevent him from formulating a strategy." Jones dep. at 86:6-15, ***Ex. 2***. Jones testified that his goal in using physical force against Plaintiff was "to keep him from thinking through a plan of either attack or escape." *See id.* at 96:4-20. Jones admitted that this technique was consistent with the training he had received from the Mesa Police Department (MPD). *See id.* However, when asked to identify his basis for concluding that Plaintiff might attempt an attack or escape, Jones could only say that Plaintiff was breathing, leaning back against the wall, looking down at his phone, and the position of his feet and shoulders made Jones suspicious. *See id.* at 96:11-101:2

54. Officers moved toward him repeatedly stating "all the way down." Ex. 8, Bridges AXON video.

**RESPONSE**: Admit. In addition, the Officer Defendants did not give Plaintiff any time to sit "all the way down" before they began to strike him. Only about four seconds elapsed between the time Defendant Jones stated, "all the way down, all the way down," to the time he threw his first strike at Plaintiff's face. *See* Bridges Axon Video at 2:04, Dkt. 172, Ex. 8.

55. Officer Jones believed that Johnson was trying to avoid sitting down in order to retain a position of physical advantage by remaining on his feet. Ex. 6, Jones deposition, p. 64, 81.

**RESPONSE**: Admit only that Jones later claimed in his incident report and his deposition that he believed Plaintiff was trying to retain a "position of physical advantage." However, Plaintiff denies that this belief was objectively reasonable and disputes whether Jones actually believed this at the time of the incident, given that mere seconds elapsed between the time Jones stated, "all the way down, all the way down," to the time he threw his first strike at Plaintiff. *See* Bridges Axon Video at 2:04, Dkt. 172, Ex. 8.

56. Officer Jones believed that Johnson understood the commands he was given and that he simply chose not to comply to maintain "a position of mobility as opposed to sitting down and not being able to be mobile and to launch or flee or launch an attack or whatever that may have happened." *Id.*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**RESPONSE**: See Response to ¶ 55, *supra.* There was absolutely no basis for Jones to believe that Plaintiff was going to "launch an attack" or flee. *See generally*, Bridges Axon Video, Dkt. 172, Ex. 8.

57. Officer Jones explained:

> Based upon the physical cues that I was seeing from Mr. Johnson at the time, that, along with his verbal confrontationalism (sic) towards whatever we were asking of him, led me to believe that he was trying to retain a position of advantage…So his body positioning, the way he was breathing was another cue. Just little things that I've been trained to pay attention to that would allow me to believe or assess that potentially a violent incident is imminent or could be imminent in the near future…His shoulders were slightly hunched forward. His toes were pointing somewhat inward. And his breathing has become shallower, if that makes sense.

*Id.* at p. 66-69.

**RESPONSE**: Admit only that Jones made this statement during his deposition. Plaintiff denies that he was ever verbally or physically confrontational or aggressive, and Jones agreed that Plaintiff had not threatened anyone. Jones Dep. at 81:10-12, ***Ex. 2***. Plaintiff also disputes whether Jones' alleged perception of Plaintiff's body language was objectively reasonable. No reasonable person viewing the videos would find anything remarkable or confrontational about Plaintiff's breathing or the way he was slouched back against the wall. *See generally*, Bridges Axon Video, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2.

58. Officer Jones explained that the positioning of Johnson's toes was consistent with boxing/combat sport training, in which the subject is trained to point their toes front or slightly inward toward their opponent to be able to generate power. *Id.* at p. 67-68.

**RESPONSE**: Plaintiff admits that Jones claimed in his deposition that having one's toes pointed inward is something taught "with boxing or fighting of any combat sport." Jones Dep. at 67:7-18, ***Ex. 2***. However, Plaintiff disputes that Jones' claim was objectively reasonable because no reasonable person viewing the video, as shown in the screenshot below, would interpret Plaintiff's posture or the position of his feet as consistent with any sort of boxing or combat stance. *See* Security Video at 23:47:28, Dkt. 178, Ex. 2.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267



59. On the apartment surveillance, Johnson can be seen purposefully adjusting his toes into an inward position. Ex. 10, Apartment surveillance video, at 23:47:26-29.

**RESPONSE**: Plaintiff disputes that he "purposefully" adjusted his feet in any position. However, Plaintiff admits that his feet appeared to turn slightly inward as he slid further down the wall. *See* Security Video at 23:47:28, Dkt. 178, Ex. 2.

60. In his deposition, Johnson admitted that he did not comply with any of Officer Calderon's commands. Ex. 11, Johnson deposition, pp. 122-123, 128.

**RESPONSE**: Dispute. Plaintiff immediately complied with Defendant Calderon's request to not take the elevator and remain on the balcony. Calderon Axon Video, Dkt. 172, Ex. 7.

61. Rather, unknown to officers, Johnson subjectively believed that being asked to stand in the corner was disrespectful because of childhood issues with his mother. *Id.* at pp. 283-284.

**RESPONSE**: Object to relevance and admissibility. Plaintiff admits that being asked to stand in the corner brought up painful memories from his childhood and that his internal thought process was not known to the officers at the time. Information of which the officers were unaware may not be considered in determining whether their use of force was objectively reasonable. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (noting that the court "can only consider the circumstances of which [the defendant officers] were aware when they employed deadly force"); *Glenn v. Washington County*, 673

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

F.3d 864, 873, n. 8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways."); Fed. R. Evid. 402, 403.

62. Johnson disregarded these commands because he was not ever going to stand in the corner:

> Q: Were you going to comply with his directive to stand in the corner?
> A: No.
> …
> Q: Were you going to comply with any officer's directive to sit down on the ground?
> A: No.

*Id.* at 295.

**RESPONSE**: Object to relevance and admissibility. Plaintiff admits that he answered "no" in response to the questions quoted above, but he denies making any such statements to the Officer Defendants at the time of the incident. Because the Officer Defendants had no knowledge of this information at the time, it is not relevant to whether their use of force was objectively reasonable. *Hayes*, 736 F.3d at 1232–33; *Glenn*, 673 F.3d at 873, n. 8; Fed. R. Evid. 402, 403.

63. Johnson also claimed that he "didn't feel like listening" to Officer Calderon because he had seen Officer Calderon with his gun drawn—even though he admitted it was never pointed at him—because it allegedly reminded him of his days in Chicago. *Id*. at p. 285-288.

**RESPONSE**: Object to relevance. Plaintiff made no such statement to the Officer Defendants before their use of force. *See* Plaintiff's Response to ¶¶ 61 and 62, *supra*.

64. Yet, Officer Calderon never pointed his gun at Johnson and, instead, exited the elevator with his gun out of the holster and pointed at the ground—fearing that he might be ambushed—and re-holstered it immediately when he saw no one in the hallway. Ex. 12, Calderon deposition, pp. 19-20.

**RESPONSE**: Object to relevance.

65. Video confirms that Johnson never saw any gun drawn at him as Officer Calderon's weapon was re-holstered before he ever even came into contact with Johnson. Ex. 10, Apartment surveillance video, at 23:44:20-30.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**RESPONSE**: Object to relevance. In addition, from the angle of the surveillance video, it is unclear whether Plaintiff would have been able to see the gun in Calderon's hand before he re-holstered it.

66. As Johnson braced himself against the wall, it was Officer Jones' impression that Johnson was utilizing techniques taught in martial arts and noted that he recognized this stance "from combative training I have received in the past which boasts on the necessity of putting a wall to your back when confronted with multiple opponents." Ex. 9, Jones police report; Ex. 6, Jones deposition, pp. 81-83.

**RESPONSE**: Dispute. Plaintiff never "braced" himself against the wall. He leaned back and slid down the wall because the Officer Defendants had asked him to sit in that specific spot. Plaintiff also denies that Jones' alleged impression was objectively reasonable because no reasonable person viewing the videos would interpret Plaintiff's posture as consistent with combat or martial arts training. *See* Security Video at 23:47:28, Dkt. 178, Ex. 2; *see also* Plaintiff's Response to ¶ 58, *supra*.

67. Officer Jones perceived Johnson's position as an "ideal base" for fighting multiple opponents as Johnson was pinning himself against the wall to "counteract force." Ex. 6, Jones deposition, pp. 83-85.

**RESPONSE**: Dispute. No reasonable person viewing the video would conclude that Plaintiff was preparing his body for a fight. Plaintiff was looking down at his cellphone as the Officer Defendants closed in on him and began to strike him. *See* Bridges Axon Video at 2:04, Dkt. 172, Ex. 8. In addition, Plaintiff denies that Jones' alleged perception was objectively reasonable and disputes whether Jones actually believed this at the time of the incident, given that mere seconds elapsed between the time Jones stated, "all the way down, all the way down," to the time he threw his first strike at Plaintiff. *See* Bridges Axon Video at 2:04, Dkt. 172, Ex. 8.

68. Johnson, indeed, has a history of martial arts training, which he described, in part, as positioning his body to absorb hits in a fight. *Id.* at pp. 69-71, 161-163.

**RESPONSE**: Object to relevance and admissibility. Any prior martial arts training that Plaintiff may have had is totally irrelevant because Plaintiff never attempted to fight

anyone, and the Officer Defendants had no knowledge of his background. *Hayes*, 736 F.3d at 1232–33; *Glenn*, 673 F.3d at 873, n. 8; Fed. R. Evid. 402, 403.

69. Officer Jones explained his concerns during the encounter before moving toward Johnson and using any force:

> Q: Why was it so important to put him at a position of disadvantage?
> A: There are several aspects in play during the time of the contact of him and Mr. Reyes. One being it was him and Mr. Reyes, so it was more than one. Two being the area that there, you know, there was up there on that third-story balcony was very short from the wall to the balcony. The rail on the balcony was about waist high, give or take a few inches. So it was very easy to topple over. So my goal was to put him at a place and a position where if something did happen, if something were to get dynamic, so to speak, there wouldn't be a potential of us potentially falling over the railing or anyone else falling over, being pushed over the rail.

*Id*. at pp. 76-77.

**RESPONSE**: Admit only that the quoted statements were made at Jones' deposition. In addition, Plaintiff denies that Jones' alleged perception was objectively reasonable because there was no reason for any officer to believe that Plaintiff would become violent or throw someone off the balcony. Plaintiff also disputes whether Jones actually engaged in this analysis before using force, given that mere seconds elapsed between the time Jones stated, "all the way down, all the way down," to the time he threw his first strike at Plaintiff. *See* Bridges Axon Video at 2:04, Dkt. 172, Ex. 8.

70. Officer Jones described the totality of the circumstances justifying Johnson's detention as follows:

> Q: Well, you just said it was reasonable under the totality of circumstances in Graham v. Connor, so I want to know what you mean by that?
> A: The area that we were in, which is a high-crime area, the time of day, his actions, his demeanor, the crime that we were investigating, the severity, the potential severity of the crime that we were investigating, i.e., could have potentially been a home invasion. There was a mention of at least two firearms potentially. One, being the reporting party having one; and one in Erick Reyes saying, 'you're lucky I didn't' have my strap.'

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

> Him leaving, coming back. Those things were inherent to me that, you know what, this could be a potential—a serious situation. I should detain him on this.

*Id*. at p. 89.

**RESPONSE**: Objection. The testimony is inadmissible under Rules 701 and 704 of the Federal Rules of Evidence because it is an opinion on an ultimate issue. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059–60 (9th Cir. 2008) ("In general, "[t]estimony that simply tells the jury how to decide is not considered 'helpful' as lay opinion."). Plaintiff admits only that the quoted statements were made at Jones' deposition. Plaintiff disputes that the Officer Defendants' use of force was objectively reasonable under the circumstances because the Officers had no reason to suspect he committed any crime, had no probable cause to arrest him, and knew he was not threatening, violent, or aggressive. *See* Calderon dep. at 25:16-26:6, 207:1-23, ***Ex. 1***; Jones dep. at 61:3-62:11, 81:10-12, ***Ex. 2***; Monarrez dep. at 27:18-28:11, 105:4-12, ***Ex. 4***; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13; Bridges Axon Video, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2.

> 71. Officer Monarrez also recognized Johnson's position—with his back to the wall and a lowered center of gravity—as giving Johnson a tactical advantage against the police officers. Ex. 16, Monarrez Deposition, p. 45, 48.

**RESPONSE**: Admit only that Monarrez testified that Plaintiff was in a "tactical advantageous position" by having his back to the wall. *See* Monarrez dep. at 47:21-48:4, ***Ex. 4***. However, Plaintiff denies that Monarrez's perception was objectively reasonable. Plaintiff only had his back to the wall because the Officer Defendants told him to move there. No reasonable person viewing the video would perceive Plaintiff's position or body language, as he slouched back against the wall and scrolled through his phone, as tactically advantageous. *See* Security Video at 23:47:28, Dkt. 178, Ex. 2.

> 72. Officer Calderon acknowledged that Johnson's position against the wall gave him a "good fighting base" and he could have easily pushed off the wall. Ex. 17, Officer Calderon Interview, pp. 13-14; Ex. 12, Calderon deposition, pp. 121-122 (verifying accuracy of interview under oath).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**RESPONSE**: Admit only that Calderon stated in his post-incident interview that the wall behind Plaintiff made, in his opinion, a "good fighting base." *See* Defendants' Exhibit 17, Dkt. 172-2 at p. 182. However, Plaintiff denies that Calderon's opinion was objectively reasonable. *See* Plaintiff's Response to ¶ 71, *supra*; Security Video at 23:47:28, Dkt. 178, Ex. 2.

73. Officer Calderon heard and witnessed Plaintiff's body positioning, his continued defiance, and his refusal to comply with the officers' directives and moved in to assist his fellow officers. *Id.*; Ex. 12, Calderon deposition, pp. 35-36.

**RESPONSE**: Admit only that Calderon "moved in" to assist the other Officer Defendants with beating Plaintiff. Plaintiff disputes that he ever exhibited "continued defiance" or that anything about his "body positioning" provided justification for the Officer Defendants' use of force. *See* Security Video at 23:47:28, Dkt. 178, Ex. 2.

74. Given his perceptions of Johnson's behavior and body positioning, Officer Jones decided to detain Johnson to prevent him from formulating a strategy for attack or escape: "One for our protection. And, two, for his protection, to keep from doing something that could potentially get him in trouble and get us hurt." Ex. 6, Jones deposition at pp. 86, 96-100.

**RESPONSE**: Admit only that Jones made the quoted statement during his deposition. Plaintiff disputes that Jones' alleged perceptions and his use of force to detain Plaintiff were objectively reasonable. *See* Plaintiff's Response to ¶¶ 55, 58, 66, 70; Bridges Axon Video at 2:04, Dkt. 172, Ex. 8; Security Video at 23:47:28, Dkt. 178, Ex. 2.

75. Officer Jones perceived Johnson's body language as preparing for a physical altercation, to include his perception that Johnson was looking towards the floor to use his peripheral vision to track several opponents simultaneously and that Johnson's breathing was transitioning to fight or flight mode. *Id.* at pp. 100-101, 104-105.

**RESPONSE**: Dispute. *See* Plaintiff's Response to ¶¶ 55, 58, 66, 70; Bridges Axon Video at 2:04, Dkt. 172, Ex. 8; Security Video at 23:47:28, Dkt. 178, Ex. 2.

76. Officer Jones also perceived that it would be better to detain Johnson while he was against the wall as "across the landing from the wall was a balcony with a four-foot high railing. If a struggle were to ensue at that location, the chance of a person falling over the railing would be higher." *Id.* at pp. 107-108.

**RESPONSE**: Admit only that Jones made the quoted statement in his incident report and that the statement was read at his deposition. Plaintiff disputes that Jones' alleged perceptions and his use of force to detain Plaintiff were objectively reasonable. *See* Plaintiff's Response to ¶¶ 55, 58, 66, 70; Bridges Axon Video at 2:04, Dkt. 172, Ex. 8; Security Video at 23:47:28, Dkt. 178, Ex. 2. In addition, Jones never told Plaintiff or any of the other officers that he intended to "detain" Plaintiff:

> Q.  So it was at this point you decided that you were going to detain Robert Johnson?
>
> A.  Yes, sir.
>
> Q.  Did you express to him that you intended to detain him?
>
> A.  I did not, sir.
>
> Q.  Did you express to any of the other officers that you intended to detain Robert Johnson?
>
> A.  Not that I recall, no, sir.

Jones dep. at 86:16-24, *Ex. 2*. In fact, prior to the use of force, no officer told Plaintiff he was under arrest or being detained or that he was not free to leave. *Id.* at 46:17-7, 159:25-160:6; 164:25-165:2.

> 77. Officer Jones moved toward Johnson and grabbed Johnson's left wrist. His intent was to utilize a OCCS control grasp, which is a form of wrist-lock that can be used in handcuffing and positioning a person for handcuffing. *Id.* at pp. 108-114, 118-119.

**RESPONSE**: Objection. Plaintiff disputes and objects to Paragraphs 77 through 89, 91, 92, and 94 through 99 to the extent that they attempt to break down an event that lasted seconds into minute detail, thus giving the misleading impression that the Officer Defendants had time to give thought and consideration into the assault they were inflicting on Plaintiff. As the Ninth Circuit has explained, the video "alone raises material questions of fact about the reasonableness of [the officer defendant's] actions and the credibility of his post-hoc justification of his conduct." *Longoria v. Pinal County*, 873 F.3d 699, 706 (9th Cir. 2017) (citing *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1177 n.7 (9th Cir. 2013) (observing that a video, even when an imperfect account of an officer's perspective,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

is relevant to his credibility)). Because the Officer Defendants were perceiving these events in real time, and not in a frozen frame, the videos played at their ordinary speed provide important evidence as to what the Officer Defendants did and saw. *See id.* In deciding the motions for summary judgment, the Court need not accept the Officer Defendants' post-hoc explanations of the incident which are directly refuted by video. *See Scott v. Harris*, 550 U.S. 372, 372 (2007).

The video of the incident shows that Jones stated, "all the way down, all the way down," and began to immediately move toward Plaintiff. *See* Bridges Axon Video at 2:05, Dkt. 172, Ex. 8. Four seconds after saying "all the way down, all the way down," Jones used his left fist to punch Plaintiff's abdomen. *See* Bridges Axon Video at 2:09, Dkt. 172, Ex. 8. It does not appear that Jones tried to execute a "control grasp" at any time before he struck Plaintiff or that any alleged control grasp was unsuccessful because of anything Plaintiff did. *See id.*; *see also* Security Video, Dkt. 178, Ex. 2. Over a period of several seconds, Jones grabbed Plaintiff's neck, performed at least one knee strike to Plaintiff's abdomen, and forcefully struck Plaintiff several times in the face and head." *See* Bridges Axon Video at 2:09-2:17, Dkt. 172, Ex. 8. Defendants Calderon and Monarrez also punched Plaintiff. *See* Security Video, Dkt. 178, Ex. 2; Calderon Axon Video at 3:13, Dkt. 172, Ex. 7; Monarrez Axon Video at 0:26, Dkt. 172, Ex. 13. Plaintiff's body began to slide down the wall, his hands limp at his sides. *See* Security Video at 23:47:38, Dkt. 178, Ex. 2.

Then, only eight seconds after he threw his first punch, Jones delivered a final elbow strike to Plaintiff's face as Calderon pulled Plaintiff's legs out from beneath him. *See* Bridges Axon Video at 2:17, Dkt. 172, Ex. 8; Security Video at 23:47:38, Dkt. 178, Ex. 2. During the entire encounter, Plaintiff did not resist or attempt to fight back, and he did not even raise his hands to protect his face from the Officer Defendants' punches. *See id*. After his body collapsed onto the ground, Plaintiff said nothing and did not move for several seconds. *See id.*

> 78. If the hold had worked as intended and Johnson had not physically resisted by balling his fists and tensing his arms, Officer Jones would have brought

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Johnson's hand toward the small of his back, turned him around, and handcuffed him. *Id.*

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

79. Officer Jones then tried to deploy an arm drag, low leg sweep combination, which was unsuccessful due to Johnson's bracing against the wall. *Id.*

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

80. Officer Monarrez tried to execute a control hold on Johnson's right arm or right hand, but was unable to maintain the hold due to Johnson's physical struggle. Ex. 16, Monarrez deposition, at pp. 22-24.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*. At the time Monarrez grabbed Plaintiff's right wrist, Plaintiff was not physically struggling; he was being choked and beaten by the other Officer Defendants.



*See* Monarrez Axon Video at 0:22, Dkt. 172, Ex. 13.

81. Officer Jones then moved to deploy a Muay Thai style hand clasp, behind Johnson's head, which he could use to pull Johnson's head down—in a manner that prevented Johnson from headbutting Officer Jones—and cause him to fall forward to the ground to allow officers to gain more effective control and detain Johnson quickly. Ex. 6, Jones deposition at pp. 119-120.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*. However, Plaintiff admits that Jones placed his hands around Plaintiff's neck. *See* Monarrez Axon Video at 0:22, Dkt. 172, Ex. 13.

82. Johnson prevented Officer Jones from pulling his head down by arching his head and neck. *Id.* at pp. 121-123, 178-179.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*. *See also* Monarrez Axon Video at 0:22, Dkt. 172, Ex. 13.

83. With Johnson still physically resisting, Officer Jones delivered two knee strikes to Johnson's abdomen, which appeared ineffective as Johnson's actions and resistance did not lessen. *Id.* at pp. 130-131.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

84. "Johnson's arms remained tense and his body twisted in an effort to neutralize the forces applied by the officers." *Id.*

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

85. Officer Monarrez perceived that the knee strikes deployed by Officer Jones were ineffective. Ex. 16, Monarrez depo, pp. 34:1-3.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

86. When efforts to gain compliance failed and it did not seem reasonable to disengage to use OC spray or the Taser, Officer Jones transitioned to strikes to distract Johnson from the takedown efforts. Ex. 6, Jones deposition, at pp. 131.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

87. Officer Jones then deployed five fist strikes to the left side of Johnson's jawline, which appeared to have no effect. *Id.* at pp. 194.

**RESPONSE**: Admit only that Jones delivered five strikes (punches) to Plaintiff's face. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

88. Of these five strikes, Officer Jones' fifth strike completely missed Mr. Johnson. Ex. 8, Bridges AXON video; Ex. 10, Apartment surveillance video; Ex. 13, Monarrez AXON video.

**RESPONSE**: Dispute. It appears, based on the video, that each of the five strikes made contact with Plaintiff's head or face. *See* Bridges Axon Video, at 2:09-2:16, Dkt. 172, Ex. 8. *See also* Plaintiff's Objection and Response to ¶ 77, *supra*.

89. In delivering these strikes, Officer Jones did not use his body or foot stance to assist with delivering harder strikes. Instead, he used short strikes and a narrow stance because "I was only trying to establish a stunning response after hitting him," similar to the electrical stinging sensation when you hit your funny bone. Ex. 6, Jones deposition, pp. 133-134, 193.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

90. Officer Monarrez delivered one (1) closed fist strike that contacted Johnson in the area of his upper left chest/lower left side neck. Ex. 8, Bridges AXON Video.

**RESPONSE**: Admit.

91. Because Officer Monarrez was attempting to control Johnson's right arm, he did not see Officer Jones deploy any strikes to Johnson's head or face. Ex. 16, Monarrez deposition, p. 60.

**RESPONSE**: Dispute. Jones' strikes are visible on Monarrez's body camera video, which refutes the claim that Monarrez could not or did not see Jones' strikes. *See* Monarrez Axon Video, Dkt. 172, Ex. 13; Plaintiff's Objection and Response to ¶ 77, *supra*. There is no question that all the Officer Defendants knew they were all using force against Plaintiff.

92. Officer Calderon was attempting to control Johnson's left arm and did not see Officer Jones or Officer Monarrez deploy any strikes to Johnson. Ex. 12, Calderon deposition, p. 56.

**RESPONSE**: Dispute. Jones' strikes are visible on Calderon's body camera video, which refutes the claim that Calderon could not or did not see Jones' strikes. *See* Calderon Axon Video at 03:08, Dkt. 172, Ex. 7; *see also* Plaintiff's Objection and Response to ¶ 77, *supra*. There is no question that all the Officer Defendants knew they were all using force against Plaintiff.

93. Officer Calderon held Johnson's left forearm and delivered three strikes toward Johnson's shoulder. *Id*. at pp. 44-45, 82.

**RESPONSE**: Admit.

94. Of these three strikes toward Johnson's shoulder, Officer Calderon's third strike missed Johnson entirely. *Id*. at pp. 83-84.

**RESPONSE**: Dispute. It appears, based on the video, that all of Calderon's strikes made contact with Plaintiff. *See* Calderon Axon Video at 03:08, Dkt. 172, Ex. 7; *see also* Plaintiff's Objection and Response to ¶ 77, *supra*.

95. Officer Calderon's intention was to bring Johnson's arm to his back to handcuff him, but Johnson's arm was tense and he was resisting and physically stronger than Officer Calderon, and Officer Calderon delivered strikes to Johnson's shoulder, attempting to have Johnson release his tension to bring the arm back for handcuffing. *Id*. at pp. 47-48.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

96. Officer Jones deployed a single elbow strike to Johnson's forehead, because the prior strikes appeared ineffective, but the video footage does not capture a primary or direct elbow contact. Ex. 6, Officer Jones deposition, at p. 136, 185-186; Ex. 10, Apartment surveillance video; Ex. 8, Bridges AXON video.

**RESPONSE**: Admit only that Jones delivered an elbow strike to Plaintiff's face. However, the strike did make contact with Plaintiff's face. Plaintiff disputes that the "prior strikes appeared ineffective" as Jones' final elbow strike was delivered as Plaintiff was already sliding down the wall. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

97. Officer Monarrez did not see Officer Jones deploy an elbow strike. Ex. 16, Monarrez deposition, p. 61.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77 and Response to ¶ 91, *supra*.

98. Officer Calderon did not see Officer Jones deploy an elbow strike. Ex. 12, Calderon deposition, p. 56.

**RESPONSE**: Dispute. *See* Plaintiff's Objection and Response to ¶ 77 and Response to ¶ 92, *supra*.

99. Officer Calderon moved toward Johnson's left leg and had ahold of his left wrist to bring him to the ground. *Id*. at pp. 45, 87-88.

**RESPONSE**: Dispute. Calderon performed a leg sweep as Jones delivered an elbow strike to Plaintiff's face, and Plaintiff collapsed onto the ground. *See* Plaintiff's Objection and Response to ¶ 77, *supra*.

100. During the entirety of the encounter to the point that Johnson is on the ground, Johnson retains control of his cell phone in his hand. Ex. 10, Apartment surveillance video; Ex. 8, Bridges AXON video.

**RESPONSE**: Admit, but object to relevance.

101. Officers quickly moved to place Johnson in handcuffs. Ex. 8, Bridges AXON video.

**RESPONSE**: Admit.

102. Reyes repeatedly yells, "just sit down bro." *Id.*

**RESPONSE**: Dispute. During the attack, as the Officer Defendants are striking Plaintiff, someone can be heard offscreen shouting, "just sit down bro," although it is unclear if the speaker is Reyes or another officer. *See* Bridges Axon Video at 02:13, Dkt. 172, Ex.

8. In addition, the officers are heard shouting vulgarities as they are striking Plaintiff, including "sit your ass down, motherfucker!" Calderon Axon Video at 03:15, Dkt. 172, Ex. 7.

103. Johnson claims that he recalls nothing from the physical struggle. Ex. 11, Johnson deposition, p. 175. Johnson's statements made on the video after the force are inconsistent with this claim. Ex. 8, Bridges AXON video.

**RESPONSE**: Dispute. Plaintiff testified in his deposition that he did not recall being struck in the face, that "everything turned black," and that he woke up on the ground with pain in his face. Johnson dep. at 175:14-20, ***Ex. 3***. Plaintiff objects to the second sentence of paragraph 103 as vague, ambiguous, and irrelevant. Notwithstanding these objections, Plaintiff was obviously very upset after he came to. He knew he had been beaten unconscious, and as he laid on the ground in handcuffs and restraints, he admittedly used explicit language. *See e.g.*, Monarrez Axon Video at 8:00, Dkt. 172, Ex. 13.

104. In addition to containing the interview with Kimberly Luevano—where she confirmed the details of the 911 call and Reyes' history of physically assaulting her—Officer Johnson's [sic] AXON video captures his interview of Reyes. Ex. 2, Jones AXON video.

**RESPONSE**: Object to relevance and admissibility. Information that was unknown to the Officer Defendants at the time they used force may not be considered in determining whether their use of force was objectively reasonable. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013); *Glenn v. Washington County*, 673 F.3d 864, 873, n. 8 (9th Cir. 2011); Fed. R. Evid. 402, 403.

105. While interviewing Reyes, Johnson can be heard screaming threats for an outrageous period of time directed to the officers including that they are: "Pussies;" "wet behind the years," "who the fuck are you to tell me to calm down," "who the fuck are you pussy boy," "you ain't saying shit." His mother, standing below the balcony, repeatedly yelled at Johnson to "calm down." *Id.*

**RESPONSE**: Object to relevance and admissibility. Information that was unknown to the Officer Defendants at the time they used force may not be considered in determining whether their use of force was objectively reasonable. *Hayes*, 736 F.3d at 1232–33 (9th Cir. 2013); *Glenn*, 673 F.3d at 873, n. 8 (9th Cir. 2011); Fed. R. Evid. 402, 403.

Plaintiff disputes that he made any "threats." None of his statements threatened any harm to the officer or anyone else. However, Plaintiff admits that he called the officers vulgar names and used obscenities after they attacked and restrained him. *See e.g.*, Monarrez Axon Video at 8:00, Dkt. 172, Ex. 13.

106. During Officer Jones' interview of Reyes—that is barely comprehensible over Johnson's irrational screaming and threats—Reyes confirmed that he brought Johnson ("junior") to come with him as muscle. *Id.* After an exchange of keys and the backpack, Reyes admitted that he was "talking shit" through the door and that Johnson kicked the door. *Id.*

**RESPONSE**: Dispute and object to relevance and admissibility. *See* Plaintiff's Response and Objection to ¶ 105, *supra*. In addition, Plaintiff disputes that Reyes ever referred to Plaintiff as "the muscle." *See* Jones Axon Video at 19:00-20:00, Dkt. 172, Ex. 2. Reyes described that he asked Plaintiff (who lived in the complex) to come with him to the apartment and to give Luevano Reyes' key to the unit in exchange for his backpack. *See id.* The exchange was successful; however, once the apartment door was closed, Reyes began "talking shit" to Luevano's new boyfriend through the door. *See id.* Reyes claimed that Plaintiff kicked the closed door but was adamant that neither of them tried or had any intention of entering the apartment. *See id.*

107. Following his interviews with Luevano and Reyes, Officer Jones spoke with Johnson's mother who confirmed that he is called "junior," and she surmised that Johnson's "mouth went north," "he get's angry," "acts stupid," and that if told to do something— Johnson will not do it. *Id.*

**RESPONSE**: Object to relevance and admissibility. Information that was unknown to the Officer Defendants at the time they used force may not be considered in determining whether their use of force was objectively reasonable. *Hayes*, 736 F.3d at 1232–33 (9th Cir. 2013); *Glenn*, 673 F.3d at 873, n. 8 (9th Cir. 2011); Fed. R. Evid. 402, 403.

108. She recounted that Johnson's standard response is "who the fuck are you, you don't tell me what to do." *Id.*

**RESPONSE**: Object to relevance and admissibility. *See* Plaintiff's Objection and Response to ¶ 107, *supra*.

109. Johnson's mother explained that "when he is in angry rage mode, nothing can get through." *Id.*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

**RESPONSE**: Object to relevance and admissibility. *See* Plaintiff's Objection and Response to ¶ 107, *supra*.

> 110. In support of his physical prowess, Johnson's mother told Officer Jones that Johnson could easily lift Officer Jones and that he can lift "300 pounds." *Id.*

**RESPONSE**: Object to relevance and admissibility. *See* Plaintiff's Objection and Response to ¶ 107, *supra*.

> 111. Photographs of Johnson's head/face, do not document any cuts, bruising, or swelling and instead show a superficial abrasion on his right cheek and tiny scratches on his left temple area.

**RESPONSE**: Dispute and object to relevance.

Because of Plaintiff's dark complexion, bruising would likely not be as visible immediately after the incident as it would be on an individual with a lighter complexion. In addition, Plaintiff presented to the Banner Desert Emergency Department on May 31, 2018 with complaints of headaches and pain in his head, neck, back, and left rib. *See* Banner Records, JOHNSON 000053 and 000081, ***Ex. 6***. He was diagnosed with bruising and contusions to his right hand and left chest wall. *See id.* Plaintiff has also been diagnosed with a concussion, post-traumatic stress disorder, and chronic musculoskeletal pain as a result of the incident. *See* Report of Allan M. Block, M.D. (02/18/2020) at pp. 9-10, ***Ex. 7***. In addition, an officer's use of force may be objectively unreasonable, and the intrusion on a plaintiff's liberty interest may be substantial, even if injuries are minor. *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002) (citing *Robinson v. Solano Cty.,* 278 F.3d 1007, 1015 (9th Cir. 2002)).

> 112. Johnson was not struck in the right cheek. Exs. 7, 8, and 10.

**RESPONSE**: Admit. However, the Officer Defendants restrained Plaintiff face-down on the concrete ground for a considerable period of time after the assault and also slammed his face into the elevator door before dropping him back onto the ground. *See* Monarrez Axon Video at 8:28, Dkt. 172, Ex. 13.

> 113. Johnson did not sustain any fractures to any portion of his body, including his head and/face and no injuries were identified on a CT scan. Ex. 15, Banner Desert Medical Center diagnostic radiology reports, Johnson 000063-65.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**RESPONSE**: Admit. However, he was diagnosed with hand and chest contusions in the emergency department and was later diagnosed with a concussion, post-traumatic stress disorder, and chronic musculoskeletal pain. *See* Banner Records, JOHNSON 000053 and 000081, ***Ex. 6***; *See* Report of Allan M. Block, M.D. (02/18/2020) at pp. 9-10, ***Ex. 7***.

114. The City of Mesa Police Department ("MPD") operates its own Police Academy. Ex. 18, Affidavit of Timothy Walker, at ¶ 3.

**RESPONSE**: Admit.

115. The training and curriculum provided at the Academy has been certified by the Arizona Peace Officer Standards and Training Board ("AZPOST") as complying with AZPOST standards. *Id.*

**RESPONSE**: Admit.

116. The instructors at MPD are certified by AZPOST to teach at the Police Academy. *Id.* at ¶ 4.

**RESPONSE**: Admit.

117. The City of Mesa hires Police Officers that are certified by AZPOST. *Id.* at ¶ 5.

**RESPONSE**: Admit.

118. Officer Ernesto Calderon is certified by AZPOST to be a law enforcement officer in the State of Arizona. *Id.* at ¶ 6.

**RESPONSE**: Admit.

119. Officer Calderon was hired by the City of Mesa in October 1996. *Id.*

**RESPONSE**: Admit.

120. Officer Calderon completed training through the Mesa Police Academy. He has completed additional training on numerous topics and issues throughout his tenure with Mesa Police Department. Ex. 19, Officer Calderon's Training Matrix.

**RESPONSE**: Admit.

121. Officer Jhonte Jones is certified by AZPOST to be a law enforcement officer in the State of Arizona. Ex. 18 at ¶ 7.

**RESPONSE**: Admit.

122. Officer Jones was hired by the City of Mesa in February 2006. *Id.*

**RESPONSE**: Admit.

123. Officer Jones completed training through the Mesa Police Academy. He has completed additional training on numerous topics and issues throughout his tenure with Mesa Police Department. Ex. 20, Officer Jones' Training Matrix.

**RESPONSE**: Admit.

124. Officer Rudy Monarrez is certified by AZPOST to be a law enforcement officer in the State of Arizona. Ex. 18 at ¶ 8.

**RESPONSE**: Admit.

125. Officer Monarrez was hired by the City of Mesa in January 2017. *Id.*

**RESPONSE**: Admit.

126. Officer Monarrez completed training through the Mesa Police Academy. He has completed additional training on numerous topics and issues throughout his tenure with Mesa Police Department. Ex. 21, Officer Monarrez's Training Matrix.

**RESPONSE**: Admit.

127. MPD had a policy that required officers to report certain uses of force. Ex. 22, 30(b)(6) Deposition of Timothy Walker, pp. 48-49.

**RESPONSE**: Admit.

128. MPD had a policy that documented the uses of force. Ex. 23, Policy DPM 2.1.45, Use of Force Reporting Protocols.

**RESPONSE**: Admit that the Mesa Police Department (MPD) maintained a policy titled "Use of Force Reporting Protocols," which provided MPD personnel "with general guidelines for use of force reporting protocols and should not be considered as all inclusive." *See* Defendants' Ex. 23, Dkt. 172-6 at p. 2.

129. MPD maintained a tracking system that sent an alert to command staff when an officer was involved in a certain number of uses of force within a 12-month period. Ex. 24, 30(b)(6) Deposition of Robert Christopher Rash, p. 44.

**RESPONSE**: Admit that MPD utilized IAPro/Blue Team software, which would trigger an alert to the professional standards lieutenant if an officer received a certain number of complaints or was involved in a certain number of use of force incidents or vehicle accidents (or any combination thereof) within the prior 12 months. *See* Defendants' Ex. 24, Dkt. 172-6 at p. 9. The professional standards lieutenant would then send the alert to the officer's commander and the chain of command. *See id.*

130. MPD presented command staff with annual reports on uses of force. Ex. 25, Deposition of Ramon Batista, pp. 58-59.

**RESPONSE**: Admit that MPD Chief Batista testified that an MPD officer was tasked with preparing an annual or semi-annual report that complied the IAPro/Blue Team data. However, Chief Batista also acknowledged that the use of force reports relied on the officers' self-reporting. He acknowledged that there did not appear to be an policy for identifying use of force incidents when no use of force report or citizen complaint was generated. He did not know whether there was a procedure for reviewing or auditing Axon body camera videos to identify use of force incidents which had not been reported. *See* Defendants' Ex. 25, Dkt. 172-6 at pp. 17-18.

131. MPD's Professional Standards Unit investigated prior uses of force (and other, non-force-related complaints) against Officer Jones, and MPD issued discipline based upon those findings. Ex. 26, Concise Employee History for Police Officer Jhonte L. Jones.

**RESPONSE**: Admit only that the "Concise Employee History" for Defendant Jones lists a total of seventeen (17) use of force incidents, two (2) citizen complaints, and two (2) departmental incidents between September 14, 2012 and May 31, 2018. *See* Defendants' Ex. 26, Dkt. 172-6 at pp. 21-25. However, the document does not clearly indicate whether the Professional Standards Unit (PSU) investigated each incident or what the outcome was. *See id.* Plaintiff also disputes any inference that the PSU investigations and discipline taken against Jones were constitutionally adequate. Most of the inquiries into Jones' use of force incidents, for example, do not appear to be based on whether Jones' force was reasonable but whether the type of force used (i.e., verbal commands, strikes, etc.) was "effective" or "not effective." *See id.* In addition, no use of force incidents and complaints against Jones prior to September 14, 2012 appear on the list because the MPD maintained a policy where records of such incidents could be purged from the officers' files every three years. *See* Jones dep. at 251:15 -252:11, ***Ex. 2***.

132. MPD's Professional Standards Unit investigated prior uses of force (and other, non-force-related complaints) against Officer Calderon, and MPD issued discipline based upon those findings. Ex. 27, Concise Employee History for Police Officer Ernesto L. Calderon.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RESPONSE**: Admit only that the "Concise Employee History" for Defendant Calderon lists a total of twenty-five (25) use of force incidents and six (6) citizen complaints between January 7, 2013 and May 31, 2018. *See* Defendants' Ex. 27, Dkt. 172-6 at pp. 28-33. However, the document does not clearly indicate whether the Professional Standards Unit (PSU) investigated each incident or what the outcome was. *See id.* Plaintiff also disputes any inference that the PSU investigations and discipline taken against Calderon were constitutionally adequate. Most of the inquiries into Calderon's use of force incidents, for example, do not appear to be based on whether his force was reasonable but whether the type of force used (i.e., verbal commands, strikes, etc.) was "effective" or "not effective." *See id.* In addition, use of force incidents and complaints that occurred before January 7, 2013 do not appear on the list and were likely purged due to MPD's document retention policy. *See* Jones dep. at 251:15 -252:11, ***Ex. 2***.

133. Officer Monarrez had no reportable uses of force prior to May 28, 2018. Ex. 28, Concise Employee History for Police Officer Rudy A. Monarrez.

**RESPONSE**: Admit only that the "Concise Employee History" for Monarrez lists one (1) departmental incident prior to the incident involving Plaintiff for "conduct unbecoming an officer" and lists the "actions taken" as "administratively closed." *See* Defendants' Ex. 28, Dkt. 172-7 at p. 2.

134. MPD's Use of Force Policy, DPM 2.1.5, followed the law set forth in *Graham v. Connor* and required an officer to consider the totality of circumstances in evaluating whether force was necessary and what level of force was reasonable in the specific situation the officer faced. Ex. 29, Policy DPM 2.1.5, Use of Force, p. 3.

**RESPONSE**: Object to the extent that this statement appears to assert a legal opinion or conclusion and dispute any inference that the MPD's use of force policy was constitutionally adequate. Plaintiff admits that the MPD maintained a policy titled "Use of Force" DPM 2.1.5, the purpose of which was to provide MPD personnel with "guidelines" for the "appropriate and acceptable use of force," as well as officer safety protocols, reporting guidelines, and treatment of injuries arising from the use of force. *See* Defendants' Ex. 29, Dkt. 172-7 at p. 5. Plaintiff also admits that the policy directed officers to "consider

the totality of the circumstances in evaluating whether force is necessary and what level of force would be reasonable before using a particular force option." *See id.* at p. 7.

135. The Use of Force Policy provided a lengthy, non-exhaustive list of factors to be considered by the officer. *Id.* at pp. 3-4.

**RESPONSE**: Plaintiff admits that the MPD's Use of Force policy listed 14 factors that officers may consider in evaluating whether force was necessary and reasonable. *See id.*

136. The Use of Force Policy further defined "strikes," and required the officer to "consider the totality of circumstances in evaluating which area of the body to strike." *Id.* at p. 1.

**RESPONSE**: Admit. In addition, the Use of Force policy defined "strikes" as "[t]echniques that have more than a minimal chance of injury. Examples: Kicks, elbow, palm or knee strikes, and punches." *See id.* at p. 5. Plaintiff's expert, Roger Clark, has opined that the policy was constitutionally inadequate because it did not provide sufficient clarity regarding the appropriate use of head strikes. *See* Report of Roger Clark at p. 29, ***Ex. 8***. This was a policy gap which MPD then filled with bad training. *See id.* Mesa police officers were trained to use head strikes in two circumstances where head strikes are not appropriate: (1) as a preventive measure to "take out the computer" and (2) to gain compliance over uncooperative but non-aggressive subjects. *See id.* In Mr. Clark's opinion, this policy gap and MPD's poor training were moving forces behind the Officer Defendants' attack on Plaintiff. *See id.*

137. Pursuant to A.R.S. § 41-141.12 [sic], the Arizona State Library, Archives and Public Records developed a General Records Retention Schedule for All Public Bodies ("Retention Schedule"). Ex. 30, General Records Retention Schedule Issued to: All Public Bodies, Law Enforcement Records.

**RESPONSE**: Object to the extent that the statement appears to give a legal opinion or state a legal principle. Plaintiff presumes that Defendants intended to refer to Section 41-151.12, which has been repealed. Nevertheless, Plaintiff admits that Defendants' Exhibit 30 states that, pursuant to A.R.S. § 41-151.12(3), the Arizona State Library has the authority to set records retention periods and the sole authority to modify, extend, or decrease records retention periods.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

138. For Law Enforcement Records, all internal investigation files must be maintained for five (5) years after a sustained finding(s) resulting in discipline and for three (3) years for all other records. *Id*. at p. 9.

**RESPONSE**: Plaintiff admits that the document retention schedule set by the Arizona State Library was five (5) years for Professional Standards/Internal Affairs records of "sustained finding(s) resulting in discipline." *See* Defendants' Ex. 30, Dkt. 172-7 at p. 20. The timing of the retention was noted as "[a]fter separation of employee. Trigger begins when discipline is final." *See id.* Plaintiff also admits that all other Professional Standards/Internal Affairs records were to be retained for three (3) years after review was completed. *See id.* The Arizona State Library also set document retention schedules for "police department strategic plans" and "historical" law enforcement records such as "promotions, retirements and proclamations." It does not appear, based on Defendants' Exhibit 30, that the Arizona State Library set any document retention policy for citizen complaints or reports that did not result in a Professional Standards/Internal Affairs investigation, substantiated findings, or discipline.

| Record Series Number | Record Series Title | Description | Retention Period | Retention Remarks | Legal Citation(s) |
|---|---|---|---|---|---|
| 20831 | Permanent Historical Law Enforcement Records | May include one-time events with historical value, operations plans, documents, videos, promotions, retirements and proclamations. | Permanent | Preserve pursuant to ARS §39-101. Transfer to State Archives after administrative or reference value has been served.  Note: State Archivist reserves the right to make a final determination regarding the historical status of records. | ARS §39-101 |
| 20828 | Police Department Strategic Plans | | Until superseded or obsolete | Start of retention begins when plan is adopted. | |
| 53218 | Professional Standards / Internal Affairs Records - All Other Records | May include critical incident reviews, use of force, weapons deployments, and other related records. | 3 Years | After review is completed. | |
| 20834 | Professional Standards / Internal Affairs Records - Sustained Finding(s) Resulting in Discipline | May include critical incident reviews, use of force, weapons deployments, and other related records. | 5 Years | After separation of employee. Trigger begins when discipline is final. | |

*See id.*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

139. At all times prior to the subject incident, MPD's policy met the requirements of Arizona's Retention Schedule. Ex. 31, Policy DPM 1.4.25, Professional Standards, at p. 10.

**RESPONSE**: Admit only that the MPD "Professional Standards" policy, DPM 1.4.25, provided that (a) all "inquiries" will be retained for three (3) years from the date of final adjudication; (b) investigations resulting in a finding of unfounded, exonerated, not sustained, policy failure, or sustained-no discipline will be retained for three (3) years from the date of final adjudication; (c) sustained investigations resulting in a written reprimand, disciplinary probation, or disciplinary suspension, will be retained for five (5) years from the date of final adjudication; and (d) sustained investigations resulting in dismissal or resignation in lieu of termination or involuntary demotion will be retained indefinitely. *See* Defendants' Ex. 31, Dkt. 172-7 at p. 42.

140. MPD voluntarily exceeded these requirements by providing that records from sustained investigations resulting in dismissal or resignation in lieu or termination would be retained indefinitely. Ex. 24, pp. 49-50 and Ex. 31, at p. 10.

**RESPONSE**: Dispute. Plaintiff disputes that MPD "voluntarily exceeded these requirements" because it does not appear that the Arizona State Library's records retention schedule set a specific minimum retention requirement for investigations resulting in dismissal or resignation in lieu of termination. *See* Defendants' Ex. 30, Dkt. 172-7 at p. 20.

141. When MPD destroyed records pursuant to the Retention Schedule in 2014 and 2016, it provided Certificates of Records Destruction to the Records Management Center of the Arizona State Library, Archives and Public Records. Ex. 24, pp. 48-49, Ex. 32, Certificate of Records Destruction 2014 and Ex. 33, Certificate of Records Destruction 2016.

**RESPONSE**: Admit.

142. MPD recognizes that internal investigations can result in other findings such as unfounded, exonerated, not sustained, policy failure, and sustained: no discipline. Ex. 31 at p. 10.

**RESPONSE**: Admit. For records resulting in such findings, MPD required that they be retained for three (3) years and allowed officers to purge "the entire investigation" after that time. *See* Defendants' Ex. 31, Dkt. 172-7 at p. 42. MPD also allowed attachments,

investigations, forms, recordings, etc., to be purged from the IAPro "storage vault" although the IAPro database itself was maintained. *See id.*

### PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS

**A.    The Officer Defendants' assault on Plaintiff Robert Johnson**

143.    On May 23, 2018, Plaintiff Robert Johnson resided at the El Rancho Del Sol Apartments in Mesa, Arizona. Johnson dep. at 11:24-12:5, *Ex. 3*.

144.    Plaintiff saw an acquaintance, Erick Reyes, pacing in the complex and asked him if something was wrong. Mr. Reyes explained that his girlfriend had kicked him out of their apartment and still had a bag that belonged to him. Johnson dep. at 110:1-18, 112:22-25, *Ex. 3*.

145.    At Mr. Reyes' request, Plaintiff accompanied Mr. Reyes to his ex-girlfriend Kimberly Luevano's apartment to get the bag. Johnson dep. at 118:1-4, *Ex. 3*.

146.    Plaintiff knocked on the door, and Ms. Luevano opened it. Plaintiff asked if he could have the bag, and Ms. Luevano allowed him to take it. Plaintiff then handed the bag to Mr. Reyes and told him it was time to go, but Mr. Reyes and Ms. Luevano began to argue. Johnson dep. at 118:5-19, *Ex. 3*.

147.    Ms. Luevano shut the door, and Plaintiff and Mr. Reyes left. Johnson dep. at 120:2-20, *Ex. 3*.

148.    Meanwhile, Mesa police officers were dispatched to the apartment because Ms. Luevano's boyfriend, Carlos Diaz, had called 911 a few minutes earlier when Mr. Reyes had first been at the apartment by himself. *See Dkt. 178-1*, p. 3.

149.    The dispatcher informed the officers that Mr. Reyes was reported to be verbal and physical, had stated it was lucky he "did not have his strap (gun)," and had a key to the apartment. *See Dkt. 178-1*, p. 3. The dispatcher also told officers that Mr. Reyes had tried to force himself into the apartment and was kicking the door and that he had allegedly choked Ms. Luevano a couple days ago. *Id.* at pp. 4-5.

150.    The dispatcher mentioned that a black male friend was with Mr. Reyes and that the two were on the third floor near the elevator. *See Dkt. 178-1*, p. 5.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

151.    The dispatcher provided no other descriptive information about the friend and did not claim that the friend had been involved in the domestic dispute between Mr. Reyes and his ex-girlfriend, or that the friend was suspected of any crime. *See* Dkt. 178-1, p. 5.

152.    Plaintiff and Mr. Reyes were in the process of leaving the apartment complex, and as they approached an elevator, a Mesa police officer, Defendant Ernesto Calderon, exited it. Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7.

153.    Defendant Calderon told Mr. Reyes to "hang on," put his arm out to block Mr. Reyes from leaving, and instructed Mr. Reyes to take a seat on the ground. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

154.    As Plaintiff continued toward the elevator, Defendant Calderon asked Plaintiff to "do [him] a favor and don't leave" and to "grab a seat, if you don't mind." *See* Calderon Axon Video, Dkt. 172, Ex. 7.

155.    Plaintiff complied with Defendant Calderon's request to remain there and began using his cellphone while standing against the balcony. Additional officers arrived as Johnson continued using his cell phone. *See* Security Video, Dkt. 178, Ex. 2.



156.    Defendant Calderon began speaking with Mr. Reyes, who was seated on the ground around the corner from the elevator. Security Video, Dkt. 178, Ex. 2.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

157.    Plaintiff explained to Defendant Calderon that Mr. Reyes "just needed his backpack" and that he had accompanied Mr. Reyes to get the backpack. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

158.    Defendant Calderon responded that was not what he was told, and that "other people" were coming. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

159.    Plaintiff continued to use his cellphone while standing against the balcony railing and appeared to be having a conversation with someone on the line. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

160.    Other police officers pulled into the parking lot, and Plaintiff suddenly got a bright light in his face from a police helicopter hovering above the building. Johnson dep. at 124:2-12, ***Ex. 3***.

161.    Moments later, several other Mesa police officers, including Defendants Jhonte Jones and Rudy Monarrez, exited the elevator. *See* Calderon Axon Video, Dkt. 172, Ex. 7.

162.    While Plaintiff was still using his phone, Defendant Jones asked to search him for weapons. Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Bridges Axon Video, Dkt. 172, Ex. 8.

163.    Plaintiff consented to the search, offered no resistance, and did not hinder the search in any way as Jones patted him down. *See* Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Jones depo. at 47:8-21, 49:25-50:4, 53:5-19, ***Ex. 2***.

164.    During the search, Plaintiff told Defendant Jones he might have a knife in his pocket and Jones checked. This was not correct, as Plaintiff did not, in fact, have a knife or any other weapons. Jones depo. at 53:5-19, ***Ex. 2***.

165.    Plaintiff continued trying to use his phone while Defendant Jones searched Plaintiff to his satisfaction. *See* Security Video, Dkt. 178, Ex. 2; Jones depo. at 53:5-19, ***Ex. 2***.



166. When Defendant Jones finished his search, he tapped Plaintiff on the shoulder and said, "have a seat right there by the wall for me, doc." *See* Bridges Axon Video at 01:39, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7.

167. Plaintiff moved toward the wall, continued to try to use his cellphone, and asked, "what do I need to sit in the corner for?" *See* Bridges Axon Video at 01:45, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2.

168. None of the officers ever told Plaintiff that he was being detained or arrested.

> Q. BY MR. SHOWALTER: But you never told him that he was a suspect and you never told him that he wasn't free to leave?
>
> A. No, I did not.
>
> Q. You never told him he was arrested?
>
> A. No, I did not.
>
> * * * *
>
> Q. BY MR. SHOWALTER: You never told him -- and to be fair, prior to using force, you never told him that he was under arrest, correct?
>
> A. No, I did not.
>
> Q. And prior to using force, you never told him that he was being detained?
>
> A. No, I did not.

Jones dep. at 164:12-17, 164:21-165:2, ***Ex. 2***. *See also* Calderon Axon Video, Dkt. 172, Ex. 7; Bridges Axon Video, Dkt. 172, Ex. 8.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

169. Nor did the officers ever ask Plaintiff to get off his phone and put it away. *See* Calderon Axon Video, Dkt. 172, Ex. 7; Bridges Axon Video, Dkt. 172, Ex. 8.

170. However, Defendant Jones was apparently displeased with Plaintiff's phone usage because he believed Plaintiff was not showing him the "importance" he felt he deserved:

> Q. And you note in your report that Johnson was holding a cell phone up to his ear when you tapped him on the side and asked him to have a seat on the floor. Did I read that correctly?
>
> A. Yes, sir.
>
> Q. Why is that important?
>
> A. To me, sir, to my -- That shows -- or at least that showed me that he wasn't -- he wasn't showing his contact with me with -- he wasn't displaying any importance or concern as to why I was there or what I had to say. So, in essence, he was somewhat ignoring me, I guess would be a good term.

Jones dep. at 47:22-48:9, ***Ex. 2***.

171. An officer asked Plaintiff again to "have a seat, have a seat" against the wall. *See* Bridges Axon Video at 01:52, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video at 2:50, Dkt. 172, Ex. 7.

172. Plaintiff remarked, "you are small, you are small," in reference to the officers' small-mindedness and attitude towards him, as he held his phone up to his ear. *See* Bridges Axon Video at 01:54, Dkt. 172, Ex. 8; Johnson dep. at 130:15-25, ***Ex. 3***.

173. Defendant Jones stated, "I ain't gonna ask you again, have a seat." *See* Bridges Axon Video at 01:56, Dkt. 172, Ex. 8.

174. As Plaintiff leaned back against the wall and looked down at his phone, four Mesa police officers, including Defendants Jones, Monarrez, and Calderon ("the Officer Defendants"), rapidly approached him from all sides. *See* Bridges Axon Video at 01:56, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267



175.    Defendant Jones yelled, "all the way down, all the way down," as all four officers advanced. *See* Bridges Axon Video at 02:04, Dkt. 172, Ex. 8; Calderon Axon Video at 3:03, Dkt. 172, Ex. 7.

176.    The Officer Defendants did not give Plaintiff time to comply with Jones' command. Instead, they attacked Plaintiff, striking him repeatedly. *See* Bridges Axon Video at 02:09, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video at 3:09, Dkt. 172, Ex. 7.

177.    Defendant Jones grabbed Plaintiff's throat, performed at least one knee strike to Plaintiff's abdomen, and struck Plaintiff numerous times in the face and head. *See* Bridges Axon Video at 02:09-02:17, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video at 3:09, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.



ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

178.     Defendants Calderon and Monarrez also punched Plaintiff. *See* Bridges Axon Video at 02:09-02:17, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video at 3:13, Dkt. 172, Ex. 7; Monarrez Axon Video at 0:26, Dkt. 172, Ex. 13.

179.     As they beat him, an officer yelled, "dude, dude – they told you to sit down!" Bridges Axon Video at 02:09, Dkt. 172, Ex. 8.

180.     Another officer yelled, "sit your ass down motherf***er . . . see what happens, see what happens!" Calderon Axon Video at 3:13, Dkt. 172, Ex. 7.

181.     Plaintiff began to slide down the wall with his hands limp at this sides. Defendant Jones delivered a final elbow strike to his face while Defendant Calderon pulled Plaintiff's legs out from under him. *See* Security Video at 23:47:38, Dkt. 178, Ex. 2; Bridges Axon Video at 02:17, Dkt. 172, Ex. 8.



182.     For about forty (40) seconds, Plaintiff was completely still and silent. *See* Bridges Axon Video at 02:17-02:56, Dkt. 172, Ex. 8. He appeared to be unconscious as the officers handcuffed him, placed him on his stomach, and kneeled on his back. *See id.*; Security Video at 23:27:48, Dkt. 178, Ex. 2.

183.     At the time of the beating, Plaintiff was not under arrest, and the Officer Defendants had no reason to believe he had committed any crime. Defendant Calderon testified at his deposition:

> Q. . . . I asked whether or not at the time that he was beaten, he
> was not under arrest, correct?

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

[objections omitted]

THE WITNESS: At the time of the appropriate use of force, no, he was not under arrest. He was being detained.

Q. BY MR. ROBBINS: And there was no probable cause to believe that he had committed a crime, correct?

[objections omitted]

THE WITNESS: We were working on that. The investigation was still processing.

Q. BY MR. ROBBINS: So at the time of the beating, there was not probable cause to believe that he would be arrested, correct?

[objection omitted]

THE WITNESS: At the time of the use of force, we didn't have probable cause to arrest him, but we had a right to detain him.

Calderon depo. at 207:1-23, *Ex. 1*. *See also* Jones depo. at 61:3-62:11, *Ex. 2*; Monarrez dep. at 105:4-12, *Ex. 4*.

184. Defendant Jones similarly testified that he had no information that Plaintiff had committed a crime at the time of the use of force:

Q. BY MR. SHOWALTER: What information did you have that Robert Johnson had committed a crime at the time when you told him to sit down?

MS. RETTS: Form.

MS. ALVARADO: Join.

THE WITNESS: I did not have any information to a specific crime at the time.

Jones dep. at 61:3-9, *Ex. 2*.

185. At the time of the beating, Plaintiff had not been violent, combative, or aggressive. *See* Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.

186. At the time of the beating, Plaintiff had not tried to escape or flee from the officers. *See* Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7 Monarrez Axon Video, Dkt. 172, Ex. 13.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

187.     At the time of the beating, Plaintiff had not threatened or attempted to assault any officer. *See* Calderon depo. at 25:16-26-18, ***Ex. 1***; Monarrez depo. at 28:5-11, ***Ex. 4***; Jones dep. at 77:14-80:3, ***Ex. 2***; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.

188.     Plaintiff did not pose a danger to any officer or third person. *See* Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.

189.     When the officers were beating him, he did not even raise his hands to protect his face from their blows. *See* Bridges Axon Video at 02:09-02:17, Dkt. 172, Ex. 8; Security Video, Dkt. 178, Ex. 2; Calderon Axon Video, Dkt. 172, Ex. 7; Monarrez Axon Video, Dkt. 172, Ex. 13.

190.     When Plaintiff regained consciousness after the beating, as he lay restrained and shackled on the ground, he was shaken and upset and used expressive and explicit language. *See* Monarrez Axon Video at 8:00, Dkt. 172, Ex. 13.

191.     In response, the officers, including the Officer Defendants, shoved Plaintiff's face into the elevator door, dropped him back to the ground, and muzzled him with a "spit mask." *See* Monarrez Axon Video at 8:28, Dkt. 172, Ex. 13.

192.     The Officer Defendants then wrongfully arrested Plaintiff and wrongfully charged him with disorderly conduct and hindering prosecution, both class one misdemeanors, despite knowing that Plaintiff had committed no crime and there was no probable cause for his arrest. *See* Mesa Arrest Booking Record, Dkt. 178-1, p 34; Calderon depo. at 207:1-23, ***Ex. 1***; Jones depo. at 61:3-62:11, ***Ex. 2***; Monarrez dep. at 105:4-12, ***Ex. 4***.

193.     Both charges against Plaintiff were dismissed. *See* State's Motion to Dismiss Without Prejudice, Dkt. 172, pp. 36-38

194.     A few days later, Plaintiff presented to the Banner Desert Emergency Department with complaints of headaches and pain in his head, neck, back, and left rib. *See*

Banner Records, JOHNSON 000053 and 000081, *Ex. 6*. He was diagnosed with bruising and contusions to his right hand and left chest wall. *See id.*

195.    Plaintiff has subsequently been diagnosed with a concussion, post-concussion headaches, chronic musculoskeletal pain, and post-traumatic stress disorder as a result of the incident. *See* Report of Allan M. Block, M.D. (02/18/2020) at pp. 9-10, *Ex. 7*; Report of Emily Bashah at pp. 15-18. *Ex. 9*.

**B.    Defendant City of Mesa's unconstitutional policies, practices, and customs**

196.    The City of Mesa hired George Gascon as its police chief in 2006. Chief Gascón came from the Los Angeles Police Department and made a number of policy changes within the Mesa Police Department (MPD) during his tenure from 2006 through 2009. *See* District Attorney George Gascón – Meet George, https://www.georgegascon.org/meet-george/.

197.    In particular, Chief Gascón implemented a policy requiring that an internal affairs investigation be completed for every citizen complaint or allegation of misuse of force. *See* Garin Groff, New chief aims to bring stability to Mesa police, EAST VALLEY TRIBUNE (July 18, 2010), https://www.eastvalleytribune.com/local/new-chief-aims-to-bring-stability-to-mesa-police/article_396b8168-9140-11df-997a-001cc4c002e0.html.

198.    The City replaced Chief Gascón with Frank Milstead in 2010. *See id.*

199.    Early in his term, Chief Milstead announced that he was putting an end to the automatic review of citizen complaints and use of force incidents. *See id.*

200.    According to Milstead, that policy "could work against officer who were trying to be more active." *Id.* "The more work you do, the more people you meet through the day, so the more likely you're going to find somebody who takes umbrage with your way of doing things," Milstead said.

201.    Milstead also produced a video called "Off the Cuff" in which MPD officers were instructed to "purge" their workstation, department, and internal affairs files. *See* Off the Cuff, *Ex. 10*. In the video, Milstead explained that "there is a policy that is in place now that not only covers your workstation file but your department file as well." *See id.* at 0:32-

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

0:40. Milstead stated the department had already reviewed old internal affairs files to "make sure" the department was not "needlessly keeping" records of old investigations. *See id.* at 0:41-0:54.

202.    In the "Off the Cuff" video, Milstead mentioned a "media person" had been inquiring about old internal affairs records, and Milstead did not want "anyone to have to relive a problem that's already been adjudicated . . . ." *See id.* at 0:54-01:20. Milstead instructed officers to "make sure that the things that you don't want in there aren't in there." *See id.* at 01:24-01:29.

203.    Defendant Jones' internal affairs records were purged in 2012, and Defendant Calderon's records were purged in early 2013, so their citizen complaints and use of force investigations prior to those dates are no longer available. *See* Concise Employee History re: Jones, Dkt. 172-6, pp. 21-25; Concise Employee History re: Calderon, Dkt. 172-6, pp. 28-33.

204.    Defendant Jones had seventeen (17) use of force incidents, two (2) citizen complaints, and two (2) departmental incidents between September 14, 2012 and May 31, 2018. *See* Concise Employee History re: Jones, Dkt. 172-6, pp. 21-25.

205.    Defendant Calderon had a total of twenty-five (25) use of force incidents and six (6) citizen complaints between January 7, 2013 and May 31, 2018. *See* Concise Employee History re: Calderon, Dkt. 172-6, pp. 28-33.

206.    Chief Milstead and Assistant Chief Heston Silbert pivoted the training at Mesa Police Academy from training "guardians" to training "Spartans." Silbert was known to be particularly aggressive and emphasized terrorizing the public, while Milstead ignored misconduct. In a 2019 Mesa Police Association Survey, an anonymous MPD officer described the culture during Milstead's term:

> Under the previous admin our moral compass went sideways. We had an A/C [assistant chief] that emphasized kicking ass and scaring the public, and a Chief who turned a blind eye to everything. Our academy went from training guardians to training 'Spartans.' Our detectives became lazy and civilian staff became bitter. The line-level Officers were happy because we

had someone 'speaking for us . . .' but in the end neither Milstead nor Silbert really cared about anyone but themselves.

*See* Mesa Police Association Survey, p. 19, ***Ex. 11***. *See also* Batista dep. at 48:14-24, 53:4-18, 59:16-61:3, ***Ex. 12***.

207.  On May 8, 2017, a representative of MPD, Jeff Jacobs, testified in a deposition in another excessive force case, *Krstic v. Gransee, et al.*, No. CV-16-02830-PHX-ROS. Mr. Jacobs testified about MPD's flawed training methods in which officers were taught to take a more "aggressive approach" and escalate their force when it was not reasonable to do so because it could "end a situation faster."

> Q. (By Mr. Robbins) Do you ever teach that the officer should use aggression in order to deescalate situations? That they should become aggressive and try to push things towards deescalation?
>
> [objection omitted]
>
> THE WITNESS: Yes.
>
> Q. (By Mr. Robbins) Under what circumstances?
>
> A. Well, I think -- I apologize. I think I understand what you're saying. But let me make sure.
>
> Q. Sure.
>
> A. **One of the things I teach our officers is that sometimes a more aggressive approach can solve a problem or end a situation faster, thus making it less likely that you'll use force.**
>
> * * * *
>
> Q. . . . In terms of the objective reasonableness of the behavior, under what circumstances do you teach that it's appropriate to become more aggressive because it will effectively end the threat sooner?
>
> [objection omitted]
>
> (The reporter read back the requested portion of the record.)
>
> THE WITNESS: Well, I guess I don't really teach a circumstance for that.

Jacobs dep. at 40:24-41:12, 42:5-17 (emphasis added), ***Ex. 13***.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

208.    Defendant Jones' deposition testimony is consistent with the training he received from the MPD. Jones testified that he intended to, and did, use physical force against Plaintiff solely to prevent Plaintiff from "formulating a strategy":

> Q. So your goal was to prevent him from formulating a strategy. I don't understand that. Can you explain what you mean by "prevent him from formulating a strategy"?
>
> A. My intent was to keep him from thinking through a plan of either attack or escape. That's -- that was my intent.
>
> * * * *
>
> Q. BY MR. SHOWALTER: . . . . You wanted to "detain Johnson as soon as possible to prevent him from formulating a strategy.  This would also lessen the chance of officers having to detain a ready and mentally prepared subject."
>
> So what you did is you wanted to go hands on and take him before he could make some threat towards officers or take some overt act towards officers; is that fair?
>
> [objection omitted]
>
> THE WITNESS:  I wouldn't say that's fair.  **I would say I wanted to detain him before he was able to effectively -- or at least what I could perceive as a reasonable time, I guess, to effectively form a plan to counteract us or be aggressive towards us.**
>
> * * * *
>
> Q.  Let me ask you this:  Why didn't you simply ask Robert Johnson to turn around, face the wall and put his hands behind his back?
>
> A.  I guess, that takes us back to what we discussed earlier.  My plan was not to allow him the opportunity, especially at that point -- you mean while I'm contacting him or beforehand?
>
> Q.  When he refused to sit down.
>
> A.  Right.
>
> Q.  And you decided to detain him.
>
> A.  Yes, sir.
>
> Q.  Why didn't you say:  Mr. Johnson or, sir, please turn around and face the wall?
>
> A.  **That's because my intent was contact him before he had a chance to formulate any further planning.**

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Q. Okay.

A. So that would allow more time for him to be able to think about what he was going to do, if he was going to do anything.

Jones dep. at 96:4-10, 99:15-100:7, 114:4-22 (emphasis added), ***Ex. 2***.

209. When asked if he was trained to use force offensively to prevent a subject from formulating plans, Defendant Jones described "live-training scenarios" that had been presented:

Q. Did you have a supervisor who trained you about going to the offensive to prevent suspects or -- subjects from formulating plans?

[objection omitted]

THE WITNESS: A supervisor?

Q. BY MR. SHOWALTER: Yeah.

A. Or just a trainer or anything of that sort?

Q. Yeah.

A. We were presented with several training scenarios, live-training scenarios.

Q. And in what context were you presented with those live-training scenarios?

A. Those were presented in the DT, the defensive tactics, room or house at the time, to where you're presented with several individuals or a individual who was not being cooperative, was being physically resistant, things of that sort.

Jones dep. at 116:22-117:13, ***Ex. 2***; *see also id.* at 96:11-20.

210. After the subject incident, MPD Chief Ramon Batista had the case reviewed by John McMahon, a police practices expert from Los Angeles. McMahon condemned the strikes that the Officer Defendants used on Plaintiff as "disproportionate, unnecessary, and objectively unreasonable," and found that their restraint of Plaintiff was excessive. *See* McMahon Report at Mesa/Johnson 002355-002358, 002367-002382, ***Ex. 14***.

211. The City of Mesa hired former Maricopa County Attorney Richard Romley to review the case and the MPD's handling of the internal affairs investigation. Mr. Romley concluded that the Professional Standards Unit's investigation was objective and thorough,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

but he identified policy, training, and tactical issues within the MPD, which included the purging of past internal affairs files, incomplete training records, and a policy gap regarding the proper use of RIPP restraints and prone positioning. *See* Romley Report at pp. 3-6, ***Ex. 15***.

212.   In August 2018, the City of Mesa had the Police Executive Research Forum (PERF) complete a use-of-force review of the MPD. PERF made numerous recommendations, including that MPD should (a) define "proportionality," "de-escalation," and "duty to intervene" in its use of force policies; and (b) provide clarity in its use of force policies on when strikes to the head, face, and neck are permitted. *See* PERF Use-of-Force Review of the Mesa Police Department, Final Report (March 2019), pp. 6-16, ***Ex. 16***.

213.   PERF reviewed use of force and IAPro/Blue Team reports dated between July 2015 and June 2018 and determined that 52% of all strikes deployed by officers during that period were to a subject's face, head, or neck. *See* PERF Use-of-Force Review of the Mesa Police Department, Final Report (March 2019), pp. 12-13, ***Ex. 16***. PERF noted that under MPD's current policy, strikes to the head, face, and neck were authorized against subjects who were not displaying active aggression (i.e., an actual attempt to assault an officer). *Id.* at pp. 6, 12. PERF recommended that the policy be updated to clarify that "an individual ***must be actively using physical force*** against an officer to warrant a face, head, or neck strike" and that officers receive training on the updated policy. *Id.* (emphasis in original). PERF determined that MPD personnel were being trained to use head strikes against subjects regardless of whether such use of force was reasonable or permitted by policy. *Id.* at p. 49.

214.   At the time of the subject incident, MPD's use of force policy defined "strikes" as "[t]echniques that have more than a minimal chance of injury" such as "[k]icks, elbow, palm or knee strikes, and punches." DPM 2.1.5, Dkt. 172-7, p. 5. The policy stated that the "officer will consider the totality of circumstances in evaluating which area of the body to strike" but provided no guidance to officers on when strikes were appropriate or, more specifically, when strikes to a subject's face or head would be warranted. *See id.*

215. At the time of the subject incident, MPD used IAPro/Blue Team, an early warning software system, which would trigger an alert to the professional standards lieutenant if an officer received a certain number of complaints or was involved in a certain number of use of force incidents or vehicle accidents (or any combination thereof) within the prior twelve (12) month period. *See* Rash dep. at 41:18-45:18, ***Ex. 17***. The professional standards lieutenant would then send the alert to the officer's commander. *See id.* However, the executive staff of the MPD set the threshold number of incidents that were required to trigger an alert. *See id.* at 42:13-22, ***Ex. 17***.

216. In the year prior to the subject incident, Defendant Jones had triggered at least three (3) separate IAPro/Blue Team alerts. *See* Employee Alert History re Jones, ***Ex. 18***.

217. Plaintiff's police practices expert, Roger Clark, has opined that the MPD's head strike policy was a moving force behind the attack on Plaintiff. "This 'preemptive beating' to keep Mr. Johnson from mounting an imaginary attack is again consistent with the MPD training of using head strikes for the failure to follow instructions quickly enough (passive resistance or at worst active resistance)." *See* Clark Report at p. 26, ***Ex. 8***.

218. Mr. Clark has also opined that the City of Mesa knew that Defendant Jones had a history of using excessive force and failed to take action through progressive discipline, retraining, or even termination. *See* Clark Report at pp. 29-31, ***Ex. 8***.

219. Plaintiff's police practices expert, George Richards, has written a report providing his opinions in this matter. Mr. Richards opined that the force used by Jones, Calderon and Monarrez was unreasonable, disproportionate, and excessive based on Richards' experience as a police officer in Arizona. *See* Richards Report, pp. 22-31, ***Ex. 19***.

RESPECTFULLY SUBMITTED: April 1, 2021

**ROBBINS & CURTIN, p.l.l.c.**

By:  /s/ Jesse M. Showalter
        Jesse M. Showalter
        301 E. Bethany Home Road, Suite B-100
        Phoenix, Arizona 85012
        *Attorneys for Plaintiff Robert Johnson*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kim S. Alvarado, Esq.
City of Mesa Attorney's Office
MS-1077
P.O. Box 1466
Mesa, Arizona 85211-1466
kim.alvarado@mesaaz.gov
*Attorney for Defendants City of Mesa and Rudy Monarrez*

Kathleen L. Wieneke, Esq.
Christina Retts, Esq.
Wieneke Law Group, PLC
1095 W. Rio Salado Parkway, Suite 209
Tempe, Arizona 85281
kwieneke@wienekelawgroup.com
cretts@wienekelawgroup.com
*Attorneys for Defendant Jhonte Jones*

Daniel J. O'Connor, Esq.
Karen J. Stillwell, Esq.
O'Connor & Dyet, P.C.
7955 South Priest Drive
Tempe, Arizona 85284
daniel.oconnor@occlaw.com
karen.stillwell@occlaw.com
*Attorneys for Defendant Ernesto Calderon*

/s/ Julie W. Molera