***Johnson v. City of Mesa, et al.***
**Case No. 2:19-cv-02827-JAT-JZB**
**Exhibits to Plaintiff's Response to Defendants' Global**
**Statement of Facts and Plaintiff's Controverting Statement of Facts**

| Description | Exhibit |
|---|---|
| Ernesto Calderon Deposition | 1. |
| Jhonte Jones Deposition | 2. |
| Robert Johnson Deposition | 3. |
| Rudy Monarrez Deposition | 4. |
| Michael McClure Deposition | 5. |
| Banner Records (Sealed) | 6. |
| Report of Allan Block (Sealed) | 7. |
| Report of Roger Clark | 8. |
| Report of Emily Bashah (Sealed) | 9. |
| Off the Cuff (Non-Electronic) | 10. |
| Mesa Police Association Survey | 11. |
| Ramon Batista Deposition | 12. |
| Jeff Jacobs Deposition | 13. |
| McMahon Report | 14. |
| Romley Report | 15. |
| PERF Use-of-Force Review of MPD, Final Report | 16. |
| Robert Rash Deposition | 17. |
| Jhonte Jones Alert History | 18. |
| Report of George Richards | 19. |

**EXHIBIT 1**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Robert Johnson, an          ) No. 2:19-CV-02827-JAT-JZB
individual,                 )
                            )
                            )
            Plaintiff,      )
                            )
vs.                         )
                            )
City of Mesa, et al.,       )
                            )
                            )
            Defendants.     )
_____)

VIDEOTAPED DEPOSITION OF ERNESTO CALDERON

Phoenix, Arizona
February 3, 2020
1:04 p.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
P (602) 230-5454
F (480) 546-3721
www.dlvreporting.com

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

1  I'm interested in your capacity to read minds.  What is

2  it that allowed you to perceive that he wanted to but

3  decided at some point not to, hesitantly, in your

4  words?

5           MS. STILLWELL:  Form.

6           THE WITNESS:  By no means did I ever say I

7  was a mind reader.

8      Q.  BY MR. ROBBINS:  Okay.  Okay.

9      A.  His actions.  The way he looked at the

10  elevator, the way he looked back at me, that's it.  He

11  thought about it.  I'm thinking -- my opinion was that

12  he thought about getting on the elevator, he just

13  didn't.

14      Q.  Okay.  But he didn't, right?

15      A.  Correct.

16      Q.  And then did he verbally threaten you at that

17  point?

18           MS. STILLWELL:  Form.

19           THE WITNESS:  No.

20      Q.  BY MR. ROBBINS:  Did he physically -- did he

21  brandish a knife or a gun --

22           MS. STILLWELL:  Form.

23      Q.  BY MR. ROBBINS:  -- at any point?

24           MS. STILLWELL:  Form.

25           THE WITNESS:  No.

ERNESTO CALDERON  FEBRUARY 03, 2020

1    Q.  BY MR. ROBBINS:  Did he verbally threaten you

2   at any time before you participated in the striking of

3   Robert Johnson?

4              MS. STILLWELL:  Form; foundation.

5              THE WITNESS:  Not before the appropriate

6   use of force was applied, no.

7    Q.  BY MR. ROBBINS:  Okay.  You said appropriate

8   use of force, so I'm going to start describing it as

9   what I refer to it as which is a beating, okay.  Your

10  lawyers are going to object to form.  I was going to

11  try to give you a neutral term, but if we're going to

12  get to use our own terms, I guess we'll both play by

13  those rules.

14             So before the beating, did Mr. Johnson

15  verbally threaten you?

16             MS. STILLWELL:  Form.

17             MS. RETTS:  Form.

18             THE WITNESS:  No.

19   Q.  BY MR. ROBBINS:  And so during the beating you

20  administered two strikes to the, you said, the arm,

21  correct?

22             MS. STILLWELL:  Form.

23             MS. RETTS:  Form.

24             THE WITNESS:  During the use of force,

25  yes, two strikes to the arm.

ERNESTO CALDERON   FEBRUARY 03, 2020

1    Q.  BY MR. ROBBINS:  Did you hear Robert Johnson

2  say, "All I did was come up here to get the backpack.

3  That's it"?

4                MS. STILLWELL:  Form.

5                THE WITNESS:  That's -- yeah, that's what

6  came across.

7                MR. ROBBINS:  Okay.

8           (Video played.)

9    Q.  BY MR. ROBBINS:  At this point, fellow officers

10  are pulling up to the apartment complex, correct?

11                MS. STILLWELL:  Form; foundation.

12    Q.  BY MR. ROBBINS:  Could you hear him say that

13  they're pulling up, there's a supervisor?

14    A.  I heard him say fellow supervisors.  But I

15  could also see the police cars going by in the video.

16    Q.  Okay.  And were you able to see them when you

17  were standing and interacting with Mr. Reyes?

18    A.  Not from that -- where I was standing, no.

19    Q.  Okay.  But you heard Robert talking about the

20  police that were coming up?

21                MS. STILLWELL:  Form.

22                THE WITNESS:  Yes.

23           (Video played.)

24    Q.  BY MR. ROBBINS:  You heard Robert say, "Your

25  boys are showing up."  And then he looks over at Reyes

1  and said, "What the fuck you been up to?"

2              MS. RETTS:  Form.

3              MS. STILLWELL:  Form.

4      Q.  BY MR. ROBBINS:  Did you hear that?

5      A.  That's what he said, yes, on the video.

6      Q.  Okay.

7          (Video played.)

8      Q.  BY MR. ROBBINS:  Did you hear him say, "Hello"?

9              MS. STILLWELL:  Form.

10             THE WITNESS:  I don't know what he said.

11 I didn't hear him.

12     Q.  BY MR. ROBBINS:  Okay.  Do you see the light,

13 how it shifts around?  That's because there's a

14 helicopter putting a light on the apartment.

15             MS. STILLWELL:  Form; foundation.

16             MS. RETTS:  Form; foundation.

17     Q.  BY MR. ROBBINS:  Do you remember whether there

18 was --

19     A.  The helicopter was there.  I don't know

20 where the -- it was putting the light on him.

21         (Video played.)

22     Q.  BY MR. ROBBINS:  Okay.  Now, there's three

23 people -- three officers walking out of the elevator.

24     A.  Can you back it up just a little bit?

25     Q.  Yeah.

1    Q.  BY MR. ROBBINS:  Maybe you didn't hear.  I

2  asked whether or not at the time that he was beaten, he

3  was not under arrest, correct?

4            MS. STILLWELL:  Form.

5            MS. RETTS:  Form.

6            THE WITNESS:  At the time of the

7  appropriate use of force, no, he was not under arrest.

8  He was being detained.

9    Q.  BY MR. ROBBINS:  And there was no probable

10  cause to believe that he had committed a crime,

11  correct?

12            MS. STILLWELL:  Form.

13            MS. RETTS:  Form; foundation.

14            MS. STILLWELL:  Foundation.

15            THE WITNESS:  We were working on that.

16  The investigation was still processing.

17    Q.  BY MR. ROBBINS:  So at the time of the beating,

18  there was not probable cause to believe that he would

19  be arrested, correct?

20            MS. STILLWELL:  Form and foundation.

21            THE WITNESS:  At the time of the use of

22  force, we didn't have probable cause to arrest him, but

23  we had a right to detain him.

24            MR. ROBBINS:  That's all the questions I

25  have.

```
 1   STATE OF ARIZONA        ) SS.
                             )
 2   COUNTY OF MARICOPA      )

 3

 4          BE IT KNOWN that the foregoing proceedings
     were taken before me, DONNA DELAVINA, Certified
 5   Reporter No. 50468; that the witness before testifying
     was duly sworn by me to testify to the whole truth;
 6   that the foregoing 209 pages are a full, true and
     accurate record of the proceedings, all done to the
 7   best of my skill and ability; that the proceedings were
     taken down by me in shorthand and thereafter reduced to
 8   print under my direction.

 9          [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
     of the parties thereto nor am I in any way interested
13   in the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.  DATED
15   at Phoenix, Arizona, this 11th day of February, 2020.

16

17          Donna DeLaVina, RPR
            Certified Reporter
18          Certificate No. 50468

19              *     *     *     *     *     *

20

21      I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206.

23

24          Donna DeLaVina, RPR, Owner
            Donna DeLaVina Reporting, LLC
25          Arizona RRF No. R1010
```

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Robert Johnson, an            ) No. 2:19-CV-02827-JAT-JZB
individual,                   )
                              )
                              )
              Plaintiff,      )
                              )
vs.                           )
                              )
City of Mesa, et al.,         )
                              )
                              )
              Defendants.     )
_____)

VIDEOTAPED DEPOSITION OF JHONTE JONES

Phoenix, Arizona
January 8, 2020
9:33 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468           www.dlvreporting.com

1  that he was under arrest?

2      A.  Not that I recall, no, sir.

3      Q.  Before using force, did you ever tell him he

4  wasn't free to leave?

5              MS. RETTS:  Form.

6              THE WITNESS:  I don't recall telling him

7  that, no, sir.

8      Q.  BY MR. SHOWALTER:  The next sentence in your

9  report says, "I asked if he had any weapons on him and

10 he stated he had a knife in his right front trouser

11 pocket."

12              Did I read that correctly?

13     A.  I'm locating that sentence real quick, sir.

14              Okay.

15              Yes, sir.

16     Q.  Did Robert Johnson do anything to resist your

17 frisk, your search of him?

18     A.  Not that I can recall, no, sir.

19     Q.  In fact, he volunteered that he thought he had

20 a knife that he didn't actually have, true?

21     A.  Yes, sir.

22     Q.  And you note in your report that Johnson was

23 holding a cell phone up to his ear when you tapped him

24 on the side and asked him to have a seat on the floor.

25              Did I read that correctly?

1    A.  Yes, sir.

2    Q.  Why is that important?

3    A.  To me, sir, to my --

4         That shows -- or at least that showed me

5    that he wasn't -- he wasn't showing his contact with me

6    with -- he wasn't displaying any importance or concern

7    as to why I was there or what I had to say.  So, in

8    essence, he was somewhat ignoring me, I guess would be

9    a good term.

10   Q.  Did you feel disrespected?

11   A.  No, sir.

12        MS. RETTS:  Form.

13   Q.  BY MR. SHOWALTER:  What you're saying is he

14   wasn't saying -- he wasn't showing you that you were

15   important and that he was ignoring you?

16        MS. RETTS:  Form

17        MS. ALVARADO:  Form.

18        THE WITNESS:  No, sir.  I will elaborate

19   on that, if you would like me to.

20   Q.  BY MR. SHOWALTER:  Yeah.

21   A.  Generally, usually when contacting people prior

22   to Mr. Johnson, they are more attentive to what I'm

23   telling them to do or any officer on scene is telling

24   them to do.  And Mr. Johnson did not seem to be

25   attentive towards what we were trying to tell him to

JHONTE JONES  JANUARY 08, 2020

1    Q.  I want to make sure I phrase it correctly.

2         Did you have any reasonable information

3  that led you to believe that Robert Johnson had a

4  weapon on his person after you had completed your Terry

5  search?

6         MS. RETTS:  Form.

7         THE WITNESS:  I did not locate any weapons

8  during the frisk.  And so any -- if any of those areas

9  were a concern, they weren't as a concern as they were

10  prior to performing the frisk, if that's what you're

11  asking.

12    Q.  BY MR. SHOWALTER:  And that's not what I'm

13  asking.

14         Had anybody told you at any point that

15  Robert Johnson had a weapon?

16    A.  No, not directly.

17    Q.  Other than Robert Johnson saying he believed he

18  had the knife?

19    A.  Yes, sir.

20    Q.  And upon conducting the Terry search, you found

21  no weapons and you told him to go and sit by the wall,

22  correct?

23    A.  I located -- I did not locate any weapons

24  during the frisk.  And then I asked him to go have a

25  seat by the wall.

1  officer on, such as stabbings.  There was also a murder

2  suicide, not too different than the incident that we're

3  talking about here that occurred here.  They're not

4  much -- not much before this incident occurred.

5          So there were several -- you know, and

6  very intimate concerns reference, you know, dealing

7  with somebody who has the baggy clothes, dealing with

8  them during the time this incident went down.

9     Q.  Hold on.

10          Are you saying that Robert Johnson was

11  involved in a murder suicide?  That's anything to do

12  with him?

13          MS. RETTS:  Form.

14          MS. STILLWELL:  Form.

15          THE WITNESS:  No, sir.

16     Q.  BY MR. SHOWALTER:  So are you saying that

17  because of other stuff that happened at the apartment

18  complex, you could detain and search anybody you found

19  at that apartment complex?

20          MS. RETTS:  Form.

21          MS. STILLWELL:  Join.

22          MS. ALVARADO:  Join.

23          THE WITNESS:  No, sir, that's not what I'm

24  saying.

25     Q.  BY MR. SHOWALTER:  So I think what I'm trying

1  to get out is with respect to Robert Johnson what

2  specific information did you have that he might be

3  armed, particularly after you had completed your Terry

4  search?

5    A.  I did not get any information after that that

6  he was armed, no, sir.

7    Q.  Okay.

8         MS. ALVARADO:  If you're switching topics,

9  can we just take a break?  I didn't interrupt you while

10  you were in the. . .

11         MR. SHOWALTER:  Now is a perfect time to

12  take a break.

13         MS. ALVARADO:  Okay.

14         MR. ROBBINS:  It's been about an hour.

15         THE VIDEOGRAPHER:  This ends Media 1.

16  We're off the record at 10:38 a.m.

17      (Whereupon, a brief recess ensued from

18  10:38 a.m. to 10:53 a.m.)

19         THE VIDEOGRAPHER:  This begins Media 2 in

20  the deposition of Jhonte Jones.  We are on the record

21  at 10:53 a.m.

22    Q.  BY MR. SHOWALTER:  All right.  When we left

23  off, we were going through your investigative report.

24  And I'm going to ask you to continue on Exhibit 2, page

25  Mesa/Johnson 000032.

1 | Mr. Johnson was potentially the male that was with
2 | Mr. Reyes.
3 |     Q.  BY MR. SHOWALTER:  What information did you
4 | have that Robert Johnson had committed a crime at the
5 | time when you told him to sit down?
6 |           MS. RETTS:  Form.
7 |           MS. ALVARADO:  Join.
8 |           THE WITNESS:  I did not have any
9 | information to a specific crime at the time.
10 |     Q.  BY MR. SHOWALTER:  Did you have a specific
11 | belief that he had committed a crime at that time?
12 |     A.  I had a belief that he was with the person that
13 | may have been involved with the person who was
14 | described as being the aggressor or the -- I guess you
15 | would call it -- yeah, the aggressor on the call or the
16 | person who reported it, yes, sir.
17 |     Q.  BY MR. SHOWALTER:  But as to Robert Johnson,
18 | when you told him to sit down, you had no specific
19 | information that led you to believe that he committed
20 | any crime, fair?
21 |     A.  At the time, I did not know whether Mr. Johnson
22 | had committed a crime or had been involved in any crime
23 | committed prior to me going there.  I just knew he was
24 | with the person described by the RP.
25 |     Q.  And I just want to phrase it really

1  specifically, which is you had no specific information

2  that led you to believe that Robert Johnson had

3  committed a crime?

4          MS. RETTS:  Form.

5          MS. STILLWELL:  Form.

6          MS. ALVARADO:  Join.

7          THE WITNESS:  I didn't have any specific

8  information about a crime that Mr. Johnson had

9  committed.  That doesn't mean I, you know -- I don't

10 know exactly what happened before that, which is why we

11 are there.

12     Q.  BY MR. SHOWALTER:  Yeah.

13          So after you said he didn't want to sit

14 down, what did Robert Johnson do that appeared to be

15 confrontation and verbally defiant?

16     A.  Okay.  So Mr. Johnson, he remained standing up.

17 His general demeanor, if you would like me to elaborate

18 on his demeanor?

19     Q.  Sure.

20     A.  So his general demeanor, his stance, the way he

21 was standing with his back braced against the wall, his

22 foot positioning, things of that sort, told me that, in

23 my training and experience, told me that, hey, this --

24 he's being -- I'm not going to be say difficult, but

25 being confrontational.  In other words, his mind isn't

1    Q.  We'll watch the video in a little bit.  But can

2  you tell me what -- other than the breathing, what

3  physical cues you're talking about?

4    A.  His shoulders were slightly hunched forward.

5  His toes were pointed somewhat inward.  And his

6  breathing had become shallower, if that makes sense.

7    Q.  So his toes are pointed inward?

8    A.  Yes, sir.

9    Q.  And it's your testimony that gives a positional

10  advantage?

11    A.  It does, sir.

12    Q.  How so?

13    A.  I don't know how familiar you guys are with

14  boxing or fighting of any combat sport, but it is

15  inherently known and taught that if you're going to be

16  able to generate power, that your toes should be

17  directed towards whatever you're going to generate

18  power towards.

19          So whether that be the front of you or,

20  you know, to the side, you would generally turn your

21  toes towards that power.  Because that, in essence,

22  provides you a base and ability to launch pressure

23  forward towards that target.

24    Q.  And you're saying -- you're saying that both of

25  his feet were pointed inward?

1   A.  There were several aspects in play during the

2   time of the contact of him and Mr. Reyes.  One being it

3   was him and Mr. Reyes, so it was more than one.  Two

4   being the area that there, you know, there was up there

5   on that third-story balcony was very short from the

6   wall to the balcony.  The rail on the balcony was about

7   waist high, give or take a few inches.  So it was very

8   easy to topple over.

9       So my goal was to put him at a place and a

10  position where if something did happen, if something

11  were to get dynamic, so to speak, there wouldn't be a

12  potential of us potentially falling over the rail or

13  anybody else falling over, being pushed over the rail.

14  Q.  Did -- you've already testified that you

15  weren't aware of any crime that Johnson had committed.

16      Did Johnson -- at the time that you

17  decided that he needed to sit town so that he would be

18  disadvantaged, had he made any threats to you or any

19  other officer?

20      MS. RETTS:  Form.

21      MS. STILLWELL:  Form.

22      MS. ALVARADO:  Join.

23      THE WITNESS:  He had made some statements

24  and I conveyed this to the professional standards

25  board.  He had made some statements that I wasn't

1   necessarily extremely clear on, but I had heard him say

2   like direct conversations towards Mr. Monarrez, Officer

3   Monarrez during the transition between the rail and the

4   wall.

5       Q.  BY MR. SHOWALTER:  I'm talking about when you

6   decided that he needed to sit down, which is when you

7   told him to sit down.

8       A.  Yes, sir.

9       Q.  Had he made any threats to you?

10      A.  Not to me, sir, no.

11      Q.  Had he made any threats to any other officers?

12      A.  I'm not 100 percent whether he did or didn't.

13      Q.  What is the comment that he made to Officer

14  Monarrez?

15      A.  I believe he looked at Mr. Monarrez and told

16  him that he was small, that he was a small one.

17      Q.  Yeah.  He said, "You're a small one"?

18      A.  Yes, sir.

19      Q.  And did you understand that to mean -- you're a

20  small man is an insult that has nothing do with size,

21  correct?  It has to do with things like small

22  mindedness or small heartedness or something like that,

23  right?  It's like a -- it's a way of talking about

24  somebody's character.

25          MS. RETTS:  Form.

1          MS. STILLWELL:  Form.

2          MS. ALVARADO:  Form and foundation.

3     Q.  BY MR. SHOWALTER:  Correct?  You're familiar

4  with that as a term?

5          MS. RETTS:  Form; foundation.

6          MS. STILLWELL:  Join.

7          MS. ALVARADO:  Join.

8          THE WITNESS:  It could be.  I've only seen

9  it used in movies and it's usually accompanied by a

10 British accent.  So I wouldn't know for sure.

11    Q.  BY MR. SHOWALTER:  British accents.

12         But you didn't perceive it as a threat at

13 the time?

14         MS. RETTS:  Form.

15         MS. STILLWELL:  Form.

16         MS. ALVARADO:  Join.

17         THE WITNESS:  Not to me, sir.

18    Q.  BY MR. SHOWALTER:  Well --

19    A.  Actually, I perceived it as a -- it could have

20 been an analysis.  It could have been -- my goal or my

21 job is to perceive things for potentially the most

22 dangerous aspect.

23    Q.  Did you put it in your report?

24    A.  I did not.

25    Q.  And it's your testimony that you've been

1 | trained to write complete and accurate reports,

2 | correct?

3 |     A.  To the best of my recollection, sir.

4 |     Q.  And you didn't recognize that statement that

5 | Johnson had made about Monarrez until afterward, when

6 | you reviewed the video in preparation for your

7 | interview with professional standards; isn't that true?

8 |             MS. RETTS:  Form.

9 |             MS. STILLWELL:  Form.

10 |             MS. ALVARADO:  Join.

11 |             THE WITNESS:  I don't recall reviewing the

12 | video to prepare -- other than seeing what was in the

13 | media.  I didn't particularly review the video in

14 | preparation for the professional standards review.

15 |     Q.  BY MR. SHOWALTER:  Well, in the professional

16 | standards review you talk about having reviewed the

17 | videos?

18 |     A.  Well, I talk about having seen the videos in

19 | the media and on YouTube.  And that's about it, sir.

20 |     Q.  Well, we can get to that.  But you didn't

21 | perceive -- what I'm trying to understand is nowhere do

22 | you say Robert Johnson made a threat to Monarrez

23 | related to his stature?

24 |     A.  In my report, no, sir, I don't recall putting

25 | that in my report.

JHONTE JONES  JANUARY 08, 2020

1    Q.  And at the time, in the moment, you didn't

2    perceive his statement as a threat --

3              MS. RETTS:  Form.

4              MS. STILLWELL:  Form.

5    Q.  BY MR. SHOWALTER:  -- to Officer Monarrez?

6    A.  I can't say that I didn't perceive that, sir.

7    There's a lot of things that I perceived and all of

8    those things may have not have been annotated in my

9    report.  That doesn't mean I did not perceive it, sir.

10   Q.  Can you show me anywhere in your report where

11   you reference Robert Johnson threatening anyone?

12   A.  I don't recall listing anything in my report.

13   Q.  Okay.  You then write, "Johnson then leaned

14   with his back against the wall, but with his legs fully

15   extended.  In that position, Johnson not only had

16   lateral mobility, but also a strong base in the wall to

17   fight off of."

18              Did I read that correctly?

19   A.  Yes, sir.

20   Q.  And so it is your testimony that when somebody

21   is leaning against a wall with their legs fully

22   extended that that is a strong base to fight off?

23   A.  Yes, sir.

24   Q.  You say, "I recognize this from combative

25   training I have received in the past which boasts on

1           MS. RETTS:  Object to the form.

2           MS. STILLWELL:  Form.

3           MS. ALVARADO:  Form.

4           THE WITNESS:  I believe he was leaning

5   against the wall, sir.

6      Q.  BY MR. SHOWALTER:  Okay.  Let's go to the next

7   paragraph.

8           You say, "Recognizing this," and I think

9   the "this" refers to your training in the past about

10  putting a wall to your back when confronted with

11  multiple opponents, "recognizing this, I decided to

12  detain Johnson as soon as possible to prevent him from

13  formulating a strategy."

14          Did I read that correctly?

15     A.  Yes, sir.

16     Q.  So it was at this point you decided that you

17  were going to detain Robert Johnson?

18     A.  Yes, sir.

19     Q.  Did you express to him that you intended to

20  detain him?

21     A.  I did not, sir.

22     Q.  Did you express to any of the other officers

23  that you intended to detain Robert Johnson?

24     A.  Not that I recall, no, sir.

25     Q.  Did you ever tell any of the other officers why

1  have to detain a ready and mentally prepared subject."

2      Did I read that correctly?

3  A.  Yes, sir.

4  Q.  So your goal was to prevent him from

5  formulating a strategy.  I don't understand that.

6      Can you explain what you mean by "prevent

7  him from formulating a strategy"?

8  A.  My intent was to keep him from thinking through

9  a plan of either attack or escape.  That's -- that was

10  my intent.

11  Q.  And is that what you were trained at the City

12  of Mesa?

13  A.  A lot of our training is incorporated -- or

14  involves common sense, along with actual, you know,

15  particular instruction on things.  In this common

16  sense -- in this common sense evaluation, it was to try

17  not to allow this person to think completely through a

18  plan of attack or to be able to flee, to look for a

19  window basically to formulate that plan to be able to

20  do so.

21  Q.  What was the reason that you believed Robert

22  Johnson was going to attack someone?

23  A.  My perception of his demeanor.  My perception

24  of his body position.  The fact that he was being

25  verbally -- not combative, I guess you can call it

1  that.  Being very, very against whatever we were trying

2  to tell him what to do.  Being very vocal and

3  outspoken, using profanity, things of that -- which

4  profanity alone is not a big deal.  But those in

5  conjunction with everything else I was seeing, was

6  leading me at the time to believe that Mr. Johnson

7  would be willing to -- or could be formulating a

8  plan --

9      Q.  But that's true of every --

10     A.  -- to be aggressive.

11     Q.  I'm sorry.

12     A.  No.  Go ahead.

13     Q.  No.  You said, to be aggressive?

14     A.  To be aggressive or attack, yes, sir.

15     Q.  So there was the possibility that he could do

16  that?

17     A.  Yes, sir.

18     Q.  But I'm asking you is did he take some

19  affirmative step towards assaulting any officer?

20          MS. RETTS:  Form.

21          THE WITNESS:  My job at the time, sir, my

22  goal, was to prevent him from taking those physical

23  steps, if you will, to assaulting, based on the cues he

24  was giving me.  The cues I was perceiving.

25     Q.  BY MR. SHOWALTER:  And so the cues that you

1  perceived were his breathing?

2       A.  Yes, sir.

3       Q.  That he was leaning back against the wall?

4       A.  Yes, sir.

5       Q.  And that he was looking down at his phone?

6            MS. RETTS:  Form.

7            THE WITNESS:  The way his feet were

8  positioned.  The way his shoulders were positioned,

9  things of that sort.  The things he was saying.  All of

10  those things were a totality, a mixture of elements

11  that allow me to make the decision that I made.

12      Q.  BY MR. SHOWALTER:  Can you tell me what -- when

13  you say the things he was saying, what were the things

14  he was saying, other than I don't want to sit down?

15      A.  He asked, "Then why the fuck do I have to sit

16  down?"  Things of that sort, yes, sir.

17      Q.  Okay.  And, I mean, is that an unreasonable

18  question for a member of the public, a citizen of the

19  United States to ask a police officer who's told them

20  to sit down?

21           MS. RETTS:  Form.

22           THE WITNESS:  It very well could be, yes,

23  sir.

24      Q.  BY MR. SHOWALTER:  It could be.  But is it?

25           MS. RETTS:  Form.

JHONTE JONES  JANUARY 08, 2020

1          THE WITNESS:  I perceived it was at that

2   point, sir.

3      Q.  BY MR. SHOWALTER:  Other than refusing to sit

4   down, isn't it true that Robert Johnson complied with

5   every request that you made of him?

6      A.  Up to that point, yes, sir.

7      Q.  So he complied with multiple requests,

8   including he submitted to the Terry search.  He moved

9   back to the wall where you asked him to go.  And the

10  only thing he didn't do is sit down --

11         MS. RETTS:  Form.

12     Q.  BY MR. SHOWALTER:  -- all the way, fair?

13         MS. RETTS:  Form.

14         THE WITNESS:  Yes, sir.

15     Q.  BY MR. SHOWALTER:  So look at the next

16  paragraph.  It says, "Johnson's body language" -- well,

17  let me go back to one thing.  You say this thing about

18  formulating a strategy.  You wanted to "detain Johnson

19  as soon as possible to prevent him from formulating a

20  strategy.  This would also lessen the chance of

21  officers having to detain a ready and mentally prepared

22  subject."

23         So what you did is you wanted to go hands

24  on and take him before he could make some threat

25  towards officers or take some overt act towards

1  officers; is that fair?

2          MS. RETTS:  Form.

3          THE WITNESS:  I wouldn't say that's fair.

4  I would say I wanted to detain him before he was able

5  to effectively -- or at least what I could perceive as

6  a reasonable time, I guess, to effectively form a plan

7  to counteract us or be aggressive towards us.

8      Q.  BY MR. SHOWALTER:  Why is it that you believed

9  he was going to formulate a plan to be aggressive

10  towards you or to counteract you, other than he doesn't

11  want to sit down?

12          MS. RETTS:  Form.

13          THE WITNESS:  That he was being verbally

14  combative, if you will, towards us.  Even though he did

15  move from the rail, he did allow me to do a Terry

16  frisk.  The things he was saying, his body language

17  were telling me different things.

18      Q.  BY MR. SHOWALTER:  And it sounds like this is

19  where you describe that you say, "Johnson's body

20  language was projecting he was preparing for a physical

21  altercation."

22          Did I read that correctly?

23      A.  Yes, sir.

24      Q.  You write, "Johnson's shoulders were bowed

25  forward slightly and head slightly nodded"?

1  wall."

2             Did I read that correctly?

3      A.  Yes, sir.

4      Q.  Let me ask you this:  Why didn't you simply ask

5  Robert Johnson to turn around, face the wall and put

6  his hands behind his back?

7      A.  I guess, that takes us back to what we

8  discussed earlier.  My plan was not to allow him the

9  opportunity, especially at that point -- you mean while

10 I'm contacting him or beforehand?

11     Q.  When he refused to sit down.

12     A.  Right.

13     Q.  And you decided to detain him.

14     A.  Yes, sir.

15     Q.  Why didn't you say:  Mr. Johnson or, sir,

16 please turn around and face the wall?

17     A.  That's because my intent was contact him before

18 he had a chance to formulate any further planning.

19     Q.  Okay.

20     A.  So that would allow more time for him to be

21 able to think about what he was going to do, if he was

22 going to do anything.

23     Q.  And what is the City of Mesa policy or training

24 that tells you that you need to go on the offensive

25 before people can formulate plans?

1  is capable of performing -- of forming a plan to

2  attack, correct?

3            MS. RETTS:  Form; foundation.

4      Q.  BY MR. SHOWALTER:  Whether it would be

5  effective or not?

6      A.  Potentially.  But everybody is not on a third

7  story balcony and being interviewed and investigated

8  for a potential crime, sir.

9      Q.  Have you ever received training on a term

10  called "OODA loop"?

11     A.  I've heard the term.  I'm familiar with it.

12     Q.  Do you know what that term means?

13     A.  I believe that would mean somebody -- their

14  ability to recognize and effect an action, yes, sir.

15     Q.  Yeah.  Do you -- so it's an acronym.  Do you

16  know what the acronym stands for?

17     A.  Yeah.  I don't recall off the top of my head,

18  sir.

19     Q.  Did you receive training on OODA loops at the

20  Mesa Police Academy?

21     A.  I believe I did, sir.

22     Q.  Did you have a supervisor who trained you about

23  going to the offensive to prevent suspects or --

24  subjects from formulating plans?

25            MS. RETTS:  Form.

1          THE WITNESS:  A supervisor?

2      Q.  BY MR. SHOWALTER:  Yeah.

3      A.  Or just a trainer or anything of that sort?

4      Q.  Yeah.

5      A.  We were presented with several training

6  scenarios, live-training scenarios.

7      Q.  And in what context were you presented with

8  those live-training scenarios?

9      A.  Those were presented in the DT, the defensive

10  tactics, room or house at the time, to where you're

11  presented with several individuals or a individual who

12  was not being cooperative, was being physically

13  resistant, things of that sort.

14      Q.  And you never told Robert Johnson, "I'm

15  detaining you or you're under arrest," fair?

16      A.  No.

17      Q.  And at least before you went hands on?

18      A.  No, I did not.

19      Q.  Okay.  The arm drag, low sweep leg -- low leg

20  sweep combination, what is that?

21      A.  That was a logical attempt to get Mr. Johnson

22  to the ground quickly, without -- I guess without

23  exaggerated actions.  By exaggerated, I mean grabbing

24  him and like throwing him to the ground, slamming him,

25  I guess would be a more. . .

1  "Why do I need to sit in the corner?"

2          MS. RETTS:  Form.

3     Q.  BY MR. SHOWALTER:  Fair?

4     A.  Several times he asked that, yeah.

5     Q.  Yeah.  And then one of the officers said --

6  says something to the effect of it makes us feel

7  comfortable?

8     A.  I didn't catch that part.  You can say that

9  again -- or you can rewind it, like.

10    Q.  So and then you say -- you say, "I'm not going

11  to ask you again."  So do you recall that?

12    A.  Yes, sir.

13    Q.  So I'll play it for you again and tell me if

14  I'm wrong about it.

15         (Video played.)

16    Q.  BY MR. SHOWALTER:  Was it Officer Bridges who

17  said, "It makes us feel comfortable"?

18    A.  Rewind it one more time, please.

19         (Video played.)

20    Q.  BY MR. SHOWALTER:  And so was I -- do you agree

21  with me that one of the officers says, "It makes us

22  feel comfortable"?

23    A.  One of them said it.  I couldn't see their

24  mouths, so I don't know which one could have said it.

25    Q.  You agree with me that nobody told Robert that

1  he was under arrest or that he was being detained?

2      A.  Yes, sir.

3      Q.  And you would agree with me that you said, "I'm

4  not going to tell you again" or "I'm not going to ask

5  you again," correct?

6      A.  Yes, sir.

7      Q.  And so Robert is standing and then he sits back

8  against the wall.  And then you say, "All the way

9  down," and somebody else says "All the way down"?

10          MS. ALVARADO:  Object to form.

11          THE WITNESS:  I guess -- I assume somebody

12  else said it.  I know I said it.

13      Q.  BY MR. SHOWALTER:  So is that accurate?

14      A.  Well, watching the video, I would say, yes.

15      Q.  Okay.  And then you say, "All the way down," as

16  you begin to walk toward him, correct?

17      A.  Yes.

18          (Video played.)

19      Q.  BY MR. SHOWALTER:  And at this point, are you

20  physically touching him, do you know?

21      A.  I could be.  Like I say, I can't see.  I

22  imagine I am.

23          (Video played.)

24      Q.  BY MR. SHOWALTER:  As you're advancing on

25  Robert here, is this when you formed the plan to use

1  commands and he refused to do so.

2      Q.  BY MR. SHOWALTER:  But he wasn't suspected of

3  any crime?

4              MS. STILLWELL:  Form.

5              MS. RETTS:  Form.

6              THE WITNESS:  He was with a person who was

7  the aggressor involved in a domestic dispute that we

8  had been dispatched to, which was hindering on the

9  possibility of a home invasion.  So he was definitely

10  involved with the incident and he was definitely not

11  free to leave, if that's what you're asking.

12      Q.  BY MR. SHOWALTER:  But you never told him that

13  he was a suspect and you never told him that he wasn't

14  free to leave?

15      A.  No, I did not.

16      Q.  You never told him he was arrested?

17      A.  No, I did not.

18      Q.  You never told him --

19              MS. ALVARADO:  Object to the form of that

20  one.

21      Q.  BY MR. SHOWALTER:  You never told him -- and to

22  be fair, prior to using force, you never told him that

23  he was under arrest, correct?

24      A.  No, I did not.

25      Q.  And prior to using force, you never told him

1 that he was being detained?

2     A.  No, I did not.

3          (Video played.)

4     Q.  BY MR. SHOWALTER:  Is there -- is there

5 something that -- well, let me take this really slow.

6          So I'm going to push play and can you tell

7 me what you're doing.  Right now it's 23:47:30.  So

8 we're four seconds after you said, "All the way down."

9 You're now right on top of Robert.  And can you tell me

10 what happens in the next two seconds.

11          MS. RETTS:  Form; foundation.

12          (Video played.)

13          THE WITNESS:  I grabbed his hand.  He

14 tensed up.  I attempted to sweep his leg out from under

15 him.  He braced himself against the wall.

16     Q.  BY MR. SHOWALTER:  So all of that stuff, from

17 the OCCS -- from your attempt to do the OCCS, to your

18 transition, to the attempt to do the arm pull and leg

19 sweep --

20     A.  Yes, sir.

21     Q.  -- all of that happens in two seconds?

22     A.  Yes, sir.

23          MS. RETTS:  Form.

24     Q.  BY MR. SHOWALTER:  Additionally, can you see --

25 I'm sorry.  Is that Officer Monarrez, who's right by

1    Q.  And can I have you look at -- and so that

2  simply reflected that 40-hours suspension without pay?

3    A.  Yes, sir.

4    Q.  Can I have you look at Exhibit 10?

5    A.  (Witness complies.)

6    Q.  Have you ever seen this document before?

7    A.  I don't recall seeing this document no, sir.

8    Q.  This has been provided to us as something

9  called a "Concise Employee History."  And our

10  understanding is that it documents uses of force and

11  citizen complaints.

12    A.  Yes, sir.

13    Q.  But you've never seen this document before?

14    A.  No, sir.

15    Q.  Well, let me ask you this:  Do you recall going

16  through a process sometime in 2014 to have portions of

17  your file expunged?

18          MS. RETTS:  Form.

19          THE WITNESS:  I don't remember the

20  particular process.  But I do know I believe it's

21  every, what, three years, the records are purged or

22  whatever or something like that.

23    Q.  BY MR. SHOWALTER:  So was it your understanding

24  that every three years records were automatically

25  purged?

1    A.   I don't know if they're automatically purged or

2  not.

3    Q.   Did you ever request that any of your records

4  be purged?

5    A.   I don't remember requesting any, any purges.

6    Q.   Do you remember any supervisors ever asking or

7  reminding officers that their -- about the retention

8  policy and that they could elect to have records

9  purged?

10   A.   I probably was informed of that.  I don't

11  recall exactly when, though.

12   Q.   Let's go through these as quickly as possible.

13        Well, let me ask you this:  The first one

14  we have is for a unsatisfactory performance allegation

15  that resulted in written reprimand.

16        Do you see that?

17   A.  Yes, sir.

18   Q.  It's file Number 2012-262?

19   A.  Yes, sir.

20   Q.  Do you know what that involved?

21   A.  I do not.

22   Q.  Prior to September 14th at 2012, were you the

23  subject of any internal affairs investigations?

24   A.  I don't recall, sir.  I don't.

25   Q.  Do you recall any citizen complaints prior to

```
1   STATE OF ARIZONA        ) SS.
                            )
2   COUNTY OF MARICOPA      )

3

4           BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
5   Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
6   that the foregoing 307 pages are a full, true and
    accurate record of the proceedings, all done to the
7   best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
8   print under my direction.

9           [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 21st day of January, 2020.

16

17          _____
                Donna DeLaVina, RPR
                Certified Reporter
18              Certificate No. 50468

19              *    *    *    *    *    *

20

21      I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23          _____
                Donna DeLaVina, RPR, Owner
24              Donna DeLaVina Reporting, LLC
25              Arizona RRF No. R1010
```

**EXHIBIT 3**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Robert Johnson,                         )
                                        )
           Plaintiff,                   )
                                        )
vs.                                     )Case No.:
                                        )2:19-cv-02827-JAT-JBZ
City of Mesa, a municipality;           )
Jhonte Jones, an individual;            )
Rudy Monarrez, an individual;           )
and Ernesto Calderon, an                )
individual,                             )
                                        )
           Defendants.                  )
                                        )

VIDEO-RECORDED DEPOSITION OF ROBERT JOHNSON

Tempe, Arizona
December 19, 2019
9:06 a.m.

REPORTED BY:
Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200

1        Q.    How long have you been going to New

2   Beginnings?

3        A.    For about a few years now.

4        Q.    When did you first start going there?  Do

5   you remember?

6        A.    About 2016, around about.

7        Q.    How did you end up going to that church?

8        A.    Well, I -- I can't -- sorry.  Sorry.

9   Sorry.  Can you -- repeat the question again, please?

10        Q.    I sure can.

11              How did you start going to that church?

12        A.    I was -- I helped Pastor Andre with a few

13   things that he needed help with.  Come up, basically,

14   to remove some -- I'm sorry -- to move some items

15   from his car upstairs to his apartment, and that's

16   how we actually, like, finally actually met.

17        Q.    And is this the same apartment complex

18   you live in now?

19        A.    No, ma'am.

20        Q.    So what apartment complex did you meet

21   him in 2016?

22        A.    It was -- it was adjacent to my apartment

23   complex.

24        Q.    Okay.  What apartment complex do you live

25   in?

```
 1          A.    El Rancho.

 2          Q.    Say that again.

 3          A.    El Rancho.

 4          Q.    And how long have you lived at El Rancho?

 5          A.    Since 2016 when it opened.

 6          Q.    It was a brand-new complex?

 7          A.    Yes, ma'am.

 8          Q.    And how did you move into El Rancho?

 9          A.    I moved in with my mom.

10          Q.    And was it just you and your mom living

11     there?

12          A.    No, ma'am.

13          Q.    Who else lived with you and your mom?

14          A.    My sister and brothers.

15          Q.    And what is your mom's name?

16          A.    Linda Roberta Hardy Johnson.

17          Q.    And you said your sister and brothers?

18          A.    Yes.

19          Q.    And who are they?

20          A.    Darnell Roman Johnson, Bobby Lee Johnson,

21     and Jonathan Lee Johnson.

22          Q.    And you said there was a sister too?

23          A.    Yes.

24          Q.    And who is that?

25          A.    She is Christina -- Christina Emerald
```

1      Q.    Okay.  And then what?

2      A.    Then I sent -- the kid in the second

3  building was pacing behind me and I had asked him,

4  Hey, bro, everything -- everything okay?  He was

5  like, Man, I just got into it -- got into it with my

6  girlfriend, she kicked me out, this, that, and the

7  other.  I was like, Well, is it anything I could help

8  you with?  Like, if you need --

9            And he was like, yeah, she got my bag,

10  and I'm just trying to get my bag so I can leave.  I

11  was like, oh, well, since I'm not the cause of the

12  party, can I -- can I be of some assistance to you?

13     Q.    Okay.  The -- you said you saw a kid

14  pacing.  Is that Erick Reyes?

15     A.    Yes.

16     Q.    And did you know Mr. Reyes before that

17  date?

18     A.    I see him around the complex.

19     Q.    How often would you see him around the

20  complex?

21     A.    When he gets off work.  That's normally

22  late.

23     Q.    Does he live in the complex?

24     A.    Well, at the time, he did.

25     Q.    Okay.  Do you know where in the complex

1  together?

2       A.   No.

3       Q.   Did he ever crash on the couch in your

4  apartment?

5       A.   Not ever.

6       Q.   Did he ever hang out with you in your

7  apartment?

8       A.   No.

9       Q.   You said he would talk to you about what

10  it was like to be in his shoes?

11       A.   Yeah.

12       Q.   What does that mean?

13       A.   Drawn-out life stories.

14       Q.   His life stories?

15       A.   Yes.

16       Q.   Did you share your life stories with him?

17       A.   I don't like to talk that much.

18       Q.   Had you ever met his girlfriend, Kimberly

19  Lovano, before?

20       A.   See, that's the first time I ever heard

21  her name.  Very first time.

22       Q.   And he had told you that she had his bag?

23       A.   Yes.

24       Q.   And he wanted it back?

25       A.   Yes.

1     Q.    What did he want you to do?

2     A.    Get his bag.

3     Q.    What did you offer to do?

4     A.    Get his bag.

5     Q.    What happened when you went to the

6  apartment?

7     A.    I knocked on the door.  She opened it and

8  she took two, three steps back where the kitchen

9  island is, and I seen a guy there, but I really

10 didn't pay no attention.  I just asked her calmly, I

11 said, Excuse me, ma'am, if it's okay, can I get your

12 permission, can I reach in your house to grab this

13 guy's backpack, if it's okay?  And she said, Yes.  I

14 grabbed the doorway and I leaned in, grabbed the

15 backpack, set it in front of him, and I said, Now

16 we're done here.  Let's go.

17          Then, they commenced the arguing.  I'm

18 not here for this.

19     Q.    Who started arguing?

20     A.    Erick Reyes and his girlfriend.

21     Q.    Okay.  Did the other gentleman say

22 anything or do anything?

23     A.    No.  He stayed out of it.

24     Q.    Okay.  And so Ms. Lovano and Mr. Reyes

25 began arguing?

1    in the middle of an argument.

2         Q.    Well, she had shut the door, correct?

3         A.    I said, Let's go.  Then she shut the

4    door.

5         Q.    When you left the apartment, you planned

6    to go finish your cigarette?

7         A.    Yeah.

8         Q.    What else were you planning to do?

9         A.    Go back in my house and go lay with my

10   wife -- my girlfriend, Brittany.

11        Q.    Were you planning to hang out with

12   Mr. Reyes at all?

13        A.    No.  Mr. Reyes was by far any thought

14   that was in my head anymore.

15        Q.    When you came around the corner from the

16   apartment --

17        A.    Uh-huh.

18        Q.    -- is that when you came into contact

19   with the first police officer?

20        A.    The white-haired police officer, yes.

21        Q.    The white-haired police officer, is that

22   Officer Calderon?

23        A.    I don't even know them by names.  I just

24   heard their names during this case.

25        Q.    And he asked you both to stop, correct?

1      A.   Uh-huh.

2      Q.   -- did you see other officers arriving in

3  the parking lot?

4      A.   I seen a ton of officers pulling up in

5  the parking lot.

6      Q.   When you say a "ton"?

7      A.   A lot of people.  I mean, a lot.  I mean,

8  how do I say?  I didn't count them at the time.  It

9  was more like, I didn't count cars neither.  It was

10  just like overwhelming thing that was going on, and

11  all of a sudden, I get a bright light in my face from

12  a helicopter.

13      Q.   Do you remember if there were two, five,

14  how many officers?

15      A.   I think I just answered that one the

16  first time.

17      Q.   I'm asking, can you --

18      A.   Okay.

19      Q.   -- guess how many?

20      A.   No.  Not at the time.  Because after I

21  got hit with the light, I was down there for like 10

22  seconds.  I don't know who pulled up or what.  All I

23  know, when three people got off the elevator, they

24  asked me one question.

25           Sorry.  I think I'm just going too far.

1    -- their size or how tall they were or how much they

2    weighed?

3         A.    I never even looked back.

4         Q.    You didn't look at any of the officers?

5         A.    No.   Until they started touching me, and

6    then when I looked down, I said, No, I got a knife on

7    my side because I just want you to know for your

8    safety only, I probably got a knife.   And he was

9    like, Okay, he patted it, lifted up my shirt, scooted

10   my pants over.   I was like, Oh, I ain't got nothing

11   on there.

12        Q.    Did you -- do you recall looking at

13   Officer Monarrez, looking him up and down?

14        A.    I had to look at him down and up.

15        Q.    Do you remember making a comment to him,

16   you're small?

17        A.    You're small?   He was kind of short.

18   Just being honest.   There were no direction there.

19        Q.    Say that again.

20        A.    It was not for him there.

21        Q.    So the comment "you're small" was not

22   directed towards him?

23        A.    Oh, no.   No.

24        Q.    Who was it directed to?

25        A.    The mentalities that were there.

1       Q.   You understand that sometimes we don't

2  know the reasons for directions, but that it's

3  important to follow officers' commands?

4       A.   Not when they treating you like dirt.

5       Q.   Do you understand that their commands are

6  usually for your safety and their own?

7       A.   Then you'll come off right.

8       Q.   Say that again.

9       A.   Then you'll come off respectful.

10      Q.   I don't --

11      A.   They would have used the language

12  respect.  The term "respect" means I can respect your

13  place and respect mine.  I didn't cross in no way.  I

14  didn't talk bad to him.  I didn't yell at him.  I

15  didn't say anything else.  Just...

16      Q.   I understand, I've asked before, but when

17  you braced yourself against the wall, you don't

18  recall the officers asking you to sit all the way

19  down?

20          MR. ROBBINS:  Object to form.

21          THE WITNESS:  All I remember was

22  everything started going black.

23      Q.   BY MS. STILLWELL:  What is the last thing

24  that you remember before it went black?

25      A.   Waking up, feeling pain, and wondering

1          A.    Yes.  Yes.  Yes.

2          Q.    So it's the larger African-American

3    officer?

4          A.    Yes, ma'am.

5          Q.    Okay.  Because you don't know his name,

6    right, as you sit here today?

7          A.    No.

8          Q.    Okay.  And then you had testified that

9    you woke up feeling pain, and then you said, Why am I

10   in handcuffs?  Where were you feeling pain?  What

11   part of your body?

12         A.    The main thing that they were hitting, my

13   face.

14         Q.    Do you remember being struck in the face?

15         A.    No.  All I remember is everything turned

16   black.

17         Q.    Okay.  So you just woke up on the ground?

18         A.    Yes.

19         Q.    And you remember pain in your face?

20         A.    Yes.

21         Q.    Which part of your face?

22         A.    All here.

23         Q.    Okay.  So the front part of your face?

24         A.    Yes.

25         Q.    The cheeks?

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Robert Johnson, an     ) No. 2:19-CV-02827-JAT-JZB
individual,             )
                          )
                          )
          Plaintiff,    )
                          )
vs.                     )
                          )
City of Mesa, et al.,     )
                          )
                          )
          Defendants.   )
_____)

VIDEOTAPED DEPOSITION OF RUDY MONARREZ

Phoenix, Arizona
February 4, 2020
1:05 p.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:          P (602) 230-5454
                      F (480) 546-3721
Donna DeLaVina, RPR     www.dlvreporting.com
Certified Reporter
Certificate No. 50468

RUDY MONARREZ  FEBRUARY 04, 2020

1  wall, correct?

2        MS. STILLWELL:  Form.

3        THE WITNESS:  After the pat-down, yes.

4    Q.  BY MR. ROBBINS:  And he goes over to the wall,

5  maybe slowly, but goes over to the wall, correct?

6    A.  He makes his way.

7    Q.  Yeah.

8    A.  After being told a couple of times, yes.

9    Q.  Now, there's a time when Mr. Johnson says

10  something like, you're short.  But the video that I

11  looked at has him looking at Jones and saying that.

12  Almost in a sarcastic way as opposed to looking at you

13  and saying it in an aggressive way; is that your

14  memory?

15        MS. STILLWELL:  Form.

16        MS. RETTS:  Form.

17        THE WITNESS:  That is not my memory.

18    Q.  BY MR. ROBBINS:  Okay.  You're going to testify

19  at trial, then, that he looked at you and said "You

20  short"?

21    A.  Yes.

22        MS. RETTS:  Form.

23        MS. STILLWELL:  Form.

24        MS. ALVARADO:  Form.

25    Q.  BY MR. ROBBINS:  Okay.  And as he's doing that,

1  he's not looking at Officer Jones, correct?

2          MS. STILLWELL:  Form.

3          THE WITNESS:  No.  It was directed towards

4  me.

5     Q.  BY MR. ROBBINS:  Okay.  And, at that point, did

6  he say anything like, I'm going to get you first?  Or

7  did he make a threat towards you?

8          MS. ALVARADO:  Form.

9          THE WITNESS:  Like a direct threat?

10     Q.  BY MR. ROBBINS:  Yeah, a direct threat.

11     A.  Not that I recall, no.

12     Q.  Now, you had heard, at least on the video,

13  where he said something to the effect of being

14  retarded.

15          Do you remember hearing it that night?

16          MS. STILLWELL:  Form.

17          MS. ALVARADO:  Form.

18          THE WITNESS:  I don't remember hearing it

19  that night.

20     Q.  BY MR. ROBBINS:  Okay.  And as of the time that

21  you have come up in the elevator -- does your -- I

22  don't know if your radio is like a telephone.

23  Sometimes if I'm in an elevator I won't get a phone

24  signal.  Is it the same with your radios?

25     A.  I've never had an issue --

1  that's what I see from this video.

2      Q.  Okay.  Does that somehow -- now, is that --

3  you're telling me -- or you're going to try to get

4  someone to believe that that's an offensive or a

5  defensive position with his back against the wall and

6  legs out straight in front of him?

7              MS. STILLWELL:  Form.

8              MS. RETTS:  Form and argumentative.

9              THE WITNESS:  Absolutely, it's both.

10     Q.  BY MR. ROBBINS:  Which one?  Both?

11     A.  Both.

12     Q.  Okay.  So he can -- so if you guys come in,

13  then what's he going to have to do to be able to deal

14  with you guys?  Is he just going to keep his back

15  against the wall and then he'll, from the solidity of

16  the wall, be able to punch you all?

17             MS. ALVARADO:  Form and foundation.

18             MS. RETTS:  Form.

19             THE WITNESS:  You need to say it one more

20  time.  I've got a short-term memory.

21     Q.  BY MR. ROBBINS:  Oh, yeah, no worries.

22             With his back up against the wall is what

23  you're trying to say is that he's going to be able to

24  punch you all with the solidity of the wall behind him

25  and that will make his punches harder or something?

1              MS. STILLWELL:  Form.

2              MS. RETTS:  Form.

3              THE WITNESS:  I'm just saying that it's a

4    tactical advantageous position.

5        Q.  BY MR. ROBBINS:  Have you ever -- who in the

6    world taught you that that is an advantageous position?

7              MS. RETTS:  Form.

8              THE WITNESS:  Specifically, I've been

9    through training, fighting multiple subjects, and you

10   put your back towards a wall.

11       Q.  BY MR. ROBBINS:  Well, but your back towards a

12   wall doesn't mean you lean with your legs forward?

13       A.  But your back towards the wall.

14       Q.  Okay.  So it's not the way his legs are, it's

15   that his back is up against the wall?

16             MS. RETTS:  Form.

17             MS. STILLWELL:  Form.

18             THE WITNESS:  It's a combination.

19       Q.  BY MR. ROBBINS:  But legs forward is somehow an

20   advantage?

21       A.  Back to the lower center of gravity, in a

22   squatting position, yes.

23       Q.  Okay.  You agree he's not squatting, his legs

24   are straight?

25       A.  That looks like a squat to me.  His knees are

1    Conduct."

2                Do you see that?

3        A.  I do, yes.

4        Q.  And let me read the second paragraph, it says,

5    "It is alleged Officer Rudy Monarrez, Number 21672,

6    used unnecessary or improper use of force during Mesa

7    Police Incident Number 2018143028; in accordance with

8    DPM 1.4.5 Code of Conduct."

9                Did I read that correctly?

10       A.  Yep.  It looks like you did.

11       Q.  Okay.  And on following -- or two pages back,

12   on page -- it's on the bottom it says "4."  That has

13   your height and weight being 6', 185 [sic] pounds.

14                MS. STILLWELL:  Form.

15                THE WITNESS:  165.

16                MR. ROBBINS:  165.

17                Did I say something different?

18                MS. ALVARADO:  185.

19                THE WITNESS:  You said 185.

20       Q.  BY MR. ROBBINS:  Okay.  I gave you 20 pounds.

21   I gave you some of mine.

22       A.  It's not mine.

23       Q.  I wish I could.

24                So at the time, was that your approximate

25   correct height and weight?

RUDY MONARREZ   FEBRUARY 04, 2020

1   p.m. to 3:28 p.m.)

2          THE VIDEOGRAPHER:  We are on the record at

3   3:28 p.m.

4      Q.  BY MR. ROBBINS:  At the time that Robert

5   Johnson was struck, he was not under arrest, correct?

6      A.  Not to my knowledge, no.

7      Q.  And there was no probable cause that you're

8   aware of, of why he would have been under arrest at the

9   time, correct?

10          MS. RETTS:  Form.

11          THE WITNESS:  Probable cause, not that I

12   was aware of, no.

13      Q.  BY MR. ROBBINS:  And had you ever been taught

14   that it was appropriate to use force if a person was

15   not following orders as quickly as you would like if

16   they're under investigative detention?

17          MS. RETTS:  Form.

18          MS. STILLWELL:  Form.

19          THE WITNESS:  If there's reasonable

20   suspicion, yes.

21      Q.  BY MR. ROBBINS:  Okay.  And do you have any

22   criticisms of Robert Johnson?

23          MS. STILLWELL:  Form.

24          THE WITNESS:  Criticisms?

25      Q.  BY MR. ROBBINS:  Yes.

```
 1   STATE OF ARIZONA      ) SS.
                           )
 2   COUNTY OF MARICOPA    )

 3

 4        BE IT KNOWN that the foregoing proceedings
     were taken before me, DONNA DELAVINA, Certified
 5   Reporter No. 50468; that the witness before testifying
     was duly sworn by me to testify to the whole truth;
 6   that the foregoing 110 pages are a full, true and
     accurate record of the proceedings, all done to the
 7   best of my skill and ability; that the proceedings were
     taken down by me in shorthand and thereafter reduced to
 8   print under my direction.

 9             [X]  Review and signature was requested.

10             [ ]  Review and signature was waived.

11             [ ]  Review and signature not required.

12        I CERTIFY that I am in no way related to any
     of the parties thereto nor am I in any way interested
13   in the outcome hereof.

14        I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.  DATED
15   at Phoenix, Arizona, this 12th day of February, 2020.

16

17             Donna DeLaVina, RPR
               Certified Reporter
18             Certificate No. 50468

19             *    *    *    *    *    *

20

21        I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206.

23

24             Donna DeLaVina, RPR, Owner
               Donna DeLaVina Reporting, LLC
25             Arizona RRF No. R1010
```

**EXHIBIT 5**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Robert Johnson, an          ) No. 2:19-CV-02827-JAT-JZB
individual,                 )
                            )
                            )
            Plaintiff,      )
                            )
vs.                         )
                            )
City of Mesa, et al.,       )
                            )
                            )
            Defendants.     )
_____)




30(b)(6) DEPOSITION OF MICHAEL MCCLURE

Phoenix, Arizona
January 9, 2020
4:21 p.m.









DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
PREPARED BY:                Gilbert, Arizona 85234
                            P (602) 230-5454
Donna DeLaVina, RPR         F (480) 546-3721
Certified Reporter          www.dlvreporting.com
Certificate No. 50468

1  the taser, to impact weapons.

2      Q.  And in terms of active resistance where someone

3  is tensing up their arms, but there's no indication

4  that they're going -- that they've not threatened to

5  hit anyone.  They've not made verbal threats.  They've

6  not tried to do anything.  They've not killed anyone

7  prior to or committed an act of violence before they've

8  been encountered, would active resistance once you're

9  grabbing them justify a head strike prior to the change

10  in policy in June of 2018?

11              MS. STILLWELL:  Form.

12              MS. RETTS:  Form; foundation.

13              THE WITNESS:  So in a general way, I would

14  say, no.  Again, you're giving me a general guideline

15  to officers without any specific facts or details, so

16  that general guideline is going to tie impact to the

17  head and face, active aggression and then limited forms

18  of impact to other parts of the body, not including the

19  head and face, and control options and OC spray to

20  behavior like active resistance or less.

21      Q.  BY MR. ROBBINS:  What about passive resistance,

22  is any force justified if there's only passive

23  resistance and they may be moving slower than you want

24  them to, but they're not actively resisting?

25              MS. ALVARADO:  Form.

1       THE WITNESS:  So passive resistance, by

2  definition, is a form of resistance that doesn't

3  include any actual physical resistance.  So the amount

4  of force it would take to control a passively resistant

5  person, in all likelihood, wouldn't rise to the level

6  of impact.  You could probably just grab ahold of the

7  person and put their hands behind their back and cuff

8  them up.  They're just dead weight.  So, yeah, I think

9  in a general way, yeah, it wouldn't become necessary to

10  rise to that level.

11     Q.  BY MR. ROBBINS:  Do you agree that force should

12  not be used unless it is reasonably justified?

13     A.  Yeah, I agree with that.

14     Q.  Would you agree with me, if you can politely

15  ask someone to sit down, that if that would be

16  effective that that's preferable to using force?

17          MS. ALVARADO:  Object to the form.

18          MS. RETTS:  Form and foundation.

19          THE WITNESS:  Yeah.  If it was a safe

20  method or tactic, based on the circumstances, then that

21  would be a reasonable -- that would be a preferred

22  method.

23     Q.  BY MR. ROBBINS:  Are knee strikes different

24  than hard hands?  Is there different training for knee

25  strikes?

```
1   STATE OF ARIZONA        ) SS.
                            )
2   COUNTY OF MARICOPA      )

3

4        BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
5   Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
6   that the foregoing 97 pages are a full, true and
    accurate record of the proceedings, all done to the
7   best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
8   print under my direction.

9             [X]  Review and signature was requested.

10            [ ]  Review and signature was waived.

11            [ ]  Review and signature not required.

12            I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14            I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 22nd day of January, 2020.

16
                  _____
17                Donna DeLaVina, RPR
                  Certified Reporter
18                Certificate No. 50468

19
                  *    *    *    *    *    *
20

21        I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23                _____
24                Donna DeLaVina, RPR, Owner
                  Donna DeLaVina Reporting, LLC
25                Arizona RRF No. R1010
```

**Banner Records (Sealed)**

**EXHIBIT 6**

**Allan Block Report (Sealed)**

**EXHIBIT 7**

**EXHIBIT 8**

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

March 4, 2020

Joel B. Robbins, Esq.
Robbins & Curtin, p.l.l.c.
301 East Bethany Home Road, Suite B-100
Phoenix, AZ 85012

***Regarding:   Robert Johnson v. City of Mesa, et al.***
***              Case No. 2:19-CV-02827-JAT-JZB***

Dear Mr. Robbins:

Thank you for retaining me to review the materials concerning the City of Mesa Police Department (MPD) policies, training, monitoring, and enforcement of police use of force as it relates to the Robert Johnson case.  Pursuant to the requirements of Federal Rule 26, I have studied the reports, video and audio recordings, deposition transcripts, photographs, AZPOST training, MPD training and policies and other material (attached as exhibits) provided to me thus far regarding this case.  (*See* Exhibit A, *List of Materials Provided*, attached hereto.)  Please be advised that if/when any additional information is submitted, it is possible that a supplemental report refining my opinions will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by Defendants and/or witnesses versus the allegations and statements proffered by Mr. Johnson and/or other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflict is delegated to and is within the purview of a jury.

## Commentary:

The use of police force under color of law must be guided by the requirements of the Constitution of the United States and the Constitution of the State of Arizona and consistent with democratic principals.  To conform to these requirements, police departments must implement clearly defined policies and training that can be taught, monitored, reviewed, and enforced.  Upon any such review necessary consequences must be expressed and corrective discipline/training applied to enforce the standards consistent

with those guiding principles.  Simply stated, "inadequate discipline is tantamount to no discipline."  *(Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007)).

Officers are trained that in the United States the criminal justice system gives law enforcement two extraordinary powers: 1) the power of arrest; and 2) the power to use physical force.  The police authority to do so does not come from the rule of an authoritarian dictator.  Rather, it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost care and restraint.  This is why it is important to emphasize that peace officers do not confer "police powers" on themselves.  These powers come from the people they serve because the power of the American government is derived from the people.  There is no king or dictator with absolute power.  As stated by the founding fathers, all men (and women) in the United States are "endowed" at birth with "life, liberty, and the pursuit of happiness."  Accordingly, the Constitution restricts the government's power to search or seize people and includes protections from the use of force under the color of law.  The Courts have restricted uses of force to circumstances where that force is *objectively reasonable* under the circumstances.  Additionally, officers are trained that unreasonable force occurs when the type, degree, and duration of force employed was not necessary or appropriate under the circumstances.

There are a number of cases that guide police departments to establish polices and training that establish an acceptable standard of care.  These standards have been well known for over a century.  They were best expressed by Sir Robert Peel (1788-1850) when he organized the first modern police department - the London Metropolitan Police in 1829.  (Who are still called, "Bobbies" to this day in honor of Sir Robert.)  His "Nine Principles of Policing are known as the foundation of the "Community Policing" model and are quoted in police procedures and policies manuals throughout the nation and by national, state professional organizations (i.e. DOJ, NIJ, IACP, PERF COPS, CALEA, etc.).  They are as follows:

- To prevent crime and disorder, as an alternative to their repression by military force and by severity of legal punishment.
- To recognize always that the power of the police to fulfill their functions and duties is dependent on public approval of their existence, actions and behavior, and on their ability to secure and maintain public respect.
- To recognize always that to secure and maintain the respect and approval of the public means also securing of the willing co-operation of the public in the task of securing the observance of laws.
- To recognize always that the extent to which the co-operation of the

public can be secured diminishes, proportionately, the necessity of the use of physical force and compulsion for achieving police objectives.

- To seek and to preserve public favor, not by pandering to public opinion, but by constantly demonstrating absolutely impartial service to law, in complete independence of police and without regard to the justice or injustices of the substance of individual laws; by ready offering of individual service and friendship to all members of the public without regard to their wealth or social standing; by ready offering of sacrifice in protecting and preserving life.
- To use physical force only when the exercise of persuasion, advice and warning is found to be insufficient to obtain public co-operation to an extent necessary to secure observance of law or to restore order; and to use only the minimum degree of physical force which is necessary on any particular occasion for achieving a police objective.
- To maintain at all times a relationship with the public that gives reality to the historic tradition that the police are the public and that the public are the police; the police being only members of the public that are paid to give full-time attention to the duties that are incumbent on every citizen, in the interests of community welfare and existence.
- To recognize always the need for strict adherence to police executive functions, and to refrain from seeming to usurp the powers of the judiciary or avenging individuals or the state, and of authoritatively judging guilt and punishing the guilty.
- To recognize always that the test of police efficiency is the absence of crime and disorder, not the visible evidence of police action in dealing with them.

Police must determine whether force is reasonable based on objective facts. Unfounded fear or imaginary risks cannot justify the use of force. Facts not known to officers at the time force is used cannot justify the use of force. Case law has long established that where no force is objectively justified, any force is excessive.

Policies across America are for the most part uniform, but there are policy failures in this case that will be discussed later. The reason that most American police policies are objective is that police organizations generate model policies that are reviewed and adopted nationwide. The establishment of policies by itself is insufficient because policies must also be taught, monitored, reviewed and enforced. To be taught, monitored,

reviewed and enforced, policies must be measurable. Policies that can't be measured, can't be enforced.

The combination of philosophical underpinning and policies along with clarification by the courts, create enforceable standards for the use of force. In becoming a police officer, a good candidate will recognize that there are risks inherent in the job which at times will place the officer at risk for injury. Contrary to popular belief, the dangers of being a police officer are not as great as many other professions. In fact, Police and Sheriff's patrol officers rank 14th behind: 1) Logging workers; 2) Fishers and related fishing workers; 3) Aircraft pilots and flight engineers; 4) Roofers; 5) Refuse and recyclable material collectors; 6) Structural iron and steel workers; 7) Driver/sales workers and truck drivers; 8) Farmers, ranchers, and other agricultural managers; 9) First-line supervisors of construction trades and extraction workers; 10) Miscellaneous agricultural workers; 11) Grounds maintenance workers; 12) First-line supervisors of mechanics, installers, and repairers; and 13) Construction laborers.
(www.usatoday.com/.../2018/01/05/25-most-dangerous-jobs-in-america/109193204)
Countering the dangers are the many benefits of being a police officer. The power to protect the public and to stop and prevent crime, the pay and benefits, the comradery, and the admiration of the public are all benefits of being a police officer.

Using force with proper restraint increases officer safety by fostering community support and in reducing the fear of those who may have contact with the police in the future. Improper use of force creates fear and increases disrespect which not only increases the danger to officers but also makes them less effective in performing the positive duties of an officer.

To adequately prepare officers to use force, training must teach both the letter and spirit of the policy. A respect for the individual in this society, which may not be returned, is a vital philosophical requirement inherent in any use of force training. A person may insult or disrespect an officer. The officer cannot respond with injurious force such as strikes to the head or body in response to disrespect or slow cooperation. The Constitution and case law do not allow the governmental officer's decision to use of force to be influenced by a person's attitude unless that attitude jeopardizes the safety of the officers, the suspect, or the public. A person not moving quickly enough to allow a crowd to exit a burning theater might justify helping the person to move faster. It wouldn't justify a head strike which might slow the crowd's exit. As will be discussed later, the training in this case taught officers to use aggression in order to allegedly "de-escalate" situations and in one instance, the training taught to use head strikes to respond to an uncooperative suspect.

After implementing proper policies and training, there must be an effort to measure

compliance. Such measurements of use of force must be accompanied by enforcement. Without such monitoring, a police department can stray from its mandates and increase danger to officers and to the public. These measurements and enforcement should not disappear over time because an officer may have a time period where their behavior deviates from the acceptable standards and they may be retrained and disciplined into compliance, but unless the department measures that, there can be no progress reflected in the behavior of the officers, or changes to the monitoring or discipline. A department can have the best policies that money can buy and superb training, but without monitoring and discipline, the department can create an atmosphere of unnecessary violence which weakens the government and endangers the police and the public. Lack of monitoring and disciple can create customs and practices within the department contrary to the inherent power of government, the Constitution, and the case law.

**Factual Background – Mesa Police Department**:

Mesa was founded in 1878. In the past one hundred years, one Mesa police officer has died while on duty. He was struck by a vehicle while making a traffic stop. https://www.odmp.org/agency/2457-mesa-police-department-arizona
In 1991, the Mesa Police Department was involved in a highly publicized sex scandal which was widespread.

https://www.phoenixnewtimes.com/news/the-scandal-at-the-mesa-police-department-641 1729 Three years later, in 1994, the Mesa Police Department opened its own academy. https://www.mesaaz.gov/home/showdocument?id=18036 page 5 of 48. Following that, a number of police chiefs have come and gone.

Chief George Gascon came from the Los Angeles police department and brought with him a number of changes in 2006 through 2009.

https://www.georgegascon.org/meet-george/ Specifically, one of his policies was that every allegation of misuse of force incident was reviewed. Exhibit 84 – East Valley Tribune - New chief aims to bring stability to Mesa police - https://www.eastvalleytribune.com/local/new-chief-aims-to-bring-stability-to-mesa-police /article_396b8168-9140-11df-997a-001cc4c002e0.html

He was replaced with Chief Frank Milstead. Early in his term, Chief Milstead announced that he was putting an end to automatic use of force reviews.

Milstead also dropped an IA system that required any complaint about an officer - no matter how small - to result in an internal affairs investigation.

Police work is supposed to be fun. Police work is supposed to be rewarding and some of the things that had been put in place under the previous regime were very stifling to the officers," Milstead said.  "They felt that they weren't trusted, that there had to be all these different levels of review.  My opinion is I have to be able to trust not only the line-level sergeants and lieutenants, but the commanders and assistant chiefs as well so I've changed some of those things around to give people a little more trust.

Milstead explained his new approaches last week in a meeting with the Tribune's editorial board. His style is sharply different than predecessor George Gascon, who brought a big-city approach to Mesa when he arrived from the Los Angeles Police Department. Gascon left in June after overseeing a sharp drop in crime.

Gascon's orders were consistent, Milstead said, but he knew the police force needed stability.  He abolished a Gascon practice of launching an internal affairs investigation over any complaint made about an officer, including when a citizen simply had a question about procedure and didn't want to file a formal complaint.

The number of internal investigations skyrocketed and that created a great amount of stress, even though the officers were cleared nearly all the time. Milstead said the practice could work against officers who were trying to be more active.

The change has been a boost to officers, said Bryan Seller, president of the Mesa Fraternal Order of Police. Seller said he was impressed that Milstead began his job already highly knowledgeable of how the force operates and that his changes have focused on stabilizing the police force.

"When you talk to him, you just feel like he's your best friend," Soller said. "You get a real trust out of him.  If he says something, it will get done."

Exhibit 84, p. 3 – 4, JOHNSON 1150 - 1.

According to a video produced by Chief Milstead, the officers were instructed to and did purge their old IA files.  He said that they should get rid of the old files because those matters have been adjudicated.  Exhibit 61 – Off the Cuff Video.

In a survey of the Mesa Police the following appeared:

"Under the previous admin our moral compass went sideways. We had an
A/C that emphasized kicking ass and scaring the public, and a Chief who
turned a blind eye to everything.  Our academy went from training
guardians to training "Spartans."  Our detectives became lazy and civilian
staff became bitter.  The line-level officers were happy because we had
someone "speaking for us..." but in the end neither Milstead nor Silbert
really cared about anyone but themselves.  Now...we face federal criminal
probes, lawsuits, and civil rights inquiries.  All of this because Silbert
wanted to "kick ass."  (Exhibit 83 – Mesa Police Association Survey – p.
31, JOHNSON 001136.")

The identity of this person is unknown.  This quote provides a reasonable explanation for
what has gone on in Mesa culminating in the attack on Robert Johnson.

Following Chief Milstead there were several different chiefs.  There were aspirational
goals set forth in the Mesa Police Department in the 21st Century document.  It included
the goal to have more of a guardian mentality which included de-escalation training.
(Exhibit 358, JOHNSON 001705.)

> Q.    (By Mr. Robbins) Do you ever teach that the officer should use
>       aggression in order to de-escalate situations? That they should
>       become aggressive and try to push things towards de-escalation?
>       [Form objection deleted.]
> A.    Yes.
> Q.    (By Mr. Robbins) Under what circumstances?
> A.    Well, I think -- I apologize. I think I understand what you're saying.
>       But let me make sure.
> Q.    Sure.
> A.    One of the things I teach our officers is that sometimes a more
>       aggressive approach can solve a problem or end a situation faster,
>       thus making it less likely that you'll use force.
>
> (Deposition taken in May of 2017 of the Mesa Police Department's witness
> on use of force contained this testimony.)  Exhibit 60 – Deposition of Jeff
> Jacobs, pp. 40-41, JOHNSON 00690 – 691.

As will be discussed later, this approach was taught in training exercised where the
appropriate response was taught that head strikes should be used in order to end an
encounter sooner.  This witnesses' testimony (pp. 41 – 44) demonstrate the fallacy of this
training.

Prior to the assault in the Robert Johnson case, a new police chief, Ramon Batista, took over.  In his inauguration speech, he said:

> "That's the goal and with respect to constitutional policing is that we're going to try and get it right.  We're going to always work towards getting it right. We've all heard of the 21st century policing pillars, and I'll tell you that building trust and legitimacy in the community is paramount to me and we will never be at a point when we think we've arrived and we don't have to do any more of that.  It is constant.  It's ongoing and we're always going to be working towards that end. (Exhibit 360, p. 5 , JOHNSON 001916)

On May 23, 2018, Robert Johnson was assaulted by three MPD officers in a group of four.  As he was being assaulted, two more officers exit an elevator next to where it is occurring.  Johnson is kneed.  He was punched many times in the head, neck and side.  While on the ground, officers taunted him and put their knees in his back.  As he is being led to an elevator, an officer accused him of attempting to spit at him.  Johnson's face was jammed into the elevator and his legs were jerked from under him.  These acts are uncontested and were video recorded.

Following the assault of Robert Johnson, Chief Batista went on TV to condemn the actions of the police officers.  (Exhibits 361 and 362)  The response from the Mesa Police Association and the Fraternal Order of Police was to begin a campaign to get rid of the chief because he wasn't standing behind his officers.

Mesa Police Association Representative, Sergeant Nate Gafvert, previously said issues with Batista first arose last year when Batista publicly condemned multiple Mesa officers involved in two use-of-force incidents.

In one, the video showed officers kneeing and punching an unarmed man repeatedly. In the other, two officers were seen torturing a 15-year-old armed-robbery suspect after the youngster was handcuffed.

Batista called the actions unacceptable and pledged changes during a news conference last June.  The comments were made before Scottsdale police investigated the cases and the Maricopa County Attorney's Office ultimately decided not to file any charges against the officers involved.
(https://www.azcentral.com/story/news/local/mesa/2019/06/28/mesa-police-unions-appeal-public-oust-chief-ramon-batista/1586375001/)

The Mesa Police Association paid for a survey.  (Exhibit 83.)  The comments to the

survey display upset with Chief Batista:

> The chief is a liberal snowflake who cares more about public image than his officers. He is a cancer on this department. His policies endanger officers and his conduct proves he has no spine.  Staffing and officer safety will continue to decline as long as he is in power."  (Exhibit 83, p. 30, JOHNSON 001135.)

Chief Batista had the case reviewed by a Los Angeles expert named John McMahon. McMahon condemned all the use of force against all of the officers who struck Mr. Johnson.  He also disapproved of the taunting.  He also found that the restraint of Johnson was excessive.  (Exhibits 171 and 172)

The City also hired Mr. Richard Romley to review the case.  (Exhibit 229.)  His report stated:

> Scope of responsibilities.  Currently, Professional Standards is charged with ascertaining the facts surrounding possible policy violations.  During the investigation issues outside of fact gathering arose that were of concern and should be reported to management so that they may be addressed appropriately.  They include the following:
>
> - Training failures.
> - Policy failures.
> - Tactical failures.
> - Additionally, a discussion should be undertaken as to whether Professional Standards should be charged to make recommendations as to whether an NOI should be sustained, unfounded or exonerated.
>
> Currently, Professional Standards does not respond to a scene where they may be required to investigate.  I would recommend that a discussion occur as to whether this should departmental policy. "Best Practices" from other jurisdictions mandates this is certain situations; e.g. when an officer is involved in a shooting, where a serious physical injury results or any other matter that the Chief or Assistant Chief deems necessary.
>
> Currently, the case agent in Professional Standards is not permitted to look at an officer's past history regarding Use of Force or other policy violations. In my view this hampers the officers ability to "grasp" issues that may be

occurring with that particular officer and hinders the case agent in planning and executing an interview that is meaningful.

Prior administrations ordered the "purging" of Internal Affairs files of officers in certain matters. In my view, this hinders the case agents ability to prepare adequately as well as it hinders an adjudicator's ability to determine an appropriate discipline. How can one apply progressive discipline if one does not know what discipline has been applied in the past.

DPM 2.4.65-Restraining Prisoners describes positional asphyxia and procedures when handling subjects. Department policy does not describe the proper use of RIPP restraints [hobbles] nor does it describe special considerations that must be taken when RIPP restraints are used on a prisoner. In the instant case, Mr. Johnson was handcuffed behind his back, placed in RIPP restraints, placed on his stomach with officers placing their knees on his back for several minutes. Mr. Johnson complained that he was having trouble breathing. Positional Asphyxia could have occurred." (Exhibit 229 – Romley Report re Professional Standards Investigations, pp. 3, 5, JOHNSON 00188 and 000190.)

In August of 2018, Mesa also had a Use-of-Force Review of the Mesa Police Department prepared by the Police Executive Research Forum - PERF. (Exhibit 326.) The report was completed in March of 2019. (Page 5, Mesa/Johnson 2930.) PERF held onsite interviews and focus groups, use of force policy review and analysis, use of force investigations and documentation review of all use-of-force reports from July 2015 through June 2018, professional standards division review, and use of force training review. Their findings are contained within their report pages 6 - 19 as quoted below:

### DPM 1.11.60 Use of Force Board

Recommendation: MPD should ensure its Use of Force Board consistently reviews all uses of force that result in a death, as well as force that results in serious bodily harm. MPD should revise "DPM 1.11.60 Use of Force Board" to include language on how frequently the board meets, the membership of the board, the term of members on the board, and the scope of the board's review.

"Recommendation: MPD should ensure that critical incident cases are reviewed by the Use of Force Board as expeditiously as possible upon closure of the investigation. Cases should not be allowed to languish. In addition, the review board should meet within 24 to 48 hours following an

officer involved shooting or in custody death to ensure there is not an obvious policy, training, and equipment issue that needs to be immediately rectified. The review board should be briefed by investigators regarding the facts of the case known at that time to ensure that no immediate changes to policy, training, or equipment are necessary. The review board should present all findings and recommendations to the chief of police.

## DPM 2.1.1 Use of Force Philosophy and Definitions

Recommendation: MPD should replace current references "deadly force" to "lethal force," and should change references to "non deadly force" to "less lethal" force. These terms reflect the fact that while some weapons are designed to be less lethal than firearms, they sometimes do result in death. Related agency policies should also be reviewed to ensure that all references to "deadly" force are replaced with "lethal" force, and "non deadly" is changed to "less lethal."

"Recommendation: MPD should add a definition of "Proportionality" to this section. As explained in PERF's report on Guiding Principles of Use on Force, the definition should state that proportionality involves officers: (1) using only the level of force necessary to mitigate the threat and safely achieve lawful objectives; (2) considering, if appropriate, alternate force options that are less likely to result in injury but will allow officers to achieve lawful objectives; and (3)considering the appropriateness of officers' actions. The concept of proportionality does not mean that officers, at the moment they have determined that a particular use of force is necessary and appropriate to mitigate a threat, should stop and consider how their actions will be viewed by others. Rather, officers should begin considering what might be appropriate and proportional as they approach an incident, and they should keep this consideration in their minds as they are assessing the situation and deciding how to respond. Proportionality also considers the nature and severity of the underlying events.

Recommendation: MPD should add a definition of "De escalation" to this section. The definition should emphasize proportionality, the use of distance and cover, tactical repositioning, "slowing down" situations that do not pose an immediate threat, calling for supervisors and other resources, and similar actions and tactics.

Recommendation: MPD should add a definition of the duty to intervene. This definition should include the following language: "Officers have a

duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."

**Special Order #2018 001 DPM 2.1.2 Use of Force**

Special Order #2018 001 DPM 2.1.2 Section: B. Policy Statement

Recommendation:  MPD should add a sentence emphasizing the sanctity of human life as a core value in its use of force policy.  For example, the Baltimore Police Department's use of force  policy states: "The policy of the Baltimore Police Department is to value and preserve human life in all situations."

Recommendation:  In addition to adding the definition of "duty to intervene" as mentioned above, MPD should include a statement creating a duty to intervene in instances where force is not being used appropriately. This statement should contain the following language: "Officers have a duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."

Recommendation:  MPD should include an overview of "proportionality" in this section, in addition to including the full definition in DPM 2.1.1 Use of Force Philosophy and Definitions. Specifically, officers should be using the test of proportionality to determine if force is appropriate.

**DPM. 2.1.5 Use of Force**

DPM 2.1.5 Section: 3. Definitions

Recommendation:  MPD should replace current references to "deadly force" and "non deadly force" with the more precise and correct terms "lethal force" and "less lethal force".

Recommendation:  MPD should combine "strikes" and "limited strikes" into one category. Currently, both definitions refer to a hands on approach, and there is little utility in keeping these two categories separate.

Recommendation:  PERF has traditionally recommended the prohibition of any type of neck restraint, such as MPD's Carotid Control Technique, due to the limited occasions in which it is necessary/required, and the extensive

training and skill required to perform it safely and effectively. Should MPD decide to continue the use of the Carotid Control Technique, MPD should ensure that it remains authorized at the level of lethal force, as is current practice, and that all officers are trained and tested yearly on the Carotid Control Technique.

MPD should also remove the following language from the current definition, because it does not specify a situation in which lethal force would be justified: "When a subject is actively assaulting an officer or another person and other control methods have been exhausted or the officer reasonably believes other methods would be ineffective." This scenario may present confusion for members of the department as it conflicts with the directive in current policy that the Carotid Control Technique be considered a lethal force option.

**DPM 2.1.5 Section: 4. Use of Force Factors**

Recommendation: MPD should consider strengthening its policy by adding language to this section that more clearly defines the basis for using force. This language should go beyond the minimum legal standard established in the U.S. Supreme Court decision Graham v. Connor (1989), and should reflect key concepts such as de escalation and proportionality. These concepts should also be incorporated into all MPD's policies, practices, and training on use of force.

**DPM 2.1.45 Section: 2. Non Deadly Force Police Incidents**

Recommendation: MPD should state in policy that supervisors should respond to the scene of ALL reportable uses of force to conduct the initial investigation. Supervisors should also be dispatched to all incidents where it is anticipated that force might be used.

Recommendation: MPD should add a requirement that supervisors immediately respond to any scene: where a weapon (including a firearm, edged weapon, rocks, or other improvised weapons) is reported; where a person experiencing a mental health crisis is reported; or where a dispatcher or other member of the department believes there is potential for significant use of force.

Recommendation: MPD should ensure that Blue Team reports (the

software MPD uses to record use of force incidents) include a thorough description of the incident in question, including the names of the officers and subjects involved, the circumstances surrounding the use of force, and the result of the force used. Sergeants should also document the steps of the investigative process, including who was interviewed and what materials were reviewed. Finally, the sergeants should document the findings of their review in the Blue Team system.

Recommendation: MPD should require that each individual involved in the routing process documents the steps taken in reviewing the use of force report, and that each individual states his or her agreement or disagreement with the findings of the investigating supervisor.

**MPD action taken:**

The September 2018 update to DPM 2.1.45 Use of Force Reporting Protocols specifies the expected documentation requirements for sergeants and lieutenants.

- Moving forward, sergeants now must make one of two possible determinations: "No issues identified after initial review" or "Additional Review Required" by a senior officer. Upon making either determination, sergeants must include a statement indicating the factors that led them to the stated conclusion.
- Lieutenants must also conduct an investigation of the facts of the incident and make a determination as to whether any issues were identified following the initial review and if additional review is needed. If no issues are identified, lieutenants must include their final comments on the use of force incident and forward the file to the Training Section. If additional review is needed, the Blue Team file is to be forwarded to the appropriate Division commander, with the Advanced Training Lieutenant copied.

**Data Review**

PERF's review of electronic data exported from 1610 use of force reports captured from July 2015 June 2018 showed that, although use of force reports have increased slightly over the last three years, a relatively small number of MPD officers were involved in those incidents. PERF also electronically reviewed a smaller sample of full Blue Team reports to

analyze the location of strikes.  PERF's review found that 52% of the strikes identified in the sample were to the face, head, or neck, demonstrating that recent policy changes made by MPD leaders limiting the use of strikes to the face, head, or neck were necessary.

Recommendation: MPD should merge "strikes" and "limited strikes" into a single category.  Combining the categories will improve the accountability process by making it easier for supervisors to track the location of strikes under one category.

Recommendation:  MPD should state clearly in policy that strikes to the face should only be utilized when the circumstances warrant such action. Officers should be trained on this policy update.

**MPD action taken:**

In Special Order # 2018 001 in relation to DPM 2.1.2, effective June 2018, it was clarified that face, head, and neck strikes are prohibited absent active aggression/aggravated active aggression.

Recommendation: MPD should make substation commanders and supervisors (sergeants and above) aware of the findings in this report in a briefing or in service training. Supervisors should continue to track use of force involving officers under their command and should use these findings to determine whether additional training is needed. Supervisors should also be tasked with ensuring that current policies are followed in the field.

**Use of Force Training**

In addition to reviewing MPD's current training, PERF also provided a train the trainer seminar to assist MPD in the implementation of PERF's Integrating Communications, Assessment, and Tactics (ICAT) training.

Recommendation: MPD should, as a general matter, evaluate instructors regularly to ensure that training is being implemented in a consistent manner. With respect to ICAT, which is a new type of training developed just two years ago, senior leaders in MPD's academy should sit in on classes to personally observe the instruction of ICAT and ensure that training is presented in the manner intended by MPD command.
Recommendation: MPD should involve the Training Section in the policy

making process when it is expected that training will need to be altered in accordance with the new policy directive(s).

Recommendation: MPD should require sergeants and lieutenants to monitor the implementation of training in the field. If officers are not in compliance with training, sergeants and lieutenants should intervene and correct the behavior immediately. Supervisors should be held accountable if these corrective measures are not taken.

Recommendation: MPD should stipulate in DPM 2.1.45, Use of Force Reporting Protocols, that the Training Section should monitor trends and emerging issues by tracking data found in use of force complaints. Specifically, the Training Section should monitor the types of force being used and the reasons for use of force. This review will allow instructors to identify needs for future training sessions.

**Improving Officers' Experiences**

Recommendation: MPD should, to increase accountability, revisit its current bidding process for squad assignments to ensure that supervisors do not remain in a particular squad for an extended period of time. Doing so will expose officers to different supervisory styles among the sergeants and lieutenants.

Recommendation: MPD should commend officers who demonstrate appropriate use of force or restraint in accordance with department policy and who practice de escalation techniques in the field.

The Study Noted:

PERF's recent work regarding use of force has focused largely on police encounters with persons who are behaving erratically or dangerously due to a mental illness, a developmental disability, or another condition that prevents them from understanding and obeying orders from law enforcement. PERF also has focused on incidents involving individuals who either are unarmed, or are armed only with an edged weapon, a rock, or other weapon other than a firearm. In 30 percent of the 990 fatal officer involved shootings across the country in 2015, the subjects either were unarmed or were armed with a weapon other than a firearm.

It is these types of incidents where PERF believes there is the greatest potential for de escalation and increasing the safety of everyone involved, including officers, by teaching officers to "slow the situation down," to bring additional resources to the scene, and to use communications skills and operational safety tactics to resolve the incident with minimal use of force. In situations where criminal suspects are brandishing firearms, officers have fewer options for how they can respond, and use of lethal force is more likely.

PERF's report, Re Engineering Training on Police Use of Force, documents findings from the conference as well as from a 2015 PERF survey of law enforcement agencies that examined the use of force training provided to officers in the academy and in service. The survey found that use of force training in many agencies was primarily focused on firearms and defensive tactics training, while training on topics such as de escalation, communication, and crisis intervention was far less common. Participants at the meeting agreed that agencies should supplement firearms and defensive tactics training with additional training on under represented topics, and that training on de escalation and crisis intervention should be integrated into a comprehensive training program, rather than "siloed" from other subjects. In this regard, the PERF report stated:

**DPM 1.11.60 Use of Force Board**

Although MPD historically has had a use of force board, many of the interviewees during PERF's site visit stated that it is not effective and does not provide appropriate oversight of the department's use of force. During the site visit, there was support among MPD officials for changes to the current use of force board to improve its utility as an accountability mechanism.

Current MPD policy broadly outlines the objectives of the use of force review board and when the board should meet. Section 2. General Guidelines states the following:

The Use of Force Board reviews Use of Force incidents in an effort to:
• Determine if the use of force complied with Mesa Police Department (MPD) policies.
• Identify training needs in regard to specific tactics, techniques, or procedures.
• Improve the overall officer safety of our members by evaluating the

effectiveness of tactics and techniques.

As stated in policy, the board is to meet as often as necessary. Board members are appointed by the Chief and include: the Human Resources Commander (Chair) and 3 sworn officers above the rank of sergeant. Advisory members, who may include a training lieutenant, policy lieutenant, or other subject matter experts, and two civilians are included on the board as non voting members. An MPD legal advisor also serves with the board to provide legal counsel but is not considered a member.

In setting out a clear use of force philosophy, there are specific tenets that emphasize the sanctity of life of all involved in an incident. These include the idea that force used should be proportional, that officers should attempt to de escalate situations whenever possible, and that officers have a duty to intervene when fellow officers are not acting in accordance with the department's use of force policy. To avoid confusion, the expectations associated with these aspects of the department's philosophy should be fully explained in policy. PERF recommends that the following language be incorporated into MPD's current policy:

Recommendation: MPD should add a definition of "Proportionality" to this section. As explained in PERF's report on Guiding Principles on Use of Force, he definition should state that proportionality involves officers: (1) using only the level of force necessary to mitigate the threat and safely achieve lawful objectives; (2) considering, if appropriate, alternate force options that are less likely to result in injury but will allow officers to achieve lawful objectives; and (3) considering the appropriateness of officers' actions. The concept of proportionality does not mean that officers, at the moment they have determined that a particular use of force is necessary and appropriate to mitigate a threat, should stop and consider how their actions will be viewed by others. Rather, officers should begin considering what might be appropriate and proportional as they approach an incident, and they should keep this consideration in their minds as they are assessing the situation and deciding how to respond. Proportionality also considers the nature and severity of the underlying events.

During the course of PERF's review, it came to the attention of PERF staff members that a training exercised used in the past emphasized strikes to the head. PERF staff members questioned various ere varying responses as to the circumstances of the training exercises, particularly around whether the suspect was demonstrating active or passive resistance, and its impact on

the department's culture, our primary takeaway from these conversations was that there was a clear expectation that a punch to the face was required to stop the threat and end the scenario. In separate interviews, MPD members described this technique as "taking out the computer." Coupled with the national news stories, this training exercise raised concerns about the prevalence of strikes to the face being used in instances that are not allowed per current policy.

Although strikes to the face, head, and neck do not fall under MPD's definition of "limited strikes," PERF analyzed a sample of limited strike reports to determine whether the definitions of force were being used correctly. PERF found that there was some indication that strikes to the face, head or neck were not appropriately labeled: 5% of the limited strikes recorded were to the face, and 2% were to the back of the head. There were no limited strikes directed at the neck recorded in the sample. This indicates that limited strikes are, for the most part, appropriately coded.

As noted in the policy recommendations, however, PERF recommends combining the categories of "strike" and "limited strike." A single definition will make it easier for MPD to accurately track the location of strikes on persons' bodies.



| Location of Strike – Front of Body | Percentage of Total Strikes |
|---|---|
| 1 | 42% |
| 8 | 17% |
| 7 | 6% |
| 2 | 3% |
| 4 | 2% |
| 10 | 1% |
| 12 | 0% |
| 3 | 0% |
| 5 | 0% |

| Location of Strike – Back of Body | Percentage of Total Strikes |
|---|---|
| G | 11% |
| H | 9% |
| A | 7% |
| C | 0% |
| E | 0% |
| I | 0% |
| X | 0% |

*Figure 10 Sample: Location of Strike*

Figure 13 below shows the distribution of the reason for force in reports in the sample that involved a strike to the face, head, or neck.



Figure 13 Sample: Reason for Use of Force - Strikes to Face, Head, Neck

Under MPD policy that took effect on June 7, 2018, strikes to the face, head, or neck should only be utilized when there is a clear need and should only be utilized when the subject is exhibiting "active aggression" or "aggravated active aggression," defined as follows:

Active Aggression – Assault with non deadly physical force. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, attacks with weapons or other actions which present an imminent threat of physical harm to the officer or another. Aggravated Active Aggression – Assault with deadly force. The subject's actions are likely to result in the death or serious bodily harm of the officer, themselves, or another. These actions may include firearm, use of blunt or bladed weapon, and extreme physical force.

Within PERF's sample of cases from July 2015 through June 2018 (nearly all of which occurred before the MPD policy change on June 7, 2018), 52% of reports involving strikes to the face, head, or neck were due to active

aggression and 0% were due to aggravated active aggression. Active
resistance was cited in 38% of reports in the sample as the primary reason
for the use of force, which is not an allowable justification under the current
policy.35

Thus, only 52% of the past cases involving a strike to the face, head, or
neck from would be justified under current policy.

Recommendation: MPD should state clearly in policy that strikes to the face
should only be utilized when the circumstances warrant such action.
Officers should be trained on this policy update.

MPD action taken:  In Special Order # 2018 001 in relation to DPM 2.1.2,
effective June 2018, it was clarified that face, head, and neck strikes are
prohibited absent active aggression/aggravated active aggression.

In PERF's review of MPD use of force reports, a number of important
findings were identified.  A relatively small number of officers are involved
in incidents that require use of force reports, with some apparent outliers
involved in a disproportionate number of reports.  In looking at reports
involving all types of force, incidents tended to involve officers on patrol in
the evening shifts.

These findings were mirrored in the analysis of incidents involving strikes,
which indicates that the use of strikes is not isolated to a particular unit or
situation, and is used throughout the department.  In taking a sample of
these cases, it was found that 52% of strikes were directed at the face, head,
or neck.  The most commonly cited reasons for these strikes were active
aggression and active resistance.  However, active resistance does not
warrant a strike to the face, head, or neck under the current policy and did
not warrant a strike in the previous policy. Moving forward, it will be
important for MPD to ensure that its current policy is enforced throughout
the department.

The second to the last sentence makes the training exercise identified at page 49, in a
particularly bad light, as the training directly conflicted with the policy of not using head
strikes on those who were actively resisting, but not being aggressive.  Pages 57 – 62 of
the PERF evaluation deal with the Professional Standards Division ("PSD").  They note
that use of force incidents may be under-reported.  Pages 57 – 59.  There was discussion
"not to assess the quality of the investigations,  but rather to determine if the correct
terminology and processes were used by the [PSD]".  Page 59.  The report noted that

"MPD's 'Policy Failure' disposition, for example, is a useful way to indicate the need for improvement in a situation in which there was no official misconduct, but the situation showed flaws in current policy."

**Maintenance of Case Files**

During PERF interviews of MPD personnel, we were advised that a large number of personnel files had been purged in 2014, including files containing sustained complaints.  Given the importance of personnel files in monitoring officers throughout their careers and the possibility of future lawsuits, PERF recommends that MPD create a record retention policy specifying when records can be purged.

For example, in New Jersey, the Division of Archives and Records Management requires local police departments to permanently maintain internal affairs investigation files concerning a criminal homicide involving an officer. Incidents resulting in an officer's arrest are to be maintained for 75 years.  The New Jersey guidelines suggest that all other criminal or administrative internal affairs records should be maintained for at least five years, and if the officer involved is still on the force, it is recommended they maintain the records for the duration of that officer's career plus five years.41

Recommendation:  MPD should develop a policy that outlines the circumstances in which personnel files held by the Professional Standards Division can or cannot be purged.  The New Jersey Division of Archives and Records Management policy described above may be one example of how MPD can develop such a system. PERF recommends that this policy include a stipulation that sustained complaints against an officer are held indefinitely.

MPD action taken: MPD has put a halt to the purging of files pending a review of public records laws and existing policy.

While on the site visit, the PERF team heard about a training exercise involving a suspect resisting arrest that could only end when the officer punched the suspect in the head The purpose behind the training exercise appeared to have become distorted between the training and operationally in the field.  Many officers referred to punches to the head as a way to "take out the computer" – i.e., a way to stun suspects who resist an officer's orders.  As seen in the data provided in this report, strikes to the

face have often been used when suspects demonstrated active resistance, which, under current policy, is not justification for a strike to the face. Supervisors should be charged with recognizing and correcting behavior in the field that does not comply with policy.

Recommendation: MPD should require sergeants and lieutenants to monitor the implementation of training in the field. If officers are not in compliance with training, sergeants and lieutenants should intervene and correct the behavior immediately. Supervisors should be held accountable if these corrective measures are not taken.

Although accountability at the first line supervisor level is important, this accountability needs to be seen through all levels of the department up to command staff. Recognizing the issues of accountability, MPD leaders have made significant changes to training leadership and to expectations regarding the department's use of force. These actions have been made to address the use of strikes to the face, head, or neck and to correct previous training on strikes that was misinterpreted in the field.

PERF commends MPD leaders for making the necessary changes, which demonstrates accountability extending to the highest levels of the department. MPD leaders will need to take appropriate steps to continue to support changes that increase accountability. Specifically, Chief Batista can support changes by addressing officers during roll calls and recording videos articulating the reasons behind changes and setting clear expectations for the department.

Jhonte Jones was interviewed on August 22, 2018.

"I do. Um, I feel the force I used was well within policy. Um, and, in essence, in my opinion, I think, uh, the l- the - the force used was pretty much outside of - of - of other tools - um, which I had precluded at the time - uh, were the only things I had at my - at my - at my option. Um, there's probably a million other things that somebody could've - could say I could have done, and I - and I - and maybe I should have done, but at the time, that's all that seemed logical and reasonable to me. Which was to keep him contained to that area and use the - the methods and the means necessary to - to effect the - the custodial detention."

"I began to igni- uh, initiate hard hands or fist strikes to his face. My

target area for those strikes were to the jawline.  Um, the strength of those strikes were about 60%.  Um, I wasn't trying to damage, uh, Mr. Johnson or break anything or any kind of samurai stuff or any crap like that.  I basically trying to create an electrical shock to this - to his, uh, nervous system, along the jawline.  Um, at least enough to get him, you know, unfocused and undetermined, so we can get him to the ground.  Um, it took five strikes, as I'm striking him with those fists, um, targeted - and they all landed about the same area on the - the - the left side of his jaw.  Um, after each strike, he's turning and looking at me. Each strike, he's turning and lookin' at me.  And not a recoil action.  He's actually getting hit, turning - actually physically turning his head and looking back at me.  So at that point, it appeared that the strikes weren't taking effect.  Um, so after the fifth strike and I realized those strikes weren't taking effect, I paused, um, just to assess for - for a second.  And then I obviously, uh - I decided to go to a - a more potent strike, which was the elbow strike.  Which is a little harder, um, than the closed-fist strikes, um, that I was throwing.  My target area for that, also, was gonna be to the jawline.  Um, to create that electrical shock.  Basically, shock the computer.  Um, my intent was not to incapacitate Mr. Johnson.  My intent was to shock the computer.  Basically, create an electrical interruption to get me to be able to dominate him and put him on the ground so we can handcuff him and take him in a more controlled position.  So as I threw the - the elbow, um, obviously, I - I - it appeared to have hit him towards the - the forehead area.  Um, at least, that's what I - what I perceived was the forehead area.  Um, just by the feeling.  It was very hard.  Um, harder than I thought it would be.  It was painful to my elbow, actually.  Um, so it hit him to the forehead area."

This statement by Jones conflicts with the video in which Johnson appears to be unconscious as he slides down the wall as his feet are being pulled by Calderon.  Johnson never raises his hands to the officers.  His description is consistent with the training he received and inconsistent with the law.  Multiple head strikes under these circumstances appear to result from teaching that overwhelming a person who has no known relationship to an event, who is not sitting as fast or as far as an officer would like, does not support any use of force.  Rather, with the overwhelming superiority of officers, a request to sit down all the way with an explanation of why he was being asked to sit (concern for officer safety) and the warning that they considered it serious enough that they would have to force him to sit if he wouldn't do so would have been the most force reasonably necessary.

Additionally, the tactic of freezing the computer or the OODA Loop as it is referred to by Mesa, applies to the officers yelling and swarming Johnson. The imminent threat of three officers approaching while yelling would have the effect of either causing him to protect himself which the officers would have used as an excuse to then use force or to freeze him which would not have helped them to get him on to the ground, but justified the use of force according to the officers. In Jones' words:

> At the time, um, Mr. Johnson did not have the time or opportunity, and that was on purpose. Um, was not given that time or opportunity, um, to launch an offensive, uh, stri- an offensive strike. Um, and I wasn't inclined to allow him the time or opportunity to launch an offensive strike. Um, so if there was any strike that was begun or perceived by anybody else during that time, I'm not sure. But from where I was, uh, engaged with Mr. Johnson, from his left side to the clench to the knee strikes to I- everything else, that was, um, purposefully done not to allow him the option and the time to launch an offensive strike and to bring this - this, uh, detainment to a close as fast as possible.

This "preemptive beating" to keep Mr. Johnson from mounting an imaginary attack is again consistent with the MPD training of using head strikes for the failure to follow instructions quickly enough (passive resistance or at worst active resistance).


**The Early Intervention System (EIS) - Early Warning System (EWS) Necessity;**

Pursuant to the Rodney King beating (on March 1991), and the riot that erupted upon the acquittal of the involved LAPD officers (on April 1992), the City of Los Angeles contracted with Mr. Warren Christopher to provide an in-depth independent evaluation of the factors that caused the riot to occur and the linkage - if any - between the management culture of the LAPD and the obvious animus that existed within the community. His report: *"The Independent Commission on the Los Angeles Police Department,"* produced a seminal study that has changed police management throughout the nation. The report documented a causal linkage between the culture of the LAPD to "look the other way" in their management of line officers. The Report was "blunt," "plainspoken," and unequivocal in its conclusions and recommendations:

- *The failure to control officers who repetitively use excessive force is a management issue that is at the heart of the problem.* (Emphasis added.) The documents and data analyzed by the commission were all available to the Department and the vast majority of the data

analyzed came from that source. The LAPD's failure to analyze and act upon the revealing data evidenced a significant breakdown in the management and leadership of the Department. The report also documented that the existing Police Commission, lacking investigators or other resources, failed in its duty to monitor the Department in the sensitive use of force area.

- The commission stated that the leadership/management of the LAPD must go beyond rhetoric in carrying out its existing policies against excessive force from the Chief of Police on down to the sergeants. This required *taking a firm stand against the 'bad guys' on the force* (Emphasis added.), and employing all the instruments available - training, discipline, assignments, and promotion. It also required monitoring and auditing all available data - patrol car transmissions, use of force reports, and citizen complaints - and then acting on the data., and required comparable efforts to monitor and root out the manifestations of racism and bias.

- The commission required *a new standard of accountability*. (Emphasis added.) Further, that Los Angeles should have a Police Department whose Chief is accountable for the Department's performance, and where ranking officers are responsible for the conduct of those they lead. The Police Commission needed new personnel, more resources, and an enhanced commitment to carrying out its duties under the charter. The commission predicted (and it has held true) that ugly incidents will not diminish until ranking officers know they will be held responsible for what happens in their sector, whether or not they personally participate.

Since the publication of the report, numerous other studies have verified the recommendations and findings as absolutely necessary and accurate. Since the publication of the report, the necessity for a robust EIS-EWS management system has been a part of every competent Law Enforcement agency throughout the nation. For example, the following publication produced a decade later by the Legal & Liability Risk Management Institute illustrates the point:

The Vision that Changed American Policing

Since the late 1970's police departments nationwide have developed Early Intervention Systems (EIS) to monitor individual officers' actions which might be indicative of stress. Stress issues can potentially manifest into

problems on the street. These EIS have become very sophisticated in many agencies with numerous triggers ranging from a minimum of tracking complaints and use of force, to tracking preventable accidents, performance issues and utilization of sick leave to name a few. The Phoenix Police Department and Pittsburgh P.D. are examples of very complex systems, which monitor officers on a daily basis.

It appears, however, that a void exists in most agencies in tracking group behavior of officers assigned to platoons, squads, and even different shifts. This is especially troubling when examined in the context of infamous scandals in recent years involving groups of officers as opposed to individuals who have engaged in serious criminal misconduct, which went undetected for long periods of time. The Miami River Cops, the Washington Dozen, the Rampart scandal, the L.A. Majors, the Buddy Boys, the Dirty Thirty, and the Atlanta 3 represent a small sampling of some of the worst law enforcement scandals in U.S. history, all of which involved groups of officers as opposed to individual officers who went undetected for long periods of time before they were exposed and prosecuted.

For example, if three officers receive one theft complaint each in six months, it might not trigger an alert in an EIS. However, if all three of these officers work on the same squad, it could signal a significant problem which would go undetected in most EIS because they are not structured to identify potential problems involving groups of officers.

Another void which most EIS fail to identify concerns supervisors - For example, if one squad has several officers who are receiving numerous complaints of excessive force, it would be prudent to determine who the squad supervisor is to determine if his action or inaction is a factor. If that same supervisor is transferred to another squad and now that squad is receiving an increase in complaints, it would be important to identify this information in case action is appropriate.

The same would apply to field training officers and training advisors in the academy. If several officers who have been trained by the same FTO become involved in misconduct, it would be important to be aware of that information in case the FTO is contributing to the problem by failing to encourage ethical behavior of trainees he/she is supervising.

The most important lesson we have learned about EIS is that in order to be

successful they have to be fair and credible. False alerts happen on a regular basis and police managers are wise not to over react when an officer becomes identified. The administration must be aware of officers who are engaging in improper behavior as soon as possible in order to protect the public, the department and the officer involved. Law enforcement is a stressful occupation and occasionally an officer or group of officers can destroy the credibility of an entire agency by their misconduct. A functioning EIS, which monitors individual officers, squads, FTO's and supervisors is an important management tool. (http://www.patc.com/weeklyarticles/tracking-group-behavior.shtml www.patc.com)

## Conclusions

Mesa's policies for internal affairs created a system in which the effectiveness and reasonableness of Mesa's use of force policies were not subject to measure or review. Specifically, by ceasing to investigate uses of force and citizen complaints, and by the widespread purging of internal affairs files, Mesa unreasonably created a system in which it was willfully ignorant of the actions of its own officers and incapable of measuring the adequacy or sufficiency of its use of force policies and training.

Mesa's use of force policy was not sufficiently clear regarding when it was appropriate to use head strikes. This was essentially a gap in the policy.
This policy gap was filled with bad training. Specifically, Mesa police were trained that they should use head strikes in two situations where head strikes are not appropriate: (1) as a preventative measure to "take out the computer"; and (2) to gain compliance from uncooperative but non aggressive subjects. This policy gap, combined with improper training, caused the attack on Robert Johnson. The causal relationship is evidenced by the statements of the officers and their supervisors who have stated that they believe they were acting within policy and according to their training. The causal relationship is further evidenced by the conclusion of the officers' supervisors, at the Lieutenant level, who deemed Jhonte Jones' repeated head strikes on Robert to be a "policy failure" rather than excessive force.

The incomplete IA and use of force histories for Officer Jones and Officer Calderon are disturbing and indicative of a department wide problem. For example, Jones was involved in an incident on approximately September 14, 2012 in which he "bumped a male subject with his patrol vehicle…sprayed the subject with capstun (OC spray) and left the scene without following proper departmental protocol." A complaint was initiated against Jones for violating Mesa Police Department ADM 510 (Code of Conduct) #50 Willful disobedience of Department rules or orders; #61 Unnecessary

use of force; #69 Failure to complete written report as directed by policy; and #74 Unsatisfactory performance." Ex. 390. The full scope of Officer Jones' violations is not known because no investigation ever occurred. Instead, Officer Jones admitted to the factual allegations and was allowed to essentially "plea bargain" by admitting only to Unsatisfactory Performance. Officer Jones was given only a written reprimand for what appears to have been a significant incident of officer misconduct.

The fact that Mesa did not fully document or investigate this incident made it impossible for the City of Mesa to perform any form of progressive discipline. Further, by allowing Officer Jones to plead to "unsatisfactory performance" the City of Mesa failed to note or record that this was an allegation of excessive force in which Officer Jones admitted the underlying allegations.

This incident is evidence that Mesa knew that Officer Jones had a history of using excessive force and did nothing about it. Further, this incident is evidence that Mesa's policies and practices for investigating and recording incidents of excessive force failed to document or correct excessive force. In my opinion, events of this sort created a culture of impunity at the City of Mesa that directly caused the attack on Robert Johnson.

I understand that the City of Mesa uses a software suite called IAPro/Blueteam to track complaints, discipline and uses of force involving Mesa Police Officers. IAPro/Blueteam has the ability to send out alerts or "early warnings" regarding officers who use force more than expected or who are subject to a certain number of complaints. The criteria for triggering such alerts is up to the City of Mesa, but Mesa has not released either its criteria for such alerts or any actual alerts that were issued. In my opinion, based on my review of Officer Jones' use of force and complaint history, Officer Jones should have triggered such alerts long before the Robert Johnson incident. Thus, Mesa has either set its IAPro/Blueteam alert criterion too leniently, such that Officer Jones was never flagged; or, Officer Jones did trigger an alert and the City of Mesa has failed to disclose that alert. Thus in my opinion the City of Mesa's policies and practices for tracking problem officers caused the attack on Robert Johnson by failing to identify Officer Jones as a problem officer in need of retraining, other discipline, or, possibly, termination.

A Police Department is a quasi-military organization. The character of the department generally comes from the top down. Scrupulous adherence to the requirements of the Constitution requires constant attention and focus from police chiefs and administrators. If police administrations fail to stress and monitor the stringent rules set forth in the Constitution, lower level officers will take the easy way out which is to place officer safety over all other considerations and use unnecessary force. This type

of behavior creates citizen mistrust which in turn increases the potential for violence. Once that atmosphere is created, it must be immediately dispelled. In my opinion, the conduct of Chief Milstead created just this type of atmosphere, which was a direct cause of the attack on Robert Johnson. My opinions concerning this come from my own background in reducing the violence by the NORSAT unit of the Los Angeles County Sheriff's Office.

The reaction of Mesa Police Officers to Chief Batista's public criticism of the officers involved in this matter indicate to me that Mesa has an entrenched custom and practice of violence instilled by Chief Milstead and his administration. Chief Milstead's instructions to his officers to purge their files was an indication to them that their past would be erased by the department. This indicates a willingness to accept bad conduct which in turn causes bad conduct like the assault on Robert Johnson.

It is also my opinion that the policies of allowing head strikes and the training regarding the use of head strikes for nonviolent but uncooperative people was objectively unreasonable in that it encourage the premature use of force, which amounts to excessive force.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by

the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit

known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047.  I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*  (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD.  My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).  The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013).  The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012).  The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported

argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.*, Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135-SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al*, D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children," pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v.*

*City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in *Heleine Tchayou, et al. v. City of Los Angeles, et al.*, Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al.,* Case No. 3:16-cv-00236 BAS-NLS.  There are many others.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 4, 2020 at Santee, CA.


Roger A. Clark

**EXHIBIT A**

**List of Materials Provided**

- Plaintiff's First Amended Complaint
- Plaintiff's First Set of Discovery Responses to Defendants and responses thereto
- Plaintiff's 12th Supplemental MIDP Responses and the following exhibits:

1. Audio recording - 911 call (Johnson/Mesa Johnson/Mesa 000001)
2. Audio recording - Radio Central (Johnson/Mesa 000002)
3. Audio recording – Radio Hot (Johnson/Mesa 000003)
4. Recording Authentication by Okabe (Johnson/Mesa 000004)
5. Mesa Police Communications Audio CD (Johnson/Mesa 000005)
6. Radio Catalog Report 5/23/2019 Central (Johnson/Mesa 000006)
7. Radio Catalog Report 5/23/2018 Hot (Johnson/Mesa 000007-000008)
8. Radio Catalog Report 5/24/2018 Hot (Johnson/Mesa 000009)
9. CAD History (Johnson/Mesa 000010-000017)
10. Video Recording – AXON 1 Wilcox (Johnson/Mesa 000018)
11. Video Recording – AXON 2 Calderon (Johnson/Mesa 000019)
12. Video Recording – AXON 3 Bridges (Johnson/Mesa 000020)
13. Video Recording – AXON 4 Monarrez (Johnson/Mesa 000021)
14. Video Recording – AXON 5 Jones (Johnson/Mesa 000022)
15. Video Recording – AXON 6 Wilcox (Johnson/Mesa 000023)
16. Video Recording – AXON 7 Calderon (Johnson/Mesa 000024)
17. Video Recording – AXON 8 Jones (Johnson/Mesa 000025)
18. Incident/Investigation Report by Jones (Johnson/Mesa 000026-000036)
19. Supplement by Gambee (Johnson/Mesa 000037-000038)
20. Supplement by Monarrez (Johnson/Mesa 000039-000040)
21. Field Processing Report by Petrova (Johnson/Mesa 000041-000044)
22. Photographs of Robert Johnson by Petrova (Johnson/Mesa 000045-000129)
23. Victim Rights Request Form for Luevano (Reyes) (Johnson/Mesa 000130)
24. Victim Rights Request Form for Luevano (Johnson) (Johnson/Mesa 000131)
25. Impound Record by Jones (Reyes) (Johnson/Mesa 000132)
26. Chain of Custody Signature Form (Reyes) (Johnson/Mesa 000133)
27. Mesa Arrest/Booking Record (Johnson/Mesa 000134)
28. Mesa Booking Checklist (Johnson/Mesa 000135)
29. Health Questionnaire Receiving Form (Johnson/Mesa 000136)
30. Prisoner Property Inventory Form (Johnson/Mesa 000137)
31. Victim Rights Request Form for Luevano (Johnson) (Johnson/Mesa 000138)
32. Mesa Municipal Court Release Conditions (Johnson/Mesa 000139)
33. Release Questionnaire (Johnson/Mesa 000140-000142)
34. Use of Force Report UOF2018-205 (Johnson/Mesa 000143-000149)
35. DPM 2.1.1 Use of Force Philosophy & Definitions, 11/29/2012 (Johnson/Mesa 000150-000153)
36. DPM 2.1.5 Use of Force, 1/4/2013 (Johnson/Mesa 000154-000158)
37. DPM 2.1.45 Use of Force Reporting Protocols, 5/19/2017 (Johnson/Mesa 000159-000163)

38. DPM 2.2.10 Search of Person – Consent/Incident to Arrest, 8/26/2013 (Johnson/Mesa 000164-000165)

39. DPM 2.2.15 Search of Person – Other, 7/8/2016 (Johnson/Mesa 000166-000167)

40. DPM 2.2.5 Search of Person – Frisk, 8/26/2013 (Johnson/Mesa 000168-000169)

41. DPM 2.4.15 Arrest Procedures – General, 2/7/2013 (Johnson/Mesa 000170-000181)

42. DPM 2.4.5 Person Detentions, 8/26/2013 (Johnson/Mesa 000182-000183)

43. DPM 2.4.65 Restraining Prisoners, 10/13/2017 (Johnson/Mesa 000184-000185)

44. Romley Report re Professional Standards Investigation, 10/22/2018 (Johnson/Mesa 000186-000191)

59. Scottsdale Police Incident/Investigation Report No. 18-12563 (JOHNSON 000288-000650)

60. Deposition of Jeff Jacobs, *Krstic v. Gransee*, et al. (JOHNSON 000651-000802)

61. *Off the Cuff* video by former Mesa Police Chief Milstead (JOHNSON 000803)

63. Photographs of Robert Johnson's injuries following assault (JOHNSON 000992-001000)

64. August 2018 photograph of Robert Johnson's back (JOHNSON 001001)

65. April 2019 photograph of Robert Johnson's back (JOHNSON 001002)

68. April 3, 2019 correspondence from Mesa Police Department to Robert Johnson re investigation of officers (JOHNSON 001010)

69. El Rancho Del Sol Apartment Complex Security Camera Footage 1 (Mesa/Johnson 000192)

70. El Rancho Del Sol Apartment Complex Security Camera Footage 2 (Mesa/Johnson 000193)

71. Jhonte Jones Training Matrix (Mesa/Johnson 000198-000223)

72. Ernesto Calderon Training Matrix (Mesa/Johnson 000224-000261)

73. Rudy Monarrez Training Matrix (Mesa/Johnson 000262-000266)

74. MPD Report No. 2018-1410864 (Mesa/Johnson 000267-000272)

75. Bayless Integrated Healthcare billing records (JOHNSON 001011-001015)

76. 3rd Southwest BJJ Classic video of Jhonte Jones (JOHNSON 001016)

77. Mesa Police Scorn Chief's Reforms in Survey Leaked Ahead of 'No Confidence' Vote, Phoenix New Times (May 3, 2019) (JOHNSON 001017-001020)

83. Mesa Police Association Online Survey Toplines, Strategies 360 (March 2019) (JOHNSON 001106-001147)

84. New chief aims to bring stability to Mesa police, East Valley Tribune (July 18, 2010) (JOHNSON 001148-001154)

## PROFESSIONAL STANDARDS CASE FILE (EXHIBITS 85-280)

85. NOI / NOAR / Admonishment – Abbiatti (Mesa/Johnson 000273-000286)

86. NOI / NOAR / Admonishment – Calderon (Mesa/Johnson 000287-000297)

87. NOI / NOAR / Admonishment – Gambee (Mesa/Johnson 000298-000307)

88. NOI / NOAR / Admonishment – Jones (Mesa/Johnson 000308-000318)

89. NOI / NOAR / Admonishment – Monarrez (Mesa/Johnson 000319-000328)

90. NOI / Admonishment – Moore (Mesa/Johnson 000329-000330)

91. NOI / Admonishment – Wahlberg (Mesa/Johnson 000331-000332)

92. Admonishments (Mesa/Johnson 000333-000351)

93. Officer History – Abbiatti (Mesa/Johnson 000352-000356)

94. Officer History – Calderon (Mesa/Johnson 000357-000362)
95. Officer History – Gambee (Mesa/Johnson 000363-000365)
96. Officer History – Jones (Mesa/Johnson 000366-000370)
97. Officer History – Monarrez (Mesa/Johnson 000371-000372)
98. Officer History – Moore (Mesa/Johnson 000373-000375)
99. Officer History – Wahlberg (Mesa/Johnson 000376-000377)
100. Investigative Memo PS#2018-085 – Sergeant Coon (Mesa/Johnson 000378-000457)
101. Citizen Complaint Letter from Robert Johnson (Mesa/Johnson 000458-000465)
102. CAD 20181430828 (Mesa/Johnson 000466-000473)
103. DR 2018144023 (Mesa/Johnson 000474-000490)
104. CAD 20181440023 (Mesa/Johnson 000491-000493)
105. Forensic Report 20181430828 (Mesa/Johnson 000494-000497)
106. Use of Force Report 2018-205 (Mesa/Johnson 000498-000505)
107. Timecard – Moore (Mesa/Johnson 000506)
108. Timecard – Wahlberg (Mesa/Johnson 000507)
109. Email – Wahlberg (Mesa/Johnson 000508)
110. AXON Inventory – Calderon (Mesa/Johnson 000509)
111. AXON Inventory – Jones (Mesa/Johnson 000510)
112. AXON Audit Lot – Bridges (Mesa/Johnson 000511-000514)
113. AXON Audit Log – Calderon (Mesa/Johnson 000515-000517)
114. AXON Audit Log – Calderon (Mesa/Johnson 000518-000519)
115. AXON Audit Log – Jones (Mesa/Johnson 000520-000521)
116. AXON Audit Log – Jones (Mesa/Johnson 000522-000523)
117. AXON Audit Log – Monarrez (Mesa/Johnson 000524-000526)
118. AXON Audit Log – Wilcox (Mesa/Johnson 000527-000528)
119. AXON Audit Log – Wilcox (Mesa/Johnson 000529-000530)
120. Daily Observation Report – Gambee (Mesa/Johnson 000531-000532)
121. BARS Report Booking 622624 R. Johnson (Mesa/Johnson 000533-000543)
122. Mesa City Court 2018037712 (Mesa/Johnson 000544-000546)
124. Canvass Checklist (Mesa/Johnson 000562)
125. Canvass Results Spreadsheet (Mesa/Johnson 000563-000564)
126. Canvass Fliers (Mesa/Johnson 000565-000741)
127. DPM 1.1.1 Chapter Definitions (Mesa/Johnson 000742-000746)
128. DPM 1.4.1 Professional Standards Chapter Definitions (Mesa/Johnson 000747-000755)
129. DPM 1.4.5 Code of Conduct (Mesa/Johnson 000756-000763)
130. DPM 2.1.1 Use of Force Philosophy & Definitions (Mesa/Johnson 000000764-000766)
131. DPM 2.1.5 Use of Force (Mesa/Johnson 000767-000771)
132. DPM 2.1.45 Use of Force Reporting Protocols (Mesa/Johnson 000772-000774)
133. DPM 2.4.5 Person Detentions (Mesa/Johnson 000775-000776)
134. DPM 2.2.5 Search of Person – Frisk (Mesa/Johnson 000777-000778)
135. DPM 2.4.15 Arrest Procedures – General (Mesa/Johnson 000779-000789)
136. DPM 2.4.65 Restraining Prisoners (Mesa/Johnson 000790-000791)
137. DPM 2.4.75 Prisoners – Sick or Injured (Mesa/Johnson 000792-000797)
138. DPM 3.4.35 On-Officer Body Camera Program (Mesa/Johnson 000798-000804)
139. DPM 1.1.10 Chain of Command and Obeying Orders (Mesa/Johnson 000805-000809)
140. DPM 1.5.5 Training Protocols (Mesa/Johnson 000810-000816)

141. DPM 1.5.15 Member Training (Mesa/Johnson 000817-000823)
142. STE 1.2 Duties & Responsibilities (Mesa/Johnson 000824-000829)
143. Training Matrix – Calderon (Mesa/Johnson 000830-866)
144. Training Matrix – Gambee (Mesa/Johnson 000867-000886)
145. Training Matrix – Jones (Mesa/Johnson 000887-000911)
146. Training Matrix – Monarrez (Mesa/Johnson 000912-000915)
147. Jones Training Requests – Jones (Mesa/Johnson 000916-000918)
148. AZPOST DT Manual 2017 (Mesa/Johnson 000919-001349)
149. AZPOST Lesson Plan Use of Force Policy Review/Scenarios 2014 (Mesa/Johnson 0001350-001386)
150. AZPOST Lesson Plan Incident De-Escalation & Tactics 2016 (Mesa/Johnson 001387-001468)
151. AZPOST Lesson Plan Squad Operations Tactics Training 2017 (Mesa/Johnson 001469-001510)
152. Interview Transcript – Robert Johnson (Mesa/Johnson 001511-001527)
153. Interview Transcript – Linda Hardy (Mesa/Johnson 001528-001554)
154. Interview Transcript – Christina Johnson (Mesa/Johnson 001555-001561)
155. Interview Transcript Darnell Johnson & Jennifer Pavkov (Mesa/Johnson 001562-001575)
156. Interview Transcript – Jerry Leland (Mesa/Johnson 001576-001584)
157. Interview Transcript – Bridges (Mesa/Johnson 001585-001604)
158. Interview Transcript – Wilcox (Mesa/Johnson 001605-001616)
159. Interview Transcript - Pugh (Mesa/Johnson 001617-001619)
160. Interview Transcript - Petrova (Mesa/Johnson 001620-001623)
161. Interview Transcript - Abbiatti (Mesa/Johnson 001624-001652)
162. Interview Transcript - Calderon (Mesa/Johnson 001653-001683)
163. Interview Transcript - Gambee (Mesa/Johnson 001684-001711)
164. Interview Transcript - Jones (Mesa/Johnson 001712-001756)
165. Interview Transcript - Monarrez (Mesa/Johnson 001757-001790)
166. Interview Transcript - Moore (Mesa/Johnson 001791-001813)
167. Interview Transcript - Wahlberg (Mesa/Johnson 001814-001824)
168. Scottsdale PD DR 18-12563 (Mesa/Johnson 001825-002135)
169. Scottsdale Case Review PowerPoint (Mesa/Johnson 00002136-002216)
170. Medical Records from Scottsdale PD (Mesa/Johnson 002217-002354)
171. Evaluation by John McMahon & Associates (Mesa/Johnson 002355-002383)
172. Supervisor Evaluation by John McMahon & Associates (Mesa/Johnson 002384-002392)
173. 911 Audio Recording & Communication Record (Mesa/Johnson 002393)
174. Audio 01 – 20181430828a (Mesa/Johnson 002394)
175. Audio 02 – 20181430828b (Mesa/Johnson 002395)
176. Audio 03 - 201814308228c (Mesa/Johnson 002396)
177. DVD AXON Recordings (Mesa/Johnson 002397)
178. DVD El Rancho Del Sol Surveillance Video Disc #1 (Mesa/Johnson 002398)
179. DVD El Rancho Del Sol Surveillance Video Disc #2 (Mesa/Johnson 002399)
180. DVD Canvass Interview Recordings (Mesa/Johnson 002400)
181. Video 701 E. Main – Coon & Steffa ATC Follow Up (Mesa/Johnson 00002401)
182. Video 701 E. Main – Coon & Rash Canvass (Mesa/Johnson 002402)
183. Video 701 E. Main – Denning & Steffa Canvass (Mesa/Johnson 002403)

184. Video 701 E. Main – Stegenga & Brown Canvass (Mesa/Johnson 002404)
185. Video 701 E. Main #308 – Coon & Rash ATC Follow Up (Mesa/Johnson 002405)
186. Video 701 E. Main #308 – Coon & Steffa ATC Follow Up (Mesa/Johnson 002406)
187. Video ███████████ – Coon Follow Up with Brittany Stegall (Mesa/Johnson 002407)
188. Injury Photographs or Robert Johnson 05/24/18 (Mesa/Johnson 002408)
189. Injury Photographs of Robert Johnson 08/15/18 (Mesa/Johnson 002409)
190. Photographs (Mesa/Johnson 002410-002415)
191. Audio Recorded Interviews PS#2018-085 (Mesa/Johnson 002416)
192. Audio Interview Abbiatti (Mesa/Johnson 002417)
193. Audio Interview Abbiatti (Mesa/Johnson 002418)
194. Audio Interview Calderon (Mesa/Johnson 002419)
195. Audio Interview Christina Johnson (Mesa/Johnson 002420)
196. Audio Interview Wilcox (Mesa/Johnson 002421)
197. Audio Interview Petrova (Mesa/Johnson 002422)
198. Audio Interview Bridges (Mesa/Johnson 002423)
199. Audio Interview Gambee (Mesa/Johnson 002424)
200. Audio Interview Jerry Leland (Mesa/Johnson 002425)
201. Audio Interview Jones (Mesa/Johnson 002426)
202. Audio Interview Linda Hardy (Mesa/Johnson 002427)
203. Audio Interview Monarrez (Mesa/Johnson 002428)
204. Audio Interview Moore (Mesa/Johnson 002429)
205. Audio Interview Pugh (Mesa/Johnson 002430)
206. Audio Interview Robert Johnson (Mesa/Johnson 002431)
207. Audio Interview Wahlberg (Mesa/Johnson 002432)
208. Audio Recorded Interviews Scottsdale PD (Mesa/Johnson 002433)
209. Audio ATC E. Reyes Phoenix (Mesa/Johnson 002434)
210. Audio ATC E. Reyes Tempe Apt. 1 (Mesa/Johnson 002435)
211. Audio ATC E. Reyes Tempe Apt 2. (Mesa/Johnson 002436)
212. Audio Interview Brittany Reid Stegall (Mesa/Johnson 002437)
213. Audio Celtic Property Management (Mesa/Johnson 002438)
214. Audio Interview Christina Johnson (Mesa/Johnson 002439)
215. Audio Interview Darnell Johnson (Mesa/Johnson 002440)
216. Audio Interview FAC Detective Gambee (Mesa/Johnson 002441)
217. Audio Contact El Rancho Apartment (Mesa/Johnson 002442)
218. Audio Interview Jennifer Pavkov (Mesa/Johnson 002443)
219. Audio Interview Jerry Leland (Mesa/Johnson 002444)
220. Audio Interview Linda Hardy (1) (Mesa/Johnson 002445)
221. Audio Interview Linda Hardy (2) (Mesa/Johnson 002446)
222. Audio Interview FAC Officer Bridges (Mesa/Johnson 002447)
223. Audio Interview FAC Officer Wilcox (Mesa/Johnson 002448)
224. Audio Interview Pastor Andre Miller Pastor (Mesa/Johnson 002449)
225. Audio Interview Robert Johnson (Mesa/Johnson 002450)
226. Audio Interview Sergeant Abbiatti (Mesa/Johnson 002451)
227. Audio Interview Susan Johnson (Mesa/Johnson 002452)
228. Professional Standards Case Review (Mesa/Johnson 002453)
229. Romley Report (Mesa/Johnson 002454-2459)

230. Recommendation Memo – Lieutenant Higbee (Mesa/Johnson 002460-2514)
231. Findings Memo – Commander Quesada (Mesa/Johnson 002515-002517)
232. Rebuttal Notice – Abbiatti (Mesa/Johnson 002518-002519)
233. Rebuttal Notice – Calderon (Mesa/Johnson 002520-002521)
234. Rebuttal Notice – Gambee (Mesa/Johnson 002522-002523)
235. Rebuttal Notice - Jones (Mesa/Johnson 002524-002525)
236. Rebuttal Notice – Monarrez (Mesa/Johnson 002526-002527)
237. Rebuttal Notice – Moore (Mesa/Johnson 002528-002529)
238. Rebuttal Notice – Wahlberg (Mesa/Johnson 002530-002531)
239. Rebuttal Memo – Wahlberg (Mesa/Johnson 002532-002534)
240. Rebuttal Memo – Moore (Mesa/Johnson 002535-002541)
241. Rebuttal Extension Memo – Calderon (Mesa/Johnson 002542)
242. Rebuttal Extension Memo – Jones (Mesa/Johnson 002543)
243. Rebuttal Extension Memo – Monarrez (Mesa/Johnson 002544)
244. Rebuttal Extension Approval – Calderon (Mesa/Johnson 002545)
245. Rebuttal Extension Approval – Calderon (Mesa/Johnson 002546)
246. Rebuttal Extension Approval – Jones (Mesa/Johnson 002547)
247. Rebuttal Extension Approval – Jones (Mesa/Johnson 002548)
248. Rebuttal Extension Approval – Monarrez (Mesa/Johnson 002549)
249. Rebuttal Memo – Gambee (Mesa/Johnson 002550-002551)
250. Rebuttal Memo – Jones (Mesa/Johnson 002552-002553)
251. Rebuttal Memo – Monarrez (Mesa/Johnson 002554-002556)
252. Extension Request – Commander Quesada (Mesa/Johnson 002557-002558)
253. Extension Approval – Assistant Chief Cost (Mesa/Johnson 002559)
254. Final Summary Memo – Commander Quesada (Mesa/Johnson 002560-002578)
255. Pre-Deprivation Notice – Abbiatti (Mesa/Johnson 002579-002580)
256. Pre-Deprivation Notice – Calderon (Mesa/Johnson 002581-002582)
257. Pre-Deprivation Notice – Jones (Mesa/Johnson 002583-002584)
258. Audio Pre-Deprivation Hearing – Calderon (Mesa/Johnson 002585)
259. Audio Pre-Deprivation Hearing – Abbiatti (Mesa/Johnson 002586)
260. Audio Pre-Deprivation Hearing – Jones (Mesa/Johnson 002587)
261. Final Summary & Recommendations Memo – Assistant Chief Cost (Mesa/Johnson 002588-002593)
262. Corrective Action Plan – Jones (Mesa/Johnson 002594-002596)
263. Final Notification Email – Abbiatti (Mesa/Johnson 002597)
264. Final Notification Email – Calderon (Mesa/Johnson 002598-002599)
265. Final Notification Email – Gambee (Mesa/Johnson 002600-002601)
266. Final Notification Email – Jones (Mesa/Johnson 002602)
267. Final Notification Email – Monarrez (Mesa/Johnson 002603)
268. Final Notification Email – Moore (Mesa/Johnson 002604)
269. Final Notification Email – Wahlberg (Mesa/Johnson 002605)
270. Final Signed NOI - Abbiatti (Mesa/Johnson 002606-002608)
271. Final Signed NOI – Calderon (Mesa/Johnson 002609-002612)
272. Final Signed NOI – Gambee (Mesa/Johnson 002613-002615)
273. Final Signed NOI – Jones (Mesa/Johnson 002616-002618)
274. Final Signed NOI – Monarrez (Mesa/Johnson 002619-002621)

275. Final Signed NOI – Moore (Mesa/Johnson 002622-002624)
276. Final Signed NOI – Wahlberg (Mesa/Johnson 002625-002627)
277. Final Signed Notice of Suspension – Calderon (Mesa/Johnson 002628-002629)
278. Final Signed Notice of Suspension – Jones (Mesa/Johnson 002630-002631)
279. Final Signed Written Reprimand – Monarrez (Mesa/Johnson 002632-002633)
280. Letter to Complainant Robert Johnson (Mesa/Johnson 002634)
283. MPD Report No. 2010-0280813 (JOHNSON 001181-001373)
284. MPD Report No. 2015-1320838 (JOHNSON 001374-001602)
285. UOF2013-005 re Calderon (Mesa-Johnson 002722-002727)
286. UOF2014-056 re Calderon (Mesa-Johnson 002728-002732)
287. UOF2014391 re Calderon (Mesa-Johnson 002733-002739)
288. UOF2014-315 re Calderon (Mesa-Johnson 002740-002745)
289. UOF2016-095 re Calderon (Mesa-Johnson 002746-002749)
290. UOF2016-122 re Calderon (Mesa-Johnson 002750-002760)
291. UOF2016-138 re Calderon (Mesa-Johnson 002761-002764)
292. UOF2016-158 re Calderon (Mesa-Johnson 002765-002768)
293. UOF2016-215 re Calderon (Mesa-Johnson 002769-002771)
294. UOF2016-220 re Calderon (Mesa-Johnson 002772-002777)
295. UOF2016-352 re Calderon (Mesa-Johnson 002778-002782)
296. UOF2016-480 re Calderon (Mesa-Johnson 002783-002787)
297. UOF2016-504 re Calderon (Mesa-Johnson 002788-002792)
298. UOF2017-030 re Calderon (Mesa-Johnson 002793-002796)
299. UOF2017-041 re Calderon (Mesa-Johnson 002797-002802)
300. UOF2017-284 re Calderon (Mesa-Johnson 002803-002810)
301. UOF2017-285 re Calderon (Mesa-Johnson 002811-002814)
302. UOF2017-323 re Calderon (Mesa-Johnson 002815-002820)
303. UOF2017-418 re Calderon (Mesa-Johnson 002821-002825)
304. UOF2017-529 re Calderon (Mesa-Johnson 002826-002829)
305. UOF2017-546 re Calderon (Mesa-Johnson 002830-002833)
306. UOF2017-547 re Calderon (Mesa-Johnson 002834-002839)
307. UOF2018-027 re Calderon (Mesa-Johnson 002840-002844)
308. UOF2018-072 re Calderon (Mesa-Johnson 002845-002848)
309. UOF2012-011 re Jones (Mesa-Johnson 002849-002852)
310. UOF2013-054 re Jones (Mesa-Johnson 002853-002859)
311. UOF2013-105 re Jones (Mesa-Johnson 002860-002863)
312. UOF2013-120 re Jones (Mesa-Johnson 002864-002869)
313. UOF2014-017 re Jones (Mesa-Johnson 002870-002873)
314. UOF2014-035 re Jones (Mesa-Johnson 002874-002878)
315. UOF2014-279 re Jones (Mesa-Johnson 002879-002884)
316. UOF2014-348 re Jones (Mesa-Johnson 002885-002888)
317. UOF2015-140 re Jones (Mesa-Johnson 002889-002893)
318. UOF2016-253 re Jones (Mesa-Johnson 002894-002897)
319. UOF2016-274 re Jones (Mesa-Johnson 002898-002902)
320. UOF2017-067 re Jones (Mesa-Johnson 002903-002906)
321. UOF2017-132 re Jones (Mesa-Johnson 002907-002911)
322. UOF2017-255 re Jones (Mesa-Johnson 002912-002918)

323. UOF2017-384 re Jones (Mesa-Johnson 002919-002923)
324. UOF2017-404 re Jones (Mesa-Johnson 002924-002928)
325. UOF2017-412 re Jones (Mesa-Johnson 002929-002933)
326. PERF Use of Force Review of MPD March 2019 (Mesa-Johnson 002934-003007)
327. Rudy Monarrez Workstation File (Mesa-Johnson 003008-003030)
328. Rudy Monarrez Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003031-003039)
329. Rudy Monarrez Personnel File (thru 5-23-2019) (Mesa-Johnson 003040-003096)
330. Ernesto Calderon Workstation File (Mesa-Johnson 003097-003156)
331. Ernesto Calderon Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003157-003167)
332. Ernesto Calderon Personnel File (thru 5-22-2019) (Mesa-Johnson 003168-003407)
333. Jhonte Jones Workstation File (Mesa-Johnson 003408-003475)
334. Jhonte Jones Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003476-003486)
335. Jhonte Jones Personnel File (thru 5-22-2019) (Mesa-Johnson 003487-003602)
337. Rudy Monarrez Chief's File (Mesa-Johnson 003611-003619)
338. Ernesto Calderon Chief's File (Mesa-Johnson 003620-003689)
339. Jhonte Jones Chief's File (Mesa-Johnson 003690-003746)
340. FLD 210 Use of Force, 3/1/2011 (Mesa-Johnson 003747-003754)
341. ADM 600 Use of Force Philosophy & Definitions, 11/29/2012 (Mesa-Johnson 003755-003757)
342. ADM 605 Use of Force, 11/29/2012 (Mesa-Johnson 003758-003762)
343. ADM 640 Use of Force Reporting Protocols, 11/29/2012 (Mesa-Johnson 003763-003764)
344. ADM 605 Use of Force, 12/10/2013 (Mesa-Johnson 003765-003769)
345. ADM 605 Use of Force, 1/4/2013 (Mesa-Johnson 003770-003774)
346. DPM 2.1.5 Use of Force, 8/15/2014 (Mesa-Johnson 003775-003779)
347. DPM 2.1.5 Use of Force, 3/14/2017 (Mesa- Johnson 003780-003784)
348. DPM 2.1.45 Use of Force Reporting Protocols, 5/19/2017 (Mesa-Johnson 003785-003787)
349. DPM 2.1.2 Special Order Use of Force, 6/7/2018 (termination 6/7/2019) (Mesa-Johnson 003788-003791)
350. DPM 2.1.5 Use of Force, 6/7/2018 (Mesa-Johnson 003792-003796)
351. DPM 2.1.45 Use of Force Reporting Protocols, 6/7/2018 (Mesa- Johnson 003797-003801)
352. DPM 2.1.2 Use of Force Philosophy & Definitions, 4/3/2019 (Mesa-Johnson 003802-003805)
353. DPM 2.1.5 Use of Force, 4/3/2019 (Mesa-Johnson 003806-003810)
354. DPM 2.1.45 Use of Force Reporting Protocols, 4/3/2019 (Mesa-Johnson 003811-003817)
355. DPM 2.1.2 Special Order Use of Force, 6/7/2018 (termination 6/7/2020) (Mesa-Johnson 003818-003821)
356. Jones Pre-Deprivation Hearing Transcript (JOHNSON 001665-001672)
357. Batista Settlement and Release Agreement (JOHNSON 001673-001679)
358. Mesa Police Department in the 21st Century (JOHNSON 001680-001795)
359. Final Report of the President's Task Force on 21st Century Policing, May 2015 (JOHNSON 001796-001911)
360. Transcript of Chief Batista's Inaugural Speech (JOHNSON 001912-001917)
361. CD containing Batista press conference (JOHNSON 001918)
362. CD containing Batista's response to Robert Johnson assault (JOHNSON 001919)

363. Scottsdale Police Department's response to subpoena duces tecum (JOHNSON 001920-002316)

    a. Scottsdale Police Incident/Investigation Report No. 18-12563 (JOHNSON 001920-002285)

    b. Photographs of Robert Johnson (JOHNSON 002286-002316)

364. CD containing compilation video of apartment surveillance and AXON videos (JOHNSON 002317)

365. CD containing cell phone video taken by Derek Johnson (JOHNSON 002318)

366. ADM 1410 Internal Affairs, 6-7-2004 (Mesa-Johnson 003822-003829)

367. ADM 1410 Internal Affairs, 2-15-2006 (Mesa-Johnson 003830-003836)

368. ADM 1410 Internal Affairs, 3-1-2011 (Mesa-Johnson 003837-003844)

369. ADM 525 Internal Affairs, 1-6-2012 (Mesa-Johnson 003845-003851)

370. ADM 525 Internal Affairs, 4-5-2012 (Mesa-Johnson 003852-003858)

371. ADM 525 Internal Affairs, 7-1-2013 (Mesa-Johnson 003859-003867)

372. DPM 1.4.25 Internal Affairs, 3-6-2014 (Mesa-Johnson 003868-003878)

373. DPM 1.4.25 Internal Affairs, 7-12-2016 (Mesa-Johnson 003879-003889)

374. DPM 1.4.25 Internal Affairs, 12-7-2014 (Mesa-Johnson 003890-003900)

375. DPM 1.4.25 Professional Standards, 2-8-2018 (Mesa-Johnson 003901-003911)

376. Certificate of Records Destruction 2014 (Mesa-Johnson 003912-003913)

377. Certificate of Records Destruction 2016 (Mesa-Johnson 003914-003918)

378. MetroPCS Response to Subpoena Duces Tecum (Mesa-Johnson 003919-003925)

379. Training Recommendation Memo 2-22-2019 (Mesa-Johnson 003926

380. Training Summary Update Memo 9-17-2019 (Mesa-Johnson 003927

381. PARC - Internal Affairs Recommendations for MPD (1-2009) (Mesa-Johnson 003928-003986)

382. PARC - The Mesa Police Department: A Guide for Reporting and Reviewing Internal Review of Force Incidents (5-2009) (Mesa-Johnson 003987-004000)

383. PARC - The Mesa Police Department: A Guide for Internal Review of Category 1 Force Incidents by the Use of Force Review Board (5-2009) (Mesa-Johnson 004001-004032)

384. Concise Employee History – PS History – Jones (Mesa-Johnson 004033-004034)

385. Concise Employee History – PS History – Calderon (Mesa-Johnson 004035-004036)

386. Concise Employee History – PS History – Monarrez (Mesa-Johnson 004037)

387. Concise Employee History – Use of Force – Jones (Mesa-Johnson 004038-004041)

388. Concise Employee History – Use of Force – Calderon (Mesa-Johnson 004042-004047)

389. Concise Employee History – Use of Force – Monarrez (Mesa-Johnson 004048)

390. IA#2012-262 Final Signed NOI – Jones (Mesa-Johnson 004049-004053)

391. IA#2013-056 Final Signed NOI – Jones (Mesa-Johnson 004054-004055)

392. IA#2014-109 Final Signed NOI – Jones (Mesa-Johnson 004056-004057)

393. IA#2018-076 Final Signed NOI – Jones (Mesa-Johnson 004058-004059)

394. IA#2018-190 Final Signed NOI – Jones (Mesa-Johnson 004060-004061)

395. IA#2014-061 Final Signed NOI – Calderon (Mesa-Johnson 004062-004063)

396. IA#2015-205 Final Signed NOI – Calderon (Mesa-Johnson 004064-004065)

397. City of Mesa emails related to incident (Mesa-Johnson 004066-004071; 004073-004114)

    a. Video emailed to Chief Batista by Andre Miller (Mesa-Johnson 004072)

398. Emails related to outside reviews of Mesa Police Department policies from 2010 to present (Mesa-Johnson 004115-004295)

- **<u>Deposition Transcripts</u>:**

  1. Robert Johnson - December 19, 2019
  2. Jhonte Jones – January 8, 2020
  3. Batista, Ramon – January 9, 2020
  4. Michael McClure (30(b)(6) designee) – January 9, 2020
  5. Ernesto Calderon – February 3, 2020
  6. Rudy Monarrez – February 4, 2020
  7. Timothy Walker (30(b)(6) designee) – February 5, 2020
  8. Robert Rash (30(b)(6) designee) – February 5, 2020

**Emily Bashah Report (Sealed)**

**EXHIBIT 9**

**Off the Cuff Video**

**EXHIBIT 10**

**EXHIBIT 11**



# Mesa Police Association Online Survey Toplines

March 2019

**Prepared by Strategies 360**

JOHNSON 001106

# Methodology

Strategies 360 conducted an online survey of Mesa Police Department employees.

- The survey was available for all employees to take part in March 5-20, 2019.

- A total of 533 Mesa Police Department employees took the survey.

- These results are not representative of Mesa Police Department employees as a whole; rather, those who chose to participate in the research. Survey data was checked for irregularities and duplicate responses.

JOHNSON 001107

**How would you rate the department's executive leadership (Assistant Chiefs, Chief) in their work to achieve "Excellence in Public Safety" over the past 12 months?**



| Value | Percent |
|-------|---------|
| Excellent | 3.1% |
| Good | 7.7% |
| Fair | 12.7% |
| Poor | 74.8% |
| Prefer not to say | 1.7% |

JOHNSON 001108

**How would you rate the department's staff-level leadership (Lieutenants, Commanders) in their work to achieve "Excellence in Public Safety" over the past 12 months?**



| Value | Percent |
|---|---|
| Excellent | 8.7% |
| Good | 35.8% |
| Fair | 32.7% |
| Poor | 21.5% |
| Prefer not to say | 1.4% |

JOHNSON 001109

**How would you rate the overall performance of the department's line-level (Sergeants, Officers)  in their work to achieve "Excellence in Public Safety" over the past 12 months?"**



| Value | Percent |
|---|---|
| Excellent | 40.4% |
| Good | 45.3% |
| Fair | 10.8% |
| Poor | 2.9% |
| Prefer not to say | 0.6% |

JOHNSON 001110

**Over the past 12 months, how would you rate the work of the department's executive leadership (Assistant Chiefs, Chief) in their work to achieve the department's Vision?**

| | Excellent/ Good | Excellent | Good | Fair | Poor | Prefer not to say |
|---|---|---|---|---|---|---|
| Partnering with the community. | **30.2%** | 6.4% | 23.8% | 27.5% | 39.3% | 3.1% |
| Preventing and reducing crime. | **17.1%** | 4.5% | 12.6% | 22.7% | 57.9% | 2.3% |
| Ensuring procedural justice by building trust, showing respect, and preserving human rights | **11.3%** | 3.9% | 7.4% | 11.6% | 74.2% | 2.9% |

JOHNSON 001111

**Here are some statements about the department's goal to hire, train, and develop the best workforce while emphasizing employee wellness. For each one, please indicate how much you agree or disagree with that statement. Remember, there are no right or wrong answers, we are only interested in your opinion.**

|  | Total Agree | Total Disagree | Strongly agree | Some what agree | Neither agree nor disagree | Some what disagree | Strongly disagr | Prefer not to say |
|---|---|---|---|---|---|---|---|---|
| Executive leadership places emphasis on employee wellness – specifically physical and mental health. | **23.6%** | **60.0%** | 7.4% | 16.2% | 15.5% | 20.5% | 39.5% | 1.0% |
| The Chief actively fights for increased training. | **22.5%** | **54.7%** | 7.6% | 14.9% | 20.9% | 14.0% | 40.7% | 1.9% |
| The Chief actively fights for increased manpower. | **12.3%** | **69.0%** | 5.2% | 7.1% | 17.2% | 15.1% | 53.9% | 1.5% |

JOHNSON 001112

## How would you rate the department's overall current morale?



| Value | Percent |
|-------|---------|
| Excellent | 0.4% |
| Good | 4.2% |
| Fair | 10.2% |
| Poor | 84.2% |
| Prefer not to say | 1.0% |

JOHNSON 001113

## In the past year, would you say morale at the department has improved, become worse, or stayed the same?



| Value | Percent |
|-------|---------|
| Improved | 1.2% |
| Stayed the same | 5.2% |
| Become worse | 92.5% |
| Prefer not to say | 1.2% |

JOHNSON 001114

**Thinking about the department goal to utilize teamwork and collaboration to achieve success, would you agree or disagree with the following statement: the Chief encourages Officers to work with members of the community?**



| Value | Percent |
|---|---|
| Strongly agree | 11.9% |
| Somewhat agree | 28.7% |
| Neither agree nor disagree | 21.2% |
| Somewhat disagree | 14.5% |
| Strongly disagree | 21.0% |
| Prefer not to say | 2.7% |

JOHNSON 001115

**Here are two statements about the department's goal to empower our members to solve problems through individual initiative reflecting accountability and urgency. For each one, please indicate how much you agree or disagree with that statement. Remember, there are no right or wrong answers, we are only interested in your opinion.**

| | Total Agree | Total Disagree | Strongly agree | Some what agree | Neither agree nor disagree | Some what disagree | Strongly disagree | Prefer not to say |
|---|---|---|---|---|---|---|---|---|
| The Chief empowers his direct reports to solve problems through individual initiative reflecting accountability and urgency. | **8.1%** | **70.3%** | 3.1% | 5.0% | 18.9% | 17.2% | 53.1% | 2.7% |
| The Chief empowers officers to solve problems through individual initiative reflecting accountability and urgency. | **6.9%** | **74.4%** | 2.7% | 4.2% | 16.6% | 18.5% | 55.9% | 2.1% |

JOHNSON 001116

**Here are some more statements about the department. For each one, please indicate how much you agree or disagree with that statement. Remember, there are no right or wrong answers, we are only interested in your opinion.**

| | Total Agree | Total Disagree | Strongly agree | Some what agree | Neither agree nor disagree | Some what disagree | Strongly disagree | Prefer not to say |
|---|---|---|---|---|---|---|---|---|
| The Chief provides courteous and respectful interactions with members of the department. | **18.3%** | **62.2%** | 7.3% | 11.0% | 17.2% | 17.4% | 44.8% | 2.3% |
| The Chief provides excellent service to our community. | **10.4%** | **68.7%** | 4.4% | 6.0% | 18.7% | 17.1% | 51.6% | 2.1% |
| The Chief professionally, ethically and fairly upholds his duties. | **8.1%** | **79.7%** | 3.7% | 4.4% | 10.0% | 12.9% | 66.8% | 2.1% |
| The Chief maintains the highest level of integrity. | **7.7%** | **77.6%** | 4.2% | 3.5% | 11.8% | 12.3% | 65.3% | 2.9% |
| The Chief has continually improved processes. | **7.5%** | **82.1%** | 2.9% | 4.6% | 8.9% | 13.9% | 68.2% | 1.5% |
| The Chief provides responsive leadership. | **6.4%** | **82.8%** | 3.1% | 3.3% | 8.9% | 9.8% | 73.0% | 1.9% |
| The Chief will treat an Officer fairly if he/she is involved in a critical/use of force incident. | **5.0%** | **89.2%** | 2.5% | 2.5% | 4.0% | 9.2% | 80.0% | 1.7% |
| The Chief applies discipline evenly, regardless of rank. | **4.1%** | **82.8%** | 2.9% | 1.2% | 11.4% | 9.8% | 73.0% | 1.7% |
| The Chief is not influenced by outside special interests or political entities. | **4.0%** | **87.9%** | 2.5% | 1.5% | 6.6% | 7.9% | 80.0% | 1.5% |

JOHNSON 001117

**Here is one last set of statements about the department's labor organizations. For each one, please indicate how much you agree or disagree with that statement. Remember, there are no right or wrong answers, we are only interested in your opinion.**

| | Total Agree | Total Disagree | Strongly agree | Some what agree | Neither agree nor disagree | Some what disagree | Strongly disagree | Prefer not to say |
|---|---|---|---|---|---|---|---|---|
| Mesa Police Association (MPA) has Officers' best interests (health, safety, morale, etc.) in mind. | **86.2%** | **4.8%** | 63.6% | 22.6% | 8.7% | 2.5% | 2.3% | 0.2% |
| Mesa Police Association (MPA) supports the department's mission and vision. | **84.5%** | **4.1%** | 58.2% | 26.3% | 11.4% | 1.2% | 2.9% | 0.0% |
| I am happy with the performance of the current Mesa Police Association (MPA) board. | **78.1%** | **9.3%** | 51.8% | 26.3% | 12.0% | 6.0% | 3.3% | 0.6% |
| The Fraternal Order of Police (FOP) has Officers' best interests (health, safety, morale, etc.) in mind. | **67.1%** | **6.8%** | 41.2% | 25.9% | 24.0% | 3.7% | 3.1% | 2.1% |
| The Fraternal Order of Police (FOP) supports the department's mission and vision. | **65.7%** | **4.6%** | 39.1% | 26.6% | 27.1% | 2.1% | 2.5% | 2.5% |
| I am happy with the performance of the current Fraternal Order of Police (FOP) board. | **52.4%** | **10.8%** | 28.4% | 24.0% | 33.8% | 6.0% | 4.8% | 2.9% |

JOHNSON 001118

## Please rate the overall performance of your chain of command.



| Value | Percent |
|-------|---------|
| Excellent | 17.0% |
| Good | 35.1% |
| Fair | 27.0% |
| Poor | 19.1% |
| Prefer not to say | 1.7% |

## Assistant Chief

| Value | Percent |
| --- | --- |
| K. Cost #10958 | 61.1% |
| S. Burlingame #11921 | 28.2% |
| L. Rankin #11459 | 3.8% |
| D. Butler #13907 | 6.9% |

JOHNSON 001120

**How would you rate the overall performance of your Assistant Chief? Please note that the answer you give to this question will not be used to identify anyone and answers will only be known for all Assistant Chiefs combined.**



| Value | Percent |
|-------|---------|
| Excellent | 26.7% |
| Good | 26.3% |
| Fair | 22.4% |
| Poor | 20.2% |
| Prefer not to say | 4.5% |

JOHNSON 001121

# Commander

| Value | Percent |
|-------|---------|
| R. Quesada #11030 | 18.7% |
| E. Wessing #11465 | 17.2% |
| T. Abalos #9444 | 14.9% |
| J. Cutler #11927 | 15.1% |
| T. Intrieri #11225 | 8.3% |
| G. Nesbit # 11424 | 7.5% |
| M. Beaton #10521 | 10.4% |
| M. Dvorak #8524 | 0.2% |
| M. Bellows #9448 | 4.4% |
| B. Peters #9435 | 3.3% |

JOHNSON 001122

**How would you rate the overall performance of your Commander? Please note that the answer you give to this question will not be used to identify anyone and answers will only be known for all Commanders combined.**



| Value | Percent |
|---|---|
| Excellent | 27.7% |
| Good | 30.1% |
| Fair | 22.8% |
| Poor | 14.7% |
| Prefer not to say | 4.7% |

JOHNSON 001123

## Lieutenant

| Value | Percent |
|---|---|
| M. Higbee #16248 | 3.5% |
| D. McBride #10005 | 3.7% |
| T. Wahlberg #11955 | 7.2% |
| T. McClary #12188 | 5.4% |
| J. Reynolds #13714 | 3.5% |
| J. Woodard #13323 | 3.5% |
| A. Alonzo #10135 | 8.5% |
| K. Scott #14740 | 2.2% |
| C. Rash #10740 | 2.8% |
| D. Stiers #16729 | 4.8% |
| JD. Schmidt #14419 | 4.6% |
| C. Toth #10918 | 2.8% |
| K. Scanio #15840 | 3.0% |
| D. Rudd #4500 | 3.9% |
| K. Gillis #11932 | 3.7% |
| B. Soller #10931 | 3.9% |
| D. Sterlin #17134 | 3.0% |
| A. Nesbit #12189 | 2.6% |
| J. Redwing #13458 | 2.4% |
| S. Derivan #12182 | 3.9% |
| R. Stokes #14813 | 2.6% |
| T. Landato #10016 | 0.7% |
| S. Pugh #11229 | 2.0% |
| JR. Gomez #12900 | 4.1% |
| C. Withrow #15370 | 5.0% |
| J. McCormick #10901 | 1.5% |
| T. Walker #12637 | 1.7% |
| D. Clevenger #16232 | 2.0% |
| A. Spicer #14369 | 0.9% |
| S. Martin  #10057 | 0.9% |

JOHNSON 001124

**How would you rate the overall performance of your Lieutenant? Please note that the answer you give to this question will not be used to identify anyone and answers will only be known for all Lieutenants combined.**



| Value | Percent |
|-------|---------|
| Excellent | 46.0% |
| Good | 28.5% |
| Fair | 14.3% |
| Poor | 6.7% |
| Prefer not to say | 4.5% |

JOHNSON 001125

## Sergeant

| Value | Percent |
|-------|---------|
| M. Harris #16816 | 1.5% |
| M. Moore #14192 | 1.0% |
| T. Gribble #18467 | 1.2% |
| D. Meicke #11944 | 1.0% |
| J. Hutchinson #15340 | 1.7% |
| F. Costantini #10401 | 0.2% |
| D. Riordan #11948 | 1.0% |
| C. Tautimez #14442 | 1.0% |
| J. Duce #17602 | 0.7% |
| J. King #16234 | 1.5% |
| N. Gafvert #13030 | 2.2% |
| B. Clarke #14713 | 1.2% |
| S. Wilbur #13286 | 0.7% |
| G. Pearson #15446 | 1.0% |
| S. Nieto #14972 | 1.5% |
| R. Sheehan #14626 | 0.5% |
| A. Pak #18307 | 1.2% |
| W. Vance #12636 | 0.5% |
| D. Shoenhardt #14398 | 1.0% |
| R. Campbell #10729 | 0.5% |
| D. Thomas #12194 | 0.7% |
| D. Stegenga #12192 | 1.0% |
| B. Waters #16153 | 1.2% |
| L. Brannan #10912 | 1.7% |
| J. Calkins #13192 | 3.0% |
| D. Pepper #16350 | 2.0% |
| D. Vogeler #14461 | 2.0% |
| D. Hurley #15720 | 1.5% |
| B. Walters #12196 | 0.2% |
| S. Sorensen #17444 | 1.5% |

JOHNSON 001126

| | | | | |
|---|---|---|---|---|
| R. Jones #10734 | 1.2% | | M. Lawes #12362 | 1.0% |
| N. Boulter #13526 | 1.2% | | J. Troth # 13745 | 1.2% |
| C. Atwood #12241 | 0.7% | | N. Lien #15730 | 1.0% |
| T. Lupo #12880 | 1.5% | | V. Tapia 16446 | 1.2% |
| J. Casteneda #10318 | 1.5% | | T. Baca #9674 | 1.2% |
| T. Zoglman #17973 | 1.5% | | C. Lines #11942 | 0.7% |
| S. Walkington #18375 | 0.5% | | S. Lentz #12201 | 0.7% |
| B. Abbiatti #12348 | 1.2% | | D. Robertson #10741 | 1.7% |
| B. Lavin #17496 | 0.7% | | D. Jenkins #14387 | 0.5% |
| T. Dangerfield #13529 | 1.5% | | B. Jutting #12933 | 1.2% |
| C. Simon #14101 | 1.0% | | L. Portee #14663 | 0.5% |
| I. Ortega #17526 | 1.0% | | D. Williams #15689 | 0.7% |
| V. Murua #12896 | 1.2% | | E. Rodriguez #11721 | 0.5% |
| R. Burhham #12871 | 0.5% | | G. Love #14096 | 1.0% |
| C. Whipple #15895 | 1.0% | | B. Wilson #16818 | 0.2% |
| C. Garcia #15648 | 0.7% | | K. Baggs #10178 | 1.2% |
| M. Kuntz #17462 | 0.7% | | J. Stout #12374 | 1.7% |
| B. Hibbing #16787 | 0.2% | | M. Beckett #14621 | 1.0% |
| C. Young #18852 | 0.5% | | J. LaRoche #17484 | 0.7% |
| S. Kelly #10014 | 2.0% | | J. Bellows #10543 | 0.7% |
| L. Henson #13273 | 1.7% | | D. Doane #12354 | 2.0% |
| D. Standridge #18170 | 1.0% | | J. Maddalozzo #11454 | 0.5% |
| D. Boone #12351 | 2.0% | | M. Therre #10746 | 1.2% |
| N. Miller #11538 | 0.7% | | P. Doucet #14353 | 0.7% |
| D. Lunsford #10058 | 0.5% | | Bell #15297 | 0.5% |
| A. Kalik #18351 | 1.0% | | J. Neese #13544 | 0.7% |
| J. Adair #16784 | 1.0% | | B. Hibbing #16787 | 0.7% |
| A. Vanda #17222 | 0.2% | | J. Meacham #15338 | 1.2% |
| D. Daley #14716 | 1.0% | | G. Loewenhagen #13569 | 1.0% |
| C. Trapani #10921 | 1.0% | | E. Carmona #12873 | 1.0% |
| K. Albrecht #10886 | 1.5% | | Q. Gerbich #11247 | 0.2% |
| P. Bina #11443 | 1.0% | | F. Young #12471 | 0.5% |
| D. Engle #14623 | 1.0% | | | |

JOHNSON 001127

**How would you rate the overall performance of your Sergeant? Please note that the answer you give to this question will not be used to identify anyone and answers will only be known for all Sergeants combined.**



| Value | Percent |
|---|---|
| Excellent | 63.6% |
| Good | 20.2% |
| Fair | 6.0% |
| Poor | 3.6% |
| Prefer not to say | 6.7% |

JOHNSON 001128

**And now just one question for statistical purposes.  For how many years have you been a sworn Mesa Police Department employee?**



| Value | Percent |
|---|---|
| 0-5 years | 24.4% |
| 6-10 years | 10.7% |
| 11-15 years | 23.4% |
| 16-20 years | 23.0% |
| 21-25 years | 16.1% |
| 26 years or more | 2.4% |

JOHNSON 001129

# Appendix

# Please share any final comments about anything in this survey.

Chief Batista has single handedly broken this department. He has destroyed everything great about Mesa PD and AC Burlingame is just as evil. They both need to resign before they do anymore damage.

We need a new chief.

Officers are afraid there will be retroactive punishment for acting within training and policy at the time of incident. Officers are afraid mr Bautista will sell them out to increase his 5 minutes of national fame. This is a very unstable police department in an volitale time for policing nationwide.

There is a growing distrust in our leadership- from the Commander level up, due to micro managing, jumping to conclusions without speaking to SME's and removal from positions because of differing opinions. Assistant Chiefs and Commanders don't show trust in the people below them, and second guess decisions made. Its apparent to the boots on the ground, and it degrades the Lieutenants and Sergeants ability to be effective leaders. Commanders and above are so far removed from the actual issues Officers face, and are more interested in appeasing their boss, and not being pushed out of their positions. Everyone is on edge, creating hesitation and increasing the dangers we face daily, in fear of command staffs second-guessing of use of force or events that take place in our personal lives off duty.  The distrust is apparent, but it seems only certain people are willing to stand for what is "Right". We have swayed as a Police Department, from one of the LEADERS in Public safety- that criminals feared, to a soft, uncertain, and community feelings first, Logic and Laws second approach. I used to be very proud of the department I worked for...now not so much. Hopefully like all bad things, with time it will pass, and I will be proud of this Department again.

I have been with Mesa for many years and I have NEVER seen morale this low. The chief has cut our training so he can spend more money on trainings that are politically motivated. The chief is not interested in what's best for officers or those he leads nearly as much as he is interested in satisfying the public, and notably, the small pockets of anti-PD public. Just like officers hold themselves to such a high regard that we are the first ones to identify and push for removal of "bad" officers, we will push for removal of poor leadership. Chief Batista needs to be removed from his position if this city has any interest in continuing to have a well trained, crime fighting, community loving police department that it had prior to the Chief coming into office.

Majority of the Sgts at MPD fight for the "working man" while a majority of those higher ranking positions are often driven by personal agendas for personal gain. MPD has a pattern of promoting managers, not leaders.

Leadership does not exist within this department.  From my Sgt. up, they are self serving and clearly do not have the best interest of the men/woman who work for them in mind.  They are managers, not leaders

To clarify...I think our department as a whole was fantastic and very well trained.  I do not think the Chief can take credit for the "changes" we have made, because we were doing the "changes" before he was here.

I would say The Chief is the main issue to include all the asst. Chiefs except Cost.

 Members of the department are scared to work for lack of support from the executive staff    Morale has never been lower and the physical well-being of many many officers and sergeants lieutenants and commanders is being affected by the ineffective leader ship of the Mesa police department

While the senior leadership has its collective eye off of the morale of the department, fraternization is being overlooked as a key component to the dissolving moral health of the department.

Our Department has been on a downhill slide for over a year and it doesn't look like it will get better anytime soon.  Very sad situation.

JOHNSON 001131

As far as the rating of the AC, Commander, and LT, I feel that my current chain of command has the best people in those positions to effect positive change within the department but they are not allowed to due to the "my way or the highway" leadership style that has been implemented under the Batista regime.

Feelings towards the Chief when he initial started was very positive his message was good and I supported him when Chiefs where first presented to the department. Although over the last year I feel the Chiefs values and trustworthiness is at an all time negative. The Chiefs personal feelings were brought to light and condemned not only the officers involved but anyone in the department. By him doing this has not only affected the department, but has caused criminals to take over our community. As a resident of Mesa and Officer of Mesa this concerns me. The tough mentality of crime fighting over the years kept the criminal element out of Mesa. Although since the Chief has taken over I feel fellow Officers are scared to do their jobs, which causes more crime and safety concerns for fellow officers and the community.

Chief Burlingame and Rankin are the acting henchmen the Chief to intimidate people who do not agree with the Chief.  At some point the hostile work environment they create should be addressed.

Chief Batista does not have a leadership style.  He rules like a king and has eroded trust, morale and confidence in the department.

This Chief cares more about community perception than facts and its scary working for him.  I pray I can find alternative employment with similar compensation so my family and I are protected as these witch hunt IA investigations are unprofessional and disturbing.

I have been at the Mesa police dept for a long time, I have never seen morale as low. This is the first time in a long time that the dept has come together to have a common bond of wanting this Chief gone and including the whole executive staff. Not for having a bad press conference, but for just a lack of leadership, morals and ethics. The worst leadership I have ever in all my years witnessed from one individual who is only out for himself, how he looks in the public eyes. Total waste of the fine dept that we have that this individual has completely  torn down the trust and morale of a fine department with outstanding personnel

Over the last year, officers collectively have felt they are being "Big Brothered" on everything thing they do. Random reviews of Axon videos, reviews by VORB of incidents where officers drove Code 3 which include reviewing AVL.  Also all of the audits of reports / supps, evidence dispositions, uncategorized Axon videos...etc...etc...officers are just tired of the burdensome administrative requirements which could be streamlined. But most of all officers do not feel like they will be supported in a Use of Force incident due to the actions of the Chief in the past year. Also officers express the department's leadership now gives a citizen making a complaint more credibility than they do the officer. All of this combined leads to the officers being afraid of getting in trouble when they take a necessary use of force action, which will be scrutinized by a Chief they do not trust.

No confidence in Chief Batista! He has made the already tough job of being a police officer much harder rather than easing the stress we take in. This department will continue to spiral down in regards to morale and productivity as long as Chief Batista is here.

This is a very difficult time in the department for its members, especially the officers working in the trenches. It is the opinion of this officer that morale in this department has never been worse. Officers feel that they don't have the support of the department's upper leadership in critical incidents. When Axon camera's were first introduced by Chief Milstead, we were assured that Axon was not going to be used in a manner to look for ways to get officers in trouble. Now, under the current Chief, Axon is not only used to investigate complaints, but it is also being used on "fishing expeditions" to generate accusations to "ding" the officer further. It is sad that members of this department are reluctant to be proactive and take appropriate and necessary actions in confrontational situations in fear of being scrutinized by the leadership of this department. Mesa PD has always been looked at as a model by other agencies. We have been at the cutting edge of technology and training since this officer was hired.  Now, thanks to statements made by to the

media by our current chief, Mesa PD is now constantly attacked and scrutinized on the news and social media. Trust is a difficult thing to get back once it is lost. There is no trust in the Chief from the officers.

I do not believe that the leadership commander and up can be trusted to have best interest of Officers. I also believe that it is causing some leadership to do all they can to cover themselves only.

So, a survey is just that, handpicking a wide array of questions to hopefully come to a meaningful conclusion.  I will say this, this survey does not account for collateral duties and the chain of command.  For my collateral duty I would give Burlingame and Beaton negative points for poor leadership, etc.  Thank you for letting us be heard and not silenced and threatened from vindictive, small minded admins

Question 4 asks "Over the past 12 months, how would you rate the work of the department's executive leadership (Assistant Chiefs, Chief) in their work to achieve the department's Vision?" "-Ensuring procedural justice by building trust, showing respect, and preserving human rights"     How do you build trust with the community when you takes sides on issues when you don't have all of the facts.  To come out and make comments that are disparaging to the employees of your organization before the investigation is complete might seem like your building trust, but it is not.  It definitely isn't showing the public the respect it deserves by showing one face then having to come back and show another.   Part of Question 5 asks "The Chief actively fights for increased training."  I would strongly agree with the simple answer of this but the answer is not simple.  I strongly disagree with the training the Chief is actively fighting for.  Officers need tactics and investigative skills on the street but most of those classes are being traded for more social based classes dealing with public sensitivity and public perception.  I agree that those classes are needed and should be supplemented into the existing training curriculum, but not substituted for training that will keep officers at the top of their game and to keep Mesa known for having the best, well trained officers.  Over the course of the past year I have seen fellow officers fail to take action or delay taking action when said action was legal and moral against another person because of how they might be treated by the chain of command after the fact.  This is a disgrace to the officers and the community they serve.  In my opinion, the Mesa Police Department hires the best officers it can and has the best trained officers in the country.  To stifle their ability to do police work when the work being conducted is legal, ethical, and moral is an abomination to each member of this agency, whether they have sworn an oath or not.

the chief has an out of touch mentality concerning community policing.  His initial thought is the Officer is wrong and the criminal victim is right before an investigation can be conducted.  He is more concerned with a liberal radical faith based person thoughts than those of his officers.  He has hand picked command staff to follow him blindly in his thoughts of 21st century policing.  Chief Cost has always had the Officers well being in the front of his mind but he is only one person.

Quite pleased with my chain of command, dissatisfaction with overall leadership of the department and how all officers are treated as damaged products of previous administrations

I am very grateful for my Sergeant as he has tried his hardest to support us while we risk our lives on the street and understands when we need some time off or we want training.  I am very very, very upset with our Chief and the way he has treated us over the last year.  He is in this soley for himself and his own interests.  I can't wait for the day he leaves this department so we can get someone in charge who has our back.

The Chief has made it known that he does not care what officers or those in his command think about him. The Chief has made it a point to excessively discipline and investigate everyone he can. The Chief has used money from the PD budget for his agenda-driven projects. The Chief is not only NOT backing his officers, but he is quick to judge against them...even publicly. The Chief is not a leader, he is an activist. The Chief does not have the trust of anyone in this department, but depending on rank and what they have to lose, certain people will or will not voice their true feelings.

JOHNSON 001133

It should be clear that the officers that work here are not happy with what the chief is doing. None of use agree with his mission and hate the way he deals with discipline. Making officers stay off the street for doing their job is not a way to deal with these things. One of the best things that could happen to the Mesa Police Department is to get rid of the chief.

The last year has been rather difficult here in the department, the level of trust between officer and superiors has all but disappeared and morale is non-existent. I see officers on a daily basis do the minimum and do everything to ignore any kind of confrontation for fear of discipline. Supervisor's show up on scenes and the first thing they ask is did officer's use force, instead of checking to see if everyone is okay. I observe supervisors who once would make solid decisions without a second thought, now second guessing themselves and voicing to peers that they are afraid to get in trouble. The professional standards section has gone out of control, they are sending out NOI's and investigating at an alarming rate, again another aspect of the job that causes stress and morale issues. I have no faith in the upper ranks of the department from lieutenant to chief. These ranks will do anything to draw attention to themselves at the cost of officers and family's. Chief Batista degrades the image of the department and belittles the officers who work here by the political rhetoric he blabs to the media. I have never been more ashamed of someone who calls himself the leader of this organization.

I have over 20 years experience as a Police Officer and have never seen a Chief of Police like this... The current Mesa Chief of Police should not be a Police Officer at all. He has belittled, betrayed, and ruined lives of many outstanding Mesa PD Officers. He is an embarrassment to the Law Enforcement Nation Wide.

about time, need these more often

Perhaps the leadership would do better if they were not so worried about the small percentage of the population that hates the police anyway.

There are several questions I would have liked to have been able to write comments to further explain my answers. Perception is reality and I firmly believe current perceptions are accurate amongst the majority of the department regardless of their personal involvement in recent hot topics. The effects of poor leadership have damaged morale, Officer safety and the pride many have in our agency. I'm proud to be an officer and though I honor the old ways and I'm receptive to change and remain adaptable but I fear my own agency will place blame for an incident on the shoulders of an officer or sergeant based on a media response. I feel the agency specifically the Chief quickly labels those that operate as we have been trained as heathens to shine the stars on his collar for a camera. I am confident in my skill set I am confident in my calling but I refuse to continue to be a stepping stone for a Chief trying to find his way to his next footprint on policing.

I feel the department has turned from fighting crime and locking up criminals to an attitude of catering to the media. I see the department rewarding those who sit on their hands and have an attitude of lets just see what happens and then punishing those who are aggressively fighting crime. I feel from Commander level and up they have become disconnected with Officer and detectives who are doing the work. In the past 48 hours I have seen personally supervisors "passing the buck" so to say, because they didn't want to be the one to make the final decision. There are very few Supervisor in this department who are willing to truly back their squads, divisions, and Districts. I believe this is out of fear that Staff above them will kick them out of their current assignment or demote them.

I have never seen this type of poor leadership from Commanders, AC's, and the Chief. It appears that every decision made is "knee jerk" and very short minded.

The hiring unit command staff needs to change as well as the executive staff.

The current state of morale is absolutely despicable, and the ill-effects caused by the chief's "agenda" have jeopardized the safety of our cops! Mesa PD has been infiltrated by a self-supporting "change agent" who egregiously mimics the "Gasconian" methodology of transparency in policing.

JOHNSON 001134

We employ a charlatan who fosters a perverse ideology; one that cultivates fear, indecisiveness, and discontentment amongst the troops.

Our current chief has brought morale down in this dept. In the 18 years I have done this job, this is the lowest it has been. He is the reason

I feel the mission, goal, and direction of the department hasn't been clearly communicated to line staff. The only indication line staff have of the direction the department is headed is seeing the way the chief is treating officers including slandering them to the media, reducing ammunition for training at the range making us less safe due to less training opportunity, and initiating training for "biased policing" without actually evaluating if any actual "bias" exists. It appears he singles out units and individuals he likes and awards and promotes them while also adding staffing to community engagement units while reducing staffing for actual enforcement units involved in the apprehension of dangerous felons.

The main problem is the Chief, who is nothing but a politician and his decisions are fluid based on what the public wants and what he feels makes him look better in the public's eyes. His condemnation of officers before any due process is despicable and unforgivable.

Officers, SGTS, and LTS are doing a great job.  Commanders and above that need to evaluate their performance.

Although the Chief has been providing training to the department, it was training that was not needed and poor in quality. We had similar training right before he arrived. He wasted large amounts of money while only concerned about his own image.

Somewhere between mid-management and upper-level management, there is a disconnect.  If there were a VoNC I would say lump Rankin and Burlingame into that as well.

The Chief has created an environment in our community where criminals are the victims and the officers are the bad guys. Criminals now try to provoke officers into fighting them in order to get it on video so they can sue the city.  This is costing the city millions of dollars in frivolous law suits.  Add to that the increasing dangers to the officer's safety.  Officers are being targeted and ambushed all over the country.  I feel this Chief does not have the backs of his officers when he goes on TV to condemn officers before an investigation is even completed.  I also feel the Chief has ruined the public trust in MPD.

I feel that the Executive Command staff has a political motive and does not have the best interest in mind for the rank and file officers they supervise.

There is no accountability in this department or leadership. The punishment is not the same here for people and there are people here that get to climb the chain even though they have broken policy. No trust in this department.

The chief is a liberal snowflake who cares more about public image than his officers. He is a cancer on this department. His policies endanger officers and his conduct proves he has no spine. Staffing and officer safety will continue to decline as long as he is in power.

This is a great survey and would like to rate all Sergeants, Lt's, Commanders, and Assistant Chiefs that I had interaction with.

Many of us are nervous about doing our jobs due to the selfish interests of our chief. His disregard for due process puts the entire department at risk. Any one of us could be doing our job correctly and he still sides with immediate, knee jerk public/media reactions, when he should be asking for patience during the investigation process.

I feel there is too much undermining of this department by the labor organizations.  There has been too much posturing and blaming, which has created the poor morale we now see in our department. The two organizations and executive staff should unite to bring our department out of the gutter.

JOHNSON 001135

There should be a plan put together and ultimately in motion to help with restoring pride in our agency. The Chief and both labor organization Presidents should address this department in a unified manor (as a team). All three standing in front of our department, collectively bringing us back together. Until that is done, this department will continue to rip itself apart. Additionally, it's time lower lever supervisors started to do the jobs of a supervisor. Being a supervisor is way more than spell checking a report. Before signing reports, ensure all elements are there and the proper things were addressed during the initial investigation. Take care of your officers by making sure they properly address the aspects of each call. Show them how to properly conduct and document a preliminary investigation. The better we do this, the better we serve the public, the better our department is received by everyone and the better we feel about ourselves and our organization.

I feel the Chief is in a no-win situation. Under the previous admin our moral compass went sideways. We had an A/C that emphasized kicking ass and scaring the public, and a Chief who turned a blind eye to everything. Our academy went from training guardians to training "Spartans." Our detectives became lazy and civilian staff became bitter. The line-level officers were happy because we had someone "speaking for us..." but in the end neither Milstead nor Silbert really cared about anyone but themselves. Now...we face federal criminal probes, lawsuits, and civil rights inquiries. All of this because Silbert wanted to "kick ass." In comes Batista who should not have been selected by the City, especially because they knew about all of the brewing issues. He comes in to a mess and is now in charge of dealing with it. He has to make decisive moves to keep the City happy, the public trust, and keep the DOJ off our backs. I don't like some of the things he does or says, but then again, I never agreed 100% with any Chief. I don't think he is trying to "screw the department" I don't see him as some "libtard" as he's been called. He was served a floating dumpster fire and told to deal with it. the City Council screwed us by not allowing Dvorak to right the ship before hiring an outside chief. The City Council and Manager screwed Batista by hiring him and throwing him into a furnace. The MPA and FOP are screwing us by convincing officers Batista is the bad guy and throwing around phrases like "vote of no confidence." Our own Command Staff is screwing us by making random Commander and Lieutenant changes, disrupting operations, and making decisions that are not only bad, they are nonsense. We don't promote leaders, we promote test-takers and people managers then act like we can just put them in any position and they will adjust. We have supervisors that wouldn't be qualified to run the balloon machine at Wal-Mart but promoted and favored by the 4th floor. I'm almost done with my time being a Police Officer. It has been the greatest honor of my life, but the way we've been going the last 10 years, and the way things are with these new supervisors, makes me not want to be an officer anymore. Why deal with the stress of critical incidents on the road, and the stress of incompetent leadership, warring police unions, and federal scrutiny?

Morale comes and goes, but I have NEVER seen it this bad...and we've had some rough patches during my career. Every senior officer I have spoken to recently is counting the days to retirement and planning to retire sooner than they ever intended. They simply can't wait to get out. This is untenable and will leave the department with severely diminished reserves of experience and expertise. It's obvious this Chief simply doesn't care about the lives and careers of the people who were here long before him or any of those who will be here after he's gone. It's all about him.

QUESTION #5, The Chief actively fights for increased training. The Chief's has brought in some new training. but the training he has brought in to the City is extremely poor quality and only useful to promote his agenda. All his new required training only contradicts with Mesa Police and AZPOST training. This greatly adds to the confusion Officers face when making decisions. In Every training I have attended, the instructors always point out contradictions that are never addressed, but tell Officers "this is what we were told to teach." A definitive answer is never given. Recent training only furthers the Chief's rhetoric.        QUESTION #11, The union's supports the department's mission and vision. I do not believe either supports the Chief's vision for the department, because it is going to get Officers hurt and killed. I do not believe either supports the Chief's political agenda, destructive policies or personal vendettas, nor his distortion of facts to gain personal notoriety. I believe both union want nothing more to do with the worse Chief in the history of Mesa AZ. Both would like him to be dismisses and replaced by a competent Chief with the good of Mesa,its Officers

and citizens placed in front of his own aspirations.      I believe they both support The City of Mesa and its vision to empower Officers to feel supported to fight crime and keep Officers and Citizens safe.  The Chief is a extremely poor leader with horrible communication skills.  To anyone reading this, please help us replace Chief Ramon Batista with a competent Chief, who cares about bettering Mesa and not his own interests.  "Before his ideas get an Officer Killed!"

The uncertainty that our Chief has brought to this department has damaged "us" permanently.

When the chief first got hired it appeared he was the best candidate. But due to voicing his opinion to the media before the investigation was completed lost respect for him. He has showed no leadership or backing for the officers. Implementing to many IA investigations for nothing. Seems to be more worried about what the public and media thinks about him then backing his officers, making sure they stay safe, or standing by them. Very disappointed. Morale is extremely low and it is discouraging.

The Chief does push for training but it is poor training that endangers officers. The Chief is responsive but he responds in the wrong way.

The problem is we have a horrible Chief and the MPA's credibility when he came on board was at an all time low with the City.  MPA has made great strides to improve but is having to overcome burning bridges with council in the past.

It is somewhat difficult to provide some of the answers.  Unfortunately, the chain of command I feel is unable to make many decisions at their level which should be just that due to the vindictiveness and pressure coming directly from the Chief.  He has said you are either with him or against him and is not open to any opposing opinions to his and has shown this.  It is a my way or the highway type dictatorship which handicaps those below him from making the best common sense decisions as they are afraid of the Chief's actions or reaction.  This in turn drives down morale as it handicaps officers and detectives in their crime fighting efforts.  The Chief is more concerned about his own agendas and voices outside the department than listening to his own officers.  Officers need a leader who they feel will be fair and impartial in their decision making.  A leader who listens to his SME's when making decisions and not listen to outside forces or his own uneducated biases in his decision making processes.

Overall I believe middle management supervisors are doing a good job managing employees. I do feel there is a tendency to lead by fear in upper management. Because of this I believe the department's morale and work ethic/product has suffered.

We have no true leader for this department.

I do not have a sergeant currently.  I do feel the chief pushes for more training, but the training is irrelevant to our department and the fact the ammo budget has been greatly purged is a detriment to this department and its training.

On the agree/disagree question, it would be nice to have a column of don't know or unsure.

It is a shame that the personal political goals of those in leadership positions have placed their personal goals over those of the department.  It is a cancer that has spread to the rank and file placing their moral at an all-time low.

I 100% trust, and believe in the mission of this department, and the execution from my sergeant, to lieutenant, to commander, to chief Cost. But when it goes beyond that, I do not trust that our Chief has the best interest of the Officers, our department, or our community in mind. I believe that our Chief's actions has showed that he will not honor the due process, which builds distrust amongst the department, hesitation in action on the street, and most of all distrust between the community and our fine department. I feel that the Chief's actions have specifically jeopardized my ability to stay safe, and serve my community. I love this department, this city, and the leadership of this department, but I do not trust this Chief to support the officers or citizens of the community.

JOHNSON 001137

Great survey. I'm pleased to see Sergeant King will be running the academy. I take solace in knowing that future recruits going through the academy will not hesitate or be afraid to use force when the situation calls for it. Since the two use of force incidents that gained national attention from our Central Division, I have seen several newer officers jeopardize their safety to avoid using force, in fear of punishment. Moreover, moral has dropped to a level that has made officers dread coming to work. I still love my job despite our leadership and increase of pointless trainings.

I have never seen the department in such disarray in my last 20 years. Its embarrassing what has become of this great department. Its time to provide leadership instead of politics. Lets worry about providing quality service to ALL the citizens of our great city not the "loud minority" who doesn't represent the community.

there is a lack of consistency among sergeants that has taken a toll on officer discretion. there is also a developed lack of trust in the department to address issues fairly and appropriately.

I believe all of Command Staff have been negatively affected or influenced by the Chief. He has put most in survival mode and limited their effectiveness that has created a toxic trickle down effect.

The moral of this department is extremely low. No officer trusts our chief and that makes it very hard to follow him. The department has wanted more with less for far too long and being pushed for numbers is getting overwhelming when you just try and keep your head above water. We need better leadership from a leader who does not force his support staff to get on board or get out. Diversity in policing is needed in an organization as large as ours. Policing should not be measured by numbers and some officers enjoy spending time solving problems for citizens and talking to them. That does not always equate to a lot of arrests or onviews. Numbers need to stop being pushed.

The decline in moral is affecting everyone, knowing that you will be tossed out to be judged in public as guilty before a formal investigation is completed is horrifying.

Regardless of my opinion to these questions, the chief has convinced himself that he is excellent in all of these categories and anyone who disagrees with his opinion of himself either doesn't understand the situation or they are a malcontent and out of control and need to be disciplined. Although this survey will give you the general feeling of how the troops regard our leadership, it will not change their myopic and egocentric opinions of themselves (i.e. Chief Batista and some, but not all, of Command Staff).

To the unions: all I constantly hear is a bunch of words, rumors and non stop BS politicking. If you would like to see better tic marks from this officer, stop just talking about it and start implementing change. It has been a problem for a long time with the two unions only fighting to prove who's best, only to continue proving you don't really care about the officers you supposedly represent and only your own personal ego's and agendas which is why we have seen no real effective change for a long time. To the executive leadership: the morale on the street is despair. Hesitation is rampant because rather than trust themselves to make good decisions based on their training and experience, officers are constantly second guessing themselves and their training because they fear they will get in trouble from our executive leaders who are quick to judge and place blame rather than support our people (which is the most basic and first lesson of leadership) and learn all the facts. Secondly, if you wanted to prove you actually care about your employees' wellbeing, the IA process and administrative re-assignment duration would be reduced dramatically. It is unacceptable what is being done to officers. If our well-being was actually a real priority, then so would getting these cases done in a reasonable time period i.e. no more than one month, yet just like politicians, everyone on the fourth floor says its unreasonable and something needs to be done with results once again being nonexistent rounding the whole thing to once again our morale: despair.

We have very few true leaders, but plenty of supervisors. Too many supervisors appear to be trying to make a name for themselves and some are getting way too much special treatment.

Did not rate Assistant Chief because I have no idea what he has done or is doing

JOHNSON 001138

THINGS NEED TO CHANGE WITH THE EXECUTIVE STAFF TO INCREASE MORAL WITHIN THE DEPARTMENT AND REGAIN THAT TRUST FROM ITS EMPLOYEES.

I think the unions need to make an effort to prepare officers for the professional standards process. We should be able to sit down with a rep and go over case before interview. This is a very stressful process for members.

No concern at all for professional staff in this survey although survey was advertised as such. 2nd half of survey has no responses evaluate civilian equivalents of Sgt & above and ends with asking how long the survey taker has been sworn. The survey is completely reflective of the continued view by non-executive staff that if "you're not sworn, you're not born."

The only reason I rated officers at a "good" instead of "excellent" was because of the downturn in productivity caused by fear of inappropriate discipline, due to the chief's headhunting of said officers.

The Chief doesn't care to hear from rank and file. If he did, he would provide a mechanism to be heard. Presently, any feedback or voice I have stops at my supervisor.

these new issued iPhones are a complete waste of money! that money could have been used to hire more officers - instead we have yet another piece of expensive equipment that will only yield yet ANOTHER audit for us to be placed on a list because either we don't use it enough OR someone will miss use it. the chief stated in the past that he wants the public to have easier access to patrol - lol but when we call citizens from the new phone they don't/wont answer lol so we end up leaving messages and waiting for a call back which increases investigation time simply waiting to make contact from this phone - its no different than calling from our personal cell phones & *69 to block the number. the current attitude of patrol - the alleged 'back bone' of the dept. is poor = Attitude Reflects Leadership.

The current Chief has lost the trust and confidence in the rank and file of the Mesa Police Department. The Chief cannot lead the Agency, he is and will remain ineffective because no one is willing to follow him by their own free will. The Chief has demonstrated he is unwilling to listen to other executive staff members ideas and opinions, and in fact he removes them from their positions. The Chief verbally identifies himself as a leader but his actions clearly demonstrates he runs and rules the Mesa Police Department as a DICTATOR. The Chief has destroyed the morale of the front-line personnel, which will take years to restore long after he is gone.

Reference the questions about the chief and asst. chiefs, I put poor and strongly disagree because there were no lower grades. To say I am completely disappointed and disheartened by the actions and inactions of our assistant chiefs and especially our chief is putting it very mildly. Talk about our mission, build trust, show respect, preserve human rights, I think the chief and the assistants need to read the definition of trust, respect and human rights because that is not how we officers are being treated by any stretch of the imagination. All this chief is doing is placing officers in harms way by restricting our use of officer safety tactics and making us question our actions by changing policies and instilling a fear/belief that our chief will ridicule us and speak out against us publicly as he has done so many times before. We fear he will try to take away our job, our rights and even our freedom, again, as he has attempted to do so many times before. And, if that doesn't work, he will discipline us according to his own disciplinary chart and set of rules. This chief actively looks for ways to find fault in his officers and what's equally disturbing is how the assistant chiefs allow it instead of standing up for what's right. Does that motivate me to go out and do on-view activity, NO, it makes me want to avoid it. In this profession, any call can go sideways, I can get into enough trouble when dealing with calls I'm dispatched to, why should I tempt fate and allow a target to be placed on my back by my chief. Don't get me wrong, if an officer does something wrong, he/she should be held accountable and we should accept our punishment as long as it is fair and consistent across the board, but in the same respect, if we have done nothing wrong, then that needs to be accepted as well. In today's world, this job is hard enough without your chief, the one who is supposed to have your back, looking for a way to put a knife in it. Build trust, show respect, preserve human rights; how can that be expected from us when that's not how we're treated by our chief. Are

JOHNSON 001139

we supposed to be better than our chief? NO, he is the leader, the top dog, the one we should all be looking up to. How about starting from the top, how about leading by example? I guess when Tucson P.D. officers said they were glad we got "ole hug a thug", because they lost so many good officers because of him, they were right. I didn't want to believe it, but his actions speak louder than his words. With today's marijuana laws becoming more and more lenient, and police officers being more and more vilified in the media, good officers are becoming harder and harder to find. Who's going to want or qualify to do this job? So why doesn't our city council take the blinders off, they know what's going on, how about someone step up to the plate to do what's right, build our trust, have a mutual respect for one another, preserve all our human rights...

In all my years of service I have never seen the morale of this department lower; this is a direct result of the performance of upper management and the fear caused by officers being thrown to the media. Officers are afraid to do their job because of this, which is bound to end up with an officer being seriously hurt or killed because they are afraid to be thrown to the wolves in the event they take action the Chief perceives as something HE doesn't like.    Reference the MPA and FOP, I have never been so impressed with their performance and willingness to work together to obtain a common goal.  Keep up the good work!

The command staff in this department is the worst I have seen in my 20  years on this department as is the city leadership. I am absolutely, for the first time in over 20 years, ASHAMED to work not only for the Mesa Police Department, but for the City of Mesa, and that is NOT because of the PEOPLE that I work with...it's because of the people I work FOR. This place is unbelievable, there is no integrity, no accountability, no trust, no ethical decision making.....if I could retire right now, I would. I've been through many Chiefs in my 20...this one is the ABSOLUTE WORST, he is ABSOLUTE POISON to this department and this city.

My rating on my Chain of Command, overall, gets worse the higher it goes.  Poor communication. Every interaction with the Chief, he has been late to the meeting and has had to leave early.  It's difficult to address concerns when he says he has no time and seemingly no interest in the question or clearly providing an answer.

I feel like we have managers in leadership positions... most leaders in the department are Lt's and below.  Leaders "empower" others to do their best, be their best, they are, they are ethical, good in all aspects of their lives, and are trustworthy.  These qualities in our true leaders are being stepped on by our managers at this time!

I firmly believe the performance of my direct chain of command would be better in the eyes of their employees if they were not handcuffed by the Chief of Police.  He has continually made morale worse at this department and his actions and words against officers are irreversible.

The department has weak leadership that bends to public pressure. Outspoken mid-management is being reassigned so they don't challenge upper management. People are being punished for being independent thinkers.  New officers are being trained to be softer, gentler, guardians and they're going to get killed because they're afraid to go hands on when "guardian tactics" don't work on crazy drugged out suspects.  Morale is so low that we're losing seasoned officers faster than we can train new ones. This has got to stop!

The toxic environment that the executive staff from Assistant Chiefs on up has ultimately led to the worst morale that I have seen in 15 years of this department. On one hand, the Department is actively recruiting new hire Officers to maintain staff levels while the they have been disciplining, reassigning, and forcing Veteran Officers into early retirement because they refuse to be treated so badly. Many of the Officers that are retiring are doing so because the way the Department treats them. The tail end of an Officers career should be the pinnacle of the service they have provided the City but it they are treated like damaged goods and it sure feels like the Executive Staff would rather see them gone!

The MPA board does a good job at aggressively representing the offiers at the city level. However, the MPA has a reputation that is so unreasonable at times, they shoot themselves in the foot by not

getting items from the city they could otherwise. The Fire Dept will be offered a benefit before PD, strictly because the MPA personalities get in the way of reasonable negotiating.

Under Chief Batista the departments morale has completely tanked. Every month I think it cannot get any worse, and it does. Morale is so horrible that people dread going to work due to being afraid of getting punished for doing their job the way they were trained and had before for many years before the current regime. When speaking to fellow employees, ranging from 3-15 years of experience, a vast majority are actively pursuing alternative career opportunities and are looking to leave The City of Mesa. Mesa PD is one Batisita press conference away from a mass exodus which would completely cripple the City and our citizens.

Mesa has the appearance of a sinking ship... For the first time in my career, I am seeing that people will avoid Mesa PD for other departments. Mesa needs to reverse this image

This is a much needed survey. After years of service with his department I have not seen morale this low. I appreciate the opportunity this survey gives for individual officers to share their thoughts and the state of the department.

I feel that Officers hesitate and second guess their actions for fear of how it will be perceived/judged by Executive Staff not how a reasonable officer would react.  This hesitation puts officers in danger and also lowers the  level of service to the citizens of Mesa.

Officer safety and morale throughout the Department have been affected.  Employees are second guessing themselves, because they are worried about what the chief and command will think.

The only training that has been implemented by this chief is at least a decade behind.  The discipline he has handed out is heavy handed and not in line with the law, policy, or best practices.  Assistant Chief Burlingame also refuses to be in compliance with the law, policy, or best practices.  No one within this department will address the chief as he has shown himself to be vindictive.  The department touts the crime rate is down.  That is because officers are too afraid of being disciplined or to be brought up on criminal charges to be proactive.  Even when things are done within the law and our training, officers are not safe.

In my opinion I feel the Chief does not have my best interest in mind when decisions have been made during his time as Chief. The Chief seems to appeal more to the public lather than having his Officers best interest in mind.

The Chiefs actions in the past year have resulted in this departments constant decrees in moral.

I have the highest faith in my fellow Patrol Officers and the Sergeants immediately above me to conduct our jobs to the best of our ability. I know if I am accused of anything that I will be treated fairly by my Sergeant and at this level the entire incident will be fully understood before any career or life altering decisions are made. Time and time again I have been consistently disappointed in the actions at the Commander level and above. I have no trust in anyone above my Sergeant to defend me if I am in the right or mete out appropriate and fair punishment if I am in the wrong.

I feel since the chief has taken over the overall moral around here has decreased significantly and officer's feel attacked for doing their jobs and don't feel as if the higher up's have their backs. I also don't feel as if the higher ups give judgment on everyone evenly and certain people get special treatment around the department. The chief in particular has thrown us as a department under the bus and try's to take credit for things we have already been doing here for years well before he even got here. I also feel as if the training with PERF is a joke and is training officers to become complacent and less aggressive towards bad people, which in turn will cause more injuries to officer's because they will second guess themselves and feel as if they do the wrong they will get punished for it. This chief has shown through the media that he does not have our backs and even when the investigation has been done by an outside agency he still does not believe it and wants another done just to find something wrong and punish those involved and it has shown by officer's getting complaints for doing their jobs in the right way and they are still getting in trouble for very

JOHNSON 001141

minor things that have nothing to do with the actual investigation at hand. I believe because of this officer's are not going to certain calls because they know it will generate a complaint and they will get in trouble for it. The overtime issue is also a concern of mine because the higher ups come down on patrol as if its their fault even though we don't have enough officer's out on the streets and we are constantly sending officers from patrol to specialty units and they are still counting against patrol as far as staffing levels are concerned, which in turn does not allow officer's to take a day off or go to training because the books are already full with people who aren't even at that district anymore. I feel as if this chief is so out of touch with reality and what is really going on out in the streets as people and suspects are testing us everyday and becoming more hostile and aggressive with us because they know we have a target on our backs and know our chief does not have our backs and will throw us under the bus so fast to prove some unknown point or agenda. The ammunition thing is also a joke and limiting our ammunition use to 50 rounds a quarter goes to show further proof this chief wants us to give hugs to everyone even when they are trying to hurt us or potentially put us a in a life or death situation. This lack of ammunition and being able to train and shoot is going to affect people's accuracy in training and the justification that was put out for it in the training video was so pathetic and out of touch even the speaker did not seem to believe what he was saying. But us as patrol will continue to do our jobs even if it cost us our jobs because we know we are doing the right thing and will continue to uphold the law and protect the citizens of Mesa.

I feel the moral of the department is currently a direct reflection of the top leadership. The Chief has thrown multiple officers (and the Department in general) into the limelight in order to push his own agenda and make a name for himself without having all the facts or investigation completed. Once the facts have come out and there is nothing there but good police work (as the members of this Department have always done). The Chief has never apologized for making such rash judgments about the Department or community in general. He did not "grow up" in this community and has no clue about what community policing or what calls for service are like in each district on a day to day basis. The Chief also plays favoritism amongst members of the Department which is more than obvious. The Chief needs to be held accountable for what he says and what agenda he is pushing. I do not feel the Chief or his agenda is a good reflection of Mesa in general as a whole, but rather a biased slice for what he thinks is most important.

Most of the chain of command is muted from the top. It's hard to rate the chain when they are not free to lead without fear of repercussions.

I enjoy working here very much. Are there problems, of course. Are solutions worked on....yes. Is everyone happy here....I would like to see the job where everyone is completely happy. You can't make everyone happy and there are some folks that will never be happy no matter what you do. So, Mesa PD, you are doing a fine job. Keep up the good work.

Why was Chief Batista not included in this break-down? If he were included, my overall performance rating for him would have been POOR.

This is a great survey and should be done yearly..

The moral is terrible. Similar to the saying, "The beatings will continue until the moral improves.

In the past 12 months I've had different chains of command, the above reflects the current chain as to date of this survey.

I am a civilian and therefore feel that I answer these survey questions a bit differently than from a sworn officer. I do not see questions for civilian supervisors.

Much of the frustration stems from leadership selections based on friendships, not on competency. Training

Each administration succession criticizes the previous for lack of communication, favoritism, self-serving /self-preservation decision making and lack of true leadership. Each professes to get it right if given the opportunity to be in a position to effect change. It's like Groundhog's day with every shift

JOHNSON 001142

beginning with a Sonny and Cher song as nothing improves. The vision and direction of our Department is a direct reverse to 1995 policing as we revert back to an ineffective model so many of us worked so hard to improve. The Mesa Police Department currently lacks leadership, pride and organizational credibility as some of the most incapable and ineffective members are positioned into critical positions of influence.

The chief has not regained the trust of the rank-and-file and I don't know if it is possible. The extensive time officers are being administratively re-assigned negatively impacts this relationship. In my time here there have been 2 or 3 low points for morale. While keeping recency bias in mind, this is as low as it has been. Officers continue to do their jobs admirably but they feel they will be hung out to dry as soon as something bad happens. Our department's leadership has directly influenced the difficulty we have in recruitment and retention and contributed to the nationwide negativity toward police in general.

From assistant chief to commander down the leadership has been supportive and excellent. There appears to be a huge disconnect above Chief Cost.

I do not believe the current Chief has the best interest of Officers in mind when he blatantly makes statements to the press without a thorough investigation into what occurred. He is overly worried about what the public thinks about him and how transparent he is. He was not informed of how Officers are trained to handle use of force and he himself has shown he doesn't know what to do when it comes to handling a critical incident. Arm chair quarterbacking is not good for this or any other department.

I do not believe my answers matter in that it will be used to make improvements.

It's hard to know all that goes on at the 4th floor but I do know there is a different set of rules/standards for people way up the food chain than there is for the rank and file. The main problem at the highest level is that the Chief does not appear to see officers through the eyes of an officer, he seems to see them through a view more akin to the liberally slanted media or the Black Lives Matter movement. That was clear when he spoke to the media and came to briefings after the incident on Main Street. He also does not appear to go along with findings of investigations and wants his own outcomes.

I feel that the command Staff which is the Chief and Assistant Chiefs are the worst that I have ever had to work under in my long career. The Chief is the problem and needs to be replaced in order for this department to get back on track. Morale is the worst I have seen which is directly related to the Police Chief

I am an employee of Forensic Services and I don't have a Commander, Lieutenant, or Sergeant. I will say that my direct reports do an excellent job in their positions and I'm grateful for them.

The absolute disregard to State Law, the Officer Bill of Rights is appalling. The actions of the Chief, specifically, publicly condemning Mesa Police Officers to the public both in the news and special interest group meetings is unbecoming of our Chief Law Enforcement Officer. The inaction of Assistant Chiefs has eroded any trust Officers once had in this once great organization. The poor response and inaction of our elected public officials and appointed officials has eroded the public trust and employee trust in any possible changes in the future. Commander Cutler and Commander Wessing are the top ranked leaders in this Department.

Worst chief and command staff I have ever experienced in over twenty years!

As an organization, we need to be unified. We need to stop looking at the past and forgive people of their mistakes. Yes, things were done wrong but if we keep talking about the past we will never have a good future as a department. Time to move forward and hope the Chief learned from what was said / done in the past. I'm sure he has our best interest in his thoughts and we need to give him a chance to redeem himself! I'm tired of listening to all the complaints, cries, and judgment issues! We

JOHNSON 001143

ARE ALL NOT PERFECT! I prefer you all spend my union dues doing something that benefits ME instead of arguing and crying over the past!

I feel very strongly that the Chief is a poor example of leadership and a person of low integrity. He does not look out for the well being of the people of this police department. He has demonstrated over and over again that if you do not think like him or feel like he does, he will make your professional career uncomfortable and halt any progress for those individuals. I feel Assistant Chief Burlingame is a prime example of abuse of power and someone who has no integrity. She has threatened police officers in open meetings and has not been held accountable for her workplace aggression and hostility towards those officers. Assistant Chief Burlingame threated the spouses of the Mesa Police SWAT team that they could not exercise their right to free speech and if they did not stop saying things on social media or other open and free places of expression that the SWAT team personnel would be held accountable for it and feel the repercussions of it at work. This is a threat and violation of the civil rights of the spouses of the SWAT team. Commander Mike Beaton also condoned everything Burlingame said in that meeting and called the Mesa police SWAT team an embarrassment. Chief Batista is completely aware of Assistant Chief Burlingame and Commander Beaton's actions and has done absolutely nothing to correct past actions or prevent future actions. Chief Batista has demonstrated many times that he does not treat all levels of police ranks equally when it comes to discipline and corrective measures. He has allowed the law to be violated and he himself has shown incompetency for the law, Mesa Police policy, and standard practices of the police department. Commander Mike Beaton has demonstrated his lack of trust in the units that he oversees by overwhelmingly becoming involved in matters of tactics and procedure, which he has been out of practice in these areas for several years as he has promoted. He has violated policy in regards to the disciplinary process and violated timeframes stipulated by Mesa police policy. as mentioned before he condoned the violation of civil rights and openly reprimanded and belittled several subordinates in a public forum which is violation of Mesa personnel rules. For these actions, Commander Beaton has not been held accountable and there has been no corrective action. Myself and other officers have expressed our explicit fear for coming to work and being treated with hostility, bias, and unfairness under this chain of command. Each of these examples has been disregarded by Chief Batista and he has done nothing to correct these actions, further proving that he treats his command staff differently than lieutenants, sergeants, and officers. Chief Batista is a tyrant and uses fear and threats to mandate his philosophies and personal agenda in the Mesa police department. Chief Batista has no respect for the people who work for this department if they are not in line with his thinking. The Mesa police department is a proud department that for decades has been looked upon for training, progressiveness and unmatched police service to the community. Since Chief Batista and his command staff have been in charge of Mesa police, embarrassment, unlawful treatment of police personnel, and fear of retaliation from executive staff have been the new theme of this police department. The irreparable damage that Chief Batista and served on his command staff have caused for this department will be felt for decades and the City of Mesa will suffer the consequences of his poor actions and his failure to supervise his command staff as they have violated policy and law in the treatment of police personnel. City officials are aware of these gross violations of policy and law and have yet to act on these charges.

I had high hopes and expectations when the new Chief was hired. In the short amount of time he has been here he has seen the overall destruction of department morale, as it is at it's lowest in my time on the department. I did not think that would ever be possible after Chief Gascon's time here. Publicly convicting Officers before any investigation has been done shows a lack of foresight and zero leadership ability.

We can't judge the performance of command staff because they can only do what the chief tells them to do. I have never seen such an abusive chief.

Both labor organizations lack diplomacy which Rick Perine and Ryan Russell used to have, including alienating themselves from the City Council and Mayor. I would like to see them work on this.

Mesa Police Department has some of the most amazing sworn members. Unfortunately, there was some incidents that were handled so poorly that it affected the department and city as a whole. It

JOHNSON 001144

saddens me, and I am hopeful that this will change or at least not occur again. I still love working for this department and again think that the sworn staff we have here are some of the best law enforcement in the nation. Having the backing of the higher up ranks is imperative, otherwise it is impossible to do our jobs.

Morale is horrible. You can't walk through a station without hearing constant, consistent grumbling. The number of people on "reassignment" for extended periods is beyond ridiculous.  Having outside agencies AND privately hired review boards and consultants review use of force cases is beyond words.

I believe that the performance of each member of my chain of command have been negatively influenced by Chief Bautista and his policies.

Management staff are afraid to do there jobs. Retention and progression are a serious problem with the department and are causing a massive problem with moral.

The department has an executive staff that is morally and ethically bankrupt. The problem starts with the chief and is expanded by Chief Rankin and Chief Burlingame. The executive staff has created an atmosphere where dishonesty is acceptable and sanctioned by the chief himself. A hostile work environment is a common throughout the department and is directly supported by the chief through his use of Chief Burlingame and Chief Rankin. Chief Burlingame has threatened members of the department. She also threatened the members to silence spouses constitutionally protected free speech. The chief holds the executive staff to a much lower ethical standard than the rest of the department.

I strongly believe our current chief and his personally appointed assistance chiefs minus AC: Cost has caused damage to the department's image and morale.  He continues to seek political/ progressive policies in place to appease a minority of the public.  which has caused officers and sergeants to second guess themselves and potentially cause us to be killed or seriously injured.  My current LT continues to take a personal stance on treating officers unfairly when it comes allowing training and officer advancement.

The morale at Mesa Police Department is at an all time low which is a direct result of Chief Batista. I do not know an officer that supports Chief Batista. I also do not know an officer that would publicly state this, for fear of extreme retaliation from Chief Batista. Chief Batista punishes and hands out demotions to those that do not support him. Chief Batista is putting his name and reputation before the department and it's employees. I feel as though Chief Batista has ulterior motives for working for Mesa Police Department.

Most of the low morale has to do with the Chief Of Police's statements about officers "losing their way".  All of the officers, that I have spoken with, say that if he just would have said, "The incident will be investigated" would have supported it.  I have been a police officer for many years but am a new lateral to Mesa and have seen a definite decline in morale in Mesa.

The chain of command gets a disproportionate amount of the blame for staffing problems. At the patrol level we know it's an issue, yet we seemingly refuse to acknowledge our impact on staffing. We (patrol officers and sgts) can share a lot of the blame when we start the day way below CSL because people call out sick or comp out. I understand the purpose of sick/comp time, but its contributing to the staffing problem. It's also a culture issue that needs to be addresses at the patrol level. Adding more people into the mix isn't a magical solution when people still habitually call out.

Morale has been at its lowest since we've had new leadership in office. Performance has decreased dramatically and the motivation is no longer present. Officer safety is concern due to the consequences that come with use of force. Second guessing yourself can get you hurt.

The dishonest and disturbing behavior by Chief Batista has brought disgrace and discredit to a once excellent Police Department. The Chief's persecution of Officer's in critical incidents only brings shame to his office. The lack of leadership by the Chief has sent this department into a spiraling pit

JOHNSON 001145

of the worst morale it has ever seen. The Chief runs this once Great Police Department like a Dictator and not a Leader to be looked up to. I am ashamed to call myself a Mesa Police Officer with the current Executive Staff and more so with the current Chief of Police!

I've been very sad to watch my fellow officers' trust of our leadership crumble. I hate feeling doubt as I look out the window of my patrol car at a suspicious subject instead of fire in my belly because I know I won't be supported if things go wrong. The leaders that we still look up to are obviously stifled by the Chief. The others continue to show their true colors and fail to stand up for their troops, going along with a course that they know is wrong. We're at the point that CRIMINALS know the Chief doesn't support "his" officers and they take advantage. The good people who are paying attention SEE this and know that we are effectively hobbled in PROTECTING OUR CITIZENS! This is unacceptable to us. Chief Bautista is counterproductive in general to our Mission. This is a betrayal of the trust placed in us by the citizens of Mesa, Arizona, and the United States. I don't believe that I'm being dramatic. This is such a serious subject and it warrants our passion!

With the current state of the department I will be one of the many that will be retiring right at 20 years of service.  The department would have to change dramatically for me to stay past 20 years.

Question #8 is somewhat confusing.  While I believe the Chief encourages employees to actively communicate with members of the community (which would suggest good leadership by the Chief and a positive response to the question), his treatment of employees is contrary to the underlying principle and it hinders positive interaction with the community.

I would like to single out Ken Cost as the one person on the 4th floor who I believe cares about the officers.  Everyone else up there seems to be all about themselves and their kingdom building.

Mesa PD is and will always be an awesome PD to work for.

Consistency with department wide process improvements.  Keep morale a top priority in order to maintain member retention during these current staffing shortages.  Consider the fact that we (rank and file) are being regularly asked to do more for the same pay/benefit...sometimes less.

I have had no interactions with Chief Cost this year so it was I cant accurately describe his job performance.  Commander Abalos has been my commander for the last year and I have little interaction with him.  I have no complaints with him.  My sergeant and lieutenant have been great the last year and have zero complaints.  When I look at the current chief compared to others I see a vast difference.  This chief did come into a rough situation with the Brailsford trial, but he knew that when he applied for the job.  Whenever the chief speaks he always start off by saying he did patrol for the first ten years of his career than gets into the his speech.  When he first made he trips around the department he said he wanted more cars and patrol to longer respond to suicidal people.  On any given Friday or Saturday swing shift at Red Mountain it is almost impossible to find a vehicle, and we are responding to more suicidal calls than ever.  Yes the chief has placed any emphasis on training but worthless training.  Icat and the unbiased training.  When Perf came they even said we were doing things right but it still costs the department $120,000, which happens to be the ammo budget.  I look at the 701 East Main Street situation and agree the entire situation could have been handled differently.  The officers were dealing with two males that were possibly breaking into a females house with kids.  Force was used on one of the males that didn't look great on camera.  Yes if someone asked the officers they would have liked the situation to go differently.  My biggest problem with the situation was the press conference and how our chief was disgusted before the investigation took place.  During this press conference he did not have moments to react and his thoughts should have not been emotional.  Compare this to when a Phoenix Officer shot someone in a single handcuffs, and their chief responded to the media by saying the situation is being investigated.  The worst part is our chief has still not said he did anything wrong.  Part of being a great leader is admitting when you were wrong and learning from your mistakes.  Last years officer and detective of the year was an absolute joke.  Every officer in this department knows who the meritorious board voted for.  It is an insult to the women of this department on how that situation was handled.   I see officer are scared to do their jobs on the street.  Officers are just walking away when suspects

JOHNSON 001146

become hostile towards them when the original contact was a civil violation.  Officers on the street feel the chief does not support them when push comes to shove, no matter how many videos come out.   It is obvious to officers in the department things are not going as planned on the 4th floor.  Just look at how many commander and lieutenant shake ups we have had in the last 18 months as compared to how many we have had in the last ten.

The chief does not understand real police work and does not handle the media very well. The chief buckles under pressure and does not have his officers back when the situation dictates otherwise. The chief lacks leadership to actually guide, direct, and be influential to the department. The Leadership sees it and so do the officers.  If the officers can't trust the chief, how can officers effectively do their jobs to protect and serve the community they work for.  Who would want to work for a chief that you simply can't "trust"?  His "Actions" speak louder than his words do.  The Leadership, as a whole, need to work on communication.  Messages seemed to be filtered and are political instead of being straight forward at times.

In over 20 years of service I have never seen such a divide between the Chiefs and the rank-and-file. The current Chief has promoted Assistant Chiefs and Commanders who are the most self-promoting/self-serving group I have ever witnessed.  Certain awards and positions have been given out of favoritism. These are weekly conversations with my peers and the general attitude of many.  I would go so far as to say the Chief and most Assistant Chiefs have "lost their way."  These are not leaders, but opportunistic individuals who only care for themselves.  I only have respect for the rank, not the individual – in the past, many of the people who were in these positions were respected as a person and rank was second. This department does have leaders most will follow who have proved themselves in this department.   I, and many others, believe the Chief and his Assistants think the rest of the department are idiots and do not see through his decisions.  The 40 under 40 award and the "hero" award to the recently promoted Lieutenant is a joke.  Everyone knows she's not a leader or a hero.  She may be a nice individual, but she's a "leader" no will follow.  She was sent to be the academy sergeant for one class?!  And she's supposed to be the savior of the department?!  She will work less that less than two months on the street before she is give and cushy position on the fourth floor.  The Chief has set her up for failure amongst the troops.  How can an Assistant Chief conduct herself the was she did with SWAT and the Air Unit and get away with it?  Even a first-year sergeant knows better that do act the way she did.  She leads by bullying and fear.  I've never seen the "excecutive" Assistant Chief outside of HQ for the past ten years.  Quite the "leader" there.  Just because someone goes to Quantico does not make them a leader.  That goes for everyone.   Surely Chiefs have tough decisions, but it seems many of the decisions have simply been stupid.  You can't BS a bunch of BS'ers.        Rate statement:  Executive leadership places emphasis on employee wellness – specifically physical and mental health. --- Sure they emphasize it, but only care about it when it gets them promoted.  This area is just what's popular in LE.  The implementation and real effect is a joke. Rate statement:  The Chief empowers his direct reports to solve problems through individual initiative reflecting accountability and urgency.  Sure, but only if the direct reports subordinates agree with the Assistant Chief way of "solving problems."  If you don't agree, you're punished.  The Assistant Chief and Commander positions have the least amount of accountability on this department – even if they know something is an issue.  Rate statement:  The Chief empowers officers to solve problems through individual initiative reflecting accountability and urgency.  The initiative is only a priority for the chain if it can get a Lt. or Cmdr. promoted.  Even if it's a good proposal for the department as a whole, but isn't a pet project for the Lt., Cmdr., or Asst. Chief  – they will do nothing for it.   I used to enjoy coming to work.  I did a good job for my boss because I WANTED to.  I felt empowered.  I felt my back was covered.  I felt I could make a minor mistake and move on.  Now I do not feel empowered, my Chief and his cronies are against me, I make a minor mistake and my job is at risk – sounds like a "leadership" problem to me.  Yes, I used quotation marks around the word leadership.  There is no quality leadership within the higher ranks at this point.  Promote Beaton, Nesbit, Dvorak, Bellows or those who actually care more about other people rather than themselves and this Department can get back on the right track.  We need to hit the reset button on leadership, "feel good" projects, LE fads, and get back to the basics – protect, serve, investigate, lock bad people up.

JOHNSON 001147

**EXHIBIT 12**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Robert Johnson, an        ) No. 2:19-CV-02827-JAT-JZB
individual,               )
                          )
                          )
            Plaintiff,    )
                          )
vs.                       )
                          )
City of Mesa, et al.,     )
                          )
                          )
            Defendants.   )
_____)




VIDEOTAPED DEPOSITION OF RAMON BATISTA


Phoenix, Arizona
January 9, 2020
9:05 a.m.








                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
                                    Suite 300
                              Gilbert, Arizona 85234
PREPARED BY:                     P (602) 230-5454
                                 F (480) 546-3721
Donna DeLaVina, RPR
Certified Reporter               www.dlvreporting.com
Certificate No. 50468

1   fire and told to deal with it.  The city council

2   screwed up.  Screwed us by not allowing Dvorak the

3   right to ship" -- or "to right the ship before hiring

4   an outside chief.  The City council and manager screwed

5   Batista by not hiring him and throwing" -- "by hiring

6   him and throwing him into a furnace."

7           Did I read that correctly?

8   A.  Yes.

9   Q.  Is that something that you've heard other

10  people share as well?

11          MS. RETTS:  Form.

12          THE WITNESS:  In some -- yeah, some

13  forms -- some parts of it.

14  Q.  BY MR. ROBBINS:  What are the parts that people

15  have shared with you before today?

16          MS. RETTS:  Form.

17          THE WITNESS:  That the training did

18  change.  That Chief Silbert's way of policing

19  emphasized more of the warrior mindset than the

20  guardian mindset.

21          I was trying to find a balance in

22  maintaining the community's trust.  And I was also

23  working very hard to make sure that the DOJ saw that we

24  were decisively addressing training and making changes.

25  Q.  BY MR. ROBBINS:  What were the changes in

1           MS. ALVARADO:  Object to the form.

2           MS. STILLWELL:  Form.

3           THE WITNESS:  No.

4      Q.  BY MR. ROBBINS:  You had said Chief Silbert's

5  way was more of a warrior versus a guardian mindset.

6  What were you told?

7           MS. STILLWELL:  Form.

8           THE WITNESS:  That the focus would be on

9  arresting the bad guy, catching the bad guy, that type

10 of thing.

11     Q.  BY MR. ROBBINS:  What is a warrior mentality?

12          MS. STILLWELL:  Form.

13          THE WITNESS:  A warrior mentality to me is

14 that you view yourself as a warrior.  That you go out

15 there and it's you going out there to fight the fight.

16 In the public, if we're talking about the context of

17 the warrior mentality and policing, that's how I would

18 see that.  That's what I'm thinking.

19     Q.  BY MR. ROBBINS:  So a warrior is going to

20 resort to violence more than a guardian, fair?

21          MS. ALVARADO:  Object to the form.

22          MS. STILLWELL:  Form.

23          MS. RETTS:  Form; foundation.

24          THE WITNESS:  I guess it's fair to say

25 that a warrior could look at it -- could resort in

1  a problem?

2      A.   I think it's BlueTeam.

3      Q.   BlueTeam?

4      A.   I think.

5      Q.   And do you know whether the statistics for

6  BlueTeam were kept on a year over year basis or they

7  started during your tenure?  Or do you know when that

8  was started?

9      A.   That was started way before my tenure and there

10 is an officer that's charged with pulling that data out

11 and then compiling an annual report.  And I think that

12 that report actually comes out maybe twice a year.

13 There might be a semi annual and an annual or

14 quarterly.  I can't remember.  But there is somebody

15 that's charged with that.

16     Q.   Okay.  Going back to the discussion that Chief

17 Silbert's way was kind of more of a warrior than a

18 guardian mentality.  Can you give some examples of a

19 warrior mentality?

20          MS. ALVARADO:  Form; foundation.

21          MS. RETTS:  Form; foundation

22          MS. STILLWELL:  Form; foundation.

23          THE WITNESS:  You're -- I'm giving you my

24 perspective.  I don't know if it's, you know, wholly

25 accurate.  But let's say that I've got a warrior

1  mentality.  And so I'm driving around and I avoid calls

2  that require a softer touch and all I'm looking for are

3  the hot calls, the calls that elicit the thought that,

4  hey, there could be a confrontation.

5      And so I am always available for those

6  calls versus trying to help somebody at a bus bench

7  that's, you know, sleeping and needs a place to stay.

8      Q.  BY MR. ROBBINS:  Yeah.  But going back to --

9  because you -- we had talked a little bit about Heston

10  Silbert and then you had mentioned Chief Silbert being

11  mentioned as more of instituting a warrior versus a

12  guardian mentality.

13      What did you hear?  What was the

14  specifics?  Or, you know, who were you -- let me get as

15  much as you can remember.  I know that it may not be a

16  memory that would necessarily be one that you want to

17  bring up, but I have to ask you to do that.

18      MS. ALVARADO:  Object to the form.

19      MS. RETTS:  Form.

20      MS. STILLWELL:  Form.

21      THE WITNESS:  A warrior mentality,

22  that. . .

23      Q.  BY MR. ROBBINS:  It's aggressive, right?

24      A.  Yeah --

25      MS. ALVARADO:  Object to the form.

1      MS. RETTS:  Form; foundation.

2      THE WITNESS:  Yeah.  It can be deemed

3  aggressive.

4    Q.  BY MR. ROBBINS:  And in terms of the guardian

5  mentality, you're trying to figure out or you're trying

6  to deal with the people, just like you had talked about

7  in terms of your discussion about constitutional

8  policing.  You're dealing with people and trying to see

9  if maybe politeness is going to get you somewhere.

10  That force may get you the same result.  It may be a

11  lot worse.  But you at least have tried to be nice to

12  begin with?

13    A.  Right.

14      MS. ALVARADO:  Object to form.

15      MS. STILLWELL:  Form.

16    Q.  BY MR. ROBBINS:  And do you believe that that's

17  part of the requirement for constitutional policing,

18  that people have a guardian mentality and a warrior

19  mentality only when it's necessary?

20      MS. ALVARADO:  Object to the form.

21      MS. RETTS:  Form; foundation.

22      MS. STILLWELL:  Form; foundation.

23      THE WITNESS:  I agree that you do need to

24  be able to go back and forth between those spectrums in

25  order to try to pull it off and get it right.  I think

1 | STATE OF ARIZONA        ) SS.
                           )
2 | COUNTY OF MARICOPA      )

3

4      BE IT KNOWN that the foregoing proceedings
were taken before me, DONNA DELAVINA, Certified
5 | Reporter No. 50468; that the witness before testifying
was duly sworn by me to testify to the whole truth;
6 | that the foregoing 245 pages are a full, true and
accurate record of the proceedings, all done to the
7 | best of my skill and ability; that the proceedings were
taken down by me in shorthand and thereafter reduced to
8 | print under my direction.

9      [X]  Review and signature was requested.

10      [ ]  Review and signature was waived.

11      [ ]  Review and signature not required.

12      I CERTIFY that I am in no way related to any
of the parties thereto nor am I in any way interested
13 | in the outcome hereof.

14      I FURTHER CERTIFY that I have complied with
the ethical obligations set forth in ACJA 7-206.  DATED
15 | at Phoenix, Arizona, this 22nd day of January, 2020.

16

17      Donna DeLaVina, RPR
     Certified Reporter
18      Certificate No. 50468

19      *    *    *    *    *    *

20

21      I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
complied with the ethical obligations set forth in ACJA
22 | 7-206.

23

24      Donna DeLaVina, RPR, Owner
     Donna DeLaVina Reporting, LLC
25      Arizona RRF No. R1010

**EXHIBIT 13**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


SANJA KRSTIC, et al.,           )
                                ) No. CV-16-02830-PHX-ROS
          Plaintiffs,           )     CV-16-02905-PHX
                                )     (Consolidated)
     vs.                        )
                                )
OFFICER DUSTIN GRANSEE, a City  )
of Mesa Police Officer, et al., )
                                )
          Defendants.           )
_____ )




          30(b)(6) DEPOSITION OF MESA POLICE DEPARTMENT
                         (JEFF JACOBS)

                        May 8, 2017
                        12:26 p.m.
                      Phoenix, Arizona










(Original)
PREPARED FOR:                   REPORTED BY:
                                Herder & Associates, LLC
Superior Court                  Jennifer Honn, RPR
                                Certified Court Reporter
                                CCR No. 50885


© Herder & Associates, LLC (480)481-0649
www.CourtReportersAz.com

JOHNSON 000651

1  as a Taser, bean bag shotguns, or depending on the

2  officers there, we might have a Sage gun.  Batons.

3      Q.   What's the Sage gun?  I thought that was a bean

4  bag?

5      A.   No, the bean bag is fired from a 12-gauge

6  shotgun, and it's just a sock filled with basically

7  beans.

8           A Sage is a rubber baton fired from a

9  40-millimeter firearm.

10     Q.   So when you say a 40-millimeter firearm, is that

11  a Glock?

12     A.   No.  It's its own special --

13     Q.   Are all officers equipped with Sage guns or only

14  certain officers?

15     A.   Only certain officers.

16     Q.   Who are generally the ones that possess those

17  type of alternative use of force weapons?

18     A.   SWAT team or violent offender unit.  I think

19  some of our gang unit officers have those.

20               MR. STEADMAN:  Does it look like a rifle or

21  a handgun?

22               THE WITNESS:  It looks like a rifle.  It's

23  shoulder mounted.

24     Q.   (By Mr. Robbins) Do you ever teach that the

25  officer should use aggression in order to deescalate

1  situations?  That they should become aggressive and try
2  to push things towards deescalation?
3              MR. STOUTNER:  Form.
4              THE WITNESS:  Yes.
5      Q.   (By Mr. Robbins) Under what circumstances?
6      A.   Well, I think -- I apologize.  I think I
7  understand what you're saying.  But let me make sure.
8      Q.   Sure.
9      A.   One of the things I teach our officers is that
10 sometimes a more aggressive approach can solve a problem
11 or end a situation faster, thus making it less likely
12 that you'll use force.
13     Q.   Under what circumstances do you discuss that as
14 being an optimal solution?
15     A.   Well, there really isn't --
16             MR. STOUTNER:  Form.
17             THE WITNESS:  -- circumstance where it's
18 optimal.  It just depends on the situation.
19     Q.   (By Mr. Robbins) Were you aware that the
20 training regarding mental illness suggests that trying to
21 push the situation can create additional dangers to The
22 individual being dealt with?
23             MR. STOUTNER:  Form.
24             THE WITNESS:  So you're asking me if I'm
25 aware?

1    Q.    (By Mr. Robbins) Yeah.

2    A.    That the training on mental illness --

3    Q.    Yeah.

4    A.    Yes.

5    Q.    And what do you, in terms of that, what do you

6    do when you teach people that -- or strike that.

7         In terms of the objective reasonableness of the

8    behavior, under what circumstances do you teach that it's

9    appropriate to become more aggressive because it will

10   effectively end the threat sooner?

11              MR. STOUTNER:  Form.

12              Would you mind repeating the question,

13   please?

14              (The reporter read back the requested

15   portion of the record.)

16              THE WITNESS:  Well, I guess I don't really

17   teach a circumstance for that.

18   Q.    (By Mr. Robbins) Well, it's like giving a person

19   a tool set, but not giving them the instructions if you

20   suggest that under some circumstances you might want to

21   be less aggressive and slow down things and try to pacify

22   the situation, and in other situations you'll want to

23   become more aggressive and try to push the circumstance

24   or push the situation, but you don't try to teach them

25   when.

JOHNSON 000692

1  STATE OF ARIZONA    ) SS.
                       )
2  COUNTY OF MARICOPA  )

3          BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7
           I CERTIFY that I am in no way related to any of
8  the parties hereto nor am I in any way interested in the
   outcome hereof.

9

10         [X] Review and signature was requested.
           [ ] Review and signature was waived.
11         [ ] Review and signature not required.

12
           I CERTIFY that I have complied with the ethical
13 obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
   J(1)(g)(1) and (2). Dated at Phoenix, Arizona,
14 this 18th day of May, 2017.

15
                        _____
16                      Jennifer Honn, RPR
17                      Arizona CR No. 50885

18

19                           *   *   *

20
           I CERTIFY that Herder & Associates, LLC, has
21 complied with the ethical obligations set forth in ACJA
   7-206 (J)(1)(g)(1) through (6).

22

23

24                      _____
                        Herder & Associates, LLC
25                      Arizona RRF No. R1062

**EXHIBIT 14**

# JOHN MC MAHON & ASSOCIATES,LLP

(661) 312-2434 | MCMAHON7@MAC.COM

**Ocober 6, 2018**

Ramon Batista, Chief of Police
Mesa Police Department
130 North Robson
Mesa, Arizona  85201

Chief Batista:

Attached is the report of my analysis, opinion and recommendations regarding the arrest and use of force of Mr. Robert Johnson on May 23, 2018, by Mesa Police Department officers.  Should you or any member have any questions, please don't hesitate to call me.  I can be reached at (661) 312-2434,

As indicated in the report, my opinions and recommendations are mine and based on my expertise in use of force review and adjudication and the over 29-years of experience with the Los Angeles Police Department with specialized expertise in the review of use of force.

Sincerely,

JOHN McMAHON

Attachment

# Mesa Police Department
# Use of Force Incident No. 2018-205

JOHN MCMAHON & ASSOCIATES, LLC
*A Law Enforcement Use of Force and Tactical Review Consultancy*

1

Mesa/Johnson 002356

This is an independent review of this use of force incident. This review focused solely upon the use of force and did not evaluate the quality of the related investigations.

I have reviewed the use of force incident and subsequent arrest of Robert Lee Johnson for Disorderly Conduct – Fighting and Hindering Prosecution that occurred on May 23, 2018 by the Mesa Police Department.

I have analyzed this case and all the supplied evidence for this incident by applying my more than 29 years of knowledge, skills, education, training, and experience as a law enforcement officer, together with my continuing involvement as a member of the Los Angeles Police Department (LAPD) where I have been responsible for the proper review and adjudication of more than 6,000 uses of force to include officer involved shootings. It was in this position where I was a member of the Department's Tactics Training and Review Committee and instructor on various police procedures and subjects, including lethal and nonlethal force.

My opinions in this case were based on my analysis of the documentation and evidence, then applying my knowledge and understanding of generally accepted law enforcement standards and best practices. I have also based my opinion against Mesa Police Department policy and procedure; use of force philosophy and definitions, and applicable Arizona and federal law. My opinions are offered with a reasonable degree of professional certainty and are based on:

- My review of on-body camera footage, audio of radio transmissions and 911 calls, training lesson plans, audio recordings and transcriptions of involved officer interviews, along with the criminal investigation completed by the Scottsdale Police Department and its accompanying PowerPoint presentation;

- My personal knowledge, skill, education, training, and experience as a researcher, policy developer, user, trainer, reviewer, and consultant on law enforcement use of force, tactics and procedural issues;

- More than 29 years of law enforcement experience as a sworn police officer, sergeant, lieutenant, captain, and commander with the Los Angeles Police Department;

- The training and experience I received during my duties as an officer from the Los Angeles Police Department and California Peace Officer Standards and Training;

- My specific personal experience as a police officer with detaining and/or arresting people and occasionally using physical force;

- My specific personal experience as a police captain at the Los Angeles Police Department's Use of Force Review Division where I was responsible for the proper review and adjudication of use of force;

Mesa/Johnson 002357

- Additional knowledge and/or training I have obtained, particularly from the Police Executive Research Forum (PERF), the International Association of Chiefs of Police (IACP), Los Angeles County Peace Officers Association, the Force Science Institute (FSI), the American Society of Law Enforcement Trainers, and the National Tactical Officers Association;

- Specific experience with respect to the investigation, administrative review, and adjudication at the supervisory and command levels on police use of force incidents and related command and control of these incidents;

- Prior and ongoing work as an expert witness on police procedures and policy, training, equipment, tactics, supervision and review processes; and,

- Frequent attendance as a lecturer or participant in use-of-force conferences that focus on force options.

I bring to this review an expertise in strategic policy development, de-escalation tactics, and de-escalation and command & control of law enforcement critical incidents. I have helped write and implement new policies and procedures regarding use of force and tactics. I am a nationally recognized use of force expert. I have spoken around the country on Use of Force and de-escalation and am currently one of a few Advanced Force Specialists from the Force Science Institute;

The following is my review and analysis of Mesa Police Department, Use of Force Incident No. 2018-205.

During the course of my analysis, I found that four Mesa Police Department officers were involved in applications of force that that present disturbing issues. Those four officers are Police Officers E. Calderon #11836, J. Jones #16927, R. Monarrez # 21672 and Detective R. Gambee #19170.

In addition, there were glaring tactical issues involving detention, use of force, supervisory oversight of the incident and over all failure to follow policy, procedures and training of the Mesa Police Department.

Mesa/Johnson 002358

On May 23, 2018, at approximately, 2345 hours, a call for service regarding a disturbance at 701 East Main Street, Apartment No. 307 was broadcast and assigned to Mesa Police Department (Department) patrol units. The comments of the call indicated that the ex-boyfriend of the reporting party's (RP) girlfriend, was at the location causing a disturbance. As units responded to the call, the RP reported that the suspect had left on foot and told the RP, he was lucky that he (suspect) did not have his *strap* (handgun).

While units were still en-route, the RP reported the suspect along with second male, described only as a male black, had returned to the location and attempted to force their way into the apartment by kicking the door. The radio call was then upgraded to Code-Three.

The first officer to arrive at the location was Officer Calderon.

According to Officer Calderon, the call involved two subjects, one being reported as armed with a gun. The incident was domestic violence related, which according to Officer Calderon, can be one of the most dangerous calls an officer can handle.

He explained that he arrived at the apartment complex and took the elevator to the third floor. As he rode in the elevator, he drew his service pistol because the call involved a person with a gun and he didn't want to be ambushed when the door opened.

When he reached the third floor, he exited the elevator, holstered his service pistol and walked into the hall. He had planned on waiting for additional officers to arrive due to the violent history the apartment complex but explained that he heard talking and laughing so he moved down the hallway to investigate.

As Officer Calderon turned the corner of the hallway, he encountered Erick Reyes and Robert Johnson.[2]

> **Note:** The investigation determined that Reyes was the suspect of the radio call and Johnson was the second male referenced in the comments of the call.
>
> The contact between Officer Calderon, Reyes and Johnson was captured on Officer Calderon's On-Body Camera (OBC) and the apartment complex's surveillance system.

Upon making contact, Officer Calderon directed Reyes to sit down on the floor with his back against a nearby wall. He also asked Johnson, who had walked past him towards the elevator,

---

[1] The summary and the investigation completed by the Mesa Police Department and Scottsdale Police Department as provided to me for review.
[2] Erick Reyes, 20 years old, five-foot, three inches tall, 170 pounds and Robert Johnson, 33 years old, approximately six-foot, one inch tall, 185 pounds.

Mesa/Johnson 002359

to not leave and sit as well.  Johnson refused and instead pulled out a cellular phone, walked to the balcony railing overlooking the parking lot and began talking.   Officer Calderon gave several more commands for Johnson to sit and/or move to the corner of the wall, near the elevator, but he refused.

Officer Calderon then notified responding officers and dispatch that he had contacted two males, advised his location in the complex and waited for the arrival of the responding officers.

As Officer Calderon stood and waited, Reyes remained seated on the ground and Johnson continued talking on the phone, standing at the balcony railing.

> **Note:**  For several minutes, Officer Calderon stood in a position without cover, giving no commands or instructions to either Reyes or Johnson.  In addition, he did not advise responding units that upon exiting the elevator, they would encounter Johnson or the possible crossfire that existed (**Identified Issue – High Risk Stops / No. 1**).

According to Officer Calderon, he had enough reasonable suspicion to detain both Reyes and Johnson when he stopped them based upon the call for service which reported an attempted break-in and domestic incident with someone being armed.

> **Note:**  Officer Calderon acknowledged that later, after the use of force with Johnson, he discovered the firearm reported in the comments to the call was possessed by the RP inside the apartment during the use of force incident.

Mesa Police Department Officers Jones, Monarrez, and Bridges then arrived and exited the elevator.  Officer Calderon directed the arriving officers to Johnson, who was still standing against the balcony railing on his cellular telephone
**(Identified Issue – On Body Camera / No. 2)**.

> **Note:** According to Officers Jones, Monarrez and Bridges, they all felt threatened by the fact they were on the third-floor balcony, near a railing when dealing with Johnson, but none of them gave any instruction to Johnson or made any effort to have Johnson move to a different location prior to conducting a frisk search.

Officers Jones and Monarrez then contacted Johnson as Officer Bridges assumed the role of cover officer.

According to Officer Jones, he asked Johnson, who was standing against the balcony railing talking on his cellular telephone to hang up.  Johnson, in a *somewhat confrontational* tone, refused.

Jones explained that Johnson was wearing *baggy clothes* and he was in an apartment building that was known for *shooting and stabbing.* He felt the clothing Johnson was wearing made it *easy to conceal* a *knife or gun,* so he conducted a *pat down* search for *weapons.*

Mesa/Johnson 002360

**Note:** Officer Calderon's On Body Camera (OBC) captured that as Officer Jones told Johnson he was going to conduct a "*pat down*" for weapons, Johnson advised that he had a knife in his right pocket. According to Officer Jones, he completed his search, but did not locate the knife.

In addition, while conducting the frisk search, Officer Jones and Monarrez allowed, despite being told by Johnson that he had a knife, Johnson to continue to stand and talk on his cellular telephone, unrestrained and uncontrolled. The search was incomplete **(Identified Issue – Frisk Searches / No. 3)**.

After searching Johnson, Officer Monarrez and Jones instructed Johnson to have a seat against the wall, directing him to the wall near the elevator, opposite the balcony railing. Although Johnson verbally resisted, he walked over to the wall **(Additional Identified Topics).**

At the wall Johnson did not sit, but continued to stand, talking on his cellular telephone.

According to Officer Monarrez, he again instructed Johnson to sit down against the wall, but Johnson refused, ignoring him and becoming verbally confrontational, telling Officer Monarrez he was *small*. Officer Monarrez took Johnson's statement as one of *ill intent* and explained it made the *hair on the back of his neck stand up.*

According to Officers Jones, he again instructed Johnson to sit down, telling him to *have a seat on the ground.* Johnson remained in the same position still looking down towards his cellular telephone.

**Note:** Officer Calderon's OBC captured Officer Jones advise Johnson that*, I ain't going to ask you again, have a seat,* drawing a proverbial "line in the sand" for Johnson.

Surveillance system footage then showed Johnson took his cellular telephone from his ear and moved it to a position down in front of him. Johnson then appears to look down towards the telephone as he lowered his body to a position against the wall. Johnson was positioned in a partial crouching position. His quadriceps were at about a 45-degree angle to the floor with his back pressed against the wall. Several officers are then heard on OBC telling Johnson, *all the way down* **(Additional Identified Topics – Simultaneous Commands).**

The footage then depicts that Officer Jones, Monarrez, Bridges and Calderon then began to move towards Johnson.

According to Officer Calderon, while talking with Reyes, he observed Officer Jones' interactions and felt *something was going to happen.* He thought Officer Bridges was going to assist, but observed Officer Bridges move *away from the situation,* leaving him (Officer Calderon) with *no choice* but to assist. He left Reyes seated on the floor and went to assist the other officers with Johnson, who he described as a *combative subject.*

Mesa/Johnson 002361

**Note:** When Officer Calderon went to assist with Johnson, neither Reyes nor his backpack had been searched. He was never handcuffed **(Identified Issue – Contact / Cover #4)**.

According to Officer Jones, as he *approached* Johnson, his *demeanor changed.* Johnson's *breathing became shortened, shallow* and he appeared to *brace himself a little more against the wall.* In addition, he noticed Johnson began to *look down at the floor.*

**Note:** Jones explained that his training and experience in martial arts, looking down enables a person to better track *multiple assailants*, especially when *braced against* an object.

According to Officer Jones, he felt Johnson was *preparing mentally and physically for something, possibly* an attack*.* He decided that he *needed to act now* and attempted to obtain an *OCCS control hold.*

**Note:** Despite feeling that Johnson was preparing to attack, Jones did not communicate his observation to any of the other officers who were also vulnerable to such an attack. There was no planning or coordination amongst the other officers despite adequate time and opportunity.

He reached out and *grabbed* Johnson *left* hand. Upon making contact, he found that Johnson had his left hand in a *balled fist* making the OCCS hold ineffective. He further explained that once he *grabbed* Johnson's *wrist,* Johnson then *began his active resistance* **(Use of Force – Control Hold)**.

**Note:** Officer Calderon's OBC captured that when Officer Jones grabbed Johnson's left wrist, Johnson's left arm moved down and away from his body. Officer Jones then released his grip on the wrist and reached for Johnson's neck. The footage also revealed that no verbal commands or instructions, beyond the repeated requests to sit, were given to Johnson prior to the officers' approach.

According to Officer Monarrez, he *grabbed* Johnson's *right arm* to establish a *control hold.* As he grabbed Johnson's hand/arm, he could *feel* the *arm* and *muscles tensing.* He explained that he fought for *control* of Johnson's arm and observed *out* of his *peripheral* vision that Officer Jones delivered a few *limited strikes* to Johnson **(Use of Force – Control Hold).**

According to Officer Calderon, Johnson *wasn't being compliant,* so he *took a hold* of Johnson's left arm, which he described as *stiff* and *straightened up* with *balled fist.* He struggled to control the arm, so he *delivered two closed fist strikes to* Johnson's *upper left arm,* attempting to *loosen the arm* so he could bring it down to a position of *disadvantage.*

Mesa/Johnson 002362

**Note:** My review of the OBC and surveillance footage from the incident did not depict any actions by Johnson that would characterize "active resistance" prior to Officer Jones contact. The footage depicted that Johnson was only offering passive resistance to the officers' commands. He was complying, albeit slowly, and the officers' requests were being complied with until physical contact. In addition, Johnson's actions when the officers contacted him, appear to be more reactionary, resulting from the physical confrontation from Jones as opposed to active/assaultive. Up until the time of contact, Johnson had been given no verbal instruction other than sit down or else **(Identified Issues – Use of Force)**.[3]

According to Officer Jones, because he was unable to effectively use the OCCS hold, he attempted to *sweep* Johnson's leg out from under him. The sweep proved unsuccessful. He then decided he wanted to keep Johnson on the wall, so he moved *directly in front* of him, braced his leg and began to *control* Johnson's *head* using a *Muy Thai* type neck *clasp*, with both his arms **(Use of Force – Control Hold /Take Down & Neck Pull)**.

**Note:** Surveillance and OBC depicts that Officer Jones, after reaching for Johnson, reached up to his neck area and pulled him down and closer. It also depicted that Officer Calderon, using both hands, unsuccessfully attempted to grab Johnson's head. Calderon's hands slipped, then Calderon moved to grab Johnson's left arm. Officer Monarrez maintained control of Johnson's right arm.

According to Officer Jones, he attempted to *snap down* on Johnson neck and take him to the floor, but it didn't work. He then transitioned to *knee strikes* and delivered *three knee strikes,* delivered with both knees, *focused* on Johnson's *abdomen* to *shock* him **(Use of Force – Control Hold /Snap Down & Knee Strikes)**.

**Note:** On Body Camera footage from Officer Bridges depicts that Officer Jones delivered two knee strikes to Johnson's abdominal area.

According to Officer Jones, the knee strikes appeared ineffective, so he transitioned to *hard hand or fist strikes* on Johnson's *left jaw* area. He delivered *five strikes* to Johnson's *jawline* at about 60% *strength* to, as he described, *shock the computer* of the brain. He explained that *after each strike,* Johnson would turn his head and *look at* him **(Use of Force – Strikes and Additional Identified Topic – punches to boney areas)**.

**Note:** Officer Bridges' OBC depicts that Officer Jones released his right hand from Johnson's neck area, maintained control of Johnson head/neck with his left hand and

---

[3] Active Resistance: Physical actions on the part of a subject who is ignoring verbal commands and actively attempting to prevent the officer's control, but does not constitute an assault. Examples include ignoring the officers verbal commands and pulling away, hiding behind/under objects, pinning arms under the body, thrashing around, body going rigid, assuming a fighting stance.
Passive Resistance: Physical actions that do not prevent an officer's attempts at control. May include verbal responses but no threats (DPM 2.1.45F1 REV 01-13).

Mesa/Johnson 002363

then delivered five strikes to Johnson face/head.  It also showed that during the third, fourth and fifth strike, Johnson was looking to his right, towards Officer Monarrez and not Officer Jones.  Additionally, footage depicts that Johnson's right hand was still holding his cellphone, down near his abdomen and his left hand was controlled by Officer Calderon. It did not appear that Johnson is attempting fight or assault the officers.

According to Officer Jones, he *realized* the strikes weren't effective.  He paused, *assessed and* then struck Johnson one additional time with an *elbow strike* to the *forehead area.*

Officer Jones explained that as he delivered the elbow strike, Johnson was *falling* and at the time, he *assumed* this was Johnson attempting to *duck the elbow.*

**Note:** Officer Bridges' OBC footage depicts that between Officer Jones' fifth and six strike, he delayed approximately 1.25 seconds (according video).[4]  During this delay, Officer Jones' held his right hand in a fist, in a ready position to deliver a punch.  His arm and fist moved up and down as if tracking Johnson's head/face. When the sixth strike is thrown, someone can be heard on OBC stating, "sit down."  The strain in the voice making the statement and timing with the punch being delivered by Officer Jones appears to correspond to one another.

According to Officer Monarrez, as they struggled with Johnson, he delivered one *closed, right hand fist strike* to Johnson face.  As he delivered the strike to Johnson's face, Johnson *fell* down *against the wall* and they (officers) *proceeded to* place his hand behind his back (**Use of Force – Strikes and Additional Identified Topic – punches to boney areas).**

According to Officer Calderon, the strikes of Officers Jones and Monarrez delivered were *ineffective* so he decided they *had to take him down.*  He reached down *with both* hands and *pulled* Johnson's *left leg out from under him* and Johnson *went down to the ground*.

**Note:** Officer Bridges OBC footage depicts that Officer Calderon attempted to also strike Johnson in the head with a closed fist strike during the struggle but missed.  While this is not a reportable use of force, I will address it in my analysis.

Additionally, the surveillance and OBC footage depicted that Johnson slid down the wall, he came to rest in a seated position on the floor.  As he did so, he did not offer any resistance and appeared to be dead weight.  Once seated on the floor, his left hand came to rest on the ground and his right hand was still gripping his cellular phone.  He appeared to be momentarily unconscious.

---

[4] The elapsed time is approximate only as it is recognized that the of use of video only is not an exact measure of time.

Mesa/Johnson 002364

Audio from the OBC's captured that after being motionless and possibly unconscious, Johnson then appeared to wake stating, *you know. I know you're beautiful. Guess what? What's so funny, is that you didn't need to put all that force on me.*

When asked during their interviews, the officers either didn't recall or didn't believe Johnson went unconscious. The investigation also revealed that medical assistance was not summoned to the scene for Johnson.

As Officers Jones, Monarrez, and Calderon began to physically confront Johnson, Detective Gambee and Sergeant W. Abbiatti #12348 arrived in the elevator and exited.[5] Immediately upon exiting, Detective Gamble joined the officers on the ground as the scuffle continued. Sergeant Abbiatti repositioned around the officers and Johnson, observing the struggle, before taking a position controlling Johnson's ankles.

**Note:** Surveillance footage shows that as the officers struggled to take Johnson into custody, Officer Calderon left Johnson and returned to Reyes. He then had Reyes stand up and place his hands behind his head. He then, and not until then, conducted a frisk search of Reyes' person.

Furthermore, footage depicted that during the frisk search, Officer Calderon did not control Reyes hands. Instead he used both his hands to search Reyes and his property. Once the search was completed he then again had Reyes take a seat against the wall and did not handcuff him **(Identified Issues – Frisk Search #3 and Additional identified issues – handcuffing)**.

Officers Jones, Monarrez, Bridges and Detective Gambee were then able to handcuff Johnson and Officer Monarrez and Detective Gambee conducted a search of his person. Johnson was then left positioned face down on the ground, handcuffed for approximately two minutes and ten seconds.

**Note:** During this time, Sergeant G. Moore #14192 and Officer C. Wilcox #19200 arrived on the third floor and exited the elevator. Sergeant Moore began talking with Sergeant Abbiatti at the railing of the balcony and Officer Wilcox spoke to Officer Calderon near Reyes.

Surveillance and OBC footage depicted that while lying on the floor, Johnson repositioned himself to a modified seated up position. Officer Monarrez and Gambee then approached Johnson, moved him back to his stomach and applied bodyweight to keep him facing down. Detective Gambee then stood and shortly after, Johnson thrusts his right shoulder up, pushing against Officer Monarrez who still had bodyweight on his back.

---

[5] Detective Gambee at the time was a detective in the STEP training program.

Mesa/Johnson 002365

**NOTE:** The investigation did not establish the officers' intended objective for moving him onto his stomach and placing bodyweight.

Officer Calderon again approached and applied body weight to Johnson's back and Johnson began to kick his legs. Sergeant Moore then approached and controlled Johnson's legs as Officer Wilcox applied a hobble to Johnson's ankles.

Johnson was then placed face down in a prone position with at least one officer and at times two officers applying bodyweight.

**Note:** During my review, I noted that Johnson was left in a face down position, a majority of the time hobbled, for three minutes and 25 seconds before being repositioned upright **(Additional Identified issue – positional asphyxia / Hobble procedures)**.

As they stood Johnson and walked him to the elevator, Detective Gambee and Officer Monarrez held Johnson's arms. At the elevator doors, Johnson turned towards Detective Gambee and, according to Gambee, attempted to spit on him **(Additional Identified Issue – Hobble Protocol/ escort)**.

According to Detective Gambee, he was *not very far from* Johnson, maybe *a couple feet* when he observed Johnson *curling his lips, building up a spit wad.* Believing Johnson was about to spit at him, Detective Gambee used his *right hand* to push Johnson's head *into the frame of the elevator.* He then applied a *mandibular angle* on Johnsons right ear area while instructing him to not *spit...*

According to Officer Monarrez, Johnson turned his head towards Detective Gambee and was yelling. Johnson then, as Officer Monarrez described, *cocked his head back,* in the *motion of spitting.* Detective Gambee then pushed Johnson's head away and he (Officer Monarrez) assisted. They then moved Johnson away from the elevator to wait for a *spit mask.*

According to Officer Monarrez, while waiting, *instead of having* Johnson *stand there,* they placed him on the floor. When asked about how Johnson was placed on the floor, Monarrez stated that officers near Johnson's torso area, *guided his weight down* as he *pulled his feet from under* him, by pulling the hobble strap.

**Note:** Surveillance and OBC footage depicted that as Detective Gambee moved Johnson away from the elevator, Officer Monarrez pulled the hobble strap, removing Johnson's feet from underneath him and Johnson fell abruptly to the floor. Johnson's was not supported when he fell.

Officer Monarrez also stated that he did not coordinate or tell the other officers he was going to pull the hobble strap and move Johnson to the floor (**Additional Identified Issue – Hobble Protocols)**.

*Mesa/Johnson 002366*

After Johnson was placed on the floor he remained in a prone position facedown with body weight applied to his back for approximately five minutes and forty-five seconds **(Additional Identified Issue – Hobble Protocols)**.

> **Note:** Surveillance footage depicted that after placing Johnson on the floor, Detective Gambee and Officer Monarrez remained on Johnson's back holding him down as Officer Wilcox retained control of the hobble cord. In addition, Detective Gambee appears to be applying direct bodyweight pressure to Johnson's head and neck against the floor with his hands. While on the floor, Officer Monarez took control of the hobble strap and appears to reposition the hobble to further limit Johnson's movement. Later footage from Officer Calderon's OBC appears to show that the hobble strap was attached to Johnson handcuffs to limit his movement (**Additional Identified Issue – Hobble Protocols**).

> Additionally, OBC footage captured Officer Monarrez tell Johnson, *now you're tough...real tough man...you had the chance. I was right in front of you...all talk.* Officer Monarrez explained this was *routine talking* and the statements were not made to antagonize Johnson **(Identified Issued – Discourtesy/ Number 5)**.

Johnson was then carried out by officers, placed into a patrol car, transported and booked into custody **(Identified Issue – OBC protocols/ #2)**.

FINDINGS

> In accordance with Arizona Revised Statues (ARS), police officers possess the legal authority to use reasonable levels of force necessary to lawfully control and/or arrest citizens.[6]

Use of Force:

- Control Holds:
  - Empty Hand Escort Controls
    - Officer Calderon (Firm Grip & Leg Sweep) – <u>DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.</u>
    - Officer Jones (Firm Grip, Neck Grab) – <u>DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.</u>
    - Officer Monarrez (Firm Grip) - <u>DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.</u>

---

[6] Reasonable Belief: Means that the facts or circumstances the officer knows, or should know, are such as to cause the ordinary and prudent officer to act or think in a similar way under similar circumstance (Mesa Police Department Policy Manual, Use of Force Philosophy & Definitions, DPM 2.1.1, Effective 11/29/2102.

Mesa/Johnson 002367

- o Mandibular Angle (Touch pressure and/or Quick penetration)
    - ▪ Detective Gambee – NECESSARY AND OBJECTIVELY REASONABLE
- • Strikes:
    - o Closed Fist & Elbow
        - ▪ Officer Calderon – DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.
        - ▪ Officer Jones – DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.
        - ▪ Officer Monarrez – DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.
    - o Knee Strikes
        - ▪ Officer Jones – DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE.

ANALYSIS[7]

During my analysis of this incident I identified issues that either deviated from Department policy and/or training, use of force philosophy or recognized best practices. Below are the identified issues:

**Identified Issue No. 1** High Risk Stop (Officers Calderon, Jones, Monarrez and Bridges)

O.C.C.S. Kneeling Cuffing
Kneeling cuffing can be used for a higher risk situation. Such as a high risk stop, or the officer is alone, and he/she feels it would be safer then standing.

O.C.C.S. Prone Handcuffing
Used to handcuff subjects in high-risk situation, commands should be given at gunpoint if reasonably necessary from behind cover if available or from a safe distance. IE: Armed subjects, potentially violent (Arizona Peace Officer Standards and Training Board: session Title: Handcuffing 8.5.14 and 8.5.15, June 2014)

Officer Calderon, along with Officers Jones, Monarrez and Bridges all approached a suspect they felt was possibly armed, without placing him in a position of disadvantage. Officer Calderon, who was by himself when he encountered Johnson and Reyes, stood in the hallway next to Reyes in a position without cover awaiting responding units even though he believed a firearm was involved and the suspect(s) might be armed. Additionally, Officer Calderon, did not have either Johnson or Reyes place their hands above their head or keep their hands visible.

---

[7] The analysis reflects my recommendations as supported by the preponderance of the evidence established by the investigation.

Mesa/Johnson 002368

Police officers are expected to use Department certified and trained tactics when faced with dangerous situations, by doing so they lower the risks posed to themselves and lessens the opportunity for a suspect to attack, fight, or escape. In this incident, the serious tactical flaws made by the officers could have had dire consequences had Johnson or Reyes been armed. By not following approved training, it contributed to an environment that gave Johnson the opportunity to passively resist and remain uncooperative.

Based on the totality of the circumstances, it is my opinion that Officers' Calderon, Jones, Monarrez and Bridges failure to follow certified and approved Arizona Peace Officer Standards and Training Board approved techniques likely contributed to the disproportionate, unnecessary and unreasonable use of force on Johnson and represented a deviation from approved Department training creating a substantial officer safety risk.

**Identified Issue No. 2**        On-Body Camera

All On-Body Camera Officers shall activate the On-Officer Body Camera when dispatched to a call or have any contact with the public. This includes, but is not limited to the following events:

- All calls for service.
- Code 3 Driving, Failure to Yield incidents and Vehicle Pursuits.
- Traffic stops and citizen contacts.
- Impaired driver investigations.
- Accident scenes.
- Transportation of any prisoner(s) or citizens for any reason.
- Any time an officer or supervisor deems it is appropriate to record.
- All searches (Persons, Vehicles, Structures, etc.) except those where an expectation of privacy exists. (i.e.: Strip searches, refer to DPM 2.2.15 Search of Persons-Other)
- Statements made by subjects, victims, and witnesses.
- Advising an individual of his/her Miranda Rights.
- During interrogations.
- Other official law enforcement activity.

Once activated, officers will continue to record until the completion of the event, except for instances outlined in this order.

Officers will document the reasons for any non-activations or interruptions in recordings prior to the completion of an event in CAD or RMS.

Mesa/Johnson 002369

Consideration may be given when a victim requests not to be recorded. The request to stop recording an event should be recorded.

- Contact an on-duty supervisor for resolution, if needed.

In this incident several officers either failed to activate their OBC during the call for service or started and stopped the recording while having contact with Johnson and Reyes. In addition, officers failed to activate their cameras while transporting Johnson to the booking facility.

In law enforcement today, the On-Body Camera system is used to demonstrate transparency of daily operations and provide a measure of accountability in a law enforcement agency. When an officer fails to follow established policy and procedure for activation of an OBC it can discredit the Department and give the impression that the Department is attempting to conceal something from the public.

In this incident, some of the footage not captured may have assisted in adjudicating Johnson's complaint about medical treatment, the allegations of missing property and would have aided in the use of force investigation. My suggestion is the Department address this issue Department wide as it appears to be symptom of a systemic issue.

**Identified Issue No. 3**  Frisk Searches (Officer Jones and Monarrez)

Frisk Technique, instruct the subject to turn around and face away from you with hands behind his/her back, palms out thumbs up and off the body. Spread the subject's feet and have him/her point his/ her toes out. Then place the subject in the OCCS escort hold (Arizona Peace Officer Standards and Training Board Lesson Title: Searching Techniques 8.5.16 – 8.5.19, June 2014).

In this incident, Officer Jones and Monarrez allowed Johnson to remain talking on his cellular telephone, standing against the third-floor railing of the landing while they conducted a frisk search. When the officers began their search, they did not control Johnson, nor did they have him spread his feet or place him in an OCCS escort hold.

The reason for a frisk search of a subject is for the recovery of weapons of attack, means of escape, evidence, investigative leads and other information of value. Department approved, and certified tactics are taught and used by officers because they often represent best practices identified through research. When officers work together, using the same tactics, they increase their operational safety and can address dangerous situations while minimizing risks.

While the officers articulated the reason to conduct the frisk search of Johnson for weapons, they failed to follow Department approved training to complete the search, including the possibility of missing what could have been the knife Johnson stated he possessed. Based on the totality of the circumstances, my recommendation would be

14

Mesa/Johnson 002370

that Officer's Jones and Monarrez failure to following approved Department training for frisk searches, represented a substantial officer safety risk and allowed Johnson to believe he was in control, contributing to the use of force.

**Identified Issue No. 4**        Contact Cover (Officer Calderon)

Whenever more than one officer is present during contact with an individual, one officer should become the contact officer and the other the cover officer.

General responsibilities of a contact officer:

1. Designate who is the cover officer.
2. Maintain communications with the subject(s) which includes doing the required work.
3. Maintain position relative to the subject.
4. Delegate responsibilities to the cover officer.

General responsibilities of a cover officer during a person search:

1. Protect the contact officer from outside interference.
2. Physically assist the contact officer, if necessary.
3. Constantly observe the subject(s) and the surrounding area.
4. Do not become fixated on any one (1) subject or begin assisting with the contact officer's work.
5. Assume a sound tactical position.
6. Be aware of crossfire situations should the need arise to take out a firearm.

In this incident, Officer Calderon left Reyes who was not searched and not handcuffed seated on the floor, by himself as he went to assist with Johnson.

Officers must approach every contact with officer safety in mind. Operational success is based on the ability of officers to effectively establish designated roles and communicate during critical incidents. Officers improve their overall safety by their ability to recognize an unsafe situation and work collectively to ensure a successful resolution.

Officers should never turn their back to a suspect. This is especially true when the suspect has not been searched for weapons. In this case, Reyes was seated to Johnson's left, around the hallway corner and to the right of all four officers when they approached Johnson. This left all officers in an extremely vulnerable position and needlessly exposed themselves to what was described as a potentially deadly threat.

I noted during my review, the lack of communication and designated roles of assignment. In an incident where multiple officers are available, communication is critical to ensure roles are property handled. In this incident, with the exception of Officer Bridges, every

Mesa/Johnson 002371

officer prior to the arrival of Detective Gambee and Sergeant Abbiatti were involved in a scuffle with Johnson, leaving no one in the cover role to watch Reyes or for additional threats. Additionally, no one contacted dispatch and advised they were involved in an active struggle with a suspect. There was no request for additional assistance despite the obvious need.

I also found that when supervision arrived on scene, they became involved in the incident, immediately getting physically involved, and failing to recognize the existence of a second suspect. They failed to exercise command and control of the incident. My recommendation would be that the Department address these areas as they represent a substantial officer safety issue.

**Identified Issue No. 5**        Use of Force Policy (Officer Calderon, Jones and Monarrez)

Officers must consider the totality of circumstances in evaluating whether force is necessary and what level of force would be reasonable before using a particular force option (Mesa Police Department Policy Manual, Use of Force, DPM 2.1.5)

The United States Supreme Court has held that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Force used to gain control of a situation will be used with restraint and in proportion to the resistance offered (Mesa Police Department Policy Manual, Use of Force, DPM 2.1.1)

In this case, Officer Calderon reported that he delivered two closed fist strikes to Johnson's left arm and his third attempt missed. Officer Jones reported that he employed three knee strikes (upon review of video only two were discerned), five closed fist strikes and one elbow strike to Johnson's face/head. Officer Monarrez reported that he delivered one closed fist strike to Johnson face/head. At the time these officers initially used force on Johnson there were four officers at scene, three of which were attempting to take Johnson into custody. Additionally, when Jones delivered the elbow strike to Johnson's head, Johnson had his left arm controlled by Officer Calderon and Officer Monarrez was controlling Johnson's right side, essentially leaving Johnson defenseless. Any motion, muscle rigidity or stiffness by Johnson as a result of these circumstances should be expected by officers with similar training and experience as these officers.

Police officers are expected to conduct themselves on-duty in a way that does not harm the public's respect for the Department, its operation or members, or has an adverse impact or potential for an adverse impact on the Department, and/or is contrary to the Law Enforcement Code of Ethics, which states to never employ unnecessary force or violence.

Mesa/Johnson 002372

**Identified Issue No. 6**          Discourtesy (Officer Monarrez and Calderon)

> Code of Conduct: Ethics & Discipline, No. 43 - Discourtesy; using disrespectful, vulgar, obscene, profane or insolent language or gestures to any Department member, or any citizen, directly or indirectly, face to face, or by telephone, electronic communication (e-mail), CAD, or to purposefully use disrespectful, vulgar, obscene, profane or insolent language on the police radio.

Officers Monarrez and Calderon used discourtesy and disrespectful language/statements towards Johnson during the Incident.

Police Officers are expected to enforce the laws of the State of Arizona and the City of Mesa, courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence.

In this incident, Officers Monarrez and Calderon used language that mocked and was disrespectful towards Johnson, further agitating him.  It appeared from my review that the improper comments and profane language that was directed at Johnson in a demeaning manner, unfitting a police officer.  Language similar to this oftentimes breeds contempt for the officer, is counterproductive to the law enforcement objective and tends to needlessly escalate the intensity of the encounter.

Based on the totality of the circumstances, my recommendation would be that both Officers Monarrez and Calderon's language be considered Discourtesy, as it was demeaning, antagonistic and counterproductive to attempting to detain Johnson with the minimal use of force.

ADDITIONAL IDENTIFIED TOPICS

**Simultaneous Commands**.  Officers should designate one person to communicate with suspects.  Simultaneous commands can be confusing, at times conflicting and can needlessly escalate the situation.

**Tactical Positioning**.  When searching or detaining suspects, officers should always direct suspects to a location where officers maintain a position of advantage, away from obvious danger. In this case, the officer directed Johnson up against a wall exposing their backs to third story balcony.  The officers never directed Johnson to move to a different location, nor did they ever reposition themselves to adjust for the danger.

**Punches to Boney Areas** – The investigation revealed that Officer Jones and Monarrez delivered several closed fist punches targeted at Johnson face/head area.  Officers must be aware of the fact that punches delivered to boney areas are often ineffective and more prone to injure the officer's hand, creating an issue where the officer has limited dexterity to

Mesa/Johnson 002373

summons assistance, handcuff, manipulate tools or utilize their weapons.  My recommendation would be that the Department address this issue.

**Handcuffing** – Officers Calderon, Jones and Monarrez all failed to handcuff Johnson and Reyes even though they explained that they possessed reasonable suspicion to do so.  While officers must be allowed latitude on when to handcuff a subject, officers should handcuff subjects, when reasonable suspicion/probable cause exists that the subject might be armed, is verbally confrontational, uncooperative, and passively or actively resistant, to ensure officer safety. Had Officers Jones and Monarrez handcuffed Johnson prior to the frisk search, it would have in all likelihood prevented this use of force.

**Hobble Protocols** – There were several issues identified regarding the use and application of the hobble. First, the officers and sergeants placed Johnson, who was handcuffed and "hobbled" on the ground for an extend amount of time, sometimes with bodyweight applied. Second, when being moved, Johnson was expected to walk, although the hobble was placed around his ankles, increasing the likelihood he could trip and fall. Third, when Johnson was placed back on the floor after attempting to spit, the hobble was used to remove his feet from underneath him. Fourth, to further limit Johnson's movement, the hobble was attached from Johnson's ankles to his handcuffs.

Officers must be cognizant that subjects when handcuffed and hobbled, who are placed on the ground face down can have difficulty breathing, especially after a struggle or when under the influence of alcohol and/or drugs.  Attaching or connecting the hobble to handcuffs is a technique that has been discontinued by other agencies due to the contribution to positional asphyxia. My recommendation would be that the Department address this issue.

> **Note:** With respect to the pulling of the Hobble which resulted in a handcuffed Johnson falling flat, facedown with the full force of his weight.  This act was not considered to be a tactic nor an application of reportable force.  It was unnecessary, and improper and it is recommended that issue be addressed as misconduct by the Department's Internal Affairs as part of this review.

Use of Force

> In accordance with Arizona Revised Statutes (ARS), police officers possess the legal authority to use reasonable levels of force necessary to lawfully control and/or arrest citizens.

> The MPD is committed above all to the sanctity and preservation of life, human rights, the dignity of every individual, and the Constitution of the United States and the State of Arizona. An officer's responsibility for protecting life must include his or her own and those of his or her fellow officers and the general public.

Mesa/Johnson 002374

The decision to use force when conducting official law enforcement responsibilities is among the most critical decisions made by officers. It is a decision that must be made quickly and under difficult, often unpredictable, rapidly changing and unique circumstances.

The United States Supreme Court has held that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Force used to gain control of a situation will be used with restraint and in proportion to the resistance offered (Mesa Police Department Policy Manual – Use of Force Philosophy & Definitions – effective 11/29/2012).

Officers must consider the totality of circumstances in evaluating whether force is necessary and what level of force would be reasonable before using a particular force option.

Factors that may be considered include, but are not limited to:
- The risk and foreseeable consequences of escape.
- The conduct of the individual being confronted as reasonably perceived by the officer at the time.
- The seriousness of the suspected offense or reason for contact with the individual.
- The officer's and subject's factors, including, but not limited to: age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue and number of officers versus subjects.
- The influence of drugs or alcohol and the mental capacity of the subject.
- The proximity of weapons.
- The distance of the subject to the officer.
- The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.
- Time and circumstances permitting, the availability of other options (what resources are available to the officer under the circumstances) not inclusive of the following:

  - The availability of cover. An armed suspect attempting to gain a position of cover may necessitate the use of deadly force; conversely, an officer in a position of cover may gain additional time to assess the need to use deadly force without incurring significant additional risks.
  - Time constraints. The time delay between a suspect's actions and an officer's reaction can determine whether a hesitation in the use of force will place the officer or others at an unacceptable disadvantage. The time delay between the use of force and the "stopping" of the suspect's actions may also play a critical part in determining whether there is a safe alternative to the use of force.

- The training and experience of the officer.
- The potential for injury to citizens, officers, and suspects.

Mesa/Johnson 002375

- Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.
- Prior knowledge of the subject's propensity for violence.
- Any other exigent circumstances (Mesa Police Department Policy Manual, Use of Force – DPM 2.1.5 – effective 03/14/2017).

Arizona Peace Officer Standards and Training Board, Lesson Title: Pressure Points 8.5.23 (June 2014)

TOUCH PRESSURE.

1. Pressure/counter pressure.
2. Stabilize the location.
3. Digital tip pressure.
4. Repetitive, loud verbal commands.
5. Alleviate pressure when resistance stops – IT IS RECOMMENDED TO AVOID KEEPING THE PRESSURE ON FOR MORE THAN FIVE (5) SECONDS – IF COMPLIANCE IS NOT MET, THEN CONSIDER AN ALTERNATE CONTROL METHOD.
6. Do NOT release the hold, only the pressure. It may need to be re-applied.

QUICK PENETRATION.

1. Should only be used against high levels of resistance.
2. Designed to create high levels of stunning.
3. Should be applied by touching and stabbing a nerve.
4. May be applied on:
    a. Mandibular angle.
    b. Hypoglossal.
    c. Brachial plexus origin.
5. Practice should be limited.

LINEAR STRIKING TECHNIQUES.

The fist strike:

1. Often striking with the palm has its advantages over striking with the fist.
2. When you strike with the palm, you effectively take the wrist out of action and can avoid possible wrist and hand injury that can occur by improperly striking with the fist.
3. The palm strike also disperses the force of the strike over a large (and slightly softer) area minimizing the severe bruising, cuts and contusions that are produced with the fist. However, the fist can produce more damage and have greater affect if it is needed.

Mesa/Johnson 002376

4. It is imperative that the fist and wrist of the striking arm remain straight, so the knuckles will hit flat on impact and maintain a strong position.
5. Teach the fist jab as an option.

CLOSE-RANGE STRIKES.

Close-range strikes are used in confined situations or when grappling with a violent suspect. Because of the limited range of motion, it is important to strike as fast and hard as possible with any close-range blow.

The elbow strike: Delivered correctly, the elbow strike can be one of the most effective strikes in defensive tactics. This is because the elbow is extremely hard like a hammer and can be powered by the officer's entire weight. To execute an elbow strike, bend the arm and retract the elbow as far away from the intended target as possible – in a straight line. Use the legs to drive and move the body into the target while driving the elbow directly to and through the striking surface. Elbows can be executed in a variety of directions, but forward, inward, backward and downward are the most useful. B. The knee strike. The knee strike is not the world's best strike, but it can be very useful in specific situations.

1. Never use the knee to strike hard or resilient targets such as the head. If you do, you run the risk of damaging your knee much more than you injure your attacker.
2. Instead, aim the knee for the softer areas of the body such as the groin, stomach or thighs.
3. To execute a knee strike, try to grab your attacker (for stability) and pull him/her toward you as you cock, load and drive the knee hard into a vital target.

Arizona Peace Officer Standards and Training Board, Lesson Title: Force Delivery Techniques 8.57 and 8.58 (June 2104)

Officer Calderon –

Control Holds
- Firm Grip –                    DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE
- Firm Grip / Takedown -      DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE

Strikes
- Closed Fists –                DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE

Mesa/Johnson 002377

<u>Control Hold – Firm Grip</u>

According to Officer Calderon, Officers Jones and Monarrez approached Johnson and Officer Bridges moved away.  Calderon sensed something was going to happen and approached to assist.  When he did, Officer Jones and Monarrez began struggling with Johnson.

>Officer Calderon recalled,
>
>*I immediately moved into Mr. Johnson's left-hand side. Uh, took a hold of his arm from – man, his arm was stiff. Literally straightened up, balling his fist...*[8]
>
>*When the strikes were ineffective, and his arm was still there, I decided to reach down with both my hands, I took his left leg, pulled it out from under him, and that's finally when he went down to the ground.*[9]

Based on the totality of the circumstance, my opinion is that an officer with similar training and experience would have realized that physical force at that moment would not be appropriate. His decision to use force used only contributed to the excessive force.  Therefore, my opinion is that the type and amount of force used was <u>disproportional</u>, <u>unnecessary and objectively unreasonable.</u>

<u>Strikes – Closed Fist</u>

According to Officer Calderon in an effort to loosen Johnson's arm and move it, he delivered two closed fist punches.

Officer Calderon recalled,

>*When I couldn't get his arm down in a position to where I think I had control of it, I, uh, delivered two closed fist strikes to his upper left arm in an attempt to have him loosen that arm so I could bring it down or at least bring it to his back in a - a position of disadvantage.*[10]

Based on the totality of the circumstances, which include the fact Johnson followed the orders given to him to move to the wall, albeit slowly and the lack of policy grounds to order someone to sit down, along with the fact four officers were present during the struggle, my analysis is that Officer Calderon should have communicated with the additional officers to better address Johnson. With enough officers to control each limb, coupled with Johnson's lack of active, physical resistance, punches to the arm would be disproportional to the actions and lack of

---

[8]Officer Calderon's Interview, Page 13, lines 580 to 582.
[9] Officer Calderon's Interview, Page 16, lines 689 to 692.
[10] Officer Calderon's statement, Page 15, lines 644 to 647.

Mesa/Johnson 002378

threat Johnson posed at that time.  My opinion is that an officer with similar training and experience as Officer Calderon would not believe that Johnson's actions necessitated the level of force used in the claimed attempt to gain control him.  Therefore, my opinion is that the type and amount of force used was <u>disproportional</u>, <u>unnecessary and objectively unreasonable.</u>

Officer Jones –
  Control Holds
- Firm Grip – <u>DISPROPORTIONAL</u>, <u>UNNECESSARY AND OBJECTIVELY UNREASONABLE</u>
- Neck Grab – <u>DISPROPORTIONAL</u>, <u>UNNECESSARY AND OBJECTIVELY UNREASONABLE</u>

  Strikes
- Closed Fist, Elbow and Knee – <u>DISPROPORTIONAL</u>, <u>UNNECESSARY AND OBJECTIVELY UNREASONABLE</u>

<u>Control Hold - Firm Grip</u>

According to Officer Jones (and Calderon), Johnson would not sit down at the wall, so he moved in with Officer Monarrez and attempted to obtain a firm grip on his left hand.

Officer Jones recalled,

> *Officer Monarrez actually grabbed his right arm pretty much about the same time that I grabbed his left arm. So – but, uh, he definitely positively and actively, uh, tensed his …tensed his left arm.* [11]

Based on the totality of the circumstances, which include the fact that Johnson followed the orders given to him, albeit slowly, to move to the wall and the lack of policy grounds to order someone to sit down, my analysis is that Officer Jones should have waited, formulated a plan with the additional officers at the scene to effectively address Johnson in a planned and coordinated manner.  He had time on his side.  There was no exigency to abruptly physically confront Johnson without communicating his intentions to the other officers. My opinion is that an officer with similar training and experience as Officer Jones would not reasonably believe that Johnson's refusal to sit down, necessitated the level of force used in the claimed attempt to gain control of Johnson.  Therefore, my recommendation would be the type and amount of force used was <u>disproportional, unnecessary and objectively unreasonable.</u>

> NOTE:  It should be noted that my recommendation here is based on the totality of the incident.  Had Jones merely applied a firm grip (which he did not) and only a firm grip, such force would be reasonable.

---

[11] Officer Jones' statement, Page 16, lines 694 to 697.

Mesa/Johnson 002379

## Control Hold – Neck Grab

Officer Jones, after the firm grip failed to work he then reached up and attempted to control Johnson's head and neck with a neck grab.

Officer Jones recalled,

> *If you control a person's head, you control their spine, you control their body. Um, I attempted to get him in that – that Muay Thai clasp and I – I – I tried to use the simplest technique…I grabbed. He found the pressure.* [12]

Based on the totality of the circumstances, which includes the fact Johnson followed the orders, albeit slowly, given to him to move to the wall and the lack of policy to order someone to sit down, my analysis is that Officer Jones should have waited, formulated a plan with the additional officers at scene to better address Johnson. My opinion is that an officer with similar training and experience as Officer Jones would not reasonably believe that Johnson's refusal to sit down, necessitated the level of force used in the claimed attempt to gain control of Johnson. Therefore, my recommendation would be the type and amount of force used was <u>disproportional, unnecessary and objectively unreasonable.</u>

## Strikes (knee)

According to Officer Jones, in an effort to gain control of Johnson and move him down to the ground, he delivered three knee strikes (upon review of video only two were discerned) to the abdomen of Johnson.

Officer Jones recalled,

> *So I think it was a total of uh, three strikes. Three knee strikes. Um, and they were ineffective. These knee strikes were, uh, focused and targeted towards his… abdomen.*[13]

## Strikes (Closed Fist)

According to Officer Jones in an effort to gain control of Johnson and move him down to the ground, he delivered five closed fist punches to Johnson face.

Officer Jones recalled,

> *I began to … uh, initiate hard hands or fist strikes to his face. My target area for those*

---

[12] Officer Jones' statement, Page 14, lines 550 to 555 and 561
[13] Officer Jones' statement, Page 24, lines 589 to 590 and Page 13, lines 567 to 568.

Mesa/Johnson 002380

*strikes were to the jawline. Um, the strength of those strikes were about 60%...it took five strikes.*[14]

<u>Strikes (Elbow)</u>

According to Officer Jones in an effort to gain control of Johnson and move him down to the ground, he delivered one elbow strike to Johnson's forehead.

Officer Jones recalled,

*So as I threw the – the elbow, um, obviously, I – I it appeared to have hit him towards the – the forehead area.*[15]

Based on the totality of the circumstances, which include the fact Johnson followed the orders given to him, albeit slowly, to move to the wall and sit down, and the lack of policy or legal grounds to order someone to sit down, coupled with the fact that four officers were present during the struggle, my analysis is that Officer Jones should have communicated with the additional officers to better address Johnson. With enough officers to control Johnson the use of closed fist strikes to the face, an elbow strike to the forehead and knee strikes to the abdomen would be disproportional to the actions and threat that Johnson posed at that time. My opinion is that an officer with similar training and experience as Officer Jones would not reasonably believe that Johnson's refusal to sit down, necessitated the level of force used in the claimed attempt to gain control of Johnson.  Therefore, my recommendation would be the type and amount of force used was <u>disproportional, unnecessary and objectively unreasonable.</u>

Officer Monarrez –
      Control Holds
- Firm Grip: – <u>DISPROPORTIONAL, UNNECESSARY AND OBJECTIVELY UNREASONABLE</u>
      Strikes
- Closed Fist – <u>DISPROPORTIONAL, UNNECESSARY AND OBJECTIVELY UNREASONABLE</u>

**Note**:  Monarrez's pulling of the Hobble was addressed earlier as a recommendation that it be addressed as misconduct.

<u>Control Hold (Firm Grips)</u>

According to Officer Monarrez, Johnson would not sit down at the wall, so he moved in with Officer Jones and obtained a firm grip on his right arm.

---

[14] Officer Jones' statement, Page 14, lines 605 to 607 and 611.
[15] Officer Jones' statement, Page 14, lines 626 to 627.

Mesa/Johnson 002381

Officer Monarrez recalled,

> *So after, um, asked multiple times to sit down, um, still not listening, approached Mr. Johnson, um, at which point I grabbed his right arm, um, to establish some sort of control hold.*[16]

Based on the totality of the circumstances, which include the fact Johnson followed the orders given to him to move to the wall, albeit slowly, and the lack of policy to order someone to sit down, my analysis is that Officer Monarrez should have waited, formulated a plan with the additional officers at scene to better address Johnson. My opinion is that an officer with similar training and experience as Officers Monarrez would not reasonably believe that Johnson refusal to sit down, necessitated the level of force used in the claimed attempt to gain control of Johnson. Therefore, my recommendation would be the type and amount of force used was <u>disproportional, unnecessary and objectively unreasonable.</u>

<u>STRIKES – Closed Fists</u>

According to Officer Monarrez in an attempt to gain control of Johnson, he delivered one closed first strike to Johnson face.

Officer Monarrez recalled,

> I threw my - my single closed-fist strike, at what point - at which point, um, I felt was enough. Um, we were able to gain some sort of control over Mr. Johnson.[17]

Based on the totality of the circumstances, which include the fact Johnson followed the orders given to him to move to the wall and the lack of policy or legal grounds to order someone to sit down, and the fact four officers were present during the struggle, my analysis is that Officer Monarrez should have communicated with the additional officers to better address Johnson. With enough officers to control each limb, the fact Johnson was only failing to release his arms and follow commands, under the circumstances, a closed fist strike to the face would be disproportional to the actions and threat Johnson posed at that time. My opinion is that an officer with similar training and experience as Officers Monarrez would not reasonably believe that Johnson actions necessitated the level of force used in the claimed attempt to gain control him. Therefore, my recommendation would be the type and amount of force used was <u>disproportional, unnecessary and objectively unreasonable.</u>

Detective Gambee –
              Control Hold
                            • Mandibular Angle – Necessary and Objectively Reasonable

---

[16] Officer Monarrez' interview, Page 11, lines 487 to 489.
[17] Officer Monarrez' statement, Page 14, lines 601 to 603.

Mesa/Johnson 002382

According to Detective Gambee they stood Johnson up to take him downstairs. While waiting for the elevator, it appeared Johnson was going to spit in his face, so he pushed Johnson's face away and applied a Mandibular Angle to keep him from spitting.

Detective Gambee recalled,

> I started to see spit coming out of his mouth and then at one point I watched his mouth he kinda starts curling his lips, I mean, for lack of a better I don't know how to describe it - but almost like he's building up a spit wad or, you know, a pile of spit and then I see his head go back and I kinda, like, he's about to push it forward towards me so I perceived he was about to spit on me because it appeared he was about to spit on me so that's when I take my right hand and I push his head up into the frame of the, um, the elevator... that's when I applied the mandibular angle right here behind his ear.[18]

Based on the totality of the circumstance and the fact that Detective Gambee arrived just after the struggle with Johnson began, along with the belief that Johnson was about to spit in his face, my opinion is that an officer with similar training and experience as Detective Gambee would believe Johnson's actions were consistent with a suspect who was about to spit and necessitated the amount of force used. Therefore, my recommendation would be the type and amount of force used was <u>necessary and objectively reasonable.</u>

Note: The investigation established that Johnson never actually intentionally spit.

<u>Conclusion</u>

Information and evidence submitted for this review established that Officers Calderon, Jones and Monarrez used force in excess of what an officer with similar training and experience would have reasonably believed was necessary to control and detain Johnson when they applied control holds-firm grips and strikes-closed fist, knee and elbow. Additionally, the force used by these officers was disproportionate to the lack of physical resistance offered by Johnson.

Respectfully,

JOHN McMAHON
Use of Force Expert
John McMahon and Associates, LLC

Dated: 10/6/18

---

[18] Detective Gambee's interview, Page 19, lines 824 to 830 and 837 to 838.

Mesa/Johnson 002383

**EXHIBIT 15**



*Richard M. Romley*

A Professional Limited Liability Corporation

October 22, 2018

To: Ramon Batista, Chief of Police
    Mesa Police Department
From: Richard M. Romley
    RMR, PLLC

**Re. Professional Standards investigations:**
    **Case: PS #2018-076; 1645 N. Date, Mesa, Arizona**
    **Case: PS #2018085; 701 E. Main, Mesa, Arizona**

On June 8, 2018, the Mesa Police Department retained RMR, PLLC, Richard M. Romley, to participate in the investigations of Case: PS #2018-076; 1645 N. Date, Mesa, Arizona and Case: PS #2018085; 701 E. Main, Mesa, Arizona with the Professional Standards Bureau [Internal Affairs]. The scope of my responsibilities included strategic planning, advice, oversight and later was amended to include the providing of legal counsel.

This Report shall discuss the thoroughness of the investigation, the objectivity of the investigation, as well as discuss issues that were identified during the course of the investigation.

#### Case: PS #2018-076; 1645 N. Date, Mesa, Arizona

Thoroughness of Investigation:

Throughout the course of the investigation there were many discussions as to how best to proceed so as to gather all relevant information, thus ensuring a thorough investigation. The following is a partial list of items obtained and reviewed during this investigation:

- Mesa Police Communications 911 and Radio Traffic.
- Mesa Police Computer Aided Dispatch [CAD] event history.
- Mesa Incident Report# 20181360043
- Axon On-Officer Body Camera Video Recordings/Logs [when available] [It should be noted that helicopter video footage was not available of incident].
- Use of Force Report# 2018-192.
- Photographs
- Mesa Police Department Policies and Procedures.

1

10267 East Gold Dust Avenue • Scottdale, Arizona 85258 • Phone: (480) 451-0531 • Mobile: (480) 773-3419 • Email: rromley@cox.net

- AZPOST Lesson Plans.
- Training History for Officers Santiago and Glover.
- Interview of thirteen (13) officers [including Officers Santiago, Glover, Gambee and Sgt. Abbiatti].
- Interview of Crime scene specialist.
- Interviewed two (2) witnesses identified through the canvass that provided relevant information.
- Interviewed subject Gabriel Ramirez, Jr.
- Canvassed for possible witnesses or evidence at 1645 N. Date, 465 W. Ivyglen and 1718 N. Date, Mesa, Arizona.
- Monitored social media for possible information related to the arrests of subjects.
- Monitored incoming calls for possible information related to the arrests of subjects.
- Monitored walk-in public contacts for possible information related to the arrests of subjects.
- Scottsdale Police Report# 18-12561.
- Letter from attorney Kavanaugh.

It is my opinion that this investigation was thorough. Certain limitations did occur during this review but in my opinion they did not compromise the Report submitted and its thoroughness. Areas that complicated the review included:

- Nehemah Hill [arrestee] was not able to be located for an interview as a witness. Efforts were made on numerous occasions to locate her. The following were part of the efforts made: an Arizona Motor Vehicle Division check showed that Ms. Hill did not have a record on file, phone calls were made to those who may have information of Ms. Hill's location, phone messages were left, Ms. Hill's grandparents were contacted, several addresses were identified as possible locations of Ms. Hill [including in Tucson in which the Tucson Police Department was contacted and an "officer check" was requested], Professional Standards entered a "name watch" in RMS with orders to contact Professional Standards if Mesa officers came in contact with her, visitation lists of Gabriel Ramirez were reviewed at the county jail, and a request was made of the Salt River Police Department to place a "stop file" for Ms. Hill in their system.
  - Axon On-Body Camera footage was not available from all officers at the scene. Note: Training/Policy issue.

Objectivity:

I participated in nearly every strategic development discussion, interviews, and was given a copy of all materials obtained for my review. Numerous discussions were held with Lt. Rash regarding Professional Standards practices and how best to conduct the investigation. It is my opinion that Professional Standards maintained its objectivity during the course of this investigation.

Mesa/Johnson 000187

<u>Other Issues Identified:</u>

During the course of my participation, I identified several other issues that the Mesa Police Department may wish to review in the future:

- Scope of responsibilities. Currently, Professional Standards is charged with ascertaining the facts surrounding possible policy violations. During the investigation issues outside of fact gathering arose that were of concern and should be reported to management so that they may be addressed appropriately. They include the following:
  - Training failures.
  - Policy failures.
  - Tactical failures.
  - Additionally, a discussion should be undertaken as to whether Professional Standards should be charged to make recommendations as to whether an NOI should be sustained, unfounded or exonerated.
- Currently, Professional Standards does not respond to a scene where they may be required to investigate. I would recommend that a discussion occur as to whether this should departmental policy. "Best Practices" from other jurisdictions mandates this is certain situations; e.g. when an officer is involved in a shooting, where a serious physical injury results or any other matter that the Chief or Assistant Chief deems necessary.
- Currently, the case agent in Professional Standards is not permitted to look at an officer's past history regarding Use of Force or other policy violations. In my view this hampers the officers ability to "grasp" issues that may be occurring with that particular officer and hinders the case agent in planning and executing an interview that is meaningful.
- Prior administrations ordered the "purging" of Internal Affairs files of officers in certain matters. In my view, this hinders the case agents ability to prepare adequately as well as it hinders an adjudicator's ability to determine an appropriate discipline. How can one apply progressive discipline if one does not know what discipline has been applied in the past.
- Training records were not able to be located for Officers Glover and Santiago at the Mesa Police Training Unit; re. pressure points. However, the training records were able to be ascertained by contacting AZPOST and obtaining the Lesson Plan for Pressure Points for the training timeframe of Officers Glover and Santiago. Consolidation and better record keeping is an issue that should be immediately addressed in the future.
- During the review of this case policy/training/tactical issues arose:
  - The appropriateness of an officer placing his rifle that is fully loaded in the officer's lap with the muzzle pointed upward and outside a car window while driving at a high rate of speed. Concern would be accidental discharge.
  - When an officer becomes the "lethal" officer during an incident, is it appropriate to be brandishing a loaded rifle and also be trying to stop a subject from thrashing around by placing a boot upon the subject's back? Concerns are that the officer's balance may be compromised and an accidental discharge could occur.
- Legal training. Upon handcuffing and transporting Gabriel Ramirez to the vehicle, force was utilized to try and elicit information from Gabriel Ramirez. It is questionable if any

3

information obtained or any evidence obtained from that questioning [fruits of the poisonous tree] would be admissible in a Court of Law. Mr. Ramirez was in custody, force was used and the defendant's Miranda warnings had not been given.

## Case: PS #2018085; 701 E. Main, Mesa, Arizona

Thoroughness of Investigation:

Throughout the course of the investigation there were many discussions as to how best to proceed so as to gather all relevant information, thus ensuring a thorough investigation. The following is a partial list of items obtained and reviewed during this investigation:

- Citizen Complaint-Robert Johnson.
- Banner Desert Medical records for Robert Johnson. *Confidential*
- Mesa Police Communications 911 and Radio Traffic.
- Mesa Police Computer Aided Dispatch [CAD] event history (2).
- Mesa Incident Report# 20181430828.
- Mesa Police Forensic Report #FSS052418-0002-0001.
- Timecard: Sergeant Moore & Lt. Wahlberg.
- Mesa City Court Disposition Report.
- Axon On-Officer Body Camera Video Recordings/Logs [when available].
- El Rancho Del Sol apartment video recordings.
- Use of Force Report #2018-205.
- Photographs.
- Mesa Police Department Policies and Procedures.
- AZPOST Lesson Plans.
- Training History for Officers Jones, Gambee, Calderon, Monarrez and Sgt. Abbiatti.
- Interviewed ten (10) officers [including Officers Jones, Gambee, Calderon, Monarrez and Sgt. Abbiatti].
- Interview of the the crime scene specialist.
- Interviewed six (6) witnesses identified during canvass that had relevant information.
- Interviewed complainant Robert Johnson.
- Canvassed for possible witnesses or evidence at 701 E. Main, Mesa, Arizona.
- Monitored social media for possible information related to the arrest of subjects.
- Monitored incoming calls for possible information related to the arrest of subjects.
- Monitored walk-in public contacts for possible information related to the arrests of subjects.
- Scottsdale Police Report# 18-12563.

It is my opinion that this investigation was thorough. Certain limitations did occur during this review but in my opinion they did not compromise the Report submitted and its thoroughness. Areas that complicated the review included:

4

- Numerous attempts were made to locate Erick Reyes to be interviewed as a witness. Contact was made with Mr. Reyes attorney to determine if he had any information that would assist Professional Standards in locating Mr. Reyes. Mr. Reyes' attorney did not have any contact information but stated that he may be incarcerated. Professional Standards contacted the Maricopa County jail and Core Civic to determine if he was in custody. Mr. Reyes was not in custody but information was obtained indicating that he was to self-surrender on a date certain. Mr. Reyes failed to self-surrender at that time. Mr. Reyes was scheduled to be tried in the instant case at the Mesa City Court but he failed to appear [Mr. Reyes was tried *in abstencia*]. Effort was made to contact Mr. Reyes via telephone numbers that were identified [4 in total], as well as addresses that were identified; all were unsuccessful.
- During the canvass, Professional Standards spoke with Susan Johnson who stated that although she did not witness the incident, she believed her son may have audio recorded the incident. Numerous attempts were made to obtain the audio file but it was never provided.
- Axon On-Body Camera footage was not available from all officers at the scene. Note: Training/Policy issue.


## Objectivity:

I participated in nearly every strategic development discussion, interviews, and was given a copy of all materials obtained for my review. Numerous discussions were held with Lt. Rash regarding Professional Standards practices and how best to conduct the investigation. It is my opinion that Professional Standards maintained its objectivity during the course of this investigation.


## Other Issues Identified:

During the course of my participation, I identified several other issues that the Mesa Police Department may wish to consider in the future. These are in a addition to those already identified above [1645 N. Date, Mesa, Az.]. They include:

- Officer Jones stated that he attended theAZPOST General Instructor School and the AZPOST Defensive Tactics Instructor school. However, these courses are not recorded on his Departmental training matrix. Consolidation and better record keeping is an issue that should be immediately addressed in the future.
- DPM 2.4.65-Restraining Prisoners describes positional asphyxia and procedures when handling subjects. Department policy does not describe the proper use of RIPP restraints [hobbles] nor does it describe special considerations that must be taken when RIPP restraints are used on a prisoner. In the instant case, Mr. Johnson was handcuffed behind his back, placed in RIPP restraints, placed on his stomach with officers placing their knees on his back for several minutes. Mr. Johnson complained that he was having trouble breathing. Positional Asphyxia could have occurred.

5

Conclusion:

Having participated with Professional Standards [Internal Affairs] into the investigation of Case: PS #2018-076; 1645 N. Date, Mesa, Arizona and Case: PS #2018085; 701 E. Main, Mesa, Arizona, I conclude that the incidents were thoroughly and objectively investigated and that the conduct of the Professional Standards agents assigned to this case conducted themselves professionally. Numerous policy, training and tactical issues were identified that the Mesa Police Department may wish to consider in the future.

If I can be of any further assistance, do not hesitate to ask.

Mesa/Johnson 000191

**EXHIBIT 16**

# Use-of-Force Review
# of the
# Mesa Police Department

**Final Report**



POLICE EXECUTIVE
RESEARCH FORUM

March 2019

Mesa/Johnson 002934

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................2

Executive Summary ................................................................................................................5

    Summary of Recommendations.........................................................................................5

        Policies and Procedures .............................................................................................5

        Data Review .............................................................................................................12

        Professional Standards Division Review ...................................................................13

        Use-of-Force Training.................................................................................................14

        Additional Recommendations ...................................................................................15

Introduction .......................................................................................................................17

    About the City of Mesa and the Mesa Police Department....................................................17

    Project Scope and Methodology.......................................................................................18

SECTION I. USE-OF-FORCE POLICY REVIEW .............................................................................20

    Overall Policy Organization ............................................................................................22

    DPM 1.11.60 Use of Force Board .....................................................................................23

    DPM 2.1.1 Use of Force Philosophy and Definitions .........................................................26

    Special Order #2018-001 DPM 2.1.2 Use of Force..............................................................27

        Special Order #2018-001 DPM 2.1.2 Section: B. Policy Statement .......................................27

        Special Order #2018-001 DPM 2.1.2 Section: E. Prohibitions ..............................................28

    DPM. 2.1.5 Use of Force ..................................................................................................30

        DPM 2.1.5 Section: 3. Definitions .............................................................................30

    DPM 2.1.5 Section: 4. Use of Force Factors......................................................................31

        DPM 2.1.5 Section: 5. Medical Treatment After Use of Force.........................................32

        DPM 2.1.5 Section: 6. Reporting Guidelines ..............................................................33

    DPM 2.1.20 Firearms Use ................................................................................................33

        DPM 2.1.20 Section: 2. General Guidelines ................................................................33

        DPM. 2.1.20 Section: 3. Restrictions ..........................................................................34

    DPM 2.1.35 Electronic Control Device (ECD) Protocols .....................................................35

        DPM 2.1.35 Section: 2. Definitions ...........................................................................35

        DPM 2.1.35 Section: 5. ECW Deployment Procedures ................................................36

    DPM 2.1.40 Less-Lethal Shotgun Protocols .....................................................................36

    DPM 2.1.45 Use of Force Reporting Protocols ..................................................................37

        DPM 2.1.45 Section: 2. Non-Deadly Force Police Incidents...........................................37

2

TABLE OF CONTENTS

Definitions .......................................................................................................... 37

Sergeants' Responsibilities ................................................................................ 38

DPM 2.3.5 Vehicle Pursuits ...................................................................................... 41

DPM 2.3.5 Section: 2. General Guidelines ............................................................. 41

DPM 2.3.30 Precision Immobilization Technique (PIT) ............................................ 41

TAC 4.4 Counter Sniper Program ............................................................................. 41

Additional Policies Reviewed ................................................................................... 42

SECTION II. USE-OF-FORCE DATA ANALYSIS ............................................................. 43

Use-of-Force Reports Data Review .......................................................................... 43

Overview of the Officers Involved and the Persons on Whom Force Was Used............... 43

Overview of Incident Characteristics ...................................................................... 45

Circumstances of Why the Officer Had the Encounter that Included a Use of Force ........ 48

Prevalence of Strikes to the Face, Head, and Neck ................................................. 49

Methodology ........................................................................................................... 50

Findings .................................................................................................................. 50

Summary of Findings from Report Data Analysis ................................................... 55

SECTION III. PROFESSIONAL STANDARDS DIVISION REVIEW ..................................... 56

Process of Submitting a Complaint .......................................................................... 56

Public Complaints .................................................................................................... 56

Internal Complaints ................................................................................................. 56

Complaint Form ....................................................................................................... 56

Complaint Investigation ........................................................................................... 57

Internal Affairs Investigations Process Outlined .................................................... 58

Command Investigations ......................................................................................... 58

Complaint Dispositions ............................................................................................ 59

Additional Recommendations for the Professional Standards Division .................. 61

Maintenance of Case Files ....................................................................................... 61

Physical Location of the Professional Standards Division ....................................... 61

SECTION IV. USE-OF-FORCE TRAINING REVIEW ....................................................... 63

Implementing ICAT .................................................................................................. 63

PERF's Integrating Communications, Assessment, And Tactics Training Guide ....... 64

Strengthening Use-of-Force Training ....................................................................... 65

Training on Policy Changes and Updates ................................................................. 65

Mesa/Johnson 002936

Accountability ................................................................................................................ 66

Monitoring Use-of-Force Trends ..................................................................................... 66

SECTION V. ADDITIONAL RECOMMENDATIONS ................................................................... 68

Transparency .................................................................................................................. 68

Internal Transparency .................................................................................................... 68

External Transparency .................................................................................................... 69

Improving Officers' Experiences .................................................................................... 70

CONCLUSION ....................................................................................................................... 72

Moving Forward ............................................................................................................. 74

Mesa/Johnson 002937

# Executive Summary

In August 2018, the City of Mesa, AZ commissioned the Police Executive Research Forum (PERF) to assess the Mesa Police Department's (MPD) use-of-force policies, procedures, training, and tactics. PERF reviewed departmental policies and training regarding use of force as well as MPD use-of-force report data. PERF also conducted on-site interviews with representatives of the department at all ranks. The purpose of the review was to examine use of force at the department level and not to focus on individual incidents or officers.

Throughout the review, PERF identified accountability, and the lack thereof, in the oversight of MPD's use of force as a primary issue. Without proper supervision, both in the field and in investigations of actions taken in the field, issues cannot be identified and mitigated early, before they become a larger problem for the department. Prior to recent changes made by MPD personnel, such as revised reporting protocols for use of force released in September 2018, investigations into use of force were limited and centered more around checking boxes then fact-finding. For example, supervisors tasked with a use-of-force investigation rarely responded to the scene of the incident. Without detailed investigations, common themes in uses of force cannot be identified, curtailing the ability to correct behavior that does not fully adhere to department policy.

This report presents PERF's recommendations regarding MPD's use-of-force policies and practices that seek to address the issues of accountability found and to bring MPD policies in line with industry best practices.

## Summary of Recommendations

Recommendations included in the report stem from findings of PERF's review, which was based upon the expertise PERF has developed in conducting similar reviews for other law enforcement agencies. Throughout the review process, PERF communicated initial findings to MPD command staff. MPD already has made changes based on these findings and its own review, and PERF has noted in this report instances in which MPD already addressed PERF's recommendations.

This executive summary presents an overview of the recommendations that are included in the report as well as the progress made by MPD.

## Policies and Procedures

MPD's directives regarding use of force are separated into several different policies. When issues pertaining to use-of-force are broken into numerous policies, there is a chance that revisions may not be applied uniformly and that the department's use-of-force philosophy may not be clear to officers. MPD would be better served if issues related to use-of-force were combined under a single policy.

**Overall Policy Organization**

> **Recommendation:** *MPD should combine related use-of-force policies under a single directive. This will make it easier for officers to find pertinent information on use of force and will create a*

Mesa/Johnson 002938

*more holistic approach to force within the department. This comprehensive policy should include the agency's philosophy on use of force, clear guidelines around lethal and less-lethal force options, and guidelines on the accountability and reporting measures related to use of force. Specifically, the following policies should be merged:*

- o DPM 2.1.1 Use of Force Philosophy and Definitions
- o Special Order # 2018-001 DPM 2.1.2 Use of Force Effective June 2018
- o DPM 2.1.5: Use of Force Revised June 2018
- o DPM 2.1.20 Firearms Use
- o DPM 2.1.25 Impact Weapons
- o DPM 2.1.30 Chemical Agents
- o DPM 2.1.35 Electronic Control Device (ECD) Protocols
- o DPM 2.1.40 Less-Lethal Shotgun Protocols
- o DPM 2.1.45 Use of Force Reporting Protocols
- o DPM 2.1.50 Less-Lethal Launcher Protocols

## DPM 1.11.60 Use of Force Board

**Recommendation:** *MPD should ensure its Use of Force Board consistently reviews all uses of force that result in a death, as well as force that results in serious bodily harm. MPD should revise "DPM 1.11.60 Use of Force Board" to include language on how frequently the board meets, the membership of the board, the term of members on the board, and the scope of the board's review.*

**Recommendation:** *MPD should ensure that critical incident cases are reviewed by the Use of Force Board as expeditiously as possible upon closure of the investigation. Cases should not be allowed to languish. In addition, the review board should meet within 24 to 48 hours following an officer-involved shooting or in-custody death to ensure there is not an obvious policy, training, and equipment issue that needs to be immediately rectified. The review board should be briefed by investigators regarding the facts of the case known at that time to ensure that no immediate changes to policy, training, or equipment are necessary. The review board should present all findings and recommendations to the chief of police.*

## DPM 2.1.1 Use of Force Philosophy and Definitions

**Recommendation:** *MPD should replace current references "deadly force" to "lethal force," and should change references to "non-deadly force" to "less-lethal" force. These terms reflect the fact that while some weapons are designed to be less lethal than firearms, they sometimes do result in death. Related agency policies should also be reviewed to ensure that all references to "deadly" force are replaced with "lethal" force, and "non-deadly" is changed to "less lethal."*

**Recommendation:** *MPD should add a definition of **"Proportionality"** to this section. As explained in PERF's report on Guiding Principles of Use on Force, the definition should state that proportionality involves officers: (1) using only the level of force necessary to mitigate the threat and safely achieve lawful objectives; (2) considering, if appropriate, alternate force options that*

Mesa/Johnson 002939

*are less likely to result in injury but will allow officers to achieve lawful objectives; and (3) considering the appropriateness of officers' actions. The concept of proportionality does not mean that officers, at the moment they have determined that a particular use of force is necessary and appropriate to mitigate a threat, should stop and consider how their actions will be viewed by others. Rather, officers should begin considering what might be appropriate and proportional as they approach an incident, and they should keep this consideration in their minds as they are assessing the situation and deciding how to respond. Proportionality also considers the nature and severity of the underlying events.[1]*

**_Recommendation:_**  *MPD should add a definition of **"De-escalation"** to this section.  The definition should emphasize proportionality, the use of distance and cover, tactical repositioning, "slowing down" situations that do not pose an immediate threat, calling for supervisors and other resources, and similar actions and tactics.[2]*

**Recommendation:** *MPD should add a definition of the **duty to intervene**. This definition should include the following language: "Officers have a duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."*

**Special Order #2018-001 DPM 2.1.2 Use of Force**

*Special Order #2018-001 DPM 2.1.2 Section: B. Policy Statement*

**Recommendation:** *MPD should add a sentence emphasizing **the sanctity of human life** as a core value in its use-of-force policy. For example, the Baltimore Police Department's use-of-force policy states: "The policy of the Baltimore Police Department is to value and preserve human life in all situations."[3]*

**Recommendation:** *In addition to adding the definition of **"duty to intervene"** as mentioned above, MPD should include a statement creating a duty to intervene in instances where force is not being used appropriately. This statement should contain the following language: "Officers have a duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."*

**Recommendation:** *MPD should include an overview of **"proportionality"** in this section, in addition to including the full definition in DPM 2.1.1 Use of Force Philosophy and Definitions. Specifically, officers should be using the test of proportionality to determine if force is appropriate.*

---

[1] See PERF, *Guiding Principles on Use of Force*, pp. 38-40. http://www.policeforum.org/assets/guidingprinciples1.pdf.
[2] Ibid, pp. 54-65.
[3] Baltimore Police Department (2016). "Policy 1115 ('Use of Force')". https://www.baltimorepolice.org/sites/default/files/Policies/1115_Use_Of_Force.pdf

Mesa/Johnson 002940

*Special Order #2018-001 DPM 2.1.2 Section: E. Prohibitions*

**<u>Recommendation:</u>** *MPD should include a prohibition against **shooting at moving vehicles.** PERF recommends the following language: "Shooting at or from a moving vehicle is prohibited unless someone inside the vehicle is using or threatening lethal force by means other than the vehicle itself. The only exception is an apparent act of terrorism when the vehicle is being used as a weapon of mass destruction."*

**<u>Recommendation</u>**: *MPD should require a non-involved supervisor to respond to the scene and initiate a use-of- force investigation for every reportable use of force. This investigation should include a briefing from the involved officer(s), questioning available witnesses, and speaking with the suspect.*

**<u>Recommendation:</u>** *MPD should clarify under which circumstances face, head, and neck strikes are permitted. Face, head, and neck strikes are currently authorized at the level of active aggression. According to the current definition of active aggression, a bladed/fighting stance would be categorized as active aggression and a face, head, or neck strike would be permitted. MPD should clarify this to state that an individual **must be actively using physical force** against an officer to warrant a face, heard, or neck strike.*

## DPM. 2.1.5 Use of Force

*DPM 2.1.5 Section: 3. Definitions*

**<u>Recommendation:</u>** *MPD should replace current references to "deadly force" and "non-deadly force" with the more precise and correct terms "lethal force" and "less-lethal force".*

**<u>Recommendation:</u>** *MPD should combine "strikes" and "limited strikes" into one category. Currently, both definitions refer to a hands-on approach, and there is little utility in keeping these two categories separate.*

**<u>Recommendation:</u>** *PERF has traditionally recommended the prohibition of any type of neck restraint, such as MPD's Carotid Control Technique, due to the limited occasions in which it is necessary/required, and the extensive training and skill required to perform it safely and effectively. Should MPD decide to continue the use of the Carotid Control Technique, **MPD should ensure that it remains authorized at the level of lethal force, as is current practice, and that all officers are trained and tested yearly on the Carotid Control Technique.***

*MPD should also remove the following language from the current definition, because it does not specify a situation in which lethal force would be justified: "When a subject is actively assaulting an officer or another person and other control methods have been exhausted or the officer reasonably believes other methods would be ineffective." This scenario may present confusion for members of the department as it conflicts with the directive in current policy that the Carotid Control Technique be considered a lethal force option.*

*DPM 2.1.5 Section: 4. Use of Force Factors*

**Recommendation:** *MPD should consider strengthening its policy by adding language to this section that more clearly defines the basis for using force. This language should go beyond the minimum legal standard established in the U.S. Supreme Court decision* Graham v. Connor (1989), *and should reflect key concepts such as de-escalation and proportionality. These concepts should also be incorporated into all MPD's policies, practices, and training on use of force.*

*DPM 2.1.5 Section: 5. Medical Treatment After Use of Force*
Although the need for medical treatment is included in DPM 2.1.35 Electronic Control Device (ECD) Protocols, it should be mentioned again in the overall use of force policy if these two policies remain separate.

**Recommendation**: *MPD should reiterate in this policy that all subjects who have been exposed to an Electronic Control Weapon (ECW) application receive a medical evaluation by emergency medical responders in the field or at a medical facility.*

*DPM 2.1.5 Section: 6. Reporting Guidelines*

**Recommendation**: *MPD should require that the pointing of an ECW be reported by officers. This action does not have to be captured in the official use-of-force report, but can instead be required in an incident report.*

**DPM 2.1.20 Firearms Use**

*DPM 2.1.20 Section: 2. General Guidelines*

**Recommendation:** *MPD should clarify that the authorization to use a firearm to "stop a fleeing felon" is permissible* **only** *when the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or the general public.*

*DPM. 2.1.20 Section: 3. Restrictions*

**Recommendation:** *MPD should replace the term "suppression fire" with "directed fire." The term "directed fire" is more accepted by policing experts and does not have the militaristic connotations of "suppression fire".*

**Recommendation:** *MPD should simplify the language in this section to simply state, "Shooting at or from a moving vehicle is prohibited unless someone inside the vehicle is using or threatening lethal force by means other than the vehicle itself. The only exception is an apparent act of terrorism when the vehicle is being used as a weapon of mass destruction."*

Mesa/Johnson 002942

**DPM 2.1.35 Electronic Control Device (ECD) Protocols**

*DPM 2.1.35 Section: 2. Definitions*

> **Recommendation:** *MPD should replace all references to "ECD" and "Taser" in this and any related policies with the more descriptive and appropriate term, "Electronic Control Weapon (ECW)," in order to clarify that ECWs are in fact weapons that carry a risk of harming persons.*

> **Recommendation:** *MPD should revise the definition of Drive Stun to state that "Drive stun mode should be used only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option." This definition should inform additional language on Drive Stuns included throughout the policy, specifically the language on page 3 of the policy. In addition, PERF recommends against deploying probes to the groin area as currently allowed in this section. MPD should discuss appropriate target areas during annual recertification and conduct refresher training on the use of ECWs as needed.*

*DPM 2.1.35 Section: 5. Deployment Procedures*

> **Recommendation:** *MPD should revise deployment procedures to state, "Personnel should use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent application should be independently justifiable, and the higher risk should be weighed against other force options."*

> **Recommendation**: *MPD should consider adopting brightly colored ECWs (e.g., yellow), which may reduce the risk of escalating a force situation because they are plainly visible and thus decrease the possibility that a secondary unit will mistake the ECW for a firearm.*

**DPM 2.1.40 Less-Lethal Shotgun Protocols**

> **Recommendation:** *MPD should ensure that less-lethal shotguns are clearly marked to avoid confusion with lethal shotguns.*

**DPM 2.1.45 Use of Force Reporting Protocols**

Tracking use-of-force incidents is one of the most important measures of accountability a department can undertake. **The recommendations in this section seek to strengthen the current reporting protocols in a manner that emphasizes accountability of the first-line supervisor through all levels of the department**.

Mesa/Johnson 002943

*DPM 2.1.45 Section: 2. Non-Deadly Force Police Incidents*

**Recommendation**: *MPD should state in policy that supervisors should respond to the scene of ALL reportable uses of force to conduct the initial investigation. Supervisors should also be dispatched to all incidents where it is anticipated that force might be used.*

**Recommendation:** *MPD should add a requirement that supervisors immediately respond to any scene: where a weapon (including a firearm, edged weapon, rocks, or other improvised weapons) is reported; where a person experiencing a mental health crisis is reported; or where a dispatcher or other member of the department believes there is potential for significant use of force.*

**Recommendation:** *MPD should ensure that Blue Team reports (the software MPD uses to record use-of-force incidents) include a thorough description of the incident in question, including the names of the officers and subjects involved, the circumstances surrounding the use of force, and the result of the force used. Sergeants should also document the steps of the investigative process, including who was interviewed and what materials were reviewed. Finally, the sergeants should document the findings of their review in the Blue Team system.*

**Recommendation:** *MPD should require that each individual involved in the routing process documents the steps taken in reviewing the use-of-force report, and that each individual states his or her agreement or disagreement with the findings of the investigating supervisor.*

**MPD action taken:** The September 2018 update to DPM 2.1.45 Use of Force Reporting Protocols specifies the expected documentation requirements for sergeants and lieutenants.

- Moving forward, sergeants now must make one of two possible determinations: "No issues identified after initial review" or "Additional Review Required" by a senior officer. Upon making either determination, sergeants must include a statement indicating the factors that led them to the stated conclusion.
- Lieutenants must also conduct an investigation of the facts of the incident and make a determination as to whether any issues were identified following the initial review and if additional review is needed. If no issues are identified, lieutenants must include their final comments on the use-of-force incident and forward the file to the Training Section. If additional review is needed, the Blue Team file is to be forwarded to the appropriate Division commander, with the Advanced Training Lieutenant copied.

**DPM 2.3.5 Vehicle Pursuits**

Overall, PERF's review of MPD's vehicle pursuit policy found that the policy is detailed and that it appropriately limits the situations in which a vehicle pursuit is allowed. The only issue identified was the lack of specification over the number of officers required for a pursuit.

Mesa/Johnson 002944

*DPM 2.3.5 Section: 2. General Guidelines*

**Recommendation**: *MPD should ensure that when making a consideration of the number of officers required for a pursuit, MPD should limit the number of responders to a primary unit, a secondary unit, and a supervisor who is also involved in the pursuit. This should be the limit unless exigent circumstances exist that would require additional personnel to join the pursuit.*

**DPM 2.3.30 Precision Immobilization Technique (PIT)**

**Recommendation:** *MPD should review how often it employs this technique. If it is used sparingly, MPD should discontinue its use. Should MPD elect to continue using it, policy should be updated to reflect that refresher training be provided on a regular basis. For example, the Las Cruces Police Department requires eight hours of annual training on the technique that includes both policy review and behind the wheel driving. The Las Cruces Police Department also only authorizes individuals trained by the department to use the technique and restricts its use to vehicles going forty miles per hour or less.*

**TAC 4.4 Counter Sniper Program**

**Recommendation:** *MPD should replace the term "suppression fire" with "directed fire" in TAC 4.4 as is also recommended in DPM 2.1.20 Firearms Use (above). The term "directed fire" is more accepted by policing experts and does not have the militaristic connotations of "suppression fire".*

## Data Review

PERF's review of electronic data exported from 1610 use-of-force reports captured from July 2015-June 2018 showed that, although use-of-force reports have increased slightly over the last three years, **a relatively small number of MPD officers were involved in those incidents**. PERF also electronically reviewed a smaller sample of full Blue Team reports to analyze the location of strikes. PERF's review found that 52% of the strikes identified in the sample were to the face, head, or neck, demonstrating that recent policy changes made by MPD leaders limiting the use of strikes to the face, head, or neck were necessary.

**Recommendation:** *MPD should merge "strikes" and "limited strikes" into a single category. Combining the categories will improve the accountability process by making it easier for supervisors to track the location of strikes under one category.*

**Recommendation:** *MPD should state clearly in policy that strikes to the face should only be utilized when the circumstances warrant such action. Officers should be trained on this policy update.*

Mesa/Johnson 002945

**MPD action taken:** In Special Order # 2018-001 in relation to DPM 2.1.2, effective June 2018, it was clarified that face, head, and neck strikes are prohibited absent active aggression/aggravated active aggression.

**Recommendation:** *MPD should make substation commanders and supervisors (sergeants and above) aware of the findings in this report in a briefing or in-service training. Supervisors should continue to track use of force involving officers under their command and should use these findings to determine whether additional training is needed. Supervisors should also be tasked with ensuring that current policies are followed in the field.*

## Professional Standards Division Review

PERF also assessed MPD's Professional Standards Division (PSD) to identify any areas of improvement in the PSD's review process.

**Recommendation:** *MPD should modify its website to place information on how to file a compliment or complaint to the homepage, so it can be made more visible to the public.*

**Recommendation:** *MPD should **remove** the warning about making a false complaint from its complaint materials and website. Additionally, this warning should not be given to individuals making complaints in person or over the phone.*

**Recommendation**: *MPD should ensure that all materials related to the complaint process are consistent and accurate. Specifically, MPD should reconcile the website's instructions for making a complaint via phone. Currently, the phone number on MPD's webpage differs from the phone number on the separate complaint form. MPD should also ensure all of the links on the complaint form are active and replace any broken links.*

**Recommendation:** *MPD should include the guidelines outlined in DPM 1.4.10, Disciplinary Process on which types of complaints do warrant a formal department investigation to DPM 2.1.45, Use of Force Reporting Protocols. DPM 1.4.10, Disciplinary Process states that the following complaints cannot be classified as an inquiry and warrant a department investigation:*
- *Complaints that are criminal in nature.*
- *Complaints that involve sexual harassment.*
- *Discrimination.*
- *Violations of the COM Computer use policy.*
- *Violations of DPM 1.2.110, Overtime Protocols.*
- *Neglect of duty violations.*
- *Complaints of workplace violence.*
- *Bias complaints based on race, religion, national origin, sex, and sexual orientation.*

**Recommendation:** *MPD should state in DPM 2.1.45 Use of Force Reporting Protocols that complaints are not to be discouraged and should emphasize the sergeant's role in making sure this policy is enforced. Sergeants should be trained on their responsibilities in accepting complaints.*

Mesa/Johnson 002946

**Recommendation:** *MPD should develop a policy that outlines the circumstances in which personnel files held by the Professional Standards Division can or cannot be purged. The New Jersey Division of Archives and Records Management policy described on page 60 may be one example of how MPD can develop such a system. PERF recommends that this policy include a stipulation that sustained complaints against an officer are held indefinitely.*

> **MPD action taken:** MPD has put a halt to the purging of files pending a review of public records laws and existing policy.

**Recommendation:** *MPD should consider moving the Professional Standards Division's office to an off-site location. An off-site facility, such as a mixed-use office building or another city property, can be less intimidating for complainants than police headquarters. Furthermore, for officers involved in an investigation, the off-site location will ensure a higher level of privacy and will help protect the integrity of the investigation.*

## Use-of-Force Training

In addition to reviewing MPD's current training, PERF also provided a train-the-trainer seminar to assist MPD in the implementation of PERF's Integrating Communications, Assessment, and Tactics (ICAT) training.

**Recommendation:** *MPD should, as a general matter, evaluate instructors regularly to ensure that training is being implemented in a consistent manner. With respect to ICAT, which is a new type of training developed just two years ago, senior leaders in MPD's academy should sit in on classes to personally observe the instruction of ICAT and ensure that training is presented in the manner intended by MPD command.*

**Recommendation:** *MPD should involve the Training Section in the policy-making process when it is expected that training will need to be altered in accordance with the new policy directive(s).*

**Recommendation**: *MPD should require sergeants and lieutenants to monitor the implementation of training in the field. If officers are not in compliance with training, sergeants and lieutenants should intervene and correct the behavior immediately. Supervisors should be held accountable if these corrective measures are not taken.*

**Recommendation:** *MPD should stipulate in DPM 2.1.45, Use of Force Reporting Protocols, that the Training Section should monitor trends and emerging issues by tracking data found in use-of-force complaints. Specifically, the Training Section should monitor the types of force being used and the reasons for use of force. This review will allow instructors to identify needs for future training sessions.*

Mesa/Johnson 002947

## Additional Recommendations

During the course of PERF's review, additional recommendations were identified that did not fall under the scope of work for the current assessment, but which could improve transparency and accountability within the department.

**Transparency**

>**Recommendation:** *MPD should create a formal system to be overseen by the Policy and Planning Section to allow feedback during the policy making process. This system should allow for input from internal subject matter experts and by individuals within the department who will be significantly impacted by the policy. Once the policy has been implemented, feedback should be solicited from the field on how the policy impacts daily operations. MPD should consider allowing feedback via PowerDMS and should ensure that each policy goes through the same process. For example, when a policy is issued, MPD should use the current PowerDMS system to send the policy out to a consistent group of individuals who have been designated to review policy changes. Individuals to include would be all commanders, the department's legal representatives, elected union officials, and other internal subject matter experts. Within a certain number of days, this group should provide feedback and additional recommendations to be considered by the Policy and Planning Section as they finalize the policy.*

>**Recommendation:** *MPD should create a system that allows officers in the field to make policy suggestions and should be encouraged to do so by the Chief. A timeframe should be set for when those suggestions are addressed by MPD command staff and the Policy and Planning Section. PERF recommends creating a policy committee utilizing subject matter experts on the topics of the policy in question within the department. First-line supervisors should be included on this committee due to the role they play in ensuring that officers in the field are adhering to department policy.*

>**Recommendation:** *MPD should create a link to its policies and procedures on its homepage to make them more accessible to the public.*

>**Recommendation:** *MPD should release data on the department's use of force on an annual basis. This report should present the public with detailed information on the trends identified in use of force for that year.*

>**Recommendation:** *MPD should be prepared to participate and submit data to the FBI's National Use-of-Force database as soon as possible. Data collection began on January 1, 2019.*

**Improving Officers' Experiences**

>**Recommendation:** *MPD should, to increase accountability, revisit its current bidding process for squad assignments to ensure that supervisors do not remain in a particular squad for an extended period of time. Doing so will expose officers to different supervisory styles among the sergeants and lieutenants.*

Mesa/Johnson 002948

**<u>Recommendation:</u>** *MPD should commend officers who demonstrate appropriate use of force or restraint in accordance with department policy and who practice de-escalation techniques in the field.*

Mesa/Johnson 002949

# Introduction

In August 2018, the City of Mesa, AZ commissioned the Police Executive Research Forum (PERF) to conduct an assessment of the Mesa Police Department's (MPD) use-of-force policies, procedures, and tactics. The review also included a review of how complaints of excessive use of force are documented and investigated.

The purpose of the review was not to investigate any specific incident or officer, but instead to focus on broader trends through the review of policies, procedures, training, and the department culture within MPD. PERF's review included an analysis of MPD's policies and training related to use of force, on-site interviews with department personnel of all ranks, and a review of officer-generated reports related to use-of-force.

During the review process, MPD personnel demonstrated a strong commitment to their community and an openness to recommendations for improvements and new types of training for officers that would help them serve their community. As noted throughout this report, MPD leaders proactively implemented changes to improve the department's use-of-force practices. The intention of these recommendations is to build upon these efforts by providing MPD with the tools and guidance needed to best serve the community of Mesa.

PERF's review of MPD's use-of-force policies, practices, and training is based on the expertise PERF has developed in conducting scores of similar reviews for other city and county law enforcement agencies, PERF's extensive research on use-of-force policies, and a review of policies in law enforcement agencies that have entered into consent decrees with the United States Department of Justice over use-of-force issues.[4]

## About the City of Mesa and the Mesa Police Department

The city of Mesa, AZ, covering a land area of 136 square miles, is located just east of the capital city of Phoenix and is home to 496,401 residents.[5] According to 2017 Census data, the racial composition of the City of Mesa is as follows:

- 83.8% White
- 3.7% Black or African American
- 2.3% American Indian and Alaska Native
- 2.0% Asian
- 0.4% Native Hawaiian and Other Pacific Islander
- 3.1% Two or more races.

In terms of ethnicity, 27.4% identified as Hispanic or Latino.

---

[4] PERF conducted extensive research on the DOJ consent decree process, summarized in our 2013 report, "Civil Rights Investigations of Local Police: Lessons Learned."
[5] "Mesa city, Arizona." United States Census Bureau. https://www.census.gov/quickfacts/fact/table/mesacityarizona/IPE120217

Mesa/Johnson 002950

The Mesa Police Department (MPD) employs approximately 800 sworn and 400 civilian employees.[6] MPD is comprised of a Patrol Operations Bureau, an Investigations Bureau, an Administration Bureau, and Special Projects. The Patrol Operations Bureau oversees the city's four police districts: Fiesta, Central, Red Mountain, and Superstition. The Investigations Bureau is led by an Executive Assistant Chief who directly oversees the Professional Standards Division and an Assistant Chief who oversees the Criminal Investigations, Metro, Special Operations, and Forensic Services divisions. The Administration Bureau is comprised of the Human Resources, Community Engagement, Technical Services, and Financial Services divisions. The Legal Services Division reports directly to the Chief of Police and does not fall under any of the aforementioned bureaus.[7]

## Project Scope and Methodology

PERF's review focused on five key areas:
- Use-of-force policies, procedures, and directives;
- Use-of-force practices, tactics, and techniques;
- Use-of-force documentation, investigation, and accountability;
- Processing and investigating use-of-force complaints, including case disposition;
- The organizational culture surrounding use-of-force issues within the Mesa Police Department.

To assess these key areas, PERF used the following methodology:

**Onsite Interviews and Focus Groups:** PERF staff members conducted a site visit to Mesa, AZ in September 2018 to conduct interviews and focus groups with stakeholders in the department and community. During this trip, PERF spoke with the Chief, executive staff, commanders, lieutenants, sergeants, patrol officers, civilian employees, the staff attorney, and community members. Additionally, staff members met with the Professional Standards Division and Training Division staff members. PERF staffers also conducted ride-alongs in each patrol district over three shift periods. Following the onsite interviews and focus groups, PERF maintained communication with MPD for follow-up questions and conducted a final site visit in November 2018.

**Use-of-Force Policy Review and Analysis:** PERF reviewed and analyzed MPD's policies, procedures, and other documents related to the department's use of force.

**Use-of-Force Investigations and Documentation Review:** PERF reviewed data from all use-of-force reports from July 2015 through June 2018, resulting in a review of data from 1,609 cases. MPD provided PERF with data exported from Blue Team reports (the software MPD uses to record use-of-force incidents) in Excel format for analysis. PERF then examined a random sample of 122 full case files for further analysis of variables or patterns that might be associated with a likelihood of officers needing to use force.

---

[6] *Mesa Police Department 2017 Annual Report*, Mesa Police Department, https://www.mesaaz.gov/home/showdocument?id=30366
[7] Mesa Police Department Organizational Chart, September 2018.

Mesa/Johnson 002951

Introduction

**Professional Standards Division Review:** PERF staff conducted site visits to MPD and held an extended interview with staff members of the Professional Standards Division to thoroughly discuss the process of receiving, investigating, and classifying use-of-force complaints. PERF also reviewed a small sample of Professional Standards investigative files.

**Use-of-Force Training Review**: PERF conducted site visits to MPD's training facility and held a focus group with training staffers.  PERF also reviewed training curricula and scenario-based exercises that relate to use of force.

As part of the review, PERF was also asked to provide train-the-trainer instruction on PERF's Integrating Communication, Assessment, and Tactics (ICAT) training to selected MPD training staff members. PERF conducted the train-the-trainer instruction in August 2018 and observed an MPD-facilitated ICAT session in November 2018.

**This report presents the findings from PERF's review and provides recommendations for how MPD can continue to improve its use-of-force policies and practices. Preliminary recommendations were shared with MPD command staff members during the review process, and MPD has already begun implementing a number of recommendations that will strengthen its policies, procedures, and training. These updates will be noted throughout the report. PERF's recommendations are based on current research and reflect progressive policing practices that have been adopted in other police agencies.**

Mesa/Johnson 002952

# SECTION I. USE-OF-FORCE POLICY REVIEW

PERF reviewed the Mesa Police Department's (MPD) policies related to use of force for thoroughness and compliance with nationally recognized progressive policing practices. Since 2006, four different chiefs have led MPD, and each has made changes to the department's use-of-force polices. PERF reviewed the latest iteration of each policy to develop the recommendations outlined in the following section. Previous iterations of the policies were also reviewed to provide context for the current policies.

Specifically, PERF reviewed the following policies:

- DPM 1.6.20 Patrol Rifle Protocols
- DPM 1.11.60 Use of Force Board
- DPM 2.1.1 Use of Force Philosophy and Definitions
- Special Order # 2018-001 DPM 2.1.2 Use of Force Effective June 2018
- DPM 2.1.5: Use of Force Revised June 2018
- DPM 2.1.6 Active Shooter Response
- DPM 2.1.10 Police Incidents Involving Death/Serious Injury Officer Involved Shootings and In-Custody Death Investigations
- DPM 2.1.20 Firearms Use
- DPM 2.1.25 Impact Weapons
- DPM 2.1.30 Chemical Agents
- DPM 2.1.35 Electronic Control Device (ECD) Protocols
- DPM 2.1.40 Less-Lethal Shotgun Protocols
- DPM 2.1.45 Use of Force Reporting Protocols
- DPM 2.1.50 Less-Lethal Launcher Protocols
- DPM 2.3.5 Vehicle Pursuits
- DPM 2.3.30 Precision Immobilization Technique (PIT)
- PSD 2.3 Police Service Dog Bite Incidents
- TAC 4.4 Counter Sniper Program

This section presents recommendations for how MPD can continue to improve its use-of-force policies, as well as specific recommendations for strengthening language in current policies. Policies and recommendations are presented below in sequential order based on the policy number and not in any priority order.

## Rethinking Use-Of-Force Policies, Practices and Tactics

PERF's review of MPD's use-of-force policies, training, and practices took place amid a national debate about police use of force that has been going on for several years. In the wake of high-profile lethal force incidents that have occurred across the United States in recent years, it is important for police departments to strengthen their relationships with the community and to ensure that the sanctity of human life is at the heart of everything they do. This means examining use-of-force policies, practices,

Mesa/Johnson 002953

and training to make sure that they reflect the core ideal of preserving the lives of everyone – including officers and the people they are charged with serving and protecting.

PERF's recent work regarding use of force has focused largely on police encounters with persons who are behaving erratically or dangerously due to a mental illness, a developmental disability, or another condition that prevents them from understanding and obeying orders from law enforcement.  PERF also has focused on incidents involving individuals who either are unarmed, or are armed only with an edged weapon, a rock, or other weapon other than a firearm.  In 30 percent of the 990 fatal officer-involved shootings across the country in 2015, the subjects either were unarmed or were armed with a weapon other than a firearm.[8]

It is these types of incidents where PERF believes there is the greatest potential for de-escalation and increasing the safety of everyone involved, including officers, by teaching officers to "slow the situation down," to bring additional resources to the scene, and to use communications skills and operational safety tactics to resolve the incident with minimal use of force. In situations where criminal suspects are brandishing firearms, officers have fewer options for how they can respond, and use of lethal force is more likely.

The remainder of this section discusses the key concepts at the center of PERF's recent use-of-force work, which is detailed in two reports:  *Re-Engineering Training on Police Use of Force*;[9] and *Guiding Principles on Use of Force*.[10]  These concepts are woven throughout this report and provide the basis for many of the recommendations.

### *Re-Engineering Training on Police Use of Force*

PERF held a national conference in May 2015 to explore new approaches to policies and training on police use of force.  That conference, held in Washington, D.C., brought together nearly 300 police chiefs and other law enforcement executives, federal government officials, and academic experts.

PERF's report, *Re-Engineering Training on Police Use of Force,* documents findings from the conference as well as from a 2015 PERF survey of law enforcement agencies that examined the use-of-force training provided to officers in the academy and in-service.  The survey found that use-of-force training in many agencies was primarily focused on firearms and defensive tactics training, while training on topics such as de-escalation, communication, and crisis intervention was far less common.  Participants at the meeting agreed that agencies should supplement firearms and defensive tactics training with additional training on under-represented topics, and that training on de-escalation and crisis intervention should be integrated into a comprehensive training program, rather than "siloed" from other subjects.

---

[8] Kindy, Kimberly and Kennedy Elliott. 2015. "2015 Police Shootings Investigation." *Washington Post,* December 26, 2015. https://www.washingtonpost.com/graphics/national/police-shootings-year-end/.
[9] Police Executive Research Forum. 2015. *Re-Engineering Training on Police Use of Force.* http://www.policeforum.org/assets/reengineeringtraining1.pdf
[10] Police Executive Research Forum. 2016. *Guiding Principles on Use of Force.* http://www.policeforum.org/assets/guidingprinciples1.pdf

Mesa/Johnson 002954

PERF followed up with a number of smaller regional meetings to further develop the concepts in the "Re-Engineering" report, with an eye toward developing policy concepts and training principles that police agencies can adopt.  In January 2016, PERF again convened a national meeting in Washington, in which nearly 200 police chiefs and other executives, federal agency representatives, mental health experts, academics, and others evaluated a draft of 30 "Guiding Principles on Use of Force" developed by PERF.

### *Guiding Principles on Use of Force*

The Guiding Principles, which were released in final form in March 2016,[11] are designed to give officers more specific guidance on use-of-force policy, training, tactics, equipment, and information needs.  Some of the principles are general in nature (e.g., "Adopt de-escalation as formal agency policy"), while others are more specific (e.g., "Duty to intervene:  Officers need to prevent other officers from using excessive force.").

PERF's Guiding Principles report also presents a new tool to support decision-making in the field, including during critical incidents.  This tool, known as the **Critical Decision-Making Model (CDM)**, is based largely on the National Decision Model that has been used effectively in the UK for several years.  The CDM is designed to teach officers how to think critically about many types of complex situations, including incidents that could end with a use of force.  Essentially, during a critical incident, officers using the CDM continually ask themselves questions about the nature of the incident, any threats and risks, their powers and authority to take various actions, and their options.  After taking action, they assess whether the action had the desired effect, and if necessary, begin the decision-making process again. In a situation involving a potential use of force, officers trained in the Critical Decision-Making Model ask themselves questions such as, "Do I need to take immediate action, or do I have time to slow this situation down?  What is the threat?  What information do I need about the person I am dealing with?  How can I establish rapport with this person and ask him questions that will help me assess what is happening and the risks?  Do I need additional resources at the scene, such as specialized equipment, other police units, a supervisor, or officers specially trained in mental health issues?  What could go wrong here, and how serious would the harm be?  How can I mitigate potential threats?"

While this process may sound complicated, officers who have been trained in the CDM have said that as they use it every day in various situations, it becomes second-nature.  They compare it to driving a car.  When a person is first learning to drive, every action, such as activating a turn signal or keeping the car centered in a lane, requires thought.  But after a short time, drivers perform many of the tasks of driving without consciously thinking about them.  Similarly, officers who use the CDM become accustomed to constantly evaluating situations and considering a wide array of potential responses.

## Overall Policy Organization

Currently, MPD's directives regarding use of force are separated into several different policies. For example, the department's use-of-force definitions and philosophy are in a standalone policy, while policies governing equipment used in instances of force are also outlined in separate documents. **MPD should consider consolidating the current use-of-force policies to ensure clarity.** When issues

---

[11] Ibid.

Mesa/Johnson 002955

pertaining to use-of-force are broken into numerous policies, there is a chance that revisions may not be applied uniformly and that the department's use-of-force philosophy may not be clear to officers. MPD would be better served if issues related to use-of-force were combined under a single policy. This would also make updating the policy easier as all of the critical components would be located in the same document.

> **Recommendation:** *MPD should combine related use-of-force policies under a single directive. This will make it easier for officers to find pertinent information on use-of force and will create a more holistic approach to force within the department. This comprehensive policy should include the agency's philosophy on use of force, clear guidelines around lethal and less-lethal force options, and guidelines on the accountability and reporting measures related to use of force. Specifically, the following policies should be merged:*
>
> - DPM 2.1.1 Use of Force Philosophy and Definitions
> - Special Order # 2018-001 DPM 2.1.2 Use of Force Effective June 2018
> - DPM 2.1.5: Use of Force Revised June 2018
> - DPM 2.1.20 Firearms Use
> - DPM 2.1.25 Impact Weapons
> - DPM 2.1.30 Chemical Agents
> - DPM 2.1.35 Electronic Control Device (ECD) Protocols
> - DPM 2.1.40 Less-Lethal Shotgun Protocols
> - DPM 2.1.45 Use of Force Reporting Protocols
> - DPM 2.1.50 Less-Lethal Launcher Protocols

The recommendations provided below are based on MPD's current, individual policies. **Several recommendations may be repeated in various sections due to the overlap in current policies and the need to explain a definition or philosophy in multiple sections.** For example, PERF recommends that duty to intervene be included as an addition to policy in both Special Order 2.1.2 and DPM 2.1.1 Use of Force Philosophy and Definitions. When these policies are combined, the relevant recommendations should be incorporated into the new policy, which will also eliminate duplicated recommendations. Any policies that MPD determines should remain separate should still be enhanced by adding the department's use-of-force philosophy and relevant definitions to each standalone policy involving use of force.

## DPM 1.11.60 Use of Force Board

Although MPD historically has had a use-of-force board, many of the interviewees during PERF's site visit stated that it is not effective and does not provide appropriate oversight of the department's use of force. During the site visit, there was support among MPD officials for changes to the current use-of-force board to improve its utility as an accountability mechanism.

Current MPD policy broadly outlines the objectives of the use-of-force review board and when the board should meet. Section 2. General Guidelines states the following:

Mesa/Johnson 002956

*The Use of Force Board reviews Use of Force incidents in an effort to:*
- *Determine if the use of force complied with Mesa Police Department (MPD) policies.*
- *Identify training needs in regard to specific tactics, techniques, or procedures.*
- *Improve the overall officer safety of our members by evaluating the effectiveness of tactics and techniques.*

As stated in policy, the board is to meet as often as necessary. Board members are appointed by the Chief and include: the Human Resources Commander (Chair) and 3 sworn officers above the rank of sergeant. Advisory members, who may include a training lieutenant, policy lieutenant, or other subject matter experts, and two civilians are included on the board as non-voting members. An MPD legal advisor also serves with the board to provide legal counsel but is not considered a member.

Due to the importance of use-of-force boards, PERF believes the current policy should be strengthened. A critical review of incidents helps department and civic leaders understand why most police encounters end without difficulty, but at times, an incident may end in tragedy.

Tactical decision-making is frequently at the center of an officer's need or perceived need to use force, so law enforcement agencies should constantly assess tactical decision-making in the field. Law enforcement leaders should apply a high standard when evaluating tactical decision-making, not merely to determine whether a particular use of force was legally justifiable, but whether officers used best practices, strategies, and tactics to achieve the best possible outcome given the circumstances of an incident.

In addition, review of use-of-force cases should go *beyond* tactical considerations, to address possible issues in departmental policy, training, practices and procedures. **Leading police agencies seize opportunities to identify options and lessons learned from critical incidents that can be applied in future training.** One way to do so is to utilize the CDM in the review process. The CDM offers a consistent framework through which critical incidents can be evaluated. As the CDM outlines the decision-making process from the beginning of the incident through the incident's conclusion, tactical and policy issues can be easily identified.

The utilization of a force review board is therefore essential to the agency's mission: it is important to look at every aspect of what occurred before, during, and immediately after all uses of deadly force, as well as force that results in serious bodily harm, to determine whether changes to policy, training, and procedures need to be made to improve MPD's response to these incidents.

To strengthen the current policy, PERF recommends that specific language be inserted about how often the board should meet, and that the scope of the board be broadened to include a review of the totality of the circumstances that led to the use of force. Additionally, the membership of the board should be reevaluated to be representative of MPD's unions. Term limits for members of the board will ensure that the board does not become complacent in its duty as an oversight body.

**Recommendation:** *MPD should ensure its Use of Force Board consistently reviews all uses of force that result in a death, as well as force that results in serious bodily harm. MPD should*

Mesa/Johnson 002957

*revise "DPM 1.11.60 Use of Force Board" to include language on how frequently the board meets, the membership of the board, the term of members on the board, and the scope of the board's review.*

*Specifically:*

- *The Use-of-Force Review Board should meet regularly. To start, the board should meet quarterly and then assess whether more frequent meetings are needed.*
- *Board membership should have set term limits of one year with new representatives added after the current term expires. This will help to ensure that the board does not become complacent and that the board benefits from different perspectives and experiences. MPD should stagger membership on the board to ensure there is not a complete turnover of the board at any given point. Therefore, the first iteration of the board under this new system will need to have varying timelines for their replacements until a set rotation can be established.*
- *MPD's unions should select a representative from their membership to sit on the board. The individual selected by the unions will be in touch with the challenges facing officers on the street. The local Fraternal Order of Police and the Mesa Police Association should collectively select one representative to sit on the board per term.*
- *The scope of the board's focus should be broadened beyond the review of tactics. The board should review compliance with policy, the efficacy of MPD's equipment, whether the level of assistance and oversight provided by the officer's supervisor during the incident was sufficient, and whether the investigation of the incident was thorough. The board should monitor trends across multiple incidents to identify any additional training needs. When conducting a review, the CDM should be utilized as a guide for evaluation. Using the CDM will guide members of the board through evaluating the circumstances that led to force being used, whether it was proportional to the circumstances, and whether the actions taken were in line with MPD policy.*
- *The board should consist of approximately five to seven members of varying ranks, with most members assigned to the patrol function. It should include a member of the Training Division as a member or advisor on current training practices.*

Although the Use of Force Board may meet quarterly, critical incidents should be reviewed as soon as possible. When a critical incident involves an officer-involved shooting or an in-custody death, the Use of Force Board should be convened within 24 to 48 hours following the incident. These incidents require immediate attention due to their severity. This initial review may reveal policy, training, or equipment issues that can then be addressed immediately.

**Recommendation:** *MPD should ensure that critical incident cases are reviewed by the Use of Force Board as expeditiously as possible upon closure of the investigation. Cases should not be allowed to languish. In addition, the review board should meet within 24 to 48 hours following an officer-involved shooting or in-custody death to ensure there is not an obvious policy, training, or equipment issue that needs to be immediately rectified. The review board should be briefed by investigators regarding the facts of the case known at that time to ensure that no immediate*

Mesa/Johnson 002958

*changes to policy, training, or equipment are necessary. The review board should present all findings and recommendations to the chief of police.*

## DPM 2.1.1 Use of Force Philosophy and Definitions

As mentioned previously, MPD should work to integrate its use-of-force polices into a single, cohesive policy. Recommendations made with regard to language in this specific section should also apply to language used if a singular policy is established.

Given that this policy is intended to definitively explain the department's use of force philosophy, it is important that it includes clear language and definitions. For example, throughout this policy and related other polices, MPD uses the outdated terms "deadly force" and "non-deadly force." In the past, less-lethal options were called non-deadly, as they were intended to be a clear alternative to lethal force options, such as firearms. However, some of the options traditionally termed non-deadly, such as ECWs, have resulted in death. Therefore, it would be inaccurate to label them as non-deadly options. Instead, MPD should utilize the more precise language of "lethal" and "less lethal". The term "less lethal" acknowledges the possibility that deaths have occurred as a result of less-lethal options.

> **Recommendation:** *MPD should replace current references "deadly force" to "lethal force," and should change references to "non-deadly force" to "less-lethal" force. These terms reflect the fact that while some weapons are designed to be less lethal than firearms, they sometimes do result in death. Related agency policies should also be reviewed to ensure that all references to "deadly" force are replaced with "lethal" force, and "non-deadly" is changed to "less lethal."*

In setting out a clear use-of-force philosophy, there are specific tenets that emphasize the sanctity of life of all involved in an incident. These include the idea that force used should be proportional, that officers should attempt to de-escalate situations whenever possible, and that officers have a duty to intervene when fellow officers are not acting in accordance with the department's use-of-force policy. To avoid confusion, the expectations associated with these aspects of the department's philosophy should be fully explained in policy. PERF recommends that the following language be incorporated into MPD's current policy:

> **Recommendation:** *MPD should add a definition of **"Proportionality"** to this section. As explained in PERF's report on Guiding Principles on Use of Force, he definition should state that proportionality involves officers: (1) using only the level of force necessary to mitigate the threat and safely achieve lawful objectives; (2) considering, if appropriate, alternate force options that are less likely to result in injury but will allow officers to achieve lawful objectives; and (3) considering the appropriateness of officers' actions. The concept of proportionality does not mean that officers, at the moment they have determined that a particular use of force is necessary and appropriate to mitigate a threat, should stop and consider how their actions will be viewed by others. Rather, officers should begin considering what might be appropriate and proportional as they approach an incident, and they should keep this consideration in their minds as they are assessing the situation and deciding how to respond. Proportionality also considers the nature and severity of the underlying events.[12]*

---

[12] See PERF, *Guiding Principles on Use of Force*, pp. 38-40.
http://www.policeforum.org/assets/guidingprinciples1.pdf.

Mesa/Johnson 002959

> **Recommendation:**  *MPD should add a definition of **"De-escalation"** to this section.  The definition should emphasize proportionality, the use of distance and cover, tactical repositioning, "slowing down" situations that do not pose an immediate threat, calling for supervisors and other resources, and similar actions and tactics.*[13]

> **Recommendation:** *MPD should add a definition of the **duty to intervene**. This definition should include the following language: "Officers have a duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."*

## Special Order #2018-001 DPM 2.1.2 Use of Force

In June 2018, Chief Ramon Batista issued a special order to supplement the MPD's current use of force policies. The order established the definitions to be used regarding de-escalation, specifically the levels of resistance justifying use of force. Levels of resistance include: compliant, passive resistance, active resistance, danger to self, active aggression, and aggravated active aggression. The levels of resistance were defined in policy until a policy update was issued in March 2017, in which the levels of resistance and the associated definitions were removed. The special order also established standards regarding specific instances when force can and cannot be used. Recommendations on specific areas for clarification and improvement in the special order are provided below.

## Special Order #2018-001 DPM 2.1.2 Section: B. Policy Statement

The current policy statement within the special order can be strengthened to include a statement about officers' duty to intervene and the need for force to be proportionate to the circumstances. MPD's current policy statement reads:

> *While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department shall use these guidelines to make such decisions in a professional, impartial and reasonable manner.*

> *Officers should continually assess the situation in order to increase an officer's ability to bring a situation to a safe, peaceful conclusion. This conclusion may be accomplished by using time, distance, information, isolation, teamwork, force array, coordination and other techniques, to maximize our officers' and community's safety.*

Although this policy mentions the desire to maximize officers' and the community's safety, a stronger statement on the sanctity of life should be included in this initial policy statement. Additionally, the concepts of duty to intervene and proportionality should be introduced in this section. If MPD's use of force policies are consolidated as recommended, the definitions below only need to be included once. If policies remain separate, however, it is important that the concepts of the sanctity of human life, duty to intervene, and proportionality be included in both Special Order #2018-001 DPM 2.1.2 Use of Force and DPM 2.1.1 Use of Force Philosophy and Definitions.

---

[13] Ibid, pp. 54-65.

Mesa/Johnson 002960

> **Recommendation:** *MPD should add a sentence emphasizing **the sanctity of human life** as a core value in its use-of-force policy. For example, the Baltimore Police Department's use-of-force policy states: "The policy of the Baltimore Police Department is to value and preserve human life in all situations."[14]*

> **Recommendation:** *In addition to adding the definition of **"duty to intervene"** as mentioned above, MPD should include a statement creating a duty to intervene in instances where force is not being used appropriately. This statement should contain the following language: "Officers have a duty to intervene if they anticipate or observe the unreasonable, unnecessary, or disproportionate use of force."*

> **Recommendation:** *MPD should include an overview of **"proportionality"** in this section, in addition to including the full definition in DPM 2.1.1 Use of Force Philosophy and Definitions. Specifically, officers should be using the test of proportionality to determine if force is appropriate.*

Current policy encourages officers to continually assess situations when deciding on force options. This approach can be strengthened by encouraging officers to use the Critical Decision-Making Model (CDM) which they are currently being trained to use through the Integrating Communications, Assessment, and Tactics (ICAT) program. The CDM teaches officers to continually assess the nature of a situation, the officer's legal authorities to handle the situation, the officer's goal in resolving the incident, any risks that are present, the officer's range of options, etc. Utilizing the CDM will provide officers with guidance as they work to meet the department's stated objective of bringing "a situation to a safe, peaceful conclusion" through continual assessment of the situation.

## Special Order #2018-001 DPM 2.1.2 Section: E. Prohibitions

In this section, MPD outlines the circumstances under which officers are **not permitted** to use force. Notably, this section prohibits the use of face, head, or neck strikes absent active aggression/aggravated active aggression. **These policy changes regarding strikes to the head and face were the result of MPD leaders thoroughly reviewing use-of-force incidents and identifying ways to improve policy and accountability.** However, specific restrictions surrounding face, head, and neck strikes could be further clarified in the policy (see Recommendation below).

In addition, PERF found that MPD's policy does not prohibit officers from shooting at moving vehicles. Many agencies have adopted this prohibition, starting with the New York City Police Department (NYPD) in the 1970s. Other agencies that prohibit shooting at vehicles include the Boston, Chicago, Cincinnati, Denver, Philadelphia, and Washington, DC Police Departments.[15] In New York City, the total number of shooting incidents involving NYPD officers declined 33 percent in the year following the implementation of the prohibition, and shootings continued to drop by more than 90 percent in the following years.[16]

---

[14] Baltimore Police Department (2016). "Policy 1115 ('Use of Force')". https://www.baltimorepolice.org/sites/default/files/Policies/1115_Use_Of_Force.pdf
[15] Police Executive Research Forum (2016): *Guiding Principles on Use of Force.* Page 44. https://www.policeforum.org/assets/30%20guiding%20principles.pdf
[16] See PERF, *Guiding Principles on Use of Force*, pp. 45. http://www.policeforum.org/assets/guidingprinciples1.pdf

Mesa/Johnson 002961

However, PERF recognizes the recent trend of using motor vehicles as a weapon of mass destruction.  This has been observed both internationally and within the United States. [17] PERF understands that this type of threat may require an extraordinary response to stop the threat and protect life.  If this type of event were to occur within Mesa, any use of force, particularly lethal force, must be evaluated based on the totality of the circumstances and the necessary, reasonable, and proportional use of force.

> **Recommendation:** *MPD should include a prohibition against **shooting at moving vehicles**. PERF recommends the following language: "Shooting at or from a moving vehicle is prohibited unless someone inside the vehicle is using or threatening lethal force by means other than the vehicle itself. The only exception is an apparent act of terrorism when the vehicle is being used as a weapon of mass destruction."*

Finally, MPD policy does not adequately detail the responsibilities of sergeants during a use-of-force investigation. For example, Special Order 2018-001 DPM 2.1.2 specifies patrol supervisors should respond to the scene of an incident when a face, head, or neck strike is deployed. Supervisors, however, should respond to the scene of all reportable uses of force, regardless of what type of force is used and where the force was used. The lack of supervisors responding to the scene of a reportable use of force was an accountability issue raised in numerous interviews.

> **Recommendation**: *MPD should require a non-involved supervisor to respond to the scene and initiate a use-of- force investigation for every reportable use of force. This investigation should include a briefing from the involved officer(s), questioning available witnesses, and speaking with the suspect.*

One of the issues that led to the release of the Special Order was concern over the use of strikes to the face, head, and neck. Although the Special Order outlines that such strikes are now only permissible in instances where a subject is demonstrating aggravated active aggression or active aggression, there is still room for improvement. Specifically, there are situations in which a subject may be classified as demonstrating active aggression according to MPD's definition, but the threat to an officer is low. For example, a subject who is standing in a fighting stance would be categorized as actively aggressive. Given the seriousness of a strike to the face, head, or neck, it should be specified further that officers can only use a strike to the face, head, or neck when a subject is physically using force against an officer or member of the public.

> **Recommendation:** *MPD should clarify under which circumstances face, head, and neck strikes are permitted. Face, head, and neck strikes are currently authorized at the level of active aggression. According to the current definition of active aggression, a fighting stance would be categorized as active aggression and a face, head, or neck strike would be permitted. MPD*

---

[17] For example, in July 2016, a cargo truck was driven into a crowd in Nice, France.  This attack resulted in the deaths of 86 people and 458 people were injured.  In the United States, a vehicle was used to attack a crowd in Charlottesville, VA in August 2017.  One person was killed, and 19 others were injured.  In October 2017, a vehicle was rammed through a crowded bike lane in New York City.  Eight people were killed, and 12 were injured.

Mesa/Johnson 002962

*should clarify this to state that an individual **must be actively using physical force** against an officer to warrant a face, heard, or neck strike.*

## DPM. 2.1.5 Use of Force

In recent years, MPD has seen a number of changes to its main use-of-force policy as a result of changes in the department's leadership. A policy change made between 2013 and 2017 removed definitions of the levels of resistance within the main policy. Special Order #2018-001 reestablished those definitions that were still absent in the latest use-of-force policy.  PERF identified the following areas in which the current policy can be strengthened.

### DPM 2.1.5 Section: 3. Definitions

As mentioned, this iteration of MPD's use-of-force policy included definitions pertaining to force options but did not include definitions for levels of resistance. The following recommendations are intended to strengthen the language within the current draft of the policy. While a recommendation would have been made to define the levels of resistance, that is covered in Special Order #2018-001 which supersedes DPM 2.1.5.

> **Recommendation:** *MPD should replace current references to "deadly force" and "non-deadly force" with the more precise and correct terms "lethal force" and "less-lethal force".*

MPD's current force options includes both strikes and limited strikes. The only difference between the two categories is the location of the strike. As the location of all uses of force is noted in the Blue Team use-of-force reports, separating strikes and limited strikes is unnecessary. Both definitions result in a hands-on approach being taken with a suspect with the same type of force being used. Combining these two categories will further streamline MPD's policy. Additionally, by tracking one "strikes" category, it will be easier to track trends in the use of strikes, specifically as to whether strikes to the face, head, or neck are being used.

> **Recommendation:** *MPD should combine "strikes" and "limited strikes" into one category. Currently, both definitions refer to a hands-on approach and there is little utility in keeping these two categories separate.*

MPD's policy also includes the Carotid Control Technique as a lethal force option. PERF agrees with this classification of the technique as a lethal option, based upon language the U.S. Department of Justice has used in consent decrees with police agencies. Consent decrees for the City of Albuquerque and the City of New Orleans state that "neck holds" should be prohibited except when lethal force is authorized.[18] Due to the potential safety concerns associated with the use of the Carotid Control

---

[18] *United States v. City of Albuquerque*, Settlement Agreement (2014),  pp. 12, 15. https://www.justice.gov/sites/default/files/usao-nm/legacy/2015/01/20/DOJ-ABQ%20Settlement%20Agreement%20EXECUTED.pdf,
*United States v. City of New Orleans*, Consent Decree Regarding the New Orleans Police Department (2013), p. 20. https://www.justice.gov/sites/default/files/crt/legacy/2013/01/11/nopd_agreement_1-11-13.pdf

Mesa/Johnson 002963

Technique, the New York City Police Department and the Philadelphia Police Department have forbidden its use.[19]

> **Recommendation:** *PERF has traditionally recommended the prohibition of any type of neck restraint, such as MPD's Carotid Control Technique, due to the limited occasions in which it is necessary/required, and the extensive training and skill required to perform it safely and effectively. Should MPD decide to continue the use of the Carotid Control Technique,* **MPD should ensure that it remains authorized at the level of lethal force, as is current practice, and that all officers are trained and tested yearly on the Carotid Control Technique.**
>
> *MPD should also remove the following language from the current definition, because it does not specify a situation in which lethal force would be justified: "When a subject is actively assaulting an officer or another person and other control methods have been exhausted or the officer reasonably believes other methods would be ineffective." This scenario may present confusion for members of the department as it conflicts with the directive in current policy that the Carotid Control Technique be considered a lethal force option.*

### DPM 2.1.5 Section: 4. Use of Force Factors

This section outlines what factors officers must consider when evaluating what level of force to use. The factors encourage officers to look at the totality of the circumstances, which include the availability of cover, and time constraints in the decision-making process.

*Graham v. Connor*[20] establishes a general standard of "objective reasonableness" regarding police use of force. Objective reasonableness represents the legal standard by which police use of force is judged by the courts, and it is critical that any use-of-force policy articulate that standard.

However, though *Graham* outlined broad principles for how the objective reasonableness standard should be applied, the Supreme Court ultimately left it up to individual police agencies to determine how to best incorporate those principles into their own policies, training, and tactics.  The Court stated, "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake. … *Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, … its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."* (Emphasis added.)

*Graham* is the common denominator across the United States; all police agencies must have use-of-force policies that meet *Graham's* standards. No one except the Supreme Court itself can alter that

---

[19] Kevah Waddell and National Journal. (2014). "Why Many Large Police Department Tolerate Their Officers Using Neck Holds," *The Atlantic*, https://www.theatlantic.com/politics/archive/2014/12/why-many-large-police-departments-tolerate-their-officers-using-neck-holds/458079/

[20] *Graham v. Connor*, 490 U.S. 386 (1989). http://caselaw.findlaw.com/us-supreme-court/490/386.html.

Mesa/Johnson 002964

precedent. However, many police departments have chosen to go *beyond* the bare requirements of *Graham*. For example, many police agencies have detailed policies and training on issues such as shooting at moving vehicles, rules on pursuits, guidelines on the use of Electronic Control Weapons (ECWs) [21], and many other use-of-force issues that are not mentioned in or required by *Graham*.

Furthermore, new concepts in use-of-force policy and practice, such as the "tactical pause," often reflect expectations of American communities about police use of force, particularly in assessing whether force in any given situation is not only legal, but also is necessary, proportional, and ethical. In this sense, use-of-force policies and practices currently employed by many police agencies seek to go beyond the minimum legal standard established in *Graham*.

In fact, a federal appeals court in 2016 held that professional standards in policing can sometimes become incorporated in new legal standards. (The case, *Armstrong v. the Village of Pinehurst et al.*, involved the use of an Electronic Control Weapon against a mentally ill man. The Fourth Circuit U.S. Court of Appeals cited ECW guidelines produced by PERF and the Justice Department's COPS Office to reach the conclusion that "immediately tasing a non-criminal, mentally ill individual, who seconds before had been conversational, was not a proportional response.")[22]

> **Recommendation:** *MPD should consider strengthening its policy by adding language to this section that more clearly defines the basis for using force. This language should go beyond the minimum legal standard established in the U.S. Supreme Court decision* Graham v. Connor (1989), *and should reflect key concepts such as de-escalation and proportionality. These concepts should also be incorporated into all MPD's policies, practices, and training on use of force.*

## DPM 2.1.5 Section: 5. Medical Treatment After Use of Force

In accordance with the philosophy of the sanctity of life, this section outlines the requirements for obtaining medical treatment for individuals following an officer's use of force. However, it does not include a requirement that the deployment of an Electronic Control Weapon (ECW) triggers the need for medical treatment. Given the risks involved in the use of ECWs, individuals who have received an ECW deployment should be afforded medical treatment. Although the need for medical treatment is included in DPM 2.1.35 Electronic Control Device (ECD) Protocols, it should be mentioned again in the overall use of force policy if these two policies remain separate.

> **Recommendation**: *MPD should reiterate in this policy that all subjects who have been exposed to an Electronic Control Weapon (ECW) application receive a medical evaluation by emergency medical responders in the field or at a medical facility.*

---

[21] The Mesa Police Department refers to Taser-style devices as "Electronic Control Devices." PERF recommends the term "Electronic Control Weapon," which more accurately indicates that ECWs are weapons that can harm people.
[22] See PERF, *Guiding Principles on Use of Force*, pp. 45. http://www.policeforum.org/assets/guidingprinciples1.pdf. Page 18.

Mesa/Johnson 002965

### DPM 2.1.5 Section: 6. Reporting Guidelines

The process of reporting and investigating force is an important accountability measure for police agencies. The current policy provides a brief summary of the requirements for reporting force with more details included in DPM 2.1.45, Use of Force Reporting Protocols. Other reporting requirements were found in additional policies that PERF reviewed, including DPM 2.1.20, Firearms Use, in which verbal and written reports are required when a firearm is pointed in the direction of another person and the person was aware of it. Again, it is recommended that these separate policies be brought together into a single, comprehensive policy.

PERF found that MPD does not currently require reporting on the pointing of an ECW at an individual. Agencies should capture and review reports on the pointing of an ECW at an individual as a threat of force."[23] The reason for requiring reporting in this circumstance is to help agencies identify areas for improvement with respect to policies and training, and to promote accountability and transparency within the agency. Considering that MPD officers utilized ECWs in over 40 percent of use of force reports over a three-year period, it is important that the use of ECWs be appropriately tracked, even when they are not fully deployed. With this information, MPD should also track the effectiveness of ECWs and determine whether additional training is needed informing officers on what other options are available to them in the event that the use of an ECW fails. Additionally, the potential lethality of ECWs justifies its oversight similar to the oversight of the pointing of a firearm.[24]

> **Recommendation**: *MPD should require that the pointing of an ECW be reported by officers. This action does not have to be captured in the official use-of-force report, but can instead be required in an incident report*

### DPM 2.1.20 Firearms Use

As a means of lethal force, it is important to have clear guidelines surrounding the use of firearms. MPD currently provides recommendations on firearm use in a policy separate from the primary use-of-force policy. The firearms policy includes general guidelines, restrictions, deployment procedures, post-deployment procedures, carrying and security, and training considerations. Below, PERF provides recommendations on how to improve upon the current policy.

### DPM 2.1.20 Section: 2. General Guidelines

Given that the use of firearms is a lethal option, it is important that the language governing the use of firearms be precise. Within the general guidelines, there are opportunities for the current language to be more specific. For example, language permitting the use of firearms to "stop a fleeing felon" is too broad and should be qualified to determine whether a threat is posed to officers or the public per *Tennessee v. Garner,* which prohibits shooting a fleeing suspect "unless necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[25]

---

[23] PERF, *Guiding Principles on Use of Force*, see Policy 10, pp. 48-49.
[24] See page 34 for more information about potential ECWs deployment issues and the need for alternative tactics.
[25] *Tennessee v. Garner.* 471 U.S. 1. (1985). https://supreme.justia.com/cases/federal/us/471/1/

Mesa/Johnson 002966

> **Recommendation:** *MPD should clarify that the authorization to use a firearm to "stop a fleeing felon" is permissible **only** when the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or the general public.*

### DPM. 2.1.20 Section: 3. Restrictions

Current policy allows "suppression fire" to be used when "*the officer reasonably believes the subject(s) poses an imminent threat of death or serious injury to the officer or another person, and the subject has demonstrated the subject(s) has the ability to cause death or serious injury to others (example: downed officer or citizen rescue)."*

Based on PERF's analysis of use-of-force policies, the use of the term "suppression fire" is not fully accepted in this context. PERF found that few agencies allowed for "suppressive fire" at life-threatening targets. According to police executives and training experts, "suppressive fire" is a military term referring to "sending large amounts of fire more or less indiscriminately into an enemy's general location in order to force the enemy to seek cover." It was agreed by the experts consulted that this military term should not be used in a policing context. The term "directed fire" was determined to be more appropriate, because it is more limited and involves aiming "at a specific threat in order to stop incoming fire from the threat." Training on "directed fire" should recognize it as a lethal force option, and as such, is should be considered under the legal principles that govern police officers' use of lethal force.

> **Recommendation:** *MPD should replace the term "suppression fire" with "directed fire." The term "directed fire" is more accepted by policing experts and does not have the militaristic connotations of "suppression fire".*

As previously recommended, PERF recommends that firing at a moving vehicle be prohibited. The current language included in the Firearms Use policy can be simplified to make this prohibition clear.

> **Current MPD policy:** Current policy states that:
> - *A Department member shall not discharge a firearm at an occupant of a moving vehicle unless the officer reasonably believes that:*
>   - *The subject poses an immediate threat of death or serious physical injury to the officer or another person; AND*
>   - *There is no reasonable alternative course of action for the officer to prevent the death or serious physical injury.*
> - *If at all possible, an officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants.*
> - *Discharging a firearm at a vehicle solely in an attempt to disable the vehicle is generally prohibited.*
> - *Bullets fired at a moving vehicle are extremely unlikely to stop or disable the moving vehicle.*
> - *If it becomes necessary for officers to shoot at a moving vehicle, the following ramifications shall be considered:*
>   - *Moving vehicles present a rapidly changing field of fire.*

Mesa/Johnson 002967

> o *If the driver is incapacitated, the vehicle would be uncontrolled.*
> o *The action could create a danger to the public that outweighs the reason the deadly force was initially used.*

MPD's current policy is overly complicated, which could lead to confusion in the field. Additionally, the policy does not provide officers in the field with useful guidance. Therefore, the policy should be streamlined to clearly state that shooting at vehicles is prohibited. The only exceptions to this policy would be if a subject inside a vehicle is using or threatening lethal force by means other than the vehicle or if the vehicle is being used as a weapon of mass destruction.

> **Recommendation:** *MPD should simplify the language in this section to simply state, "Shooting at or from a moving vehicle is prohibited unless someone inside the vehicle is using or threatening lethal force by means other than the vehicle itself. The only exception is an apparent act of terrorism when the vehicle is being used as a weapon of mass destruction."*

## DPM 2.1.35 Electronic Control Device (ECD) Protocols

Based on PERF's analysis of MPD's use-of-force data, electronic control weapons (ECWs) were the most often cited type of force involved in use-of-force reports. Within the 1,609 cases PERF staff reviewed, there were 656 ECW deployments, accounting for approximately 40 percent of all force recorded. Therefore, it is important that the policy governing their use be appropriate and in line with best practices. Overall, MPD's policy is reflective of PERF's *2011 Electronic Control Weapon Guidelines* developed with the support of the Department of Justice's Office of Community Oriented Policing Services.

Although ECWs are a popular less-lethal option for MPD, studies of ECW deployments have found that they are not always an effective option. In fact, some cities have found that ECWs fail to work in almost half of all deployments, for a variety of reasons, such as probes failing to make contact with the subject's body. The Los Angeles Police Department (LAPD) studied the use of ECWs in the department and found that in 2015, there were more than 1,110 incidents in which officers fired their ECWs, but in only 53 percent of cases, the use of the ECW caused the subject to submit to arrest.[26] Given that ECWs are not effective in every situation and the high use by MPD officers, it is critical that MPD train officers on what to do when an ECW fails, especially de-escalation techniques. Having this training will provide officers with additional options without resorting to an escalation in force.

### DPM 2.1.35 Section: 2. Definitions

Within MPD's policies, ECWs are referred to as "electronic control devices" (ECD) and "Tasers" interchangeably. PERF recommends that the term "electronic control weapons" be used instead and that this term be used consistently across all policies. The term ECW clarifies that ECWs are weapons that carry a risk of harm.

---

[26] See, for example, "One of the LAPD's preferred weapons to help officers avoid shootings often doesn't work." Los Angeles Times, April 1, 2016. https://www.latimes.com/local/crime/la-me-lapd-tasers-20160401-story.html

Mesa/Johnson 002968

> **Recommendation:** *MPD should replace all references to "ECD" and "Taser" in this and any related policies with the more descriptive and appropriate term, "Electronic Control Weapon (ECW)," in order to clarify that ECWs are in fact weapons that carry a risk of harming persons.*

Additionally, the current definition of "Drive Stun" included in MPD's ECW policy specifies behavior that should be discouraged. PERF recommends clarifying the definition of "Drive Stun" to discourage its use as a pain compliance technique.

> **Recommendation:** *MPD should revise the definition of Drive Stun to state that "Drive stun mode should be used only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option." This definition should inform additional language on Drive Stuns included throughout the policy, specifically the language on page 3 of the policy. In addition, PERF recommends against deploying probes to the groin area as currently allowed in this section. MPD should discuss appropriate target areas during annual recertification and conduct refresher training on the use of ECWs as needed.*

### DPM 2.1.35 Section: 5. ECW Deployment Procedures

Due to the risk of injury associated with ECWs, the policy regarding their use should be precise and in line with best practices. The policy should include considerations of the length of time subjects are exposed to ECWs.

> **Recommendation:** *MPD should revise deployment procedures to state, "Personnel should use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent application should be independently justifiable, and the higher risk should be weighed against other force options."*

Additionally, ECWs should be clearly marked (brightly colored) and easily identifiable as a less-lethal option. It is recognized, however, that specialized units such as SWAT may prefer dark-colored ECWs for tactical concealment purposes. A cost-effective option for the department is to purchase new ECWs in yellow as older devices are replaced.

> **Recommendation**: *MPD should consider adopting brightly colored ECWs (e.g., yellow), which may reduce the risk of escalating a force situation because they are plainly visible and thus decrease the possibility that a secondary unit will mistake the ECW for a firearm.*

### DPM 2.1.40 Less-Lethal Shotgun Protocols

PERF's review of DPM 2.1.40, Less-Lethal Shotgun Protocols, did not result in any specific recommendations to the content of the policy. However, it should be noted that all MPD shotguns are deployed as less-lethal devices; the department has not deployed shotguns equipped with lethal munitions for years. While MPD does not deploy shotguns to be used as lethal force, these weapons are

Mesa/Johnson 002969

not marked to indicate that they are less-lethal devices (such as being equipped with an orange stock and handguard).  This causes the potential for confusion in instances where MPD responds jointly with officers from a neighboring jurisdiction who might believe MPD officers to be armed with lethal shotguns.

> **Recommendation**: *MPD should ensure that less-lethal shotguns are clearly marked to avoid confusion with lethal shotguns.*

## DPM 2.1.45 Use of Force Reporting Protocols

**In the course of PERF's work with MPD, it became apparent that there were flaws in the current policy and practices on use-of-force reporting protocols, with policy shortcomings identified by both PERF and MPD leaders.** Issues included supervisors not conducting investigations on the scenes of a reported use of force when required to do so, the lack of documentation in reports regarding the circumstances of reported uses of force and investigations, and a lack of documentation of the review of use-of-force reports. These issues revealed the importance of accountability within the department, particularly at the level of first-line supervisors. First-line supervisors provide key support to officers and to upholding the mission of the department, often with limited resources. Therefore, it is important that MPD provide first-line supervisors with the appropriate resources to effectively fulfill their role in holding members of the department accountable for uses of force. Without first-line supervisors taking the appropriate steps to investigate and document uses of force, the department will not be able to effectively track force within the department or correct any potential policy and training deficiencies related to use of force.

**Once those issues of accountability were raised, Chief Batista and MPD acted swiftly and revised the existing policy.** MPD leaders recognized the importance of having strong accountability measures in place, specifically those involving first-line supervisors, and worked to provide clearer guidance to supervisors in the department about the expectations for documenting and reporting use of force. PERF reviewed the revised policy issued in September 2018 to determine if any other changes were needed. The following recommendations are also based on a review of use-of-force reports focused on the investigative process and the review of investigations by the officer's chain of command.

### DPM 2.1.45 Section: 2. Non-Deadly Force Police Incidents

### Definitions

Current MPD policy stipulates the circumstances in which use of force is to be reported. The current policy covers the majority of force applications, with very few exceptions. These exceptions, such as verbal commands and handcuffing, are in line with industry standards. Therefore, PERF did not identify any issues with the current definition of "reportable use of force application" used by MPD.

> **Current MPD policy:**
> - Reportable Use of Force Application
>   - All instances in which a Department member uses force on a subject shall be reported
>     Exceptions
>     - Verbal Commands.

Mesa/Johnson 002970

- ▪ Handcuffing.
- ▪ Control hold techniques used while applying handcuffs.
- ▪ Empty hand control holds.
  - o Take downs are reportable
  - o When a member uses force and a person is injured, or thought to be injured, or the person complains of injury and requests medical aid.

## Sergeants' Responsibilities

MPD officials advised PERF that, historically, supervisors often did not respond to the scene of a reported use of force. This was a common practice in many police agencies. However, there is a growing recognition in the policing profession that in critical incidents where force may be necessary, supervisors play an important role. If a supervisor can get to the scene prior to force being used, the supervisor can have a stabilizing effect and may prevent the incident from escalating unnecessarily.

At PERF's 2016 meeting on *Guiding Principles on Use of Force*, former San Diego Police Chief William Lansdowne said that in incidents that involved an officer-involved shooting, there was typically about a 15-minute window of time from when the call came in until the first shots were fired. "If you have a system set up within your organization that gets a supervisor to the scene early on, within the 15-minute window, your chance of having an officer-involved shooting … is reduced by about 80 percent, because they can manage the situation as a team," Chief Lansdowne said.[27] Therefore, PERF recommends that supervisors be aware of the types of incidents that can result in force being used – such as calls involving persons with a mental illness, developmental disability, drug addiction, or other condition that is causing them to behave erratically or dangerously – and to respond to those calls.

In situations where a supervisor is unable to arrive at the scene prior to a use of force, it is important that they respond as soon as possible to begin an investigation at the scene of the incident. While on the scene, it is beneficial for supervisors to utilize the CDM as they investigate the reported use of force. Doing so will give the supervisors a consistent framework to determine whether the actions taken were appropriate. Having supervisors use the CDM will also help reinforce the concept with officers who can see it being used in a practical situation. It also sets the expectation that officers are to utilize the CDM in their daily work.

MPD's September 2018 revision to DPM 2.1.45 expanded the categories of reported force that require a non-involved supervisor to immediately respond to the scene but fell short of requiring supervisors to respond to the scene of <u>all</u> reportable uses of force to conduct the initial investigation.

**Current MPD policy:** Current policy states that:
*Non-Involved supervisor immediately responds to the scene on any reported use of force which involves the use of:*
- *Strikes to the face, head, or neck.*
- *Electronic Control Devices (ECD).*

---

[27] Police Executive Research Forum, *Guiding Principles on Use of Force*, (Washington, D.C.: Police Executive Research Forum): p. 63.

Mesa/Johnson 002971

- *Impact Weapons.*
- *Deployment of Police Service Dog (K-9).*
- *Carotid Control Technique.*
- *Any other use of force causing the subject to be treated at the hospital for a physical injury as defined in DPM 2.1.1 Use of Force Philosophy & Definitions.*

Given the concerns that members of the department raised about a lack of supervision at the initial scene of a reportable use of force, the department should emphasize the role of supervisors in the accountability process. A critical part of that is to state clearly in policy that supervisors should respond to the scene of every reportable use of force. With supervisors on scene for the initial investigation, the investigations will be more thorough and accurate and findings will more accurately reflect the department's use of force.

> **Recommendation**: *MPD should state in policy that supervisors should respond to the scene of ALL reportable uses of force to conduct the initial investigation. Supervisors should also be dispatched to all incidents where it is anticipated that force might be used.*

As discussed above, many police agencies have found that dispatching a supervisor to the scene of a critical incident can reduce the likelihood that lethal forced will be used. There is often a short period of time between when an officer is dispatched to a scene and when force is used, so supervisory response should be prompt. Some police agencies have trained their dispatchers to go on the radio and specifically ask patrol supervisors if they are en route to certain high-risk calls.

> **Recommendation:** *MPD should add a requirement that supervisors immediately respond to any scene: where a weapon (including a firearm, edged weapon, rocks, or other improvised weapons) is reported; where a person experiencing a mental health crisis is reported; or where a dispatcher or other member of the department believes there is potential for significant use of force.*

*Post-Incident Sergeant Responsibilities*

Following the initial investigation, current policy requires sergeants to complete and submit a Use-of-Force report via Blue Team software. Within this report, sergeants are to include "a review of all applicable reports and on-body camera footage."

**A review of a sample of Blue Team Use-of-Force reports showed that incident summaries and investigative steps were rarely documented in the reports**. In a number of cases, the incident summary merely included a directive to refer to the incident report. Many MPD officers and supervisors expressed concern including the narrative information in the Blue Team report, citing potential discrepancies with other reporting requirements. This concern, however, should not impede a thorough documentation of reported uses of force.

MPD officials told PERF that supervisors often write an incident report that is sent up the officer's chain of command if serious issues are identified, but that these reports are not connected to the actual Blue Team reporting process.

Mesa/Johnson 002972

> **Recommendation:** *MPD should ensure that Blue Team reports (the software MPD uses to record use-of-force incidents) include a thorough description of the incident in question, including the names of the officers and subjects involved, the circumstances surrounding the use of force, and the result of the force used. Sergeants should also document the steps of the investigative process, including who was interviewed and what materials were reviewed. Finally, the sergeants should document the findings of their review in the Blue Team system.*

Following the initial investigation, the use-of-force report is to be submitted to the chain of command for review. PERF's review of Blue Team Use of Force reports showed very little documentation of the routing process. Documentation was primarily limited to timestamps of when reports were sent from the sergeant to the lieutenant involved in the investigation. Additionally, there was often a notation that read, "Routing was NOT handled in Blue Team. The incident was moved into IAPro by IAPro user Police Officer X." As a result, final dispositions were rarely included in the reports. Handling routing outside of the Blue Team report limits the use of these reports as an accountability tool.

Under a previous policy, sergeants conducted an investigation and completed the use-of-force report form in Blue Team. The policy did not specify what level of detail should be included in the report. Following the initial investigation, the sergeant was to forward the Blue Team report to his or her lieutenant. Although it was required that the lieutenant review the Blue Team report, there were no specific instructions in policy on how to note this review or what should be done if the investigation was not sufficient. By incorporating the CDM into the review process, individuals reviewing the investigation findings will be operating under the same framework, making it easier to determine whether they agree with the findings or if more investigation is needed.

> **Recommendation:** *MPD should require that each individual involved in the routing process documents the steps taken in reviewing the use-of-force report using the CDM as a guide, and that each individual states his or her agreement or disagreement with the findings of the investigating supervisor.*

> **MPD action taken:** The September 2018 update to DPM 2.1.45 Use of Force Reporting Protocols specifies the expected documentation requirements for sergeants and lieutenants.
> - Moving forward, sergeants now must make one of two possible determinations: "No issues identified after initial review" or "Additional Review Required" by a senior officer. Upon making either determination, sergeants must include a statement indicating the factors that led them to the stated conclusion.
> - Lieutenants must also conduct an investigation of the facts of the incident and make a determination as to whether any issues were identified following the initial review and if additional review is needed. If no issues are identified, lieutenants must include their final comments on the use-of-force incident and forward the file to the Training Section. If additional review is needed, the Blue Team file is to be forwarded to the appropriate Division commander, with the Advanced Training Lieutenant copied.

Mesa/Johnson 002973

## DPM 2.3.5 Vehicle Pursuits

Given the unpredictable and hazardous nature of vehicle pursuits, they can be a public safety threat and should only be conducted under specific instances.  MPD's current policy is strong, as it restricts vehicle pursuits to situations in which an officer determines that the apprehension of a suspect is immediately necessary because the suspect poses an imminent threat of death or serious physical injury to human life.

## DPM 2.3.5 Section: 2. General Guidelines

In order to control vehicle pursuits, the number of units involved should be limited. Current policy states that the number of officers involved should be determined by ongoing threat assessments made by either the pursuing officer or functional supervisor. While ongoing threat assessments are important, PERF recommends narrowing this aspect of the policy to reduce the number of units involved in pursuits.

> **Recommendation**: *MPD should ensure that when making a consideration of the number of officers required for a pursuit, MPD should limit the number of responders to a primary unit, a secondary unit, and a supervisor who is also involved in the pursuit. This should be the limit unless exigent circumstances exist that would require additional personnel to join the pursuit.*

## DPM 2.3.30 Precision Immobilization Technique (PIT)

The Precision Immobilization Technique (PIT) should be a highly regulated tool in vehicle pursuits as it is not well controlled and, when conducted at high speeds, can be considered a lethal use-of-force option. Depending on how frequently PIT is used, MPD should consider discontinuing the process. If it is decided to continue the practice, the policy should be updated to reflect the need for continuous training on this technique and the specific circumstances in which it is allowed.

> **Recommendation:** *MPD should review how often it employs this technique. If it is used sparingly, MPD should discontinue its use. Should MPD elect to continue using it, policy should be updated to reflect that refresher training be provided on a regular basis. For example, the Las Cruces Police Department requires eight hours of annual training on the technique that includes both policy review and behind the wheel driving. The Las Cruces Police Department also only authorizes individuals trained by the department to use the technique and restricts its use to vehicles going forty miles per hour or less.*

## TAC 4.4 Counter Sniper Program

As mentioned in the recommendations for MPD's Firearms Use policy, the term "suppression fire" is not supported by police executives and training experts.

PERF recommends again that the term "directed fire" replace "suppression fire" throughout the policy.

> **Recommendation:** *MPD should replace the term "suppression fire" with "directed fire" in TAC 4.4 as is also recommended in DPM 2.1.20 Firearms Use (above). The term "directed fire" is more*

Mesa/Johnson 002974

*accepted by policing experts and does not have the militaristic connotations of "suppression fire".*

## Additional Policies Reviewed

Several other policies were reviewed by PERF, in which no specific areas for improvement were identified. For example, DPM 2.1.25, Impact Weapons, and DPM 2.1.30, Chemical Agents, contain language reflecting progressive policing practices, such as clearly specifying aftercare following a chemical spray deployment and a requirement to immediately obtain medical assistance for subjects struck by a baton who sustain injuries or who complain of pain.

Given the high-profile nature of active shooter responses and recent controversies regarding the actions of law enforcement in responding to such incidents, MPD's Active Shooter Response policy was closely reviewed. Overall, PERF's review found that the policy covered all of the key components of an active shooter response, including rapid deployment tactics and instruction to find and neutralize the threat.

PERF did not identify any specific issues with the following policies that were also included in the review process:

- DPM 1.6.20 Patrol Rifle Protocols
- DPM 2.1.6 Active Shooter Response
- DPM 2.1.10 Police Incidents Involving Death/Serious Injury Officer Involved Shootings and In-Custody Death Investigations
- DPM 2.1.25 Impact Weapons
- DPM 2.1.30 Chemical Agents
- DPM 2.1.50 Less-Lethal Launcher Protocols
- PSD 2.3 Police Service Dog Bite Incidents – MPD's policy on police service dog bite incidents included two key components: the documentation of such use of force and the medical treatment of suspects who have been injured by a police service dog. With these two components covered, PERF did not have any recommendations on current policy.

As discussed in a previous recommendation, if MPD elects to merge some or all of these policies into the department's overall use-of-force policy, the department should ensure that each policy that remains separate contains MPD's use-of-force philosophy and associated definitions.

Mesa/Johnson 002975

# SECTION II. USE-OF-FORCE DATA ANALYSIS

This section details the results of PERF's review of the Mesa Police Department's (MPD) use-of-force reports over a three-year period.

## Use-of-Force Reports Data Review

PERF reviewed data from 1,609 use-of-force reports filed by officers, spanning from July 2015 through June 2018. MPD provided data exported from the reports stored in Blue Team IAPro software in Excel format.

PERF examined the provided data to determine general trends and areas for improvement. Figure 1 shows the number of use-of-force reports generated by quarter over the course of three years. The median number of reports per quarter was 135, with the number of reports per quarter generally increasing slightly over this timeframe.



*Figure 1. Use-of-Force Reports July 2015-June 2018*

## Overview of the Officers Involved and the Persons on Whom Force Was Used

### *Demographics of Subjects Involved in Use-of-Force Report*

A large majority of the persons on whom force was used were male (88%), and the mean age was 32. Figure 2 shows the breakdown of the race of the persons who were subjected to a use of force. In comparing the demographic data reported to Census with the racial breakdown of the use-of-force reports:

Mesa/Johnson 002976

- 83.8% of residents identified as white and 50% of the subjects in use-of-force reports were white;
- 27.4% of residents identified as Hispanic or Latino and 22% of subjects in use-of-force reports were Hispanic or Latino; and
- 3.7% of the residents identified as Black or African American and 13% of the subjects in use-of-force were Black or African American.



*Figure 2 Citizen Complaints: Race[28]*

*Citizen and Officer Injuries*

MPD reported that a person subjected to a use of force was injured in 63% of the incidents (see Figure 3). In 39% of the incidents, a person required a trip to the hospital. Officers were injured in 19% of the incidents, and officers required a trip to the hospital in 4% of the incidents. In 14% of the incidents, both the officer and subject were injured, and in 2% of the incidents, both the officer and the subject went to the hospital.

|  | Subject Injury | Officer Injury |
| --- | --- | --- |
| % of all incidents | 63% | 19% |
| % of all incidents with hospital visit | 39% | 4% |

*Figure 3 Subject and Officers - Required Hospital Treatment*

---

[28] Other/Unknown category includes Asian, Polynesian, and Unknown responses that were negligible in size.

Mesa/Johnson 002977

*Officer Characteristics*

The 1,609 reports that PERF analyzed involved 552 officers. 38.8% of the 552 officers were involved in either one or two of the 1,609 reports of use of force. The median number of reports an officer was involved in was 4, and 23 officers were involved in 15 or more reports. The median number of years an involved officer was employed at MPD at the time of the use of force was 8 years.

## Overview of Incident Characteristics

Data provided by MPD allowed PERF to examine the following report characteristics:

- The time of the incident;
- the type of force used;
- the reasons for the use of force;
- the "service rendered" (e.g. whether the use of force occurred while the officer was responding to a call for service, making a traffic stop, acting on a potential crime that the officer happened to witness, etc.); and
- the squad assignment of the officer involved.

This section discusses PERF's findings on the characteristics of the incidents and provides recommendations on how these results can be used to strengthen MPD's use-of-force policy, practices, and training.

### Incident Time of Day

Examination of the time each incident occurred involved coding each report as either occurring in the daytime or the nighttime. Daytime was defined as the hours between 6 a.m. and 6 p.m., and nighttime was defined as between 6:01 p.m. and 5:59 a.m. Uses of force were more likely to occur at night, with 57% of the reports occurring at night and 42% during the day.[29]

### Type of Force Used

The type of force recorded in the reports ranged from verbal commands to lethal force. Figure 4 shows the number of unique reports involving each recordable type of force used. Because nearly half of the reports included more than one type of force used, the total number of uses of force in Figure 4 is greater than the number of reports examined (with more than 2,700 individual uses of force cited in 1,609 reports). The use of an electronic control weapon (ECW) was the most frequently cited type of force in the reports, followed by control holds, limited strikes, and strikes.

Control holds, limited strikes, and strikes are defined in DPM 2.1.5, Use of Force as:

- **Control holds** – Techniques that have minimal chance of injury. Examples: empty hand escort controls, firm grip, pressure points, takedowns, etc.

---

[29] Time was not noted in 60 reports, accounting for the 1% discrepancy in the percentage of reports occurring in the day versus the night.

Mesa/Johnson 002978

- **Limited Strike** – Strikes applied to limited target areas. Refer to "Strikes" definition. Example target areas: brachial plexus (tie-in), radial, median, femoral, common peroneal and tibial nerves.[30]
- **Strike** – Techniques that have more than a minimal chance of injury. Examples: Kicks, elbow, palm or knee strikes, or punches.

| Type of Force | Distinct Count of File Number | Percent of Total Cases |
|---|---|---|
| Electronic Control Weapon (ECW) | 656 | 41% |
| Control Holds | 540 | 34% |
| Limited Strikes | 418 | 26% |
| Strikes | 404 | 25% |
| Verbal Commands | 365 | 23% |
| Bean Bag/Baton Round | 156 | 10% |
| Chemical Agents | 127 | 8% |
| Canine (K-9) | 28 | 3% |
| Impact Weapons | 27 | 2% |
| Lethal Force | 12 | 2% |
| Carotid Artery Restraint | 6 | 1% |

*Figure 4 – Type of Force Used*

All of the four most common types of force used (ECW, control holds, limited strikes, and strikes) were more often used at night (Figure 5).



*Figure 5 Type of Force Used and Time of Occurrence*

---

[30] MPD separates strikes applied to the pressure points in the shoulder area, arms, and legs as "limited strikes".

Mesa/Johnson 002979

*Reason for Use of Force*

The three most commonly cited reasons for using force were active resistance (43%), active aggression (30%), and arrest/detention (6%) (see Figure 6).

According the MPD's definitions of active resistance and active aggression, as outlined in Special Order 2018-001 DPM 2.1.2, the primary difference is whether the subject's actions constitute an assault. These terms are defined as:

- **Active Resistance –** Physical actions on the part of a subject who is ignoring verbal commands and actively attempting to prevent the officer's control, but do not constitute an assault. Examples include ignoring the officer's verbal commands and pulling away, hiding behind or under objects, pinning arms under the body, thrashing around and/or body going rigid.
- **Active Aggression –** Assault with non-deadly physical force. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, attacks with weapons or other actions which present an imminent threat of physical harm to the officer or another.



*Figure 6 Reason for Use of Force - Total Reports[31]*

---

[31] "Other" includes responses categorized as self-defense, none, defense of others, prevent escape, and other. These categories were negligible when reported separately.

Mesa/Johnson 002980

## Circumstances of Why the Officer Had the Encounter that Included a Use of Force

As seen in Figure 7, 58% of the use-of-force reports involved incidents that began with a call for service. That includes calls for service regarding a domestic violence incident (19%) plus all other calls for service (39%).

Encounters initiated by officers resulted in 24% of the use-of-force incidents; that includes pedestrian stops (9% of all of the use-of-force incidents), a crime in progress (9%), plus vehicle stops (6%).



*Figure 7 Service Rendered - Total Reports[32]*

## Officer Assignment

The data review also included an examination of the officer's assignment involved in use-of-force incidents. As seen in Figure 8, the patrol substations were heavily represented in use-of-force reports, which is to be expected given that patrol officer's assignment is to respond to calls for service,

---

[32] "Other" includes as Undercover Investigation, SWAT/Tactical Operation, Mental Health Detainer, and non-SWAT Warrant Service.

Mesa/Johnson 002981

proactively check suspicious behavior, and interact with the public. These patrol substations accounted for nearly 90% of all use-of-force reports.



*Figure 8 Combined Squad Assignments - Total Reports*

## Prevalence of Strikes to the Face, Head, and Neck

**Prior to PERF's work with MPD, a number of news stories highlighted use of force used by MPD officers. One video that received significant attention showed MPD officers striking a suspect in the head and face. Due to the concern over these incidents, PERF was asked to look at the department's use-of-force data to determine whether force involving strikes to the head and face were commonly used by officers.**

During the course of PERF's review, it came to the attention of PERF staff members that a training exercised used in the past emphasized strikes to the head. PERF staff members questioned various members of MPD about this training exercise in interviews and focus groups. Although there were varying responses as to the circumstances of the training exercises, particularly around whether the suspect was demonstrating active or passive resistance, and its impact on the department's culture, our primary takeaway from these conversations was that there was a clear expectation that a punch to the face was required to stop the threat and end the scenario. In separate interviews, MPD members described this technique as "taking out the computer." Coupled with the national news stories, this training exercise raised concerns about the prevalence of strikes to the face being used in instances that are not allowed per current policy.

Although the Blue Team software allows users to enter the location of each reported use of force on a diagram of the human body, that data could not be exported into a readable format and was not included in the original dataset provided to PERF. Therefore, in addition to reviewing the raw data from all cases, the PERF team requested a smaller sample of full case files to review, and manually coded the information about where force was used on the person's body from the files for analysis.

Mesa/Johnson 002982

## Methodology

In order to determine the prevalence of strikes to the face, PERF focused on cases involving either a "strike" or a "limited strike," which MPD defines as follows:

- **Strike** – Techniques that have more than a minimal chance of injury. Examples: Kicks, elbow, palm or knee strikes, or punches.
- **Limited Strike** – Strikes applied to limited target areas. Refer to "Strikes" definition. Example target areas: brachial plexus (tie-in), radial, median, femoral, common peroneal and tibial nerves.[33]

**Based on the definitions provided in MPD's policy, strikes to the face would fall under the category of strikes (not limited strikes).** Limited strikes were also included for analysis, to determine whether the definitions were being applied correctly.

As seen in Figure 4, of the total number of cases PERF analyzed, 404 of the cases involved a strike and 418 of the cases involved a limited strike, for a total population size of 822. PERF took a 15% sample of the cases involving a strike and limited strike using a stratified sampling technique, resulting in a sample size of 122 cases (two duplicate cases were removed).

## Findings

To determine the prevalence of strikes to the face, PERF conducted an analysis of the location on the person's body of strikes and limited strikes within the sample. The following characteristics were the primary focus in that analysis:

- The squad assignment of the officer involved;
- the time of day of the incident;
- the reasons for the use-of-force; and
- the reason for the encounter between the officer and the person who was struck (e.g. whether the officer was responding to a call for service, making a traffic stop, etc.)

### *Location of Strikes*

MPD use-of-force reports include simple diagrams of a human body which officers can use to indicate where on a person's body they made one strike or multiple strikes. See Figure 9.

---

[33] MPD separates strikes applied to the pressure points in the shoulder area, arms, and legs as "limited strikes".

Mesa/Johnson 002983



*Figure 9*

Of the reports in the sample, any strikes located within areas 1, 2, and A were tallied as part of the case review.  The three areas represent the face (area 1), neck (area 2), and back of the head (area A).

In many use-of-force reports, multiple separate strikes were recorded. Within the sample of "strikes" (not "limited strikes," which by definition would include certain strikes to shoulders, arms, or legs but not to a person's face), a total of 238 separate strikes were recorded.

Of those, 101 strikes were directed at the face, 17 to the back of the head, and 6 to the neck.[34]

**Thus, a total of 124 strikes – 52% of the 238 separate strikes in the PERF sample – were directed at the face, head, and neck.  Under MPD's Special Order #2018-001 DPM 2.1.2, which took effect in June 2018, those types of strikes are now prohibited except in cases where the subject is engaged in "active aggression" or "aggravated active aggression."**

This section will further explore a variety of factors surrounding strikes and strikes to the face, head, and neck specifically. Figure 10 shows the complete breakdown of the location of strikes identified in the sample (n=122). Due to lack of national data, it is not possible to determine whether MPD is an outlier in the number of strikes to the face, head, or neck. However, it is important to critically examine the circumstances in which these strikes were used.

---

[34] The term neck is being used to refer to the front of the neck, specified in area 2, but not the back of the neck (area B), as that is how the term is defined throughout MPD policy. Future references to neck refer to strikes in this region.

Mesa/Johnson 002984



| Location of Strike – Front of Body | Percentage of Total Strikes |
|---|---|
| 1 | 42% |
| 8 | 17% |
| 7 | 6% |
| 2 | 3% |
| 4 | 2% |
| 10 | 1% |
| 12 | 0% |
| 3 | 0% |
| 5 | 0% |

| Location of Strike – Back of Body | Percentage of Total Strikes |
|---|---|
| G | 11% |
| H | 9% |
| A | 7% |
| C | 0% |
| E | 0% |
| I | 0% |
| X | 0% |

*Figure 10 Sample: Location of Strike*

Although strikes to the face, head, and neck do not fall under MPD's definition of "limited strikes," PERF analyzed a sample of limited strike reports to determine whether the definitions of force were being used correctly. PERF found that there was some indication that strikes to the face, head or neck were not appropriately labeled: 5% of the limited strikes recorded were to the face, and 2% were to the back of the head. There were no limited strikes directed at the neck recorded in the sample. This indicates that limited strikes are, for the most part, appropriately coded.

As noted in the policy recommendations, however, PERF recommends combining the categories of "strike" and "limited strike." A single definition will make it easier for MPD to accurately track the location of strikes on persons' bodies.

> **Recommendation:** *MPD should merge "strikes" and "limited strikes" into a single category. Combining the categories will improve the accountability process by making it easier for supervisors to track the location of strikes under one category.*

Mesa/Johnson 002985

### Squad Assignment – Strikes

Of the 238 strikes recorded in the sample, 124 strikes were to the face, head, or neck. These strikes to the face, head, or neck were associated with 76 unique reports included in the sample. Figure 11 shows the distribution of the involved officers' assignments for these 76 reports.



*Figure 11 Sample: Reports involving Strikes to the Face, Head, Or Neck, by Officer Assignment*

### Incident Time of Day - Strikes

As noted earlier in this report, 58% of the overall use-of-force incidents occurred at night. This disparity is more apparent in assessing strikes to the face, head, or neck, 67% of which occurred at night (see Figure 12).



*Figure 12 Sample - Strikes to the Face, Head, or Neck by Time of Day*

Mesa/Johnson 002986

*Reason for Use of Force – Strikes to the Face, Head, or Neck*

Figure 13 shows the distribution of the reason for force in reports in the sample that involved a strike to the face, head, or neck.



*Figure 13 Sample: Reason for Use of Force - Strikes to Face, Head, Neck*

Under MPD policy that took effect on June 7, 2018, strikes to the face, head, or neck should only be utilized when there is a clear need and should only be utilized when the subject is exhibiting "active aggression" or "aggravated active aggression," defined as follows:

- **Active Aggression –** Assault with non-deadly physical force. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, attacks with weapons or other actions which present an imminent threat of physical harm to the officer or another.
- **Aggravated Active Aggression –** Assault with deadly force. The subject's actions are likely to result in the death or serious bodily harm of the officer, themselves, or another. These actions may include firearm, use of blunt or bladed weapon, and extreme physical force.

Within PERF's sample of cases from July 2015 through June 2018 (nearly all of which occurred before the MPD policy change on June 7, 2018), 52% of reports involving strikes to the face, head, or neck were due to active aggression and 0% were due to aggravated active aggression. Active resistance was cited in 38% of reports in the sample as the primary reason for the use of force, which is not an allowable justification under the current policy.[35]

Thus, only 52% of the past cases involving a strike to the face, head, or neck from would be justified under current policy.

---

[35] See page 45 for the definition of "active resistance".

Mesa/Johnson 002987

**Recommendation:** *MPD should state clearly in policy that strikes to the face should only be utilized when the circumstances warrant such action. Officers should be trained on this policy update.*

**MPD action taken:** In Special Order # 2018-001 in relation to DPM 2.1.2, effective June 2018, it was clarified that face, head, and neck strikes are prohibited absent active aggression/aggravated active aggression.

## Summary of Findings from Report Data Analysis

In PERF's review of MPD use-of-force reports, a number of important findings were identified. A relatively small number of officers are involved in incidents that require use-of-force reports, with some apparent outliers involved in a disproportionate number of reports. In looking at reports involving all types of force, incidents tended to involve officers on patrol in the evening shifts.

These findings were mirrored in the analysis of incidents involving strikes, which indicates that the use of strikes is not isolated to a particular unit or situation, and is used throughout the department. In taking a sample of these cases, it was found that 52% of strikes were directed at the face, head, or neck. The most commonly cited reasons for these strikes were active aggression and active resistance. However, active resistance does not warrant a strike to the face, head, or neck under the current policy and did not warrant a strike in the previous policy. Moving forward, it will be important for MPD to ensure that its current policy is enforced throughout the department.

**Recommendation:** *MPD should make substation commanders and supervisors (sergeants and above) aware of the findings in this report in a briefing or in-service training. Supervisors should continue to track use of force involving officers under their command and should use these findings to determine whether additional training is needed. Supervisors should also be tasked with ensuring that current policies are followed in the field.*

Given the findings of the data analysis, there are significant implications for the Mesa Police Department moving forward. With the recent change in policy regarding the justification required for a strike to the face, MPD leaders must ensure that these efforts to change the department's policies, training, culture, and accountability practices are sustainable and long-lasting. Charting a new path forward should not lead to a greater reliance on the use of ECWs, given the findings about their frequent ineffectiveness in the field.

Mesa/Johnson 002988

# SECTION III. PROFESSIONAL STANDARDS DIVISION REVIEW

PERF's review also included an assessment of the Mesa Police Department's Professional Standards Division (PSD) as it relates to use-of-force complaints.

PERF reviewed a selection of complete Blue Team reports and policies related to the operation of PSD, including DPM 1.4.10 Disciplinary Process and DPM 1.4.25 Professional Standards. Focus groups conducted with members of MPD and an extensive interview of members of the Professional Standards Division helped to inform PERF's recommendations.

## Process of Submitting a Complaint

PERF assessed the complaint process from the submission of a complaint through final disposition.

## Public Complaints

Citizens can report complaints in a number of ways, including in-person and through online methods. To make a complaint, an individual can:

- Directly contact an officer's supervisor and verbally make a complaint;
- Complete a complaint form through the department's website or mail/fax the form to the PSD; or
- Call the PSD and make a complaint via telephone.

MPD's methods by which citizens can file a complaint are in line with national best practices. Accessing the online form, however, may be difficult for community members who are not familiar with the structure of MPD, because the form is currently located on the PSD subpage. PERF recommends that MPD move information on how to make a complaint to its home page.

> **Recommendation:** *MPD should modify its website to place information on how to file a compliment or complaint to the homepage, so it can be made more visible to the public.*

## Internal Complaints

Complaints also can be made by members of the Police Department.  The complainant brings the complaint to the supervisor of the subject of the complaint. In these cases, the Division Commander and PSD are notified.

## Complaint Form

As discussed above, MPD does a good job of making the complaint process accessible to the public. However, PERF identified some areas for improvement in the complaint form.

MPD's current complaint form includes the statement, "Be aware that per Arizona State Law, A.R.S. 13-2907.01, it is a misdemeanor to knowingly make a false statement to a law enforcement agency. By submitting this form, you attest to the truthfulness of the statements made below."

Mesa/Johnson 002989

Warnings that making a false complaint is a criminal violation can be perceived as an impediment to the complaint process. Such warnings may discourage individuals who are hesitant about making a complaint. Some potential complainants may interpret the warning as a veiled hint that complaints are not welcome.

It is important to remove barriers that may discourage individuals from making a complaint. Therefore, unless it is required by law, complaint forms should not include threats of potential prosecution for filing a false complaint.[36] PERF recommends removing this language from MPD's complaint form, if permissible by state law.

> **Recommendation:** *MPD should **remove** the warning about making a false complaint from its complaint materials and website. Additionally, this warning should not be given to individuals making complaints in person or over the phone.*

Additionally, it is important that terminology and information be consistent in the materials that involve the complaint process. MPD's main webpage states that complaints should be made to the Professional Standards Unit at the phone number as 480-644-2010. On the Citizen Complaint Form, however, individuals are instructed to contact the Internal Affairs Unit at 480-644-5214. Additionally, the link provided on the form that directs individuals on how to submit a complaint electronically defaults to an error page.

> **Recommendation**: *MPD should ensure that all materials related to the complaint process are consistent and accurate. Specifically, MPD should reconcile the website's instructions for making a complaint via phone. Currently, the phone number on MPD's webpage differs from the phone number on the separate complaint form. MPD should also ensure that all of the links on the complaint form are active and replace any broken links.*

## Complaint Investigation

Investigations of complaints within MPD take one of two paths. They either are investigated by the chain of command or by the Professional Standards Division (PSD).

Depending on the nature of the complaint, the lieutenant or commander of the officer involved determines whether the complaint should stay under the purview of the chain of command or should be elevated to PSD. A civilian program analyst working within PSD monitors chain-of-command complaints to determine if there is a need for PSD involvement, and the lieutenant in charge of PSD reviews these complaints on a weekly basis to ensure they do not need to be elevated to a PSD investigation.

The determination of whether a complaint stays within the chain of command or goes to PSD is made by the involved commander and the Executive Assistant Chief who oversees PSD. Minor complaints typically remain with the chain-of-command lieutenant and commander for resolution.

---

[36] *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice*. (Washington, D.C.: DOJ Office of Community Oriented Policing Services): p. 17. http://ric-zai-inc.com/Publications/cops-p164-pub.pdf

Mesa/Johnson 002990

Recommendations on these processes are included below.

## Internal Affairs Investigations Process Outlined

Information entered into Blue Team is regularly reviewed by the Professional Standards Division. If a complaint submitted in Blue Team is determined to require further investigation, the incident is classified as an Internal Affairs Investigation and is assigned a tracking number within PSD. In this investigation, a PSD investigator is assigned, and the subject of the investigation is provided with a Notice of Investigation (NOI).

After the investigation is complete, the investigator completes an investigation memo summarizing the allegations and findings, and attaches it in IA Pro for review by the PSD Lieutenant. After this review by the lieutenant, the investigation is forwarded to the MPD Legal Unit for review and then returned to PSD. PSD then forwards the investigation to the lieutenant who supervises the subject of the investigation for review and recommended disposition.

If a complaint is sustained, the individual can submit a rebuttal. After the rebuttal is received, the investigation report and related files are sent to the Division Commander, who provides his or her concurrence or non-concurrence with the recommended disposition. The Division Commander then makes a recommendation for discipline and forwards the case to the Assistant Chief. The Assistant Chief then provides concurrence or non-concurrence with the recommended disposition and disciplinary action. If the final discipline is dismissal, the Chief of Police documents his or her concurrence or non-concurrence with the recommended disciplinary action.

To conclude the investigation, PSD notifies the subject of the complaint, his or her chain of command, and the complainant of the final disposition. Finally, all related documents are saved in IA Pro.

## Command Investigations

As mentioned previously, minor complaints made against officers generally do not fall under the purview of PSD and are instead resolved in the field by the accused officer's chain of command. However, PERF was advised that sergeants do not always enter minor complaints into Blue Team. This is acceptable under DPM 1.4.25 Professional Standards, which states, "All complaints against MPD members shall be accepted and *may* be entered in the Blue Team and IA Pro databases" (emphasis added). Allowing this flexibility in entering complaints into Blue Team can make tracking officers' patterns of behavior difficult and could hinder opportunities for MPD to make and "early intervention" to counsel officers and help them adjust their behavior to correct minor problems.

To ensure that complaints that do require an investigation are documented, MPD should include the guidelines outlined in DPM 1.4.10, Disciplinary Process, that govern which complaints warrant a formal department investigation and cannot be investigated as a department inquiry.

**Recommendation:** *MPD should include the guidelines outlined in DPM 1.4.10, Disciplinary Process on which types of complaints do warrant a formal department investigation to DPM*

Mesa/Johnson 002991

*2.1.45, Use of Force Reporting Protocols. DPM 1.4.10, Disciplinary Process states that the following complaints cannot be classified as an inquiry and warrant a department investigation:*

- *Complaints that are criminal in nature.*
- *Complaints that involve sexual harassment.*
- *Discrimination.*
- *Violations of the COM Computer use policy.*
- *Violations of DPM 1.2.110, Overtime Protocols.*
- *Neglect of duty violations.*
- *Complaints of workplace violence.*
- *Bias complaints based on race, religion, national origin, sex, and sexual orientation.*

Additionally, MPD should include language in policy that makes it clear that complaints made to members of the department are not to be discouraged. In PERF's interviews of MPD personnel, we heard that there was inconsistency in which complaints were forwarded for review. Sergeants should be trained on their responsibilities in accepting complaints, because a refusal to accepting a complaint can damage the public's trust in the department.

**Recommendation:** *MPD should state in DPM 2.1.45 Use of Force Reporting Protocols that complaints are not to be discouraged and should emphasize the sergeant's role in making sure this policy is enforced. Sergeants should be trained on their responsibilities in accepting complaints.*

## Complaint Dispositions

As part of its review, PERF agreed to assess whether proper classifications of cases were being used within MPD and whether the definitions of case dispositions are in line with progressive practices of similar law enforcement agencies. PERF's intent in this review was not to assess the quality of the investigations, but rather to determine if the correct terminology and processes were used by the Professional Standards Division. MPD is currently working with former Maricopa County Attorney Rick Romley to assess the quality of investigations conducted by the PSD.

DPM 1.4.10 Disciplinary Process outlines the investigative findings classifications used by MPD[37]:

1. **"Inquiry: Administratively Closed**: The initial review determines the allegations do not meet the criteria for a Department Investigation.[38] The allegations will be closed without interviewing the subject member (no NOI served). A disposition of Inquiry: Administratively Closed is not considered formal discipline.
2. **Unfounded:** The investigation revealed no facts to support that the incident complained of actually occurred.
3. **Exonerated:** Evidence shows the alleged conduct did occur but did not violate Mesa Police Department (MPD) policies, procedures, or training.

---

[37] Mesa Police Department, "DPM 1.4.10: Disciplinary Process," pg. 13-15
https://www.powerdms.com/public/MESAPD/documents/263909
[38] As outlined in DPM 1.4.10: Disciplinary Process, pg. 7-8

Mesa/Johnson 002992

4. **Not Sustained:** There are insufficient facts to decide whether the alleged misconduct occurred.

5. **Sustained: Non-Disciplinary Corrective Action**: The evidence shows by preponderance of the evidence that the alleged conduct did occur, and the actions of the member violated MPD policies, procedures or training.

    a. Per City of Mesa (COM) Management policy #339, supervisors may choose to initiate non-disciplinary corrective action in response to poor performance or inappropriate behavior. Initiation of these types of actions is generally given for problems related to first-time performance deficiencies or other minor offenses. Supervisors may choose to engage in one or more of the following non-disciplinary corrective actions:

        i. Training

        ii. Verbal Counseling in conjunction with Workstation File Documentation

        iii. Corrective Action Plan

    b. A disposition of Sustained: Non-Disciplinary Corrective Action is not considered formal discipline and not subject to a Mitigation Hearing.[39]

    c. For Sustained: Non-Disciplinary Corrective Action disposition, the affected Division Commander/Manager shall notify the member's immediate supervisor to ensure the non-disciplinary corrective action is completed and properly documented in the member's work station file.

6. **Sustained:** The evidence shows, by preponderance of the evidence, that the alleged conduct did occur, and the actions of the member violated MPD policies, procedures or training. Sustained complaints may include the following disciplinary actions: written reprimand, disciplinary probation, disciplinary suspension, involuntary demotion, or dismissal.

7. **Policy Failure:** The evidence shows the alleged conduct did occur, but the actions of the member were consistent with the MPD policies, procedures or training. If the final disposition results in a Policy Failure, the Policy & Planning Section Lieutenant shall be notified by the Professional Standards Lieutenant."

PERF reviewed MPD's disposition classifications to determine whether they meet the standard set by the Department of Justice's Office of Community Oriented Policing Services (COPS Office). The COPS Office recommends having at least four basic resolution categories for internal complaints: sustained/founded, not sustained/not resolved, exonerated, or unfounded.[40] Additional categories are encouraged for outcomes that may not fit into the four basic categories. MPD's "Policy Failure" disposition, for example, is a useful way to indicate the need for improvement in a situation in which there was no official misconduct, but the situation showed flaws in current policy.

**PERF's review found that MPD's classifications are in line with professional standards set by the COPS Office and are being utilized correctly.**

---

[39] Defined as "A meeting where a member is given the opportunity to respond to investigative findings, verbally or by written memo, or both, prior to the imposition of a disciplinary penalty of: written reprimand" in DPM 1.4.1 Professional Standards Chapter Definitions.

[40] *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice*. (Washington, D.C.: DOJ Office of Community Oriented Services): pg. 50 http://ric-zai-inc.com/Publications/cops-p164-pub.pdf

Mesa/Johnson 002993

## Additional Recommendations for the Professional Standards Division

The PERF team identified additional recommendations concerning the Professional Standards Division outside of the complaint process:

### Maintenance of Case Files

During PERF interviews of MPD personnel, we were advised that a large number of personnel files had been purged in 2014, including files containing sustained complaints. Given the importance of personnel files in monitoring officers throughout their careers and the possibility of future lawsuits, PERF recommends that MPD create a record retention policy specifying when records can be purged.

For example, in New Jersey, the Division of Archives and Records Management requires local police departments to permanently maintain internal affairs investigation files concerning a criminal homicide involving an officer. Incidents resulting in an officer's arrest are to be maintained for 75 years. The New Jersey guidelines suggest that all other criminal or administrative internal affairs records should be maintained for at least five years, and if the officer involved is still on the force, it is recommended they maintain the records for the duration of that officer's career plus five years.[41]

> **Recommendation:** *MPD should develop a policy that outlines the circumstances in which personnel files held by the Professional Standards Division can or cannot be purged. The New Jersey Division of Archives and Records Management policy described above may be one example of how MPD can develop such a system. PERF recommends that this policy include a stipulation that sustained complaints against an officer are held indefinitely.*

> **MPD action taken:** MPD has put a halt to the purging of files pending a review of public records laws and existing policy.

### Physical Location of the Professional Standards Division

Currently, PSD is located at MPD headquarters. The PERF team heard multiple times that this location has presented problems in terms of the ease of making complaints and with the confidentiality of investigations. In the past, officers who were the subject of complaints apparently have attempted to discuss their cases with PSD staff when they were at headquarters on other business, potentially compromising the integrity of the investigation. Additionally, it was noted that conversations easily carry into adjoining officers and meeting spaces, compromising the confidentiality of complainants and the integrity of cases. PERF recommends that MPD explore options to move PSD outside of headquarters. Best practices suggest that if possible, complaints should be processed at any facilities accessible to the public and that if an agency can arrange for other local government offices or another location outside of police facilities to accept complaints, they should do so.[42]

---

[41] State of New Jersey, Office of the Attorney General, Department of Law and Public Safety. "Internal Affairs Policy and Procedures," pg. 41-42.  https://www.nj.gov/oag/dcj/agguide/internalaffairs2000v1_2.pdf
[42] *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice.* (Washington, D.C.: DOJ Office of Community Oriented Policing Services): pg. 15 http://ric-zai-inc.com/Publications/cops-p164-pub.pdf

Mesa/Johnson 002994

**Recommendation:** *MPD should consider moving the Professional Standards Division's office to an off-site location. An off-site facility, such as a mixed-use office building or another city property, can be less intimidating for complainants than police headquarters. Furthermore, for officers involved in an investigation, the off-site location will ensure a higher level of privacy and will help protect the integrity of the investigation.*

Mesa/Johnson 002995

# SECTION IV. USE-OF-FORCE TRAINING REVIEW

PERF's review of the Mesa Police Department's use-of-force practices included a review of its training on use of force. PERF was also asked to provide a train-the-trainer seminar to begin MPD's implementation of PERF's Integrating Communications, Assessment, and Tactics (ICAT) training (see next page for information about ICAT).

In the course of the review, PERF reviewed Arizona POST's training curricula, which is utilized by MPD, along with other related training documents. Additionally, PERF staff members spent substantial time with MPD's Training Section, both in the provision of ICAT training and in focus groups. PERF's staff was consistently impressed by the Training Section's proficiency and professionalism.

Due to multiple recent changes in the department's use-of-force policy, however, the Training Section has had to adapt its training several times. The result is that MPD officers have received training on different policies, depending on their date of hire. Throughout PERF's site visit, it became apparent that the frequent changes in policy have impacted the effectiveness of training. The Training Division has attempted to provide consistency, but inconsistent reinforcement of training in the field cans limit the impact of these efforts.

The following sections provide an overview of the implementation of ICAT and PERF's recommendations on how to strengthen MPD's training.

## Implementing ICAT

In addition to reviewing MPD's use-of-force policies and practices, PERF was asked to provide an introduction to its ICAT training in the form of a train-the-trainer course as MPD works to incorporate ICAT into its current use-of-force training.

ICAT will also provide guidance for all members of the department on the benefits of the Critical Decision-Making Model (CDM). For officers, the CDM provides officers with the tactics to successfully assess situations, with an aim towards de-escalating force. For first-line supervisors, the CDM provides a consistent framework to evaluate whether the force used by officers in the field is appropriate and in line with department policy. For the Use of Force Board, using the CDM in the review process will help identify policy and training needs for the entire department.

To begin the process, in August 2018 PERF staff conducted a train-the-trainer seminar for MPD's Training Section staff and a selected number of Field Training Officers. In this training, PERF provided an overview of the ICAT curriculum and demonstrated several examples of the scenario-based training that is a key part of ICAT. MPD participants appeared receptive to the training and were engaged throughout the process.

In November 2018, PERF staff observed an ICAT training session facilitated by MPD staff. The training was conducted for 28 patrol officers. It was again noted that the training appeared to be well-received, and feedback was positive. PERF staff members noted no concerns in how MPD was implementing the

Mesa/Johnson 002996

ICAT curriculum. PERF recommends, however, that MPD command staff regularly evaluate how the training is being delivered. To do so, it is recommended that senior leaders in the academy attend classes and personally observe how the training is being delivered. At a 2016 PERF conference, then-Commissioner Charles Ramsey of the Philadelphia Police Department noted: "You have to periodically check to make sure that the academy training is consistent with what you're trying to achieve. Just going by and listening is a good way to do that."

> **Recommendation:** *MPD should, as a general matter, evaluate instructors regularly to ensure that training is being implemented in a consistent manner. With respect to ICAT, which is a new type of training developed just two years ago, senior leaders in MPD's academy should sit in on classes to personally observe the instruction of ICAT and ensure that training is presented in the manner intended by MPD command.*

PERF staff will continue to provide support to MPD staff members as they work to implement the ICAT curriculum within the department.

## PERF's Integrating Communications, Assessment, And Tactics Training Guide

To help law enforcement agencies implement PERF's 30 Guiding Principles on Use of Force[43], PERF developed *ICAT: Integrating Communications, Assessment, and Tactics*,[44] a training guide that represents a new way of thinking about use-of-force training for American police officers. ICAT takes the essential building blocks of critical thinking, crisis intervention, communications, and tactics, and puts them together in an integrated approach to training.

ICAT is designed to increase officer safety and public safety by providing officers with more tools, skills, and options for handling critical incidents, especially those involving subjects who are in crisis but who are not armed with firearms. The cornerstones of ICAT include slowing incidents down in order to avoid reaching a point where there is a need to use lethal force, upholding the sanctity of life, building community trust, and protecting officers from physical, emotional, and legal harm.

The ICAT Training Guide is comprised of six modules:
- Introduction to ICAT
- Critical Decision-Making Model
- Crisis Recognition and Response
- Tactical Communications
- Operational Safety Tactics
- Integration and Practice.

The ICAT Training Guide includes model lesson plans, scenario-based training exercises, PowerPoint presentations, case study videos of use-of-force incidents, and other resources. The Training Guide was

---

[43] Police Executive Research Forum (2016). *Guiding Principles on Use of Force.* https://www.policeforum.org/assets/guidingprinciples1.pdf
[44] Police Executive Research Forum (2016). *ICAT: Integrating Communications, Assessment, and Tactics. Training Guide for Defusing Critical Incidents.* http://www.policeforum.org/assets/icattrainingguide.pdf

Mesa/Johnson 002997

developed with the help of a working group of more than 60 professionals representing law enforcement agencies and other organizations from across the country. A panel of 10 policing experts reviewed a draft of the Training Guide, and the training was pilot-tested in seven sites throughout the country in August and September of 2016.

Feedback from the expert review and pilot sites was incorporated into a final report[45] that was released in October 2016.  In December 2016, PERF held a national meeting on how to implement ICAT Training. This meeting, held in New Orleans, was attended by more than 400 individuals representing more than 160 police agencies.

PERF held similar meetings in 2017 in Baltimore; Los Angeles; Columbia, SC; and Camden County, NJ to help agencies implement ICAT training. In 2018, sessions were held in Minnesota; Balch Springs, TX; and Watsonville, CA.  As of December 2018, more than 500 law enforcement agencies have attended these ICAT training meetings.

## Strengthening Use-of-Force Training

As previously mentioned, the fluctuations in MPD's use-of-force policy have impacted consistency in training. In interviews and focus groups, PERF identified a number of key areas in which training can be strengthened to improve its evenness:

### Training on Policy Changes and Updates

When policy changes necessitate training changes, the Training Section should be involved in the policy-making process. Specifically, the Training Section should be involved in policy updates and the implementation of new policies. Involving the Training Section will provide them with time to prepare new or updated curricula that can be released in tandem with any policy changes. This is important because **policy changes will not be effective in the long-term without training to implement those changes in the field**. Officers may be more receptive to policy changes if they are given the tools to meet the department's new expectations. Additionally, training plays a significant role in setting the culture of an agency by ensuring that policy changes are sustainable and practical.

> **Recommendation:** *MPD should involve the Training Section in the policy-making process when it is expected that training will need to be altered in accordance with the new policy directive(s).*

MPD leaders should ensure that changes being made in policy are supported by changes in training. For example, MPD's new directive prohibiting strikes to the face, head, and neck except in cases of active aggression or aggravated active aggression should be paired with training updates. **Not only do officers need training on the new expectations that have been outlined in policy, but they need training on alternative tactics they can use in place of strikes to the face, head, and neck**.

---

[45] Ibid.

Mesa/Johnson 002998

## Accountability

Training must constantly be reinforced in the field to remain effective. Therefore, it is critical that sergeants and lieutenants monitor the behavior of officers and ensure that training is being implemented correctly.

While on the site visit, the PERF team heard about a training exercise involving a suspect resisting arrest that could only end when the officer punched the suspect in the head. The purpose behind the training exercise appeared to have become distorted between the training and operationally in the field. Many officers referred to punches to the head as a way to "take out the computer" – i.e., a way to stun suspects who resist an officer's orders. As seen in the data provided in this report, strikes to the face have often been used when suspects demonstrated active resistance, which, under current policy, is not justification for a strike to the face. Supervisors should be charged with recognizing and correcting behavior in the field that does not comply with policy.

> **Recommendation**: *MPD should require sergeants and lieutenants to monitor the implementation of training in the field. If officers are not in compliance with training, sergeants and lieutenants should intervene and correct the behavior immediately. Supervisors should be held accountable if these corrective measures are not taken.*

Although accountability at the first-line supervisor level is important, this accountability needs to be seen through all levels of the department up to command staff. Recognizing the issues of accountability, MPD leaders have made significant changes to training leadership and to expectations regarding the department's use of force. These actions have been made to address the use of strikes to the face, head, or neck and to correct previous training on strikes that was misinterpreted in the field.

PERF commends MPD leaders for making the necessary changes, which demonstrates accountability extending to the highest levels of the department. MPD leaders will need to take appropriate steps to continue to support changes that increase accountability. Specifically, Chief Batista can support changes by addressing officers during roll calls and recording videos articulating the reasons behind changes and setting clear expectations for the department.

## Monitoring Use-of-Force Trends

Currently, the Training Section receives use-of-force reports and is responsible for reviewing each use-of-force report entered into Blue Team. Per DPM 2.1.45, Use of Force Reporting Protocols, the Training Section is responsible for reviewing Blue Team reports to ensure the information included is complete following a use-of-force investigation. If it is incomplete, the report is to be sent back the originating supervisor for completion. Once marked complete, the reports are uploaded into IA Pro.

Current policy simply states that the Proficiency Skills Unit within the Training Section should review each Use-of-Force report in Blue Team. PERF recommends that the scope and purpose of the review be specified in policy. As the Training Section has access to the Blue Team Use-of-Force reports, they can act as an additional level of accountability to ensure training is implemented correctly in the field. The Training Section should review the data to identify trends within use-of-force reports to inform training

Mesa/Johnson 002999

needs for the entire agency. Doing so can help identify potential issues before they become engrained in agency culture.

>  **Recommendation:** *MPD should stipulate in DPM 2.1.45, Use of Force Reporting Protocols, that the Training Section should monitor trends and emerging issues by tracking data found in use-of-force complaints. Specifically, the Training Section should monitor the types of force being used and the reasons for use of force. This review will allow instructors to identify needs for future training sessions.*

With the Training Section fully involved in the process of monitoring the department's use of force, it will also be able to create training derived from actual cases. The purpose of using these actual cases is not to critique the actions of the officers involved, but instead to develop realistic scenario-based training.

Mesa/Johnson 003000

# SECTION V. ADDITIONAL RECOMMENDATIONS

In the course of its review, the PERF team identified additional recommendations to assist the Mesa Police Department. While they do not all fall under the initial scope of work, they may be beneficial to the department as a whole.

## Transparency

Both internal and external transparency are important for a law enforcement organization. Transparency helps improve morale among officers and fosters trust within the community. Therefore, MPD should make an effort to promote transparency throughout the agency and with the community.

### Internal Transparency

The Mesa Police Department is undergoing major changes to use of force. Making such changes can be a difficult process for all involved. Officers expressed concern that some of the changes happened too quickly and that there is a need for better communication regarding the reasoning behind policy changes. This concern was not limited to changes in the department's use-of-force policies. Officers cited additional examples, including polices on body-worn cameras and drug enforcement. MPD leaders can communicate policy changes through videos and roll calls. Involving officers in the policy-making process and focusing on the role of first-line supervisors in explaining policy changes can also help address officers' concern about the pace of change in the department.

Involving officers in the policy-making process is important in promoting internal transparency about the direction the department is moving. To do so, PERF recommends that MPD create a system that allows officers to provide feedback on new policies and policy changes. The Policy and Planning Section should identify internal subject matter experts who can provide feedback on potential policy changes and updates. Selected individuals in the department who will be most impacted by a policy (e.g. the department's use-of-force policies that impact patrol) should be allowed to provide feedback as well. The Policy and Planning Section should review all feedback and incorporate helpful suggestions as much as possible before the policy is disseminated department-wide.

Once a policy is enacted, members of the department should be allowed to provide feedback to the Policy and Planning Section about the policy's operational impacts for a set period of time. Full impacts of the policy on operations may not be known until it has been enacted in the field. By allowing a grace period for feedback, MPD can mitigate unintended consequences from the policy that negatively impact police operations.

To encourage feedback, MPD should consider using PowerDMS in the policy review process, because officers are already familiar with the software.  The system that MPD chooses should be formalized so that each policy change goes through the same process.

> **Recommendation:** *MPD should create a formal system to be overseen by the Policy and Planning Section to allow feedback during the policy making process. This system should allow for input from internal subject matter experts and by individuals within the department who will*

Mesa/Johnson 003001

*be significantly impacted by the policy. Once the policy has been implemented, feedback should be solicited from the field on how the policy impacts daily operations. MPD should consider allowing feedback via PowerDMS and should ensure that each policy goes through the same process. For example, when a policy is issued, MPD should use the current PowerDMS system to send the policy out to a consistent group of individuals who have been designated to review policy changes. Individuals to include would be all commanders, the department's legal representatives, elected union officials, and other internal subject matter experts. Within a certain number of days, this group should provide feedback and additional recommendations to be considered by the Policy and Planning Section as they finalize the policy.*

Officers also expressed dissatisfaction with the process of suggesting policy changes. Currently, members of the department who want to make a suggestion for a new policy or a policy change must complete and submit a "DPM 1.1.15FL PowerDMS Workflow Request Form" to the Policy and Planning Section, where a Policy Project Manager enters the information from the form into PowerDMS. The overriding belief was that policy changes made by command staff are enforced immediately, but policy changes suggested from the field remain unaddressed for extended periods of time, if at all.

PERF suggests that MPD consider implementing a more efficient system for policy suggestions by members of the department, and MPD should set a timetable to address those suggestions. One way to do so would be to create a policy committee staffed by internal subject matter experts on policy and other operational areas, who can review suggested policy changes in a timely manner. The Chief should encourage the officers' participation in suggesting policy changes by addressing roll calls – either in person or via video. Additionally, first-line supervisors should be brought together to discuss policy needs. Given the role of first-line supervisors in ensuring that policy changes are implemented in the field, they are an important voice to include in conversations about policy.

> **Recommendation:** *MPD should create a system that allows officers in the field to make policy suggestions, and officers should be encouraged to do so by the Chief. A timeframe should be set for when those suggestions are addressed by MPD command staff and the Policy and Planning Section. PERF recommends creating a policy committee utilizing subject matter experts on the topics of the policy in question within the department. First-line supervisors should be included on this committee due to the role they play in ensuring that officers in the field are adhering to department policy.*

## External Transparency

MPD follows promising practices by making its policies available online through its website, an important step in promoting external transparency. PERF recommends that policies be made more accessible, because they currently can be found only by navigating through several pages.

> **Recommendation:** *MPD should create a link to its policies and procedures on its homepage to make them more accessible to the public.*

MPD currently releases an annual report which provides information about the department to the public. However, this report does not include information on the department's use-of-force statistics.

Mesa/Johnson 003002

PERF recommends that MPD prepare and release an annual report of the department's use of force, in addition to the department's official annual report. This report should be comprehensive and should detail trends in that year's use-of-force statistics as well as information on complaint dispositions.

> **Recommendation:** *MPD should release data on the department's use of force on an annual basis. This report should present the public with detailed information on the trends identified in use of force for that year.*

Continuing to collect data on use of force should be a priority for MPD.  Use-of-force data collection benefits the MPD internally, and it can benefit agencies nationally. MPD should participate in the FBI's National Use-of-Force database, which began data collection on January 1, 2019.[46] The FBI's use-of-force data collection efforts are supported by major policing organizations, including PERF, the Major Cities Chiefs Association (MCCA), the National Sheriffs' Association (NSA), the Major County Sheriffs of America, the International Association of Chiefs of Police (IACP), the Association of State Criminal Investigative Agencies, the National Organization of Black Law Enforcement Executives (NOBLE), and the Association of State Uniform Crime Reporting Programs.

> **Recommendation:** *MPD should be prepared to participate and submit data to the FBI's National Use-of-Force database as soon as possible. Data collection began on January 1, 2019.*

## Improving Officers' Experiences

First-line supervisors are a critical component in the operation of a police department. They are tasked with ensuring that officers' behaviors in the field are in line with the department's mission, values, and policy. As a result, supervisors have a great deal of influence over an agency's culture.

It came to PERF's attention that MPD's current bidding process for squad assignments allows patrol officers to follow an individual sergeant. While this is not necessarily a bad practice, it could contribute to negative behaviors becoming engrained within squads. PERF recommends that MPD revisit its bidding process to encourage the rotation of supervisors, so that officers can benefit from learning from different sergeants and enhance their own career development. This will also help to maintain a higher standard of accountability within the department.

PERF recommends a bidding process that requires supervisors, both sergeants and lieutenants, to rotate assignments every two years. For example, in year one of the new process, sergeants would move to a new squad for a 2-year period. The following year, lieutenants would rotate to a new assignment for a 2-year period, which staggers the movement of supervisors. Under this system, patrol officers would be allowed to stay in the same squad if desired.

> **Recommendation:** *MPD should revisit its current bidding process for squad assignments to ensure that supervisors do not remain in a particular squad for an extended period of time.*

---

[46] More information on the FBI's National Use of Force Database can be found at https://www.fbi.gov/services/cjis/ucr/use-of-force

Mesa/Johnson 003003

*Doing so will expose officers to different supervisory styles and will increase accountability among the sergeants and lieutenants.*

Additionally, it is important for MPD to track positive behavior related to use of force in addition to tracking areas for improvement. Doing so will help reinforce training and potentially increase morale. The Los Angeles Police Department, the Denver Police Department, and the Philadelphia Police Department are among the many departments that have implemented awards for officers who demonstrate de-escalation techniques in the field.[47]

**Recommendation:** *MPD should commend officers who demonstrate appropriate use of force or restraint in accordance with department policy and who practice de-escalation techniques in the field.*

---

[47] See: Phillips, Noelle, "Eight Denver Police Department officers awarded for showing restraint when gunfire would have been justified," *Denver Post*, 19 April 2018, https://www.denverpost.com/2018/04/19/denver-police-preservation-of-life-medal/; "Police Departments begin to reward officers for showing restraint," *CBS News*, 31 May 2016. https://www.cbsnews.com/news/police-departments-begin-to-reward-officers-for-showing-restraint-philadelphia/; Los Angeles Police Department. (2018). *Chief Michel Moore Honors 29 Officers with the Distinguished Medal of Valor, Purple Heart & Preservation of Life Awards* [Press Release]. http://www.lapdonline.org/newsroom/news_view/64534

Mesa/Johnson 003004

# CONCLUSION

The Mesa Police Department (MPD) has demonstrated a commitment to improving its policies and practices on officers' use of force, and has recognized the need for self-assessment and analysis. As this report was being written, MPD already was making changes on many of the issues that PERF identified.

Several major themes have emerged:

- **Accountability is necessary at all levels, and the role of first-line supervisors is especially important.**
  A lack of accountability over the thoroughness of use-of-force investigations has impeded the ability of department leaders to accurately track use of force. PERF recommends strengthening the policies regarding the reporting of use of force, including a requirement that a non-involved supervisor respond to the scene of all reportable uses of force. PERF was advised that in the past, supervisors very rarely responded to the scene of a reportable use of force.

  First-line supervisors play a critical role in police agencies,[48] serving as an important link between department managers and officers. In the Mesa Police Department, sergeants will be instrumental in working with officers to implement many changes in policies and practices on use of force and related issues.

  Accountability requires continuing analysis of current practices. PERF reviewed data from MPD's use-of-force reports from July 2015 through June 2018, including a sample of cases involving strikes, "limited strikes," and strikes to the face, which were the subject of news media coverage in Mesa. Under MPD's recently amended policy, only "aggravated active aggression" and "active aggression" by a subject warrant strikes to the face, head, or neck. In a sample of reports, however, 48 percent of the strikes were responses to "active resistance," "subject was armed/displayed a deadly weapon," or "arrest/detention." None of those strikes would be sanctioned under current policy.

  At the department level, PERF recommends that MPD use its Use-of-Force Board more effectively by making the membership of the board more representative of the department, and by implementing staggered term limits to ensure that fresh perspectives are taken into account. Doing so will help the department identify areas for improvement before they become a department-wide issue.

  PERF also recommends changes in the process of receiving complaints from the public, an important component of accountability and maintaining public confidence. PERF recommends making the complaint form easier to find on the department's website, and ensuring that all information included on the form is accurate.

---

[48] See *Promoting Excellence in First-Line Supervision: New Approaches to Selection, Training, and Leadership Development.* Police Executive Research Forum, 2018.
https://www.policeforum.org/assets/FirstLineSupervision.pdf

Mesa/Johnson 003005

- **Training of officers can be improved.**
  For example, PERF's review of 1,609 use-of-force reports found that Electronic Control Weapon (ECW) deployments were the most commonly cited type of force used, with ECW use cited in 41 percent of the MPD incidents reviewed.

  However, studies of ECW deployments in other cities have found that the devices often fail to work, either because the ECW probes fail to make contact with the subject's body or for other reasons. For example, a study by the Los Angeles Police Department in 2016 found that in more than 1,110 incidents in which officers fired their ECWs in 2015, the weapons caused the subject to submit to arrest only 53 percent of the time.[49]

  As part of this project, PERF provided MPD with assistance in implementing PERF's new training program, called Integrating Communications, Assessment, and Tactics (ICAT). A key part of this training is teaching officers to use a Critical Decision-Making Model (CDM),[50] which is a tool for expanding the range of options that police officers consider as they respond to any situation, including situations that may involve a use of force. By using the CDM, officers in many situations may be able to resolve an incident without using force, or they may make a better choice about the type of force that is most likely to be effective.

  PERF facilitated a train-the-trainer seminar on ICAT and the CDM for MPD's Training Section staff, and conducted a follow-up visit to observe an MPD-led ICAT training. PERF found that MPD personnel were receptive to the training, and that the training is being provided in an appropriate way. PERF recommends, however, the MPD commanders regularly attend ICAT trainings to ensure that instruction remains consistent. PERF is available to provide guidance and support to MPD as the department continues its implementation of ICAT and the CDM.

- **MPD should work to develop an overall culture of change, in which all officers can participate.**

  The specific findings and recommendations detailed in this report reflect a general approach of building accountability and continual improvement into the everyday operations of MPD. This starts at the top but involves all MPD personnel, particularly supervisors who have daily contact with line officers. At all levels of the department, personnel should strive to analyze current practices and outcomes, identify possible improvements, and work together to achieve better results. Training programs, roll call briefings, and other interactions can serve as mechanisms for soliciting input about problems and possible solutions.

  **A common issue that emerged from PERF's interviews of MPD personnel is that officers have a strong interest in becoming more engaged in the development of department policies that**

---

[49] See "One of the LAPD's preferred weapons to help officers avoid shootings often doesn't work." Los Angeles Times, April 1, 2016. https://www.latimes.com/local/crime/la-me-lapd-tasers-20160401-story.html
[50] "ICAT Module 2: The Critical Decision-Making Model." Police Executive Research Forum https://www.policeforum.org/icat-module-2

Mesa/Johnson 003006

**will impact them.** By obtaining input from officers about possible changes, MPD can convey the message that the entire MPD workforce is part of building a culture of change. PERF recommends use of technologies that will allow MPD officers to easily provide feedback on policy changes.

- **<u>MPD should foster transparency to build confidence with the public and with MPD members.</u>**

  For example, MPD can keep the public informed by making department policies more accessible on the department's website, and regularly releasing use-of-force data to the public.

  An important step that MPD leaders can take to promote internal transparency is to share major findings and recommendations of this report with MPD members.

## Moving Forward

Throughout the review process, PERF found members of the Mesa Police Department to be dedicated to their agency and their community. They expressed a strong desire to constantly improve their performance, serve the community, and be the best at what they do.

Over the last several months, MPD leaders have taken significant steps to improve use-of-force policies, practices, and training. Throughout the duration of this review, MPD leaders made changes in how the department uses force and the reporting of use of force through the release of updated policies. Additionally, changes were made to the Training Section staff, and the department began implementing ICAT training, which includes the Critical Decision-Making Model – an important tool for giving officers new perspectives on handling any situation, including situations that could end in a use of force. PERF recognizes the significant changes that the department has undertaken. **The changes MPD leaders have instituted over the last several months are noteworthy and show the department's commitment to improving practices on use of force**. This report is designed to serve as a blueprint for continued improvements on use of force and other issues.

Mesa/Johnson 003007

**EXHIBIT 17**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Robert Johnson, an          ) No. 2:19-CV-02827-JAT-JZB
individual,                 )
                            )
                            )
             Plaintiff,     )
                            )
vs.                         )
                            )
City of Mesa, et al.,       )
                            )
                            )
             Defendants.    )
_____)




30(b)(6) DEPOSITION OF ROBERT CHRISTOPHER RASH

Phoenix, Arizona
February 5, 2020
2:05 p.m.

                          DONNA DELAVINA REPORTING, LLC
                           Arizona RRF No. R1010
                           313 North Gilbert Road
                                 Suite 300
                           Gilbert, Arizona 85234
PREPARED BY:               P (602) 230-5454

Donna DeLaVina, RPR        F (480) 546-3721
Certified Reporter         www.dlvreporting.com
Certificate No. 50468

1   and going back in the history for the investigation

2   itself, goes beyond the scope of that investigation.

3   And they would not go back and look at the history.  An

4   adjudicator may go back and look at the history, but

5   not the IA investigator themselves.

6       Q.  BY MR. SHOWALTER:  And we already talked about

7   how because of the purging of the files, the

8   adjudicators can't go back and look at the history,

9   right?

10              MS. ALVARADO:  Form.

11              THE WITNESS:  Yes.

12      Q.  BY MR. SHOWALTER:  But isn't professional

13  standards' job to also identify problematic patterns?

14              MS. ALVARADO:  Form.

15              THE WITNESS:  I think, with respect to

16  patterns, that's something an adjudicator would take

17  into consideration in looking at the case.

18      Q.  BY MR. SHOWALTER:  Well, what about the

19  requirement that IAPro and BlueTeam statistics be

20  tracked by professional standards in internal

21  investigation -- or internal affairs?  What's the

22  purpose of doing that, if not to find patterns?

23      A.  The purpose of doing what?

24      Q.  Of tracking statistics about uses of force and

25  other police activities using IAPro and BlueTeam?

1    A.  Well, I guess the best way to describe this is

2  IA is responsible for IAPro.  And one component of

3  IAPro involves a use of force reporting process through

4  BlueTeam.  However, that's really for our training

5  division.  IA investigators don't really utilize that.

6  We're not necessarily tracking that, as far as the IA

7  investigators themselves.  There is an early warning

8  system.  What's called an early warning system.

9    Q.  Yeah.

10    A.  That's a feature in IAPro.

11    Q.  It's that word?

12    A.  Is that what you're talking about?

13    Q.  I don't know what I'm talking about.  I'm just

14  trying to gather information here.

15         How does early system warning work?

16    A.  So there's thresholds that are set in IAPro.

17  Those thresholds are set by the executive staff of the

18  police department.  And if an officer has -- whatever

19  the -- if he breaks that threshold, whatever that is,

20  in accidents, complaints or use of force, it triggers

21  an alert that goes, then, to that officer's commander

22  and his chain of command essentially.

23    Q.  So it's early warning -- what's the official

24  name of the alert?

25    A.  I think it's an IA alert.  I don't recall the

1  exact name of it.

2      Q.  IAPro alert?  BlueTeam alert?

3      A.  It's just an alert, as far as I know.

4      Q.  IAPro is a product, correct?  It's a software

5  suite or something of that kind?

6      A.  Yes.

7      Q.  And BlueTeam is a function of IAPro?

8      A.  BlueTeam is a component to IAPro.

9      Q.  Okay.  And the alert system is a component of

10  IAPro as well?

11      A.  Yes.

12      Q.  As you sit here today, if you know, is the

13  alert part of BlueTeam component, is it a subdivision

14  of the BlueTeam component?

15      A.  I think this is the best way to describe it.

16  So you have IAPro, which is like the main umbrella

17  software.  BlueTeam is a component of IAPro and is

18  really like the communication network or software

19  that's used for electronic transferring of information

20  from different areas of the department.

21          So, for instance, if there's a command

22  level investigation that's handled by, not IA, but by

23  the chain of command, that's documented in BlueTeam.

24  And any documents pertaining to that investigation are

25  uploaded in BlueTeam.  And then ultimately BlueTeam

1  electrically transfers to the mother database, I guess,

2  of IAPro.

3              So use of force reports done in the field,

4  that's done through BlueTeam.  A patrol sergeant

5  accesses BlueTeam and fills out and completes the use

6  of force report in BlueTeam and then automatically is

7  transferred up to IAPro.

8      Q.  If there is an alert for an individual, where

9  does that alert go?

10     A.  The alert is automatically triggered and the

11 professional standards lieutenant sends those alerts

12 out through BlueTeam to the chain of command, to the

13 officer's commander.

14     Q.  And what are the criteria for an alert?

15     A.  It varies a little bit.  But essentially,

16 again, that threshold, if you meet the threshold of so

17 many complaints, use of force, vehicle accidents, or

18 any combination thereof, that's what triggers an alert.

19     Q.  I mean, how many is kind of my -- is it based

20 on a calendar year?

21     A.  I think it's based on sliding year.  So a year

22 back from wherever that point is.

23     Q.  The last year 365 days?

24     A.  Right.

25     Q.  So how many use of force incidents or

1  accumulative incidents does an officer need to have to

2  garner an alert?

3      A.  I don't remember off the top of my head, off

4  the top of my head.  I would have to go back and

5  research that.

6      Q.  And once an alert is issued, what happens?  So

7  once an alert is issued, it's issued automatically,

8  basically if the trap is sprung, if the criteria are

9  met?

10     A.  Right.  So then the professional standards

11 lieutenant has to take that alert from IAPro and send

12 it out through BlueTeam to the officer's commander.

13     Q.  And then what?

14     A.  The officer's commander generally will review

15 it and send it to the lieutenant for a deeper look.

16     Q.  And, just for the sake of the record, when you

17 used the term "commander" you mean an actual commander?

18     A.  Correct.

19     Q.  Who has that rank?

20     A.  Yes.

21     Q.  And the commander gets it, sends it to the

22 lieutenant for a deeper look.  And then is there any

23 further required reporting?

24     A.  Yeah.  The lieutenant is supposed to review the

25 alerts, looking for any, again, pattern of behavior and

1  STATE OF ARIZONA       ) SS.
                          )
2  COUNTY OF MARICOPA     )

3

4       BE IT KNOWN that the foregoing proceedings
   were taken before me, DONNA DELAVINA, Certified
5  Reporter No. 50468; that the witness before testifying
   was duly sworn by me to testify to the whole truth;
6  that the foregoing 106 pages are a full, true and
   accurate record of the proceedings, all done to the
7  best of my skill and ability; that the proceedings were
   taken down by me in shorthand and thereafter reduced to
8  print under my direction.

9            [X]  Review and signature was requested.

10           [ ]  Review and signature was waived.

11           [ ]  Review and signature not required.

12           I CERTIFY that I am in no way related to any
   of the parties thereto nor am I in any way interested
13 in the outcome hereof.

14           I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.  DATED
15 at Phoenix, Arizona, this 14th day of February, 2020.

16
                _____
17                   Donna DeLaVina, RPR
                     Certified Reporter
18                   Certificate No. 50468

19              *    *    *    *    *    *

20

21      I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
   complied with the ethical obligations set forth in ACJA
22 7-206.

23
                _____
24                   Donna DeLaVina, RPR, Owner
                     Donna DeLaVina Reporting, LLC
25                   Arizona RRF No. R1010

**EXHIBIT 18**

Police Officer  Jhonte L. Jones [/16927]

ID Number: 16927  Hire date: Feb 06, 2006

Employee current assignment:

      Bureau: Police
      Division: Pmga Graves
      Squad: Pmga Graves

_____
_____

**Jun 27, 2013**      **Overall alert.  Incident type: Use of force**

      **Employee assignment at time of alert:**

            Bureau: Police Operations
            Division: Central Patrol
            Squad: G1

      **Alert summary:**

      Overall Alert: File Number: UOF2013-120   DR Number: 20131550044: Use of force has triggered an alert.

      As of 06/04/2013, 7 incidents of any type are linked to Police Officer Jhonte L. Jones [16927] that have occurred since 06/04/2012.

      7 or more incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

      **Action taken in response to the alert:**

      <No entry>

_____
_____

**Feb 10, 2014**      **Incident type alert.  Incident type: Use of force**

      **Employee assignment at time of alert:**

            Bureau: Police
            Division: Central Graves Shift 1
            Squad: Central Graves Shift 1

      **Alert summary:**

      Incident type specific alert: File Number: UOF2014-035  DR Number: 20140380054: Use of force has triggered an alert.

      As of 02/07/2014, 5 Use of force incidents are linked to Police Officer  Jhonte L. Jones [16927] that have occurred since 02/07/2013.

      5 or more Use of force incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

Organizational-specific theshold override alert criteria for : .

**Action taken in response to the alert:**

<No entry>

_____
_____

Jul 12, 2017        **Incident type alert.  Incident type: Use of force**

    **Employee assignment at time of alert:**

        Bureau: Police
        Division: Central Graves Shift 1
        Squad: Central Graves Shift 1

    **Alert summary:**

    Incident type specific alert: File Number: UOF2017-255  DR Number: 20171630751: Use of force has triggered an alert.

    As of 06/13/2017, 5 Use of force incidents are linked to Police Officer  Jhonte L. Jones [/16927] that have occurred since 06/13/2016.

    5 or more Use of force incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

    Organizational-specific theshold override alert criteria for : .

    **Action taken in response to the alert:**

    Jul 31, 2017  15:49: Sent from Police Commander  Kenneth Dav Cost [/10958] to Abalos, Anthony J. Police Commander [/09444]

    Instructions:

    Came to me by mistake

    Reviewed by Police Commander  Anthony J. Abalos [/09444] on Aug 03, 2017 at 14:33

    Decision: Approved

    Reviewer comment:

    Completion notes: Alert reviewed, no further action required.

_____
_____

Oct 04, 2017        **Incident type alert.  Incident type: Use of force**

    **Employee assignment at time of alert:**

        Bureau: Police
        Division: Central Graves Shift 2
        Squad: Central Graves Shift 2

    **Alert summary:**

Incident type specific alert: File Number: UOF2017-404  DR Number: 20172360029: Use of force has triggered an alert.

As of 08/28/2017, 5 Use of force incidents are linked to Police Officer  Jhonte L. Jones [/16927] that have occurred since 08/28/2016.

5 or more Use of force incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

Organizational-specific theshold override alert criteria for : .

**Action taken in response to the alert:**

I have reviewed each use of force involving Officer Jones. The one instance I had an issue with (UOF2017-384) was dealt with via verbal counseling and workstation documentation. It was not an training issue, so no further action was required.

Nov 09, 2017  22:52: Sent from Police Lieutenant  Steven Spen Pugh [/11229] to Abalos, Anthony J. Police Commander [/09444]

Instructions:

Completed. See notes.

Reviewed by Police Commander  Anthony J. Abalos [/09444] on Nov 20, 2017 at 16:36

Decision: Approved

Reviewer comment:

Preliminary review completed.

_____
_____

Oct 11, 2017      **Incident type alert.  Incident type: Use of force**

**Employee assignment at time of alert:**

      Bureau: Police
      Division: Central Graves Shift 2
      Squad: Central Graves Shift 2

**Alert summary:**

Incident type specific alert: File Number: UOF2017-412  DR Number: 20172450091: Use of force has triggered an alert.

As of 09/02/2017, 6 Use of force incidents are linked to Police Officer  Jhonte L. Jones [/16927] that have occurred since 09/02/2016.

5 or more Use of force incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

Organizational-specific theshold override alert criteria for : .

**Action taken in response to the alert:**

Duplicate alert. Already completed review.

Nov 09, 2017  22:55: Sent from Police Lieutenant  Steven Spen Pugh [/11229] to Abalos, Anthony J. Police Commander [/09444]

Instructions:

Completed

Reviewed by Police Commander  Anthony J. Abalos [/09444] on Nov 20, 2017 at 16:36

Decision: Approved

Reviewer comment:

Preliminary review completed.

_____
_____

**Jun 14, 2018        Incident type alert.  Incident type: Use of force**

    **Employee assignment at time of alert:**

        Bureau: Police
        Division: Central Graves Shift 2
        Squad: Central Graves Shift 2

    **Alert summary:**

Incident type specific alert: File Number: UOF2018-205  DR Number: 20181430828: Use of force has triggered an alert.

As of 05/24/2018, 5 Use of force incidents are linked to Police Officer  Jhonte L. Jones [/16927] that have occurred since 05/24/2017.

5 or more Use of force incidents during a 12 month period indicates that the officer's performance may need to be reviewed.

Organizational-specific threshold override alert criteria for : .

    **Action taken in response to the alert:**

Closed due to delay in review.

Reviewed by Police Commander  Ruben Valen Quesada [11030/11030] on Sep 01, 2019 at 14:51

Decision: Approved

Reviewer comment:

Completion notes: Alert reviewed - no further action taken.

Printed: Apr 16, 2020 12:19   By: Sr Program Assistant Marcella Garcia

Mesa/Johnson 004301

**EXHIBIT 19**

# George J. Richards

### Police Procedures Consultant

212 E. Hayward

Phoenix, AZ 85020

602-819-5060

cmdrgeo@aol.com

March 3, 2020

Robbins & Curtin PLLC

Joel B. Robbins

301 E. Bethany Home Rd.  Suite 100

Phoenix, AZ 85012

## Re:  Robert Johnson v. City of Mesa et al.

## United States District Court Case No. 2: 19-CV-02827-JAT-JZB

Mr. Robbins,

The following is my report and opinions in the Johnson matter.

My opinions in this matter are based on the totality of my training, education and experience as a Peace Officer in the State of Arizona for over 35 years and my review of supplied case materials.

Should further material become available, I reserve the right to supplement my report with additional opinion/s after further review.

# Materials Reviewed:

I have reviewed the following materials provided to me by your office staff:

1.      Audio recording - 911 call (Johnson/Mesa Johnson/Mesa 000001)

2.      Audio recording - Radio Central (Johnson/Mesa 000002)

3.      Audio recording – Radio Hot (Johnson/Mesa 000003)

4.      Recording Authentication by Okabe (Johnson/Mesa 000004)

5.      Mesa Police Communications Audio CD (Johnson/Mesa 000005)

6.      Radio Catalog Report 5/23/2019 Central (Johnson/Mesa 000006)

7.      Radio Catalog Report 5/23/2018 Hot (Johnson/Mesa 000007-000008)

8.      Radio Catalog Report 5/24/2018 Hot (Johnson/Mesa 000009)

9.      CAD History (Johnson/Mesa 000010-000017)

10.     Video Recording – AXON 1 Wilcox (Johnson/Mesa 000018)

11.     Video Recording – AXON 2 Calderon (Johnson/Mesa 000019)

12.     Video Recording – AXON 3 Bridges (Johnson/Mesa 000020)

13.     Video Recording – AXON 4 Monarrez (Johnson/Mesa 000021)

14.     Video Recording – AXON 5 Jones (Johnson/Mesa 000022)

15.     Video Recording – AXON 6 Wilcox (Johnson/Mesa 000023)

16.     Video Recording – AXON 7 Calderon (Johnson/Mesa 000024)

17.     Video Recording – AXON 8 Jones (Johnson/Mesa 000025)

18.     Incident/Investigation Report by Jones (Johnson/Mesa 000026-000036)

19.     Supplement by Gambee (Johnson/Mesa 000037-000038)

20.     Supplement by Monarrez (Johnson/Mesa 000039-000040)

21.     Field Processing Report by Petrova (Johnson/Mesa 000041-000044)

22.     Photographs of Robert Johnson by Petrova (Johnson/Mesa 000045-000129)

23.     Victim Rights Request Form for Luevano (Reyes) (Johnson/Mesa 000130)

24. Victim Rights Request Form for Luevano (Johnson) (Johnson/Mesa 000131)

25. Impound Record by Jones (Reyes) (Johnson/Mesa 000132)

26. Chain of Custody Signature Form (Reyes) (Johnson/Mesa 000133)

27. Mesa Arrest/Booking Record (Johnson/Mesa 000134)

28. Mesa Booking Checklist (Johnson/Mesa 000135)

29. Health Questionnaire Receiving Form (Johnson/Mesa 000136)

30. Prisoner Property Inventory Form (Johnson/Mesa 000137)

31. Victim Rights Request Form for Luevano (Johnson) (Johnson/Mesa 000138)

32. Mesa Municipal Court Release Conditions (Johnson/Mesa 000139)

33. Release Questionnaire (Johnson/Mesa 000140-000142)

34. Use of Force Report UOF2018-205 (Johnson/Mesa 000143-000149)

35. DPM 2.1.1 Use of Force Philosophy & Definitions, 11/29/2012 (Johnson/Mesa 000150-000153)

36. DPM 2.1.5 Use of Force, 1/4/2013 (Johnson/Mesa 000154-000158)

37. DPM 2.1.45 Use of Force Reporting Protocols, 5/19/2017 (Johnson/Mesa 000159-000163)

38. DPM 2.2.10 Search of Person – Consent/Incident to Arrest, 8/26/2013 (Johnson/Mesa 000164-000165)

39. DPM 2.2.15 Search of Person – Other, 7/8/2016 (Johnson/Mesa 000166-000167)

40. DPM 2.2.5 Search of Person – Frisk, 8/26/2013 (Johnson/Mesa 000168-000169)

41. DPM 2.4.15 Arrest Procedures – General, 2/7/2013 (Johnson/Mesa 000170-000181)

42. DPM 2.4.5 Person Detentions, 8/26/2013 (Johnson/Mesa 000182-000183)

43. DPM 2.4.65 Restraining Prisoners, 10/13/2017 (Johnson/Mesa 000184-000185)

44. Romley Report re Professional Standards Investigation, 10/22/2018 (Johnson/Mesa 000186-000191)

59. Scottsdale Police Incident/Investigation Report No. 18-12563 (JOHNSON 000288-000650)

60. Deposition of Jeff Jacobs, *Krstic v. Gransee*, et al. (JOHNSON 000651-000802)

61. *Off the Cuff* video by former Mesa Police Chief Milstead (JOHNSON 000803)

63. Photographs of Robert Johnson's injuries following assault (JOHNSON 000992-001000)

64.     August 2018 photograph of Robert Johnson's back (JOHNSON 001001)

65.     April 2019 photograph of Robert Johnson's back (JOHNSON 001002)

68.     April 3, 2019 correspondence from Mesa Police Department to Robert Johnson re investigation of officers (JOHNSON 001010)

69.     El Rancho Del Sol Apartment Complex Security Camera Footage 1 (Mesa/Johnson 000192)

70.     El Rancho Del Sol Apartment Complex Security Camera Footage 2 (Mesa/Johnson 000193)

71.     Jhonte Jones Training Matrix (Mesa/Johnson 000198-000223)

72.     Ernesto Calderon Training Matrix (Mesa/Johnson 000224-000261)

73.     Rudy Monarrez Training Matrix (Mesa/Johnson 000262-000266)

74.     MPD Report No. 2018-1410864 (Mesa/Johnson 000267-000272)

75.     Bayless Integrated Healthcare billing records (JOHNSON 001011-001015)

76.     3rd Southwest BJJ Classic video of Jhonte Jones (JOHNSON 001016)

77.     Mesa Police Scorn Chief's Reforms in Survey Leaked Ahead of 'No Confidence' Vote, Phoenix New Times (May 3, 2019) (JOHNSON 001017-001020)

83.     Mesa Police Association Online Survey Toplines, Strategies 360 (March 2019) (JOHNSON 001106-001147)

84.     New chief aims to bring stability to Mesa police, East Valley Tribune (July 18, 2010) (JOHNSON 001148-001154)

85.  NOI / NOAR / Admonishment – Abbiatti (Mesa/Johnson 000273-000286)

86.  NOI / NOAR / Admonishment – Calderon (Mesa/Johnson 000287-000297)

87.  NOI / NOAR / Admonishment – Gambee (Mesa/Johnson 000298-000307)

88.  NOI / NOAR / Admonishment – Jones (Mesa/Johnson 000308-000318)

89.  NOI / NOAR / Admonishment – Monarrez (Mesa/Johnson 000319-000328)

90.  NOI / Admonishment – Moore (Mesa/Johnson 000329-000330)

91.  NOI / Admonishment – Wahlberg (Mesa/Johnson 000331-000332)

92.  Admonishments (Mesa/Johnson 000333-000351)

93.  Officer History – Abbiatti (Mesa/Johnson 000352-000356)

94.  Officer History – Calderon (Mesa/Johnson 000357-000362)

95.  Officer History – Gambee (Mesa/Johnson 000363-000365)

96.  Officer History – Jones (Mesa/Johnson 000366-000370)

97.  Officer History – Monarrez (Mesa/Johnson 000371-000372)

98.  Officer History – Moore (Mesa/Johnson 000373-000375)

99.  Officer History – Wahlberg (Mesa/Johnson 000376-000377)

100. Investigative Memo PS#2018-085 – Sergeant Coon (Mesa/Johnson 000378-000457)

101. Citizen Complaint Letter from Robert Johnson (Mesa/Johnson 000458-000465)

102. CAD 20181430828 (Mesa/Johnson 000466-000473)

103. DR 2018144023 (Mesa/Johnson 000474-000490)

104. CAD 20181440023 (Mesa/Johnson 000491-000493)

105. Forensic Report 20181430828 (Mesa/Johnson 000494-000497)

106. Use of Force Report 2018-205 (Mesa/Johnson 000498-000505)

107. Timecard – Moore (Mesa/Johnson 000506)

108. Timecard – Wahlberg (Mesa/Johnson 000507)

109. Email – Wahlberg (Mesa/Johnson 000508)

110. AXON Inventory – Calderon (Mesa/Johnson 000509)

111. AXON Inventory – Jones (Mesa/Johnson 000510)

112. AXON Audit Lot – Bridges (Mesa/Johnson 000511-000514)

113. AXON Audit Log – Calderon (Mesa/Johnson 000515-000517)

114. AXON Audit Log – Calderon (Mesa/Johnson 000518-000519)

115. AXON Audit Log – Jones (Mesa/Johnson 000520-000521)

116. AXON Audit Log – Jones (Mesa/Johnson 000522-000523)

117. AXON Audit Log – Monarrez (Mesa/Johnson 000524-000526)

118. AXON Audit Log – Wilcox (Mesa/Johnson 000527-000528)

119. AXON Audit Log – Wilcox (Mesa/Johnson 000529-000530)

120. Daily Observation Report – Gambee (Mesa/Johnson 000531-000532)

121. BARS Report Booking 622624 R. Johnson (Mesa/Johnson 000533-000543)

122. Mesa City Court 2018037712 (Mesa/Johnson 000544-000546)

123. Banner Desert Medical Records (Mesa/Johnson 000547-000561)

124. Canvass Checklist (Mesa/Johnson 000562)

125. Canvass Results Spreadsheet (Mesa/Johnson 000563-000564)

126. Canvass Fliers (Mesa/Johnson 000565-000741)

127. DPM 1.1.1 Chapter Definitions (Mesa/Johnson 000742-000746)

128. DPM 1.4.1 Professional Standards Chapter Definitions (Mesa/Johnson 000747-000755)

129. DPM 1.4.5 Code of Conduct (Mesa/Johnson 000756-000763)

130. DPM 2.1.1 Use of Force Philosophy & Definitions (Mesa/Johnson 000000764-000766)

131. DPM 2.1.5 Use of Force (Mesa/Johnson 000767-000771)

132. DPM 2.1.45 Use of Force Reporting Protocols (Mesa/Johnson 000772-000774)

133. DPM 2.4.5 Person Detentions (Mesa/Johnson 000775-000776)

134. DPM 2.2.5 Search of Person – Frisk (Mesa/Johnson 000777-000778)

135. DPM 2.4.15 Arrest Procedures – General (Mesa/Johnson 000779-000789)

136. DPM 2.4.65 Restraining Prisoners (Mesa/Johnson 000790-000791)

137. DPM 2.4.75 Prisoners – Sick or Injured (Mesa/Johnson 000792-000797)

138. DPM 3.4.35 On-Officer Body Camera Program (Mesa/Johnson 000798-000804)

139. DPM 1.1.10 Chain of Command and Obeying Orders (Mesa/Johnson 000805-000809)

140. DPM 1.5.5 Training Protocols (Mesa/Johnson 000810-000816)

141. DPM 1.5.15 Member Training (Mesa/Johnson 000817-000823)

142. STE 1.2 Duties & Responsibilities (Mesa/Johnson 000824-000829)

143. Training Matrix – Calderon (Mesa/Johnson 000830-866)

144. Training Matrix – Gambee (Mesa/Johnson 000867-000886)

145. Training Matrix – Jones (Mesa/Johnson 000887-000911)

146. Training Matrix – Monarrez (Mesa/Johnson 000912-000915)

147. Jones Training Requests – Jones (Mesa/Johnson 000916-000918)

148. AZPOST DT Manual 2017 (Mesa/Johnson 000919-001349)

149. AZPOST Lesson Plan Use of Force Policy Review/Scenarios 2014 (Mesa/Johnson 0001350-001386)

150. AZPOST Lesson Plan Incident De-Escalation & Tactics 2016 (Mesa/Johnson 001387-001468)

151. AZPOST Lesson Plan Squad Operations Tactics Training 2017 (Mesa/Johnson 001469-001510)

152. Interview Transcript – Robert Johnson (Mesa/Johnson 001511-001527)

153. Interview Transcript – Linda Hardy (Mesa/Johnson 001528-001554)

154. Interview Transcript – Christina Johnson (Mesa/Johnson 001555-001561)

155. Interview Transcript Darnell Johnson & Jennifer Pavkov (Mesa/Johnson 001562-001575)

156. Interview Transcript – Jerry Leland (Mesa/Johnson 001576-001584)

157. Interview Transcript – Bridges (Mesa/Johnson 001585-001604)

158. Interview Transcript – Wilcox (Mesa/Johnson 001605-001616)

159. Interview Transcript - Pugh (Mesa/Johnson 001617-001619)

160. Interview Transcript - Petrova (Mesa/Johnson 001620-001623)

161. Interview Transcript - Abbiatti (Mesa/Johnson 001624-001652)

162. Interview Transcript - Calderon (Mesa/Johnson 001653-001683)

163. Interview Transcript - Gambee (Mesa/Johnson 001684-001711)

164. Interview Transcript - Jones (Mesa/Johnson 001712-001756)

165. Interview Transcript - Monarrez (Mesa/Johnson 001757-001790)

166. Interview Transcript - Moore (Mesa/Johnson 001791-001813)

167. Interview Transcript - Wahlberg (Mesa/Johnson 001814-001824)

168. Scottsdale PD DR 18-12563 (Mesa/Johnson 001825-002135)

169. Scottsdale Case Review PowerPoint (Mesa/Johnson 00002136-002216)

170. Medical Records from Scottsdale PD (Mesa/Johnson 002217-002354)

171. Evaluation by John McMahon & Associates (Mesa/Johnson 002355-002383)

172. Supervisor Evaluation by John McMahon & Associates (Mesa/Johnson 002384-002392)

173. 911 Audio Recording & Communication Record (Mesa/Johnson 002393)

174. Audio 01 – 20181430828a (Mesa/Johnson 002394)

175. Audio 02 – 20181430828b (Mesa/Johnson 002395)

176. Audio 3 - 201814308228c (Mesa/Johnson 002396)

177. DVD AXON Recordings (Mesa/Johnson 002397)

178. DVD El Rancho Del Sol Surveillance Video Disc #1 (Mesa/Johnson 002398)

179. DVD El Rancho Del Sol Surveillance Video Disc #2 (Mesa/Johnson 002399)

180. DVD Canvass Interview Recordings (Mesa/Johnson 002400)

181. Video 701 E. Main – Coon & Steffa ATC Follow Up (Mesa/Johnson 00002401)

182. Video 701 E. Main – Coon & Rash Canvass (Mesa/Johnson 002402)

183.    Video 701 E. Main – Denning & Steffa Canvass (Mesa/Johnson 002403)

184.    Video 701 E. Main – Stegenga & Brown Canvass (Mesa/Johnson 002404)

185.    Video 701 E. Main #308 – Coon & Rash ATC Follow Up (Mesa/Johnson 002405)

186.    Video 701 E. Main #308 – Coon & Steffa ATC Follow Up (Mesa/Johnson 002406)

187.    Video █████████ – Coon Follow Up with Brittany Stegall (Mesa/Johnson 002407)

188.    Injury Photographs or Robert Johnson 05/24/18 (Mesa/Johnson 002408)

189.    Injury Photographs of Robert Johnson 08/15/18 (Mesa/Johnson 002409)

190.    Photographs (Mesa/Johnson 002410-002415)

191.    Audio Recorded Interviews PS#2018-085 (Mesa/Johnson 002416)

192.    Audio Interview Abbiatti (Mesa/Johnson 002417)

193.    Audio Interview Abbiatti (Mesa/Johnson 002418)

194.    Audio Interview Calderon (Mesa/Johnson 002419)

195.    Audio Interview Christina Johnson (Mesa/Johnson 002420)

196.    Audio Interview Wilcox (Mesa/Johnson 002421)

197.    Audio Interview Petrova (Mesa/Johnson 002422)

198.    Audio Interview Bridges (Mesa/Johnson 002423)

199.    Audio Interview Gambee (Mesa/Johnson 002424)

200.    Audio Interview Jerry Leland (Mesa/Johnson 002425)

201.    Audio Interview Jones (Mesa/Johnson 002426)

202.    Audio Interview Linda Hardy (Mesa/Johnson 002427)

203.    Audio Interview Monarrez (Mesa/Johnson 002428)

204.    Audio Interview Moore (Mesa/Johnson 002429)

205.    Audio Interview Pugh (Mesa/Johnson 002430)

206.    Audio Interview Robert Johnson (Mesa/Johnson 002431)

207.    Audio Interview Wahlberg (Mesa/Johnson 002432)

208. Audio Recorded Interviews Scottsdale PD (Mesa/Johnson 002433)

209. Audio ATC E. Reyes Phoenix (Mesa/Johnson 002434)

210. Audio ATC E. Reyes Tempe Apt. 1 (Mesa/Johnson 002435)

211. Audio ATC E. Reyes Tempe Apt 2. (Mesa/Johnson 002436)

212. Audio Interview Brittany Reid Stegall (Mesa/Johnson 002437)

213. Audio Celtic Property Management (Mesa/Johnson 002438)

214. Audio Interview Christina Johnson (Mesa/Johnson 002439)

215. Audio Interview Darnell Johnson (Mesa/Johnson 002440)

216. Audio Interview FAC Detective Gambee (Mesa/Johnson 002441)

217. Audio Contact El Rancho Apartment (Mesa/Johnson 002442)

218. Audio Interview Jennifer Pavkov (Mesa/Johnson 002443)

219. Audio Interview Jerry Leland (Mesa/Johnson 002444)

220. Audio Interview Linda Hardy (1) (Mesa/Johnson 002445)

221. Audio Interview Linda Hardy (2) (Mesa/Johnson 002446)

222. Audio Interview FAC Officer Bridges (Mesa/Johnson 002447)

223. Audio Interview FAC Officer Wilcox (Mesa/Johnson 002448)

224. Audio Interview Pastor Andre Miller Pastor (Mesa/Johnson 002449)

225. Audio Interview Robert Johnson (Mesa/Johnson 002450)

226. Audio Interview Sergeant Abbiatti (Mesa/Johnson 002451)

227. Audio Interview Susan Johnson (Mesa/Johnson 002452)

228. Professional Standards Case Review (Mesa/Johnson 002453)

229. Romley Report (Mesa/Johnson 002454-2459)

230. Recommendation Memo – Lieutenant Higbee (Mesa/Johnson 002460-2514)

231. Findings Memo – Commander Quesada (Mesa/Johnson 002515-002517)

232. Rebuttal Notice – Abbiatti (Mesa/Johnson 002518-002519)

233. Rebuttal Notice – Calderon (Mesa/Johnson 002520-002521)

234. Rebuttal Notice – Gambee (Mesa/Johnson 002522-002523)

235. Rebuttal Notice Jones (Mesa/Johnson 002524-002525)

236. Rebuttal Notice – Monarrez (Mesa/Johnson 002526-002527)

237. Rebuttal Notice – Moore (Mesa/Johnson 002528-002529)

238. Rebuttal Notice – Wahlberg (Mesa/Johnson 002530-002531)

239. Rebuttal Memo – Wahlberg (Mesa/Johnson 002532-002534)

240. Rebuttal Memo – Moore (Mesa/Johnson 002535-002541)

241. Rebuttal Extension Memo – Calderon (Mesa/Johnson 002542)

242. Rebuttal Extension Memo – Jones (Mesa/Johnson 002543)

243. Rebuttal Extension Memo – Monarrez (Mesa/Johnson 002544)

244. Rebuttal Extension Approval – Calderon (Mesa/Johnson 002545)

245. Rebuttal Extension Approval – Calderon (Mesa/Johnson 002546)

246. Rebuttal Extension Approval – Jones (Mesa/Johnson 002547)

247. Rebuttal Extension Approval – Jones (Mesa/Johnson 002548)

248. Rebuttal Extension Approval – Monarrez (Mesa/Johnson 002549)

249. Rebuttal Memo – Gambee (Mesa/Johnson 002550-002551)

250. Rebuttal Memo – Jones (Mesa/Johnson 002552-002553)

251. Rebuttal Memo – Monarrez (Mesa/Johnson 002554-002556)

252. Extension Request – Commander Quesada (Mesa/Johnson 002557-002558)

253. Extension Approval – Assistant Chief Cost (Mesa/Johnson 002559)

254. Final Summary Memo – Commander Quesada (Mesa/Johnson 002560-002578)

255. Pre-Deprivation Notice – Abbiatti (Mesa/Johnson 002579-002580)

256. Pre-Deprivation Notice – Calderon (Mesa/Johnson 002581-002582)

257. Pre-Deprivation Notice – Jones (Mesa/Johnson 002583-002584)

258. Audio re-Deprivation Hearing – Calderon (Mesa/Johnson 002585)

259. Audio Pre-Deprivation Hearing – Abbiatti (Mesa/Johnson 002586)

260. Audio Pre-Deprivation Hearing – Jones (Mesa/Johnson 002587)

261. Final Summary & Recommendations Memo – Assistant Chief Cost (Mesa/Johnson 002588-002593)

262. Corrective Action Plan – Jones (Mesa/Johnson 002594-002596)

263. Final Notification Email – Abbiatti (Mesa/Johnson 002597)

264. Final Notification Email – Calderon (Mesa/Johnson 002598-002599)

265. Final Notification Email – Gambee (Mesa/Johnson 002600-002601)

266. Final Notification Email – Jones (Mesa/Johnson 002602)

267. Final Notification Email – Monarrez (Mesa/Johnson 002603)

268. Final Notification Email – Moore (Mesa/Johnson 002604)

269. Final Notification Email – Wahlberg (Mesa/Johnson 002605)

270. Final Signed NOI - Abbiatti (Mesa/Johnson 002606-002608)

271. Final Signed NOI – Calderon (Mesa/Johnson 002609-002612)

272. Final Signed NOI – Gambee (Mesa/Johnson 002613-002615)

273. Final Signed NOI – Jones (Mesa/Johnson 002616-002618)

274. Final Signed NOI – Monarrez (Mesa/Johnson 002619-002621)

275. Final Signed NOI – Moore (Mesa/Johnson 002622-002624)

276. Final Signed NOI – Wahlberg (Mesa/Johnson 002625-002627)

277. Final Signed Notice of Suspension – Calderon (Mesa/Johnson 002628-002629)

278. Final Signed Notice of Suspension – Jones (Mesa/Johnson 002630-002631)

279. Final Signed Written Reprimand – Monarrez (Mesa/Johnson 002632-002633)

280. Letter to Complainant Robert Johnson (Mesa/Johnson 002634)

281. Mind Clinic medical records for Robert Johnson (JOHNSON 001155-001172)

282. Arizona Neuropsychological Services medical and billing records for Robert Johnson (JOHNSON 001173-001180)

283. MPD Report No. 2010-0280813 (JOHNSON 001181-001373)

284. MPD Report No. 2015-1320838 (JOHNSON 001374-001602)

285. UOF2013-005 re Calderon (Mesa-Johnson 002722-002727)

286. UOF2014-056 re Calderon (Mesa-Johnson 002728-002732)

287. UOF2014391 re Calderon (Mesa-Johnson 002733-002739)

288. UOF2014-315 re Calderon (Mesa-Johnson 002740-002745)

289. UOF2016-095 re Calderon (Mesa-Johnson 002746-002749)

290. UOF2016-122 re Calderon (Mesa-Johnson 002750-002760)

291. UOF2016-138 re Calderon (Mesa-Johnson 002761-002764)

292. UOF2016-158 re Calderon (Mesa-Johnson 002765-002768)

293. UOF2016-215 re Calderon (Mesa-Johnson 002769-002771)

294. UOF2016-220 re Calderon (Mesa-Johnson 002772-002777)

295. UOF2016-352 re Calderon (Mesa-Johnson 002778-002782)

296. UOF2016-480 re Calderon (Mesa-Johnson 002783-002787)

297. UOF2016-504 re Calderon (Mesa-Johnson 002788-002792)

298. UOF2017-030 re Calderon (Mesa-Johnson 002793-002796)

299. UOF2017-041 re Calderon (Mesa-Johnson 002797-002802)

300. UOF2017-284 re Calderon (Mesa-Johnson 002803-002810)

301. UOF2017-285 re Calderon (Mesa-Johnson 002811-002814)

302. UOF2017-323 re Calderon (Mesa-Johnson 002815-002820)

303. UOF2017-418 re Calderon (Mesa-Johnson 002821-002825)

304. UOF2017-529 re Calderon (Mesa-Johnson 002826-002829)

305. UOF2017-546 re Calderon (Mesa-Johnson 002830-002833)

306. UOF2017-547 re Calderon (Mesa-Johnson 002834-002839)

307. UOF2018-027 re Calderon (Mesa-Johnson 002840-002844)

308. UOF2018-072 re Calderon (Mesa-Johnson 002845-002848)

309. UOF2012-011 re Jones (Mesa-Johnson 002849-002852)

310. UOF2013-054 re Jones (Mesa-Johnson 002853-002859)

311. UOF2013-105 re Jones (Mesa-Johnson 002860-002863)

312. UOF2013-120 re Jones (Mesa-Johnson 002864-002869)

313. UOF2014-017 re Jones (Mesa-Johnson 002870-002873)

314. UOF2014-035 re Jones (Mesa-Johnson 002874-002878)

315. UOF2014-279 re Jones (Mesa-Johnson 002879-002884)

316. UOF2014-348 re Jones (Mesa-Johnson 002885-002888)

317. UOF2015-140 re Jones (Mesa-Johnson 002889-002893)

318. UOF2016-253 re Jones (Mesa-Johnson 002894-002897)

319. UOF2016-274 re Jones (Mesa-Johnson 002898-002902)

320. UOF2017-067 re Jones (Mesa-Johnson 002903-002906)

321. UOF2017-132 re Jones (Mesa-Johnson 002907-002911)

322. UOF2017-255 re Jones (Mesa-Johnson 002912-002918)

323. UOF2017-384 re Jones (Mesa-Johnson 002919-002923)

324. UOF2017-404 re Jones (Mesa-Johnson 002924-002928)

325. UOF2017-412 re Jones (Mesa-Johnson 002929-002933)

326. Police Executive Research Forum Use of Force Review of MPD March 2019 (Mesa-Johnson 002934-003007)

327. Rudy Monarrez' Workstation File (Mesa-Johnson 003008-003030)

328. Rudy Monarrez Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003031-003039)

329. Rudy Monarrez Personnel File (thru 5-23-2019) (Mesa-Johnson 003040-003096)

330. Ernesto Calderon Workstation File (Mesa-Johnson 003097-003156)

331. Ernesto Calderon Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003157-003167)

332. Ernesto Calderon Personnel File (thru 5-22-2019) (Mesa-Johnson 003168-003407)

14

333. Jhonte Jones Workstation File (Mesa-Johnson 003408-003475)

334. Jhonte Jones Personnel File (5-19-2019 thru 11-26-2019) (Mesa-Johnson 003476-003486)

335. Jhonte Jones Personnel File (thru 5-22-2019) (Mesa-Johnson 003487-003602)

336. Mind Clinic billing records for Robert Johnson (JOHNSON 001663-001664)

337. Rudy Monarrez Chief's File (Mesa-Johnson 003611-003619)

338. Ernesto Calderon Chief's File (Mesa-Johnson 003620-003689)

339. Jhonte Jones Chief's File (Mesa-Johnson 003690-003746)

340. FLD 210 Use of Force, 3/1/2011 (Mesa-Johnson 003747-003754)

341. ADM 600 Use of Force Philosophy & Definitions, 11/29/2012 (Mesa-Johnson 003755-003757)

342. ADM 605 Use of Force, 11/29/2012 (Mesa-Johnson 003758-003762)

343. ADM 640 Use of Force Reporting Protocols, 11/29/2012 (Mesa-Johnson 003763-003764)

344. ADM 605 Use of Force, 12/10/2013 (Mesa-Johnson 003765-003769)

345. ADM 605 Use of Force, 1/4/2013 (Mesa-Johnson 003770-003774)

346. DPM 2.1.5 Use of Force, 8/15/2014 (Mesa-Johnson 003775-003779)

347. DPM 2.1.5 Use of Force, 3/14/2017 (Mesa- Johnson 003780-003784)

348. DPM 2.1.45 Use of Force Reporting Protocols, 5/19/2017 (Mesa-Johnson 003785-003787)

349. DPM 2.1.2 Special Order Use of Force, 6/7/2018 (termination 6/7/2019) (Mesa-Johnson 003788-003791)

350. DPM 2.1.5 Use of Force, 6/7/2018 (Mesa-Johnson 003792-003796)

351. DPM 2.1.45 Use of Force Reporting Protocols, 6/7/2018 (Mesa- Johnson 003797-003801)

352. DPM 2.1.2 Use of Force Philosophy & Definitions, 4/3/2019 (Mesa-Johnson 003802-003805)

353. DPM 2.1.5 Use of Force, 4/3/2019 (Mesa-Johnson 003806-003810)

354. DPM 2.1.45 Use of Force Reporting Protocols, 4/3/2019 (Mesa-Johnson 003811-003817)

355. DPM 2.1.2 Special Order Use of Force, 6/7/2018 (termination 6/7/2020) (Mesa-Johnson 003818-003821)

356. Jones Pre-Deprivation Hearing Transcript (JOHNSON 001665-001672)

357. Batista Settlement and Release Agreement (JOHNSON 001673-001679)

358.    Mesa Police Department in the 21st Century (JOHNSON 001680-001795)

359.    Final Report of the President's Task Force on 21st Century Policing, May 2015 (JOHNSON 001796-001911)

360.    Transcript of Chief Batista's Inaugural Speech (JOHNSON 001912-001917)

361.    CD containing Batista press conference (JOHNSON 001918)

362.    CD containing Batista's response to Robert Johnson assault (JOHNSON 001919)

363.    Scottsdale Police Department's response to subpoena duces tecum (JOHNSON 001920-002316)

    a.    Scottsdale Police Incident/Investigation Report No. 18-12563 (JOHNSON 001920-002285)

    b.    Photographs of Robert Johnson (JOHNSON 002286-002316)

364.    CD containing compilation video of apartment surveillance and AXON videos (JOHNSON 002317)

365.    CD containing cell phone video taken by Derek Johnson (JOHNSON 002318)

366.    ADM 1410 Internal Affairs, 6-7-2004 (Mesa-Johnson 003822-003829)

367.    ADM 1410 Internal Affairs, 2-15-2006 (Mesa-Johnson 003830-003836)

368.    ADM 1410 Internal Affairs, 3-1-2011 (Mesa-Johnson 003837-003844)

369.    ADM 525 Internal Affairs, 1-6-2012 (Mesa-Johnson 003845-003851)

370.    ADM 525 Internal Affairs, 4-5-2012 (Mesa-Johnson 003852-003858)

371.    ADM 525 Internal Affairs, 7-1-2013 (Mesa-Johnson 003859-003867)

372.    DPM 1.4.25 Internal Affairs, 3-6-2014 (Mesa-Johnson 003868-003878)

373.    DPM 1.4.25 Internal Affairs, 7-12-2016 (Mesa-Johnson 003879-003889)

374.    DPM 1.4.25 Internal Affairs, 12-7-2014 (Mesa-Johnson 003890-003900)

375.    DPM 1.4.25 Professional Standards, 2-8-2018 (Mesa-Johnson 003901-003911)

376.    Certificate of Records Destruction 2014 (Mesa-Johnson 003912-003913)

377.    Certificate of Records Destruction 2016 (Mesa-Johnson 003914-003918)

378.    MetroPCS Response to Subpoena Duces Tecum (Mesa-Johnson 003919-003925)

379.    Training Recommendation Memo 2-22-2019 (Mesa-Johnson 003926)

380.    Training Summary Update Memo 9-17-2019 (Mesa-Johnson 003927)

381.    PARC - Internal Affairs Recommendations for MPD (1-2009) (Mesa-Johnson 003928-003986)

382.    PARC - The Mesa Police Department: A Guide for Reporting and Reviewing Internal Review of Force Incidents (5-2009) (Mesa-Johnson 003987-004000)

383.    PARC - The Mesa Police Department: A Guide for Internal Review of Category 1 Force Incidents by the Use of Force Review Board (5-2009) (Mesa-Johnson 004001-004032)


- **Deposition Transcripts:**

1.    Robert Johnson - December 19, 2019

2.    Jhonte Jones – January 8, 2020

3.    Batista, Ramon – January 9, 2020

4.    Michael McClure (30(b)(6) designee) – January 9, 2020

5.    *Ernesto Calderon – February 3, 2020*

6.    *Rudy Monarrez – February 4, 2020*

7.    *Timothy Walker (30(b)(6) designee) – February 5, 2020*

8.    *Robert Rash (30(b)(6) designee) – February 5, 2020*


# Personal Background

I am a Career Law Enforcement Officer having spent 35 years as a Certified Peace Officer in the State of Arizona and sworn member of the Phoenix Police Department, beginning on February 10, 1975, and retiring on March 30, 2010. I served in numerous assignments in four different ranks, serving as a Commander for the last fourteen years of my career. From 2006 until my retirement in 2010, I served as the Commander of the Professional Standards Bureau (Internal Affairs).

A detailed summary of my qualifications, experience, education and training can be found attached to this report as Addendum A.

# Incident Overview

On May 23, 2018, at 2344 hrs. (11:44 p.m.) Mesa Police Officers responded to a citizen's report of a domestic dispute at 701 E. Main St, Apt 307, within the City of Mesa.  The reporting party, Mr. Carlos Diaz, stated that he was in Apt. 307 with his girlfriend, (Kimberly Luevano).  Mr. Diaz further stated that Ms. Luevano's ex-boyfriend, (Erick Reyes), had come to the apartment.  Mr. Diaz said that Reyes was not welcome and was told to leave and that he did so.  Mr. Diaz further advised 911 Operator that he (Diaz) had a gun and had showed it to Reyes, but had not threatened him.  Diaz said he was concerned because before Mr. Reyes left the apartment, he said something to the effect, "You're lucky I don't have my strap."  (street slang for a gun).  Mr. Diaz said he did not know if Mr. Reyes actually had a gun.  At the time of the original call, Mr. Diaz advised 911 that Mr. Reyes had in fact left the apartment approximately 3 minutes ago and that he (Diaz) and Luevano were inside the apartment.

Mr. Diaz described Ms. Luevano's ex-boyfriend as a male, Hispanic, 22 years of age.  Further, Diaz stated that his name was Erick Reyes, approximately 5'8" tall and 170 pounds, with medium length black hair and was wearing a black jacket and gray shorts

Before the arrival of the first Officer on the scene, Diaz advised 911 that Mr. Reyes had just returned to the apartment and was trying to force his way in.  Mr. Diaz further advised that Ms. Luevano was at the door of the apartment with Mr. Reyes.  Diaz advised 911 that another subject, an African American male, was now with Mr. Reyes. It is unknown if this information was broadcast on the radio.  It is possible that it was entered into CAD, but the question is which, if any of the officers had that additional information upon their arrival.

When Mr. Diaz advised 911 that Mr. Reyes had returned to the apartment, the 911 operator upgraded the priority of the call to "hot" or emergency traffic and advised  officers responding to do so "Code 3" (lights and sirens).  Almost immediately upon upgrading the call to emergency status, Officer Ernesto Calderon  advised that he was on scene.  Officer Calderon, shortly after arriving

on scene, advised that he would be out with "the male" (Reyes) and "another subject "(Robert Johnson) on the 3rd floor.

Officer Calderon has stated that when he got off the elevator on the third floor he walked toward Apt. 307, and that he could hear laughing in the hallway.  He stated that as he came around the corner he observed two male subjects, later identified as Erick Reyes and Robert Johnson, walking towards him.  Officer Calderon has stated that he spoke with both subjects, and asked them if they would have a seat on the floor.  Erick Reyes did so, 10'-20' from the elevator.

Officer Calderon stated that Robert Johnson said something to the effect of, "No, I'm good," and walked to the elevator and pushed the button to go down.  The elevator door opened but before Mr. Johnson got in the elevator, Officer Calderon stated that he told Johnson, "Don't leave, more Officers are coming."

At that point, Mr. Johnson stopped, let the elevator door close, and walked to the railing and took out his cell phone and appeared to be speaking to someone on the phone.  While standing at the railing looking down and speaking on the phone, Mr. Johnson apparently observed other marked police vehicles arrive at the complex.  He is heard saying into the phone, "No, I have to wait."  It was later learned that he was talking to his Mother, on the phone, who was on the ground floor by the elevator, and had told him to come down.

While Mr. Johnson stood at the railing speaking on his phone the elevator door opened and Officers Jhonte Jones, Rudy Monarrez and Edward Bridges got out. Officer Calderon was standing next to where Erick Reyes was sitting on the floor. Calderon motioned to Johnson and told the arriving Officers , as they exited the elevator," He (Johnson) is involved."  Officers Jones and Monarrez approached Mr. Johnson and Officer Jones told him, "Hey man, I'm going to pat you down."

Officer Jones and Monarrez then conducted a "Terry Frisk" of Mr. Johnson and determined that he did not have any weapons.

After completing the Frisk, Officer Jones verbally directed Mr. Johnson away from the railing, to the wall, and asked him to sit in the corner.  Mr. Johnson walked to the wall while asking, "Why do I need to sit in the corner like a fucking 2 year

old?"  While Mr. Johnson stood at the wall, Officers Jones and Monarrez both directed him several times to sit on the floor.  Mr. Johnson put his back against the wall and dropped down into a semi crouch position with his back and buttocks against the wall and his feet out in front of him.

Officer Jones stated, "I'm not going to tell you again, all the way down."  Mr. Johnson did not sit on the floor.

## Detention:

Officer Calderon directed Robert Johnson to "not leave," when Johnson stood at the open elevator door.  Calderon further advised Johnson that other Police Officers were en-route and that Mr. Johnson needed to wait for them to arrive.  Mr. Johnson complied with this verbal direction and let the door to the elevator close.  He (Johnson) then stood at the railing and watched as other Officers arrived.  Mr. Johnson can be heard on his phone stating, "I need to wait."  He then stood and waited until the elevator arrived and Officers Jones, Monarrez and Bridges got out.

## Opinion:

It is my opinion, based on the totality of my training, experience and education, and review of the facts in this case, that Mr. Johnson was, at that moment, detained.  It is further my opinion that he had clearly submitted to verbal direction from Officer Calderon that he "not leave."

It is further my opinion that this detention, by Officer Calderon, was lawful under the totality of the circumstances known to him at the time.

## Terry Frisk

It is my opinion, again, based on the totality of my training, experience and education, and review of the facts in this case, that Officers Jones and Monarrez , immediately upon exiting the elevator, did approach Mr. Johnson and did conduct what is known as a Terry Frisk.  This frisk is a limited pat down of a subject's outer clothing for weapons.

Mr. Johnson submitted to this frisk without objection and even volunteered the fact that he may have a pocket knife in one of his pockets, although none was found.  Mr. Johnson, submitting to this frisk is one more demonstration of the fact that he had submitted to the investigative detention by the responding officers.

It is further my opinion that this frisk by Officers Jones and Monarrez was lawful under the totality of the circumstances known to them at the time.

## Use of Force:

Certain facts in this case are obvious and undisputed.  One is the fact that Mr. Johnson was told several times by 2 or maybe 3 different officers to sit "in the corner" or "on the floor".  Another is the fact that Mr. Johnson did not do so.  Why Mr. Johnson did not put his butt on the floor is a question that I can not answer.  It appears that he may have taken offense to being told to "sit over there in the corner" because he made a statement to the effect of asking, "Why do I have to sit in the corner like a fucking 2 year old?"  Mr. Johnson is probably the only person that can say why he failed to put his butt on the ground as he was directed to do.

When Mr. Johnson was interviewed by Scottsdale Police Detectives who were charged with conducting a criminal investigation into this situation, he stated,

> "He told me to stop.  We got other people coming.  And he told me stand in the corner.  I'm not in trouble.  I'm not no kid.  I'm not a 2 year old, OK."

Another undisputed fact is that as a result of Mr. Johnson's failure to sit on the floor, Officers Jones, Calderon and Monarrez used force against Mr. Johnson to force him to the ground.

This force included a failed leg sweep, two knee strikes to the abdomen, Five closed fist strikes and one elbow strike to the head, delivered by Officer Jones.

Officer Monarrez delivered one closed fist strike to Mr. Johnson's face/head.

Officer Calderon delivered two, or possibly three closed fist strikes to Mr. Johnson's shoulder area.

All of the above described strikes occurred as Mr. Johnson stood, with his back against the wall and his arms down at his side, over the course of approximately 9 seconds. As Officer Jones delivered the last strike, a right elbow strike to Mr. Johnson's forehead, Mr. Johnson is sliding down to the floor, apparently as Officer Calderon has grabbed one of Johnson's feet and pulled it out from under him. Mr. Johnson is limp and it appears that he is unconscious as he slides down the wall to the floor.

## Opinion

It is my opinion, again based on the totality of my training, education and experience as a police officer in the State of Arizona for over 35 years, that each strike described, landed in a flurry, (12 strikes in approximately 9 seconds) was excessive and unreasonable under the circumstances.

As a (retired) police officer I understand that there are times and circumstances when fist strikes, elbow and knee strikes are both appropriate and reasonable. As a police officer I have used fist, elbow and knee strikes. As a supervisor for 28 years of my 35 year career I have been responsible to review and investigate the appropriateness of such uses of force. As a Police Commander for over 14 years it was my responsibility to review and approve Use of Force reports involving similar uses of force. I have found in many circumstances that these types of force were appropriate and reasonable.

As a Police Procedures expert over the last 10 years I have defended similar uses of force under varying circumstances. When asked to do so, I frequently refer to the 1989 U.S. Supreme Court opinion in Graham v. Connor. I find the case to be a useful measuring stick as to the appropriateness and reasonableness of different levels of force.

The Court's opinion in Graham v. Connor is that an objective reasonableness standard should apply to a civilian's claim that law enforcement officials used

excessive force.  The opinion further speaks to an attempt to view the circumstances through the eyes of a reasonable officer on the scene as opposed to 20-20 hindsight.  Further, the opinion speaks to rapidly changing circumstances and whether officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

I think it is interesting to note that in 1989, when the U.S. Supreme Court ruled in the Graham v. Connor case, there were no Body Worn Cameras attached to our Police Officers.  There were far fewer, if any, fixed post video monitoring cameras.  In this particular case there are both.  Video from various Body Worn Cameras and surveillance video from the apartment complex surveillance system provide us with an accurate view of the rapidly changing circumstances and allow us to better view the situation through the eyes of a reasonable officer on the scene, rather than through 20-20 hindsight.

In this case, we have oral statements and reports written by officers involved.  Officer Jhonte Jones, the officer with disposition on this call, wrote the Department Report.  Officer Jones is very articulate and his written report is very detailed.

In the absence of video, we would be forced to determine the objective reasonableness of the force used by Officers Jones, Monnarez and Calderon against Mr. Robert Johnson solely on the statements of the individuals involved and reports written by the officers.  This case is somewhat unique, however, because there is video.  The video consists of footage from various officers' body worn cameras as well as a static surveillance camera at the apartment complex.

It is my role as a Police Procedures Expert to review all the material available and then, based on the totality of my training, education and experience, offer my opinions to the issues of the matter at hand.  I understand it is not my role to question the credibility of any of the witnesses and I try hard not to do so.

I have reviewed the various videos, recorded on May 23, 2018, at 701 E. Main St. Mesa, Arizona.  I have reviewed Officer Jones written report and his oral

statement to Professional Standards Investigators. In a perfect world, the videos, witness statements and police reports would match. I have found that this rarely occurs and this case is no different.

I understand that how we remember things has a tendency to change over time. I think the video captures what happens, and does not change.

It is my opinion that the objective reasonableness standard set down in by Graham v. Connor is not met in this case and that the strikes delivered by Officers Jones, Monnarez and Calderon against Mr. Robert Johnson were all clearly excessive, unreasonable and not authorized by law.

The Mesa Police Department has a procedure in place similar to many other organizations where officers must report certain uses of force to their supervisor and the supervisor is responsible to prepare a Use of Force report. As is often the case, the report is prepared by a Sergeant and given to a Lieutenant for the first level of review. If and when the Lieutenant is satisfied that the report is an accurate reflection of what occurred and that it properly measures what occurred against department policies and procedures, she/he forwards the report with their approval and or recommendations for correction to a Commander.

The Commander is then responsible for the second and usually final level of review. In this particular case the Lieutenant involved was Timothy Wahlberg. Lt. Wahlberg was interviewed by Professional Standards Bureau, at least in part, because it took him 12 days to forward the report to his Commander. Following are questions and answers from his P.S.B. interview (page 7)about why it took him 12 days to forward the report.

Okay, in reviewing the report, did you have any concerns?
288
289 A: I did, yes.
290
291 Q: And what were those concerns?
292
293 A: Uh, when I saw the initial video it didn't look good. Uh, the - the, uh, multiple
294 strikes, uh, to the citizen, um, but, uh, I - I always - that - that's, uh, my - in
295 reviewing this I looked at the Axon video first and I saw that and I didn't - I
296 wasn't - it didn't look good but then I don't leave it at that. Obviously I have

24

297 to review the police reports and any other documentation that's there. So I
298 reviewed the supplements and all the - of the re- the report and all the
299 supplements and specifically with, uh, Officer Jones, um, I - I reviewed his
300 supplement which I thought was very well written, very well-articulated, uh,
301 the reasons why he used the force he used and, uh, um, I felt in reviewing in
302 the totality of everything I saw that - that his force was reasonable based on
303 the circumstances he spelled out. Me being not there just relying on what I
304 have available which is the two-dimensional video and the police report, um, I
305 made that statement. Now I'll say that - that from my perspective and my
306 review I felt that his force was justified or that it was reasonable, um, but it
307 was also concerning because videos are - I know in this day and age videos
308 are all people look at so that's why I also forwarded it to the commander
309 because I knew he - it was something that he should've - he should be aware
310 of.

It is my opinion that Lt. Wahlberg failed in his responsibility as the first level of review in the Use of Force system when he accepted Officer Jones written justification of his use of force. Lt. Wahlberg points out the fact that Officer Jones report is "well written" and "very well articulated as to the reasons why he used the force he used." He further discounted the video, although admitting that "it didn't look good," as "two dimensional."

Lt. Wahlberg stated that he met with Commander Quesada personally, the day he finally forwarded the Use of Force report to him. He explained this meeting to P.S.B. Investigators:

319 as soon as he came in I walked upstairs and talked to him in person about it, as
320 well as, the email I sent.
321
322 Q: All right and the conversation with Commander Quesada can you...
323
324 A: It was basically what I told you, that I reviewed it. It - it doesn't look good,
325 um, but - but I think the officer clearly spelled out to what - it was a well
326 written report that justified the actions that he took and, uh, that I feel that the
327 force was justified but I wanted him to be aware of it because I - I - it's
328 reasonable to assume that something's gonna come down.
329
330

It is my opinion that Officer Jones, on May 23, 2018, did not fully understand the difference between a temporary investigative detention based on reasonable

25

suspicion and a full custody arrest based on probable cause.  I say that because, while being interviewed by Professional Standards Bureau Investigators and in attempt to justify his numerous fist, knee and elbow strikes to Mr. Johnson he stated that he did so in an attempt to "complete the detention."

At another point in his PSB interview, Officer Jones stated;

> "Um, I assumed and I trusted the other officers that they would support that, bein' that I was - I  considered myself the lead officer, uh, in that - in that incident. In that altercation. So, um, I understood that their job was gonna be to support whatever I was doing, uh, in trying to get Mr. Johnson into custody."

Further, Officer Jones stated;

> "everything else, that was, um, purposefully done not to allow him the option and the time to launch an offensive strike and to bring this - this, uh, detainment to a close as fast as possible."

In his Department report, Officer Jones

> "Recognizing this i decided to detain Johnson as soon as possible to prevent him from formulating a strategy. This would also lessen the chance of officers having have to detain a ready and mentally prepared subject."

Officer Jones was asked by PSB Investigators if he considered Mr. Johnson to be a violent person.  His response was,

> "at the time of - of attempting to take him into custody or detain him, um, he was 100%, in my mind, a violent subject at that point."

It is my opinion that these statements are clear examples of Officer Jones' inability to differentiate between a temporary investigative detention based on reasonable suspicion and a full custody arrest based on probable cause.

Officer Jones spoke to P.S.B. Investigators about how training has been updated within the Mesa Police Department since he has been a Defensive Tactics Instructor.  He stated;

"You know, more line - more aligned with how we're governed, you know, through law. Which is if you perceive the threat, we - if it came to the point where we were waiting for things to happen

and, in essence, you know, compared to departments across the country, we were using far less force than we were justified in using. And when you stack those numbers next to how we're getting hurt and how many officers are getting hurt, you can probably say that's because they either waited too long or weren't decisive enough when they actually acted. And so you know, as time went on, training evolved to, okay."

Officer Jones then goes on to describe a training scenario used in the Academy as an example of how Mesa Officers are trained to act. This scenario, "Drunk in the Park", as described by Officer Jones is a situation where Officers are given probable cause for a lawful arrest and then forced to escalate their use of physical force against the subject who resists their attempts to take him into custody.

Officer Jones talks about using fist strikes to the head/face. He states;

> Understand, face strikes during these scenarios were taught , if you're good to throw one, you can throw multiple. You can throw one. You can throw two. You can throw three. However, many it takes to effect and get this person to react, from whatever it is you're doing. Once that reaction is perceived by you, now, as the student in this scenario, you have to recognize that it's taking effect.And as it's taking effect,you have to de-escalate and come back down with your use of forces and your means, and use what's necessary and reasonable to get this person into custody.

I must emphasize, once again, when Officers contacted Mr. Johnson, there was no probable cause that he had committed a crime. There was no reason to attempt to take him into custody. I agree that there was reasonable suspicion to believe that he was involved in the call and I think it was reasonable and lawful to temporarily detain him while investigating further. Mr. Johnson had submitted to Officer Calderon's verbal direction to not leave. He was, at that moment being detained. I think that detention was lawful and proper. Johnson verbalized his understanding and willingness to be detained by telling his Mother, by phone, "I gotta wait." Mr. Johnson then further submitted to the detention when he allowed Officer Jhonte Jones and Rudy Monarrez to conduct a "Terry Frisk" of his person . Mr. Johnson walked away from the railing to the wall as directed to do so by officers. When told to sit, he leaned against the wall and put his back and butt against the wall. There should be no doubt in the mind of any reasonable officer on the scene that understands the concept of temporary investigative detention, Mr. Johnson was detained.

There was no indication, whatsoever, that Mr. Johnson may try to escape. He had voluntarily submitted to be detained while officers conducted their investigation.

Officer Bridges arrived in the same elevator as Officers Jones and Monarrez.  He stood next to Officer Jones as they directed Mr. Johnson toward the wall.  Officer Bridges, who was the only officer of the four present who did not strike Mr. Johnson, was asked to describe Mr. Johnson's demeanor by PSB Investigators.

He responded,

> "I guess like **carefree**, like uh,  I can, like he can care less.  Uh, like we, it didn't matter that we were there.  Um, you know, just, he did – on, stayed on the phone you know.  If, if we were not there he was acting as if he was totally by himself and no matter what anybody said to him he pretty much was just kinda like, whatever."

Officer Jones was also asked by PSB Investigators to describe Mr. Johnson's demeanor.  His response;

> "Uh, Mr. Johnson - he was standing on the rail - or leaning on the rail, um, and he was talking on the phone. Um, I guess later we assessed that it was to his mom or his girlfriend or whoever it was. Brother. I don't know. And, uh - and his initial demeanor seemed to be, um - I don't know the best term for it. Confrontational or more, uh, indirectly confrontational, if you will. More ignoring - tryin' to ignore us, um, basically. Yet he would offer - 'cause he - he heard everything we're tellin' him to do. Uh, so you know, as we're talking to him and he's talking on the phone, tryin' to ignore us, he would address something that we said. Like, "Why do I need to get off the phone?" Or, you know, uh, something to that sort. Um, and there were expletives, um, while he was talking and conversing back and forth with us. So, uh, that was my initial - my initial, uh, perception. That he was somewhat confrontational, and he wasn't going to - or he wasn't obeying commands..."

The fact that Officer Jones describes Mr. Johnson's demeanor as being confrontational when first asked by PSB Investigators is in conflict with other comments he makes toward the end of the same interview.  On page 38, line 1702, Jones stated,

> "As I arrived, um, obviously, he seemed not to be taking this incident seriously."

I have concerns about the discrepancy between Officer Bridges' and Officer Jones' perception of Mr. Johnson's demeanor.   Both Officers stood toe to toe with Mr.

28

Johnson at the exact same time and had perceptions of his demeanor that I think could be described as diametrically opposed. I think in cases like this, the video becomes much more important in attempting to see things as each particular officer did.

We are at a disadvantage to see exactly what Officer Jones observed and compare it to Officer Bridges' view because Officer Jones failed to activate his Body Cam video, in violation of existing department policy.

While Mr. Johnson was leaning against the wall with his back and butt on the wall and his feet extended out in front of him, Officers Monarrez, Jones and Bridges approached him. Officer Jones told Mr. Johnson, "I'm not going to tell you again, all the way down."

Officer Jones, on page 7 of his Department Report, states,

> "Johnson then bound off the wall toward me."

As a result of this "bound", Officer Jones stated he clasped the base of Mr. Johnson's skull to control his head movement and prevent head butts. Officer Jones then delivered either 2 or 3 knee strikes to Mr. Johnson's abdomen.

I don't know what a "bound" is to Officer Jones but I think it's reasonable to assume that it should be a movement of some sort that would be captured by video footage.

I have reviewed the footage numerous times. I can not see any movement on Mr. Johnson's part that I think could reasonably be described as a "bound." Again, I think this is a noted discrepancy between the various video angles and Officer Jones written report.

One fact in this case remains indisputable. That is, Mr. Johnson was told several times, by 2 or 3 different officers to sit his butt on the ground. Unfortunately, all of the officers were yelling at Mr. Johnson at the same time, so it is difficult to know what he really understood. He did not sit on the ground. For that, Officer Jones delivered 2 knee strikes to Mr. Johnson's abdomen, 5 fist strikes to his left

jaw and lastly an elbow strike to his forehead, all of which, in my opinion, were both excessive and unreasonable under the circumstances.

While Jones was doing so, Officer Monarrez also struck Mr. Johnson once with a fist strike to the right side of his head.  It is my opinion that this fist strike by Officer Monarrez was excessive and unnecessary under the circumstances.

Also, during the same few seconds that Officers Jones and Monarrez are striking Mr. Johnson, Officer Calderon, who had also approached on foot, delivered 2 or 3 fist strikes to Mr. Johnson's left shoulder area.  It is my opinion that these strikes, delivered by Officer Calderon, were excessive and unnecessary under the circumstances.

While the Mesa Police Department Professional Standards Bureau was conducting their administrative investigation into Mr. Johnson's arrest and the Scottsdale Police Department was conducting a criminal investigation into the incident, the City of Mesa, at the encouraging of then Mesa Police Chief, Ramon Batista, hired an independent Police Use of Force Expert (John McMahon) to conduct an independent review of the incident.

Mr. McMahon is a nationally recognized expert in use of force incidents in police work.  He was retained by the City of Mesa in this matter, not to serve as an expert witness for either the plaintiff or defense, but to provide an independent review of the use of force in the Robert Johnson arrest.

Mr. McMahon submitted a written report to Chief Batista, dated October 6, 2018. In this report Mr. McMahon stated that it was his opinion, based on his experience, education and training, that each of the "Strikes" delivered to Mr. Johnson by Officers Jones, Calderon and Monarrez were, **"DISPROPORTIONATE, UNNECESSARY AND OBJECTIVELY UNREASONABLE."**  (McMahon report; p 12)

I have reviewed Mr. McMahon's report and am in complete agreement with his findings that each of the strikes, by Officers Jones, Calderon and Monarrez were "disproportionate, unnecessary and objectively unreasonable."

When deposed under oath, Officer Jones stated that it was his opinion that his actions, including the above described strikes were proper, and within policy and training. Officer Calderon, again under sworn deposition, stated that his actions, including the strikes he delivered, were proper and necessary. Officer Monarrez, when deposed, stated that his actions were also proper, in accordance with the policy, as it existed at the time.

This statement, by Officer Monarrez, seems to refer to the fact that then Police Chief Ramon Batista, issued a special order to the Mesa Police Department Use of Force policy within a month of the arrest of Robert Johnson. This special order seems to further restrict the use of fist strikes by officers.

The problem is that the actions of Officers Jones, Calderon and Monarrez fail to comply with the objective reasonableness criteria as set forth in the 1989 U.S. Supreme Court ruling in Graham v. Connor. There was nothing objectively reasonable about their actions, based on the totality of the circumstances that they were presented on May 23, 2018.

My opinions in this case are based on the totality of my education, training and experience as a certified peace officer in the State of Arizona for over 35 years, and on a review of supplied materials in this case. If I am provided with further facts and/or documentation for review, I may have and express additional opinions.

Pursuant to Rule 80(i) ArizR. Civ.P.and 28 U.S. Code Section 1746, I state under penalty of perjury that the foregoing is true and correct. Executed on March 3, 2020.

Respectfully submitted,

George J. Richards

# George J. Richards

## Addendum A: Personal Qualifications
## Education

1974 – B.S. Police Science and Administration. Northern Arizona University. Flagstaff, Arizona.

1980 - M.S. Police Science and Administration. (Education emphasis) Northern Arizona University. Flagstaff, Arizona.

1983 - Lifetime Arizona Community College Teaching Certificate (No 4939 awarded on 5-18-83).

1992 -1997 - Course work completed for Ph.D. in Justice Studies; Arizona State University. Tempe, Arizona.

2000 - Certified by the City of Phoenix Personnel Department as "proficient" in Spanish for Court purposes. (Spanish Language studies, earned 48 credit hours, Phoenix College and Gateway Community College; 6 graduate credit hours, Arizona State University).

## Experience

February, 1975 – March, 2010 - Certified Peace Officer, State of Arizona; Employed with City of Phoenix Police Department, Phoenix, Arizona.

May, 1975 - Graduated from the Phoenix Regional Police Academy; Earned Top Overall Recruit for Class 122.

## Assignments as a Police Officer

Uniform Patrol

Recruit Training Officer; Classroom Instructor. Phoenix Regional Police Academy.

Certified Field Training Officer

Crime Prevention Unit (plain clothes assignment). Central City Precinct.

Special Assignment Unit. (SWAT).

Promoted to Police Sergeant in 1982.

## Assignments as a Police Sergeant

Uniform Patrol
Special Assignments Squad. Uniform Precinct level.
Community Relations Bureau; Public Information Officer
Basic Training Sergeant; Classroom Instructor; Phoenix Regional Police Academy
Street Crimes Squad (plain clothes assignment); Maryvale Precinct.
Internal Affairs Bureau. (Investigated allegations of officer misconduct; Officer involved shootings/Use of Force incidents/In custody deaths).
Promoted to Police Lieutenant in 1988.

## Assignments as a Police Lieutenant

Uniform Patrol.
Internal Affairs Bureau. Inspections/Investigative Lieutenant.
Organized Crime Bureau; Vice Unit.
Basic Training Lieutenant; Phoenix Regional Police Academy
Promoted to Police Commander in 1996.

## Assignments as a Police Commander

Duty Commander. Acting Police Chief during non business hours.
Precinct Commander; Central City Precinct.
Community Relations Bureau Commander.
Administrative Commander. Police Chief's Office.
Precinct Commander; South Mountain Precinct.
Tactical Support Bureau Commander.
Professional Standards Bureau (Internal Affairs) Commander.
Honorably Retired. March 30, 2010.

## Other Professional Experience:

June 1993 - Graduated, F.B.I. National Academy, 173rd Session. Quantico Virginia.
November 1994 - Haitian Transitional Police Training. Port au Prince, Haiti. (International Criminal Investigative Training Assistance Program).
May –July, 1999 - International Law Enforcement Exchange Program. San Jose, Costa Rica. (International Association of Chiefs of Police).

2006 – 2010 - Project Team Member, Standards and Guidelines for Internal Affairs. U.S. Department of Justice. Office of Community Oriented Policing Services.

Assessment Boards Assessor for promotional candidates for the Phoenix Police Department and other agencies as listed below:

Detroit, Michigan. Investigator/Sergeant and Lieutenant's process. March 19 to April 5, 1995.

Minneapolis, Minnesota. Lieutenant's assessment center. November 17, to November 21, 1996.

San Francisco, California. Assistant Inspector oral examination process. April 14, to April 24, 1998.

San Francisco, California. Sergeant's oral examination. February 5 to February 11, 2001.

Portland, Oregon. Captain's assessment process. December 5 to December 9, 2001.

Oro Valley, Arizona. Lieutenant's assessment process. November 15 to November 17, 2004.

## Training

Documented law enforcement training in chronological order:

2-10-75 through 5-23-75 - Phoenix Regional Police Academy

2-9-77 - Defensive Driving; 8 hrs.

3-22-78 - Officer Survival; 8hrs.

9-14-78 - New Criminal Code; 4 hrs.

10-14-78 - New Criminal Code; 8 hrs.

7-10-79 to 7-11-79 - Field Training Officer School; 16 hrs.

1-31-80 to 2-1-80 - Report Writing seminar; 16 hrs.

1-21-80 to 1-25-80 - FBI Instructor School; AZPOST General Instructor Certification; 40 hrs.

11-81 - Interpersonal Effectiveness; 12 hrs.

2-82 - Rookie Sergeant School; 80 hrs.

1-24-83 to 1-28-83 - Physical Fitness Instructor School; 40 hrs.

2-9-83 - Management Development I; 8 hrs.

4-22-83 - In Service Module 1; 8 hrs.

9-19-83 - In Service Module 2; 8 hrs.
3-29-84 - In Service Module 3; 8 hrs.
9-6-84 - In Service Module 4; 8 hrs.
11-84 - Verbal Judo (Train the Trainer); 24 hrs.
4-3-85 - In Service Module 5; 8 hrs.
2-1-86 - City of Phoenix Supervisors' Academy (Session #1); 40 hrs.
4-23-86 – In Service Module 7; 8 hrs.
12-3-86 - In Service Module 8; 8 hrs.
1-20-87 to 1-23-87 - Middle Management; 32 hrs.
4-16-87 - In Service Module 9; 8 hrs.
5-20-87 to 5-21-87 - Dignitary Protection; 16 hrs.
10-5-87 to 10-7-87 - Managing the Internal Affairs; 24 hrs.
12-2-87 - In Service Module 10; 8 hrs.
6-15-88 - In Service Module 11; 8 hrs.
2-6-89 - Hazardous Materials; 8 hrs.
2-7-89 to 2-10-89 - Results Oriented Management
2-28-89 -In Service Module 12; 8 hrs.
3-21-89 - In Service Module 13; 8 hrs.
4-19-89 to 4-21-89 - High Performance Police Management; 16 hrs.
6-6-89. In Service Module 14; 8 hrs.
2-27-90 - In Service Module 15; 8 hrs.
5-16-91- In Service Module 16; 8 hrs.
6-25-91 - Recognizing and Handling the Problem Employee; 8 hrs.
11-26-91 - In Service Module; 8 hrs.
1-30-92 - Gunshot Residue Training; 3 hrs.
3-23-92 - Advanced Drivers Training; 6 hrs.
7-28-92 - Incident Command System; 6 hrs.
1-27-93 - Cultural Diversity (Train the trainer); 12 hrs.
3-8-93 - Sexual Harassment; 2 hrs.
4-1-93 - Incident Command System; 2 hrs.
4-5-93 to 6-18-93 - FBI National Academy.
3-2-94 - Community Based Policing/ Critical Incident Stress Debriefing; 6 hrs.
6-94 - Leadership through People Skills; 32 hrs.
9-94 - FBI Fall Retrainer; Flagstaff, AZ; 8 hrs.
12-94 - POPAT Administrator; 4 hrs.
3-14-95 - In Service Module (Community Based Policing, Use of Force and Search and Seizure); 8 hrs.

12-95 to 1-96 - Basic Spanish for Law Enforcement; 80 hrs.

12-28-95 - Bias Crimes (Train the Trainer); 28 hrs.

3-96 - Spanish for Law Enforcement; 80 hrs.

10-96 - Grant Sustainment; 20 hrs.

4-97 - Hate Crimes Seminar; 8 hrs.

6-97 - Spanish Language Immersion. Hermosillo, Sonora; 80 hrs.

2-18-98 - In Service Module (Ethics, Visions and Values and Ethics); 8 hrs.

6-16-98 - In Service Module (Small Team Tactics, Use of Force/Personal Weapons); 8 hrs.

6-98 - Experiential Domestic Violence; 4 hrs.

5-99 - Leadership in the 21st Century; 3 hrs.

5-18-99 - In Service Module (Domestic Violence, OC spray, Carotid/Ripp Restraint, Firearms Issues and Shooting Fundamentals); 8 hrs.

6-2-99 - Shotgun Qualification; 3 hrs.

6-99 - Management/Labor Relations; 8 hrs.

10-99 - Ethics; 4 hrs.

2-2000 - Managing the New Breed; 16 hrs.

9-2000 - FBINAA Retrainer; Flagstaff, AZ; 10 hrs.

12-2000 - Enlightened Leadership; 8 hrs.

10-01 - FBINAA Retrainer/ Page, AZ; 16 hrs.

4-02 - FBINAA Retrainer/ Scottsdale, AZ; 7 hrs.

4-03 - Officer Involved Shootings ; 6 hrs.

4-03 - Labor/Management (Employer/employee) Training; 4 hrs.

4-04 - PERF Conference/ San Antonio, TX; 24 hrs.

6-14-04 - Incident Command; 8 hrs.

6-18-04 - Spill Response Training; 24 hrs.

4-05 - FBINAA Retrainer/Police Ethics; Mesa, AZ. 6hrs.

6-05 - Equal Opportunity Training; 2 hrs.

6-05 - FBINAA Opportunity Training; 2 hrs.

10-05 - FBINAA Retrainer/ Cottonwood, AZ. 7 hrs.

2-06 - National Incident Management System

3-27 to 3-30-06 - Early Identification and Intervention Best Practices Training; 24 hrs.

5-10-07 - FBINAA Retrainer/Laci Peterson Case Presentation; Mesa, AZ.

10-31-07 - Labor/ Management training; 2 hrs.

# Fee Schedule

Case review and report preparation; $175.00 per hour.

Travel time; $75.00 per hour.

Deposition and court testimony; $1,200.00 for up to 4 hours; $240.00 per hour after 4 hours. Deposition fees are due in advance or at the time of deposition.

Actual reimbursement for all related travel expenses.

# Case Testimony

In accordance with Federal Rules of Civil Procedure (Rule 26); disclosing testimony at trial or deposition:

I have testified in the past as a witness of fact and been deposed, both in Criminal and Civil cases in accordance with my duties as a sworn Peace Officer of the State of Arizona, and an employee of the City of Phoenix Police Department.

# Expert witness testimony

I have been retained as an expert witness and been deposed and given testimony in Court in the following matters:

1. In July, 2011, I testified in Pima County Superior Court in the matter of Gendler/Ramirez v. Cochise County et al. This testimony was as an expert witness for the defense.

2. I was retained as a police procedures expert by the Defendants in the civil lawsuit of Reyes, et al., v. City of Tucson, et al., United States District Court Case No. CV 10-193 TUC DCB, and reviewed materials in the case. I submitted a report of my opinions in this case on November 10, 2010. It is my understanding that this case was later dismissed.

3. I have been retained as an expert witness for the defense in the matter of Sanchez v City of Tucson et.al.
United States District Court Case No. 14-CV-01903-TUC-JAS
I was deposed in this matter on September 18, 2015.
Testimony was provided in U.S. District Court on December 13 and 14, 2017.

4.  I was retained as an expert witness for the defense in the matter of Romero  v City of Tucson
    United States District Court Case No. CV-13-01115-TUC-DCB
    I submitted a report in this matter but was neither deposed nor did I testify.  It is my understanding that this case has been dismissed.

5.  I was retained as an expert witness for the defense in the matter of Schouler v. Dupnik et. al.  Pima County Superior Court.
    I was deposed in this matter in January, 2015 and testified in Pima County Superior Court in October, 2015.

6.  I was retained as an expert witness for the defense in the matter of Chevalier v. Mohave County et. al.  It is my understanding that the defendant I was retained to represent, Mohave County, has been removed from this case.

7.  I have been retained as an expert witness for the defense in the matter of Rizzo v. City of Phoenix.  Complaint No. CV 2015-005312.  This case is pending in Maricopa County Superior Court.  I was deposed in this matter in July, 2016.  It is my understanding that this case has been settled.

8.  I was retained as an expert witness for the defense in the matter of Stock v City of Tucson/Quezada/Santos
    Pima County Superior Court Case No. C20144597.  It is my understanding that this case has been resolved and I have no further involvement.

9.  I have been retained as an expert witness for the defense in the matter of Chambers v. City of Phoenix.  Complaint No. .  CV-15-740-PHX-SMM. I was deposed in this matter in August, 2016.  I did not testify in court in this matter.  Disposition of the case is unknown.

10. I was retained as an expert witness for the defense in the matter of Engleman v. City of Phoenix; et. al.  United States District Court; NO. CV-14-01807-PHX-DJH-(DKD)

I submitted a report in this matter and was deposed in September, 2016.  It is my understanding that this case has been resolved and I have no further involvement.

11.  I have been retained as an expert witness for the defense in the matter of Martinez v. Smith/Humphries pending in United States District Court. United States District Court; NO. CV-15-00117-TUC-JGZ . This case has been dismissed on summary judgment.

12.  I have been retained as a Police Procedures consultant for the defense in the matter of Decker v. City of Tucson, United States District Court, Case No. CV-16-00551-TUC-CKJ.  I submitted a report in this matter.  I was not deposed.  Case was voluntarily dismissed by Plaintiff.

13.  I have been retained as a Police Procedures consultant for the defense in the matter of Miles Parish v. Troy Lansdale, et al.  District Court of Arizona; Case No. 4:17-cv-00186-JGZ.  I have submitted a report in this matter and the case is pending.

14. I have  been retained as a Police Procedures consultant for the defense in the matter of Aaron Harvey Beitch v. Chris Magnus et al. District Court;  Case No. 4:18-cv-0067.  I have submitted a report in this matter and the case is pending.

15. I have been retained as a Police Procedures consultant for the defense in the matter of Lucha Unido de Padres y Estudiantes (LUPE) v. Tucson Police Officers Green et al.  US District Court No. CV 18-00085-TUC-FRZ. I submitted a report in this matter On May 28, 2019.  I have not been deposed and have not testified.

16.  I have been retained as a Police Procedures consultant for the defense in the matter of Cutler vs. Pima County, et al  U.S. District Court;  No. 18-CV-00383-FRZ.  The deadline for my report in this case is November 7, 2019.

17. I have been retained as a Police Procedures consultant for the defense in the matter of Paul Holguin v. Napier (Pima County), Brian Hill. C20192192.