SH

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Robert Johnson, | No.  CV 19-02827-PHX-JAT (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| City of Mesa, et al., | |
| Defendants. | |

Plaintiff Robert Johnson, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona law.  (Doc. 41.)  Defendants move for summary judgment (Docs. 174, 176, 181, 182), and Plaintiff opposes (Docs. 188–191). Also before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. 177), which Defendants oppose (Doc. 187).

## I.    Background

In his First Amended Complaint (Doc. 41), Plaintiff sues the City of Mesa ("the City") and Mesa Police Department (MPD) Officers Jhonte Jones, Rudy Monarrez, and Ernesto Calderon based on events stemming from Plaintiff's May 23, 2018 arrest.  In Count One, Plaintiff brings a state law assault and battery claim against all Defendants.  (*Id.* ¶¶ 54–59.)  In Count Two, Plaintiff brings a state law negligence claim against the City. (*Id.* ¶¶ 60–65.)  In Count Three, Plaintiff brings § 1983 Fourth Amendment excessive force claims against Defendants Jones, Monarrez, and Calderon.  (*Id.* ¶¶ 66–69.)  In Count Four, Plaintiff brings a § 1983 policy claim against the City.  (*Id.* ¶¶ 70–75.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the Court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The Court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

. . .

. . .

. . .

### III.     Relevant Facts

Consistent with the legal standards discussed above, the following recounting of the facts (unless otherwise noted) accepts as true the nonmovant's evidence and draws all reasonable inferences in the nonmovant's favor.

### A.     The 911 Call (*See* Defs.' Ex. 1, Flash Drive, Audio of 911 Call.)

On May 23, 2018, C. Diaz called 911 and asked for officers to be sent to his girlfriend, K. Luevano's, apartment on the third floor of a large apartment complex.  (Doc. 172 (Defs.' Statement of Facts) ¶ 1.)  Diaz reported that Luevano's ex-boyfriend, later identified as E. Reyes, had come to the apartment, threatened them, and tried to force open the door.  Diaz informed the dispatcher that Reyes had choked Luevano a couple of days before and that Reyes still had a key to the apartment.  Diaz also informed the dispatcher that there were three children sleeping in the apartment.  Diaz reported that Reyes had left about three minutes before Diaz made the 911 call and that Reyes had stated that he was going to come back with his "strap," meaning a gun.  Diaz informed the dispatcher that he (Diaz) had a gun inside the apartment and that it was on the kitchen counter.  Diaz described Reyes as a 22-year-old Hispanic male, with black medium-length hair, approximately 5'8" and 170 pounds, wearing a black jacket and gray shorts.

Approximately halfway through the 911 call, Diaz reported that Reyes was back at the front door and trying to force his way through again.  At least one male voice can be heard yelling loudly in the background while Diaz is talking to the dispatcher.  Diaz informed the dispatcher that Reyes was kicking the front door.  Diaz also informed the dispatcher that one of Reyes' friends (Plaintiff herein), an African American male, was outside with Reyes, but Diaz did not know this man.  Diaz told the dispatcher, "he just kicked the door," but it is unclear whether Diaz was referring to Reyes or Reyes' friend.  Officers eventually responded to the apartment complex and made contact with Diaz and Luevano inside the apartment.

. . .

. . .

**B.**     **Body-Worn Camera Footage**[1]

Defendant Calderon was the first officer to make contact with Reyes and Plaintiff. Defendant Calderon encountered Reyes and Plaintiff in the hallway of the apartment complex as they were heading towards the elevator.  Upon seeing Reyes and Plaintiff, Defendant Calderon told them to "hang on" and "grab a seat."  Reyes sat down in the hallway with his back against the wall.  Plaintiff did not immediately stop and continued to walk towards the elevator, stood against the wall, and pushed the button to summon the elevator.  As the elevator door opened, Defendant Calderon told Plaintiff, "Do me a favor dude and don't leave.  I got other people coming.  Grab a seat if you don't mind."  Plaintiff let the elevator door close and stood near the balcony and made a call on his cell phone. Defendant Calderon began asking Reyes questions about the reported incident.  Plaintiff was still leaning against the balcony talking on his cell phone.  While Defendant Calderon was talking to Reyes, Plaintiff told Defendant Calderon, "All I came up for was to get his [Reyes'] backpack and that's it."  Defendant Calderon told Plaintiff, "Do me a favor and just wait right there in that corner for me."  Plaintiff was still leaning against the balcony on his cell phone.  Defendant Calderon said, "In the corner man," and Plaintiff replied, "I am in the corner."   The video shows that Plaintiff was standing approximately 3-4 feet from the corner—formed by the edge of the balcony and the elevator—that Defendant Calderon appeared to be pointing to.  Plaintiff continued to speak on his cell phone and lean against the balcony with his back to Defendant Calderon.  Plaintiff saw that more officers were arriving and told Defendant Calderon that they were coming up the elevator. Plaintiff commented on the number of officers arriving, stating, "Your boys [the additional officers] are showing up…What the f**k you been up to?"  Plaintiff told officers on the ground floor that they would have to wait for the elevator because some other officers had

---

[1] The facts regarding Defendants Jones, Monarrez, and Calderon's encounter with Plaintiff are primarily drawn from the AXON body-worn camera footage submitted by the parties.  (*See* Defs.' Ex. 7, Flash Drive, *Calderon AXON Video*; Defs.' Ex. 8, Flash Drive, *Bridges AXON Video*; Defs.' Ex. 13, Flash Drive, *Monarrez AXON Video*.)  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape").

just gotten on.  Plaintiff whistled as Defendants Jones and Monarrez and MPD Officer Bridges got out of the elevator.  At this time, Plaintiff had not moved from where he had been standing.  During this time, Plaintiff was leaning against the balcony railing, talking on his cell phone, with his back to Defendant Calderon and Reyes, who was still seated in the hallway with his back to the wall.  (*See* Defs.' Ex. 7, Flash Drive, *Calderon AXON Video* at 00:00–2:10.)

As Defendants Jones and Monarrez and Officer Bridges exited the elevator, Defendant Calderon told them to, "Handle this guy first," referring to Plaintiff.  Plaintiff was still leaning against the balcony railing talking on his cell phone.  Defendant Jones told Plaintiff he was going to pat him down, and Plaintiff consented to the pat down.  Plaintiff informed Defendant Jones that he might have a knife in his pocket, but there was no knife when Defendant Jones checked Plaintiff's pockets.  No weapons were found on Plaintiff during the pat down.  During the pat down, Plaintiff continued to stand in the same spot, leaning against the balcony railing and talking on his cell phone at a normal volume.  Defendant Calderon continued questioning Reyes.  (Defs.' Ex. 7 at 02:15-02:45; Defs.'s Ex. 8, Flash Drive, *Bridges AXON Video* at 01:23–01:42.)

After the pat down, Defendant Jones told Plaintiff to, "Have a seat right there by the wall," indicating the wall across from where Plaintiff had been standing.  Plaintiff was still talking on his cell phone.  Plaintiff walked over to the wall while asking, "what do I need to sit in the corner for, sounds like a f**king two-year-old?"  Plaintiff stood against the wall and appeared to be making another call or texting.  Defendant Monarrez replied, "It makes us feel comfortable," and Plaintiff responded, "For what?" (Defs.' Ex. 8 Flash Drive, *Bridges AXON Video* at 01:43–02:07.)

At this time, Plaintiff was standing against the wall.  Defendant Jones instructed Plaintiff to have a seat.  Plaintiff looked at Defendant Monarrez and stated, "Oh yeah.  You are small."  Defendant Jones told Plaintiff to have a seat again and stated, "Guess what?  I ain't gonna ask you again.  Have a seat."  Plaintiff leaned against the wall and bent his legs so that he was not fully standing, but not seated on the floor.  Defendants Jones and

Monarrez began repeating, "All the way down," as they walked towards Plaintiff.  Plaintiff was still looking down at his phone and leaning against the wall with his legs bent.  (Defs.' Ex. 8 Flash Drive, *Bridges AXON Video* at 01:43–02:07.)

Defendant Jones then appears to grab Plaintiff. At this time, two more officers stepped off of the elevator.  Defendant Monarrez grabbed Plaintiff's right arm.  Defendant Jones grabbed Plaintiff by the back of the neck and appeared to have attempted one or two knee strikes to Plaintiff's abdomen.  Defendant Calderon punched Plaintiff in the face and then grabbed Plaintiff's left arm.  An officer yelled, "Dude, they told you to sit down!" Defendant Jones punched Plaintiff in the face six times while Defendants Monarrez and Calderon secured Plaintiff's arms and while Plaintiff had his back pushed against the wall. One of the officers yelled, "Sit your ass down!" and "See what happens?" while Plaintiff was being punched.  Plaintiff did not appear to attempt to punch or hit any of the officers, and he received most of the blows to his face while he was leaning against the wall with his hands either near or at his sides or being held by the officers.  Plaintiff did not appear to attempt to flee during any part of the encounter.  Defendant Jones hesitated after the fifth punch, and at this time, Plaintiff's arms appeared to be held by Defendants Monarrez and Calderon, but Defendant Jones punched Plaintiff in the face a sixth time, and Plaintiff went down to the ground.  (*Id.* at 02:08–02:20.)  The officers rolled Plaintiff onto his stomach and handcuffed him with his arms behind his back.  (*Id.* at 2:20–02:45.)  While he was laying handcuffed on the ground, Plaintiff yelled and cursed at the officers.  (Doc. 178 (Pl.'s Statement of Facts) ¶ 33.)

Later, as the officers were carrying Plaintiff to the elevator to go downstairs, Plaintiff yelled at one of the officers, "How pretty are you?!"  Based on the way Plaintiff enunciated the "p" in "pretty," the officer accused Plaintiff of trying to spit on him, and the officers pushed the side of Plaintiff's face into the elevator door so that he was facing away from them.  (Defs.' Ex. 13, Flash Drive, *Monarrez AXON Video* at 08:27–08:46.)  The officers put Plaintiff in a spit mask and eventually carried him downstairs and placed him

in the back of a patrol unit for transport to jail; Plaintiff continued to curse at the officers. (*Id.* at 16:16–16:26, 18:16–19:08.)

### C.   Plaintiff's Version of Events

Plaintiff asserts that when he first encountered Defendant Calderon in the hallway of the apartment complex, he complied with Defendant Calderon's instructions not to leave and began using his cell phone while standing on the balcony.   (Doc. 178 ¶¶ 5–6.) Defendant Calderon began speaking with Reyes, who was seated on the ground around the corner from the elevator, and Plaintiff explained to Defendant Calderon that Reyes "just needed his backpack" and that he had accompanied Reyes to get the backpack.  (*Id.* ¶¶ 7–8.)   Defendant Calderon informed Plaintiff that other people were coming; Plaintiff continued to use his cellphone while standing against the balcony railing.  (*Id.* ¶¶ 9–10.) At his deposition, Defendant Calderon testified as follows:

> Q. . . . I asked whether or not at the time that he was beaten, he was not under arrest, correct?
>
> [objections omitted]
>
> THE WITNESS: At the time of the appropriate use of force, no, he was not under arrest. He was being detained.
>
> Q. BY MR. ROBBINS: And there was no probable cause to believe that he had committed a crime, correct?
>
> [objections omitted]
>
> THE WITNESS: We were working on that. The investigation was still processing.
>
> Q. BY MR. ROBBINS: So at the time of the beating, there was not probable cause to believe that he would be arrested, correct?
>
> [objection omitted]
>
> THE WITNESS: At the time of the use of force, we didn't have probable cause to arrest him, but we had a right to detain him.

(Doc. 192 ¶ 183.)

Other officers arrived on the scene, and Defendant Jones asked to search Plaintiff for weapons, and Plaintiff complied. (Doc. 178 ¶¶ 12–13.) When Defendant Jones finished his search, he asked Plaintiff to move to the wall across from the balcony and "have a seat" against the wall. (*Id.* ¶¶ 16, 18.) Plaintiff moved toward the wall, continued to try to use his cellphone, and asked, "what do I need to sit in the corner for?" (Doc. 192 (Pl.'s Statement of facts) ¶ 167.) An officer asked Plaintiff again to "have a seat, have a seat" against the wall. (*Id.* ¶ 171.) Defendant Jones stated, "I ain't gonna ask you again, have a seat." (*Id.* ¶ 173.)

As Plaintiff leaned back and began to lower himself against the wall, multiple Mesa police officers, including Defendants Jones, Monarrez, and Calderon, rapidly approached him from all sides. (Doc. 178 ¶ 19.) As the officers closed in on Plaintiff, Defendant Jones screamed, "all the way down, all the way down," as they rushed toward Plaintiff. (*Id.* ¶ 20.) Plaintiff asserts that the officer Defendants did not give Plaintiff time to comply with Jones' command. (Doc. 192 ¶ 176.) Plaintiff asserts that Defendant Jones grabbed Plaintiff's throat, performed at least one knee strike to Plaintiff's abdomen, and struck Plaintiff numerous times in the face and head, (Doc. 178 ¶ 22); Defendants Calderon and Monarrez also punched Plaintiff, (*Id.* ¶ 23.). Plaintiff claims that as Plaintiff slid down the wall, his hands limp at his sides, Defendant Jones delivered a final elbow strike to his face while Defendant Calderon pulled Plaintiff's legs out from under him. (*Id.* ¶ 25.) Plaintiff did not say anything or move for several seconds once his body was on the ground. (*Id.* ¶ 25.)

Plaintiff states that as he laid restrained and shackled on the ground, he was shaken and upset and used expressive and explicit language. (*Id.* ¶ 33.) Plaintiff claims that in response, the officers, including the officer Defendants, shoved Plaintiff's face into the elevator door, dropped him back to the ground, and muzzled him with a "spit mask." (*Id.* ¶ 34.)

Plaintiff asserts that at the time of the restraining, Plaintiff was not under arrest, and the officer Defendants had no reason to believe he had committed any crime. (*Id.* ¶ 26; Doc. 192 ¶ 183.) During his deposition, Defendant Jones testified that he had no

1    information that Plaintiff had committed a crime at the time of the use of force.  (Doc. 192

2    ¶ 184.)  Plaintiff asserts that he was not violent, combative, or aggressive and was not trying

3    to escape or flee from the officers.  (Doc. 178 ¶¶ 27, 29.)  Plaintiff states that when the

4    officers were "beating" him, he did not even raise his hands to protect his face from their

5    blows.  (*Id.* ¶ 32.)  At his deposition, Defendants' counsel asked Plaintiff if he was under

6    the influence of alcohol, drugs, or medication at the time of the arrest, and Plaintiff testified

7    under oath that he was not.  (*Id.* ¶ 28.)

8        A few days after the incident, Plaintiff presented to the Banner Desert Emergency

9    Department with complaints of headaches and pain in his head, neck, back, and left rib.

10   (Doc. 192 ¶ 194.)  He was diagnosed with bruising and contusions to his right hand and

11   left chest wall.  (*Id.*)  Plaintiff was subsequently diagnosed with a concussion, post-

12   concussion headaches, chronic musculoskeletal pain, and post-traumatic stress disorder as

13   a result of the incident.  (*Id.* ¶ 195.)

14       **D.    Defendants' Version of Events**

15       Defendant Calderon was the first officer to arrive on the third-floor balcony.  As he

16   exited the elevator, he contacted Reyes and Plaintiff and told them to "hang on."  (Doc.

17   172 (Defs.' Statement of Facts) ¶ 17.)  Defendant Calderon asserts that he saw Plaintiff

18   "looking him up and down, as if sizing him up," and Defendant Calderon interpreted this

19   as a threat.  (*Id.* ¶ 20.)  As the only officer then on scene, Defendant Calderon tried to put

20   Reyes and Plaintiff at positions of disadvantage—sitting on the ground—so that if he was

21   attacked, it would take longer for either man to get to a standing position.  (*Id.* ¶ 22.)

22   Plaintiff refused to sit on the ground and responded, "for what?" and moved toward the

23   balcony—leaning against the third-floor railing.  (*Id.* ¶ 23.)

24       Defendant Calderon asserts that he interpreted Plaintiff's comments about the

25   additional officers arriving on the scene as "signaling that [Plaintiff] was going to remain

26   non-complaint."  (*Id.* ¶ 32.)  When Plaintiff began whistling, Defendant Calderon

27   "recognized the whistling as [a] tactic known to be used to warn others that the police are

28   present and to ask for assistance from the other residents."  (*Id.* ¶ 34.)

When Defendant Jones made contact with Plaintiff, Plaintiff was talking on his cell phone and appeared to be purposefully non-attentive to Defendant Jones' attempts to interact with him.  (*Id.* ¶ 38.)  For safety reasons, Officer Jones asked Plaintiff to have a seat by the wall opposite the third-floor railing—the same command given by Officer Calderon earlier, multiple times.  (*Id.* ¶ 41.)  Defendants assert that "[v]isible defiance was observable in [Plaintiff's] demeanor, with his eyes moving up and down to assess [Defendant Monarrez's] size" as Plaintiff commented that Defendant Monarrez was "small."  (*Id.* ¶ 49.)  In response to what he perceived to be Plaintiff's confrontational and defiant body language, Defendant Jones directed Plaintiff to sit down again, and that he would not be asked again to sit, as Defendant Jones believed that obtaining Plaintiff's compliance with sitting would put Plaintiff at a disadvantage if Plaintiff was to attack—in light of the violent nature of the call.  (*Id.* ¶ 51.)  Plaintiff did not sit, but instead braced himself against the wall.  (*Id.* ¶ 52.)  At deposition, Defendant Jones testified as follows regarding his interpretation of Plaintiff's demeanor:

> So his general demeanor, his stance the way he was standing with his back braced against the wall, his foot positioning, things of that sort, told me that, in my training and experience, told me that, hey, this—he's being—I'm not going to be say (sic) difficult, but being confrontational. In other words, his mind isn't on a, you know what, I didn't do anything. Let's just get out of here. Let them do their thing. I know I didn't do anything.  His mind is more so was [sic] on disputing whatever or confronting whatever I'm asking him to do or any other officers on scene are asking him to do.

(*Id.* ¶ 53.)  Defendant Jones believed that Plaintiff was trying to avoid sitting down in order to retain a position of physical advantage by remaining on his feet.  (*Id.* ¶ 55.)  Defendant Jones testified that:

> Based upon the physical cues that I was seeing from Mr. Johnson at the time, that, along with his verbal confrontationalism (sic) towards whatever we were asking of him, led me to believe that he was trying to retain a position of advantage…So his body positioning, the way he was breathing was another cue. Just little things that I've been trained to pay

> attention to that would allow me to believe or assess that potentially a violent incident is imminent or could be imminent in the near future…His shoulders were slightly hunched forward. His toes were pointing somewhat inward. And his breathing has become shallower, if that makes sense.

(*Id.* ¶ 57.) As Plaintiff braced himself against the wall, it was Defendant Jones' impression that Plaintiff was utilizing techniques taught in martial arts and noted that he recognized this stance "from combative training [Defendant Jones had] received in the past which boasts on the necessity of putting a wall to your back when confronted with multiple opponents." (*Id.* ¶ 66.) Defendant Jones perceived Plaintiff's position as an "ideal base" for fighting multiple opponents as Plaintiff was pinning himself against the wall to "counteract force." (*Id.* ¶ 67.) Defendant Jones perceived Plaintiff's body language as preparing for a physical altercation, to include his perception that Plaintiff was looking towards the floor to use his peripheral vision to track several opponents simultaneously and that Plaintiff's breathing was transitioning to fight or flight mode. (*Id.* ¶ 75.)

### E.    City of Mesa Training, Policies, and Procedures

#### 1.    Police Academy and Training

The MPD operates its own Police Academy. (*Id.* ¶ 114.) The training and curriculum provided at the Academy has been certified by the Arizona Peace Officer Standards and Training Board ("AZPOST") as complying with AZPOST standards. (*Id.* ¶ 115.) The instructors at MPD are certified by AZPOST to teach at the Police Academy. (*Id.* ¶ 116.) The City of Mesa hires Police Officers that are certified by AZPOST. (*Id.* ¶ 117.)

Defendants Calderon, Monarrez, Jones are certified by AZPOST to be law enforcement officers in the State of Arizona. (*Id.* ¶¶ 118, 121, 124.) (*Id.* ¶ 122.) Defendants completed training through the Mesa Police Academy and have completed additional training on numerous topics and issues throughout their tenure with MPD. (*Id.* ¶¶ 120, 123, 126.) Defendant Calderon was hired by MPD in October 1996; Defendant Jones was hired by MPD in February 2006; and Defendant Monarrez was hired by MPD in January 2017. (*Id.* ¶¶ 119, 122, 125.)

Ramon Batista became the MPD Chief of Police in July 2017.  (Doc. 208-1 at 4 (Batista Depo. at 71:18–21).)   During his deposition, Chief Batista testified that the previous MPD Chief "emphasized more of the warrior mindset than the guardian mindset" which he described as meaning "the focus would be on arresting the bad guy, catching the bad guy, that type of thing." (Doc. 192-1 at 165–66 (Batista Depo. at 48:17–20, 53:8–10).) Batista further described a "warrior" mentality as follows:

> A warrior mentality to me is that you view yourself as a warrior.  That you go out there and it's you going out there to fight the fight.  In the public, if we're talking about the context of the warrior mentality and policing, that how I would see that. That's what I'm thinking.
>
> . . .
>
> I'm giving you my perspective.  I don't know if it's, you know, wholly accurate.  But let's say I've got a warrior mentality. And so I'm driving around and I avoid calls that require a softer touch and all I'm looking for are the hot calls, the call that elicit the thought that, hey, there could be a confrontation.
>
> And so I'm always available for those calls versus trying to help somebody at a bus bench that's, you know, sleeping and needs a place to stay.

(*Id.* at 166–68 (Batista Depo. at 53:13–18, 59:23–60:7).)   When asked whether a warrior mentality is aggressive, Batista responded, "Yeah. It can be deemed aggressive." (*Id.* at 169 (Batista Depo. at 61:2–3.)  Batista testified that he believes that constitutional policing means that officers have a guardian mentality and a warrior mentality only when it's necessary, stating: "I agree that you do need to be able to go back and forth between those spectrums in order to pull it off and get it right." (*Id.* (Batista Depo. 61:16–25).)

In 2016, the MPD put on its first department-wide de-escalation training.  (Doc. 208-2 at 7 (McClure Depo. at 53:1–6).)   At deposition, MPD representative Jeff Jacobs testified that: "One of the things I teach our officers [during training] is that sometimes a more aggressive approach can solve a problem or end a situation faster, thus making it less likely that you'll use force." (Doc. 192-1 at 174 (Jacobs Depo. at 9–12).)

When asked if he was trained to use force offensively to prevent a subject from formulating plans, Defendant Jones described "live-training scenarios" that had been presented:

> Q:     Did you have a supervisor who trained you about going to the offensive to prevent suspects or -- subjects from formulating plans?
>
> [objection omitted]
>
> THE WITNESS:     A supervisor?
>
> Q:     BY MR. SHOWALTER:··Yeah.
>
> A:     Or just a trainer or anything of that sort?
>
> Q:     Yeah.
>
> A:     We were presented with several training scenarios, live-training scenarios.
>
> Q:     And in what context were you presented with those live-training scenarios?
>
> A:     Those were presented in the DT, the defensive tactics, room or house at the time, to where you're presented with several individuals or an individual who was not being cooperative, was being physically resistant, things of that sort.

(Doc. 192 ¶ 209.)

### 2.     MPD Use-of-Force Policy and Procedures

At the relevant time, MPD had a policy that required officers to report certain uses of force and a policy that documented the uses of force.  (*Id.* ¶¶ 127–28.)  MPD maintained a tracking system that sent an alert to command staff when an officer was involved in a certain number of uses of force within a 12-month period.  (*Id.* ¶ 129.)  MPD presented command staff with annual reports on uses of force.  (*Id.* ¶ 130.)

MPD's Use of Force Policy, DPM 2.1.5, provides a lengthy, non-exhaustive list of factors to be considered by the officer in determining whether the use of force is necessary, including, but not limited to: the risk and foreseeable consequences of escape, the conduct of the individual the confronted, the seriousness of the suspected offense, the proximity of

weapons, the influence of drugs or alcohol and the mental capacity of the individual being confronted, the availability of other options, the potential for injury to citizens, the subject's propensity for violence, and whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.  (Doc. 172-7 at 6–7 (Defs.' Ex. 29).)

Pursuant to DPM 2.1.5 reportable force applications include: "All instances in which a Department member uses force, other than verbal commands and control holds . . . OR [w]hen a member uses force and a person is injured, or thought to be injured, or the person requests medical aid, whether or not an injury is apparent."  (*Id.* at 8.)  DPM 2.1.5 also provides that "[a]ny on duty reportable use of force incident by a Department member shall be documented promptly, completely and accurately in an appropriate report."  (*Id.*)

DPM 2.1.5 defines a "strikes" as "[t]echniques that have more than a minimal chance of injury.  Examples: kicks, elbow, palm or knee strikes, and punches."  (*Id.* at 5.)  "Control holds" are defined as "[t]echniques that have minimal chance of injury.  Examples: OCCS, empty hand escort controls, firm grip, pressure points, takedown, etc."  (*Id.*)

MPD's Use of Force Reporting Protocols, DPM 2.1.45 provides MPD personnel with "general guidelines for use of force reporting protocols and should not be considered as all inclusive."  (Doc. 172-6 at 2 (Defs.' Ex. 23).)  DPM 2.1.45 reiterates the "reportable force applications" guidelines described in DPM 2.1.5.  (*Id.*)  Under DPM 2.1.45, an officer involved in a use-of-force incident must, as soon as possible after the incident, document the use of force in a Department Report or supplemental report and specify the circumstances that necessitated the use of force, the type of force used, and any injury complaints made by the subject.  (*Id.*)

The Proficiency Skills Unit reviews each Use of Force Report and transfers the reports to the IA Pro database.  (*Id.* at 4–5.)  By the 15th of each month, the Proficiency Skills Unit compiles and disseminates a monthly use-of-force report and presentation detailing the reported use of force incidents for the previous month.  (*Id.* at 5.)  At the end

of each calendar year, the Proficiency Skills Unit compiles and disseminates an annual use-of-force report and presentation.  (*Id.*)

In Special Order # 2018 001, in relation to DPM 2.1.2, effective June 2018, the MPD prohibited face, head, and neck strikes absent active aggression/aggravated active aggression by the suspect.  (*See* Doc. 192-1 at 84 (PERF Report p. 15).)

### 3.      MPD Record Retention Policy

Pursuant to Arizona Revised Statutes § 41-151.12, the Arizona State Library, Archives and Public Records developed a General Records Retention Schedule for All Public Bodies ("Retention Schedule").  (Doc. 172 ¶ 137.)  For Law Enforcement Records, all internal investigation files must be maintained for five (5) years after a sustained finding(s) resulting in discipline and for three (3) years for all other records.  (*Id.* ¶ 138.) MPD's Professional Standards policy, DPM 1.4.25 mirrors the Retention Schedule timeframes and also provides that "[s]ustained investigations resulting in dismissal or resignation in lieu of termination or involuntary demotion will be retained indefinitely. (Doc. 172-7 at 42 (Defs.' Ex. 31).)  The policy does not require records regarding citizen complaints to be retained.  (*See id.*)  When MPD destroyed records pursuant to the Retention Schedule in 2014 and 2016, it provided Certificates of Records Destruction to the Records Management Center of the Arizona State Library, Archives and Public Records.  (Doc. 172 ¶ 141.)

### 4.      Defendants' Use-of-Force Records

Excluding Plaintiff's arrest, Defendants Jones' "Concise Employee History" indicates that he was involved in 17 use-of-force incidents between December 2012 and September 2017; in these incidents, the methods of force used included bean bag/baton round, strikes, TASER, unspecified deadly force, control holds, and chemical agent.  (Doc. 172-6 at 21–24 (Defs.' Ex. 26).)  The document does not clearly indicate whether the Professional Standards Unit (PSU) investigated each incident, what the outcome was, or what discipline or reprimand Defendant Jones received, if any.  (*Id.*)  A citizen complaint

1  alleging excessive force and discourtesy was filed against Defendant Jones on May 18,
2  2013, and the allegations were deemed "not sustained."  (*Id.* at 22.)

3      Excluding Plaintiff's arrest, Defendant Calderon's "Concise Employee History"
4  indicates that he was involved in 25 use-of-force incidents between January 2013 and
5  February 2018; the methods of force used included strikes, control holds, chemical agents,
6  TASER, and carotid artery restraint.  (*Id.* at 28–33 (Defs.' Ex. 27).)  The document does
7  not clearly indicate whether the Professional Standards Unit (PSU) investigated each
8  incident, what the outcome was, or what discipline or reprimand Defendant Calderon
9  received, if any.  (*Id.*)  Citizen complaints against Defendant Calderon alleging unnecessary
10  or excessive use of force were filed on April 17, 2014; November 3, 2015; and October 12,
11  2016.  (*Id.* at 28–30.)  The April 17, 2014 complaint was deemed "not sustained";
12  Defendant Calderon was "exonerated" on the November 3, 2015 complaint; and the
13  October 12, 2016 complaint was administratively closed.  (*Id.*)

14      Defendant Monarrez's "Concise Employee History" indicates that he had no
15  reported use-of-force incidents prior to Plaintiff's arrest.  (Doc. 172-7 at 2 (Defs.' Ex. 28).)

16      Defendant Jones' internal affairs records were purged in 2012, and Defendant
17  Calderon's records were purged in early 2013, so their citizen complaints and use of force
18  investigations prior to those dates are no longer available.  (Doc. 192 ¶ 203.)

19  **IV.    Excessive Force Claims Against the Officers**

20      **A.    Legal Standard**

21      A claim that law enforcement officers used excessive force during an arrest is
22  analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v.*
23  *Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature
24  and quality of the intrusion on the individual's Fourth Amendment interest against the
25  countervailing governmental interests."  *Id.*

26      To determine whether a Fourth Amendment violation has occurred, the Court
27  conducts a three-step analysis assessing: (1) the nature of force inflicted; (2) the
28  governmental interests at stake, which involve factors such as the severity of the crime, the

threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  However, "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

At the summary judgment stage, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott* , 550 U.S. at 381 n.8.  But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

**B.    Discussion**

**1.    Nature and Quality of the Intrusion**

First, the Court evaluates "the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537 (quotation omitted).  Here, the camera footage shows that Plaintiff sustained several strikes to the face and upper body.  Accepting Plaintiff's facts as true, Plaintiff suffered pain in his head, neck, back, and left rib and was diagnosed with bruising and contusions to his right hand and left chest wall.  (Doc. 192 ¶ 194.)  On this record, the amount of force used by Defendants Jones, Monarrez, and Calderon was more than

1    insignificant and must be justified by a similar level of "government interest [that] compels

2    the employment of such force."  *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir.

3    2001).

4                           **2.      Government Interests**

5           The Court applies the *Graham* factors to evaluate the importance of the government

6    interest at stake during Plaintiff's arrest.  The first factor examines the severity of the crime

7    at issue.  *Espinosa*, 598 F.3d at 537.  More serious crimes may require greater levels of

8    force to apprehend the subject.  *See Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1297

9    (D. Idaho 2011).

10          In this case, the nature of the crime at issue is in dispute and provides little basis for

11   one way or the other regarding the officers' use of force.  At the time of the use of force,

12   Plaintiff was at most under investigation as stated in Defendant Calderon's deposition.

13   (Doc. 192 ¶ 183.) The record shows that at the time the officers made contact with Plaintiff,

14   the facts they had available to them were that Reyes was suspected of a domestic violence

15   offense, that Reyes might have had a gun, and that his friend, Plaintiff, was with him.

16   Further, the officers knew that either Reyes or Plaintiff or both attempted to enter Reyes'

17   ex-girlfriend's home by force, including attempting to open the door and kicking the door

18   (it remains unclear what Plaintiff's role was during this time).  Thus, Defendants argue

19   they were investigating a potential domestic violence and home invasion situation.  (Doc.

20   176 at 18).  Because Plaintiff's role at the ex-girlfriend's door remains in dispute, it is

21   difficult to identify the nature of the crime at issue.  For example, Plaintiff might have been

22   involved in the offense of disorderly conduct, which is considered a misdemeanor in most

23   circumstances.  *See* A.R.S. § 13-2904; *see also Smith*, 394 F.3d at 702-03 (finding that a

24   domestic violence offense "did not warrant the conclusion that [the plaintiff] was a

25   particularly dangerous criminal or that his offense was especially egregious"; thus, the

26   crime at issue provided little basis for the defendant's use of physical force).  Alternatively,

27   Plaintiff may have been attempting to commit a home invasion, which would be a felony

28   in many circumstances.  *See e.g. State v. Forde,* 315 P.3d 1200, 1221 ¶¶ 81-82 (Ariz. 2014).

1    Thus, there was a governmental interest in investigating Plaintiff. *Miller*, 340 F.3d at 964

2    (government has a legitimate interest in apprehending criminal suspects). On this record,

3    the first *Graham* factor does not favor either party for purposes of summary judgment.

4        However, the "most important *Graham* factor" is whether Plaintiff "posed an

5    immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433,

6    441 (9th Cir. 2011). Here, the video evidence creates a disputed issue of fact as to whether

7    the officers' perceptions that Plaintiff posed an immediate threat to Defendants were

8    credible. When Defendant Calderon told Plaintiff to "hang on," Plaintiff made no attempt

9    to flee in the open elevator. Instead, he let the elevator close and stood by the balcony

10   railing and talked on his phone. Plaintiff never approached Defendant Calderon while

11   Defendant Calderon was questioning Reyes. Once Defendants Monarrez and Jones and

12   Officer Bridges arrived, Plaintiff consented to a pat down. No weapons were found. When

13   an officer told Plaintiff to have a seat against the wall opposite the balcony railing, Plaintiff

14   expressed his displeasure verbally, but still went and stood against the wall (though he did

15   not sit down). Defendants place much emphasis on the fact that Plaintiff disobeyed their

16   commands for him to sit all the way down. And failure to comply with an officer's

17   commands is a factor to consider in the excessive force analysis. *See S.R. Nehad v.*

18   *Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019), *cert. denied sub nom. Browder v. Nehad*,

19   141 S. Ct. 235 (2020). Nonetheless, the video footage creates a disputed issue of fact as to

20   whether Plaintiff posed a credible threat to the officers despite his failure to sit all the way

21   down. Specifically, the footage shows that Plaintiff stood against the wall and continued

22   to type on his cell phone. Defendants contend that Plaintiff was "sizing them up," looking

23   at them threateningly, and positioning himself against the wall in preparation for an attack,

24   but the video footage creates a disputed issue of fact regarding this contention.

25   Specifically, although Plaintiff did not put his rear end all the way on the ground, he made

26   no moves to flee, he did not attempt to summon the elevator, and he did not attack or

27   ambush the officers. Instead, he stood against the wall using his cell phone. Thus, there is

28   a disputed issue of fact as to whether Defendants' claim that they were in fear for their

safety is credible.  It is undisputed that Plaintiff referred to Defendant Monarrez as "small," but there is a disputed issue of fact as to whether this was a "threat" because a verbal insult does not automatically amount to a threat against an officer.  Here, there was no follow-up action by Plaintiff in the video that confirms Defendants' contention that Plaintiff insulted Monarrez as a precursor to an attack; and, although Plaintiff had time to immediately assault the officers after he commented that Defendant Monarrez was small, Plaintiff did not do so.  In fact, the use of force started at a point when Plaintiff was leaning against the wall and typing on his phone, not contemporaneous to or immediately after Plaintiff's "small" comment.

An officer's belief that he fears for his safety or the safety of others is not sufficient; "there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation omitted).  Here, there is a disputed issue of fact as to whether such objective factors are supported in the video evidence. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017) (in the Fourth Amendment analysis, "we do not consider an officer's subjective 'intent or motivation'") (quoting *Graham*, 490 U.S. at 397).  Therefore, this factor weighs in favor denying summary judgment.

Next, the Court must consider whether Plaintiff was resisting arrest.  As an initial matter, per Defendant Calderon's deposition, Plaintiff was not under arrest when Defendants began striking him.  (Doc. 192 ¶ 183.)  Instead, Defendants began striking Plaintiff when he did not sit all the way on the ground.  Defendants contend that Plaintiff tensed his arms and body when they first grabbed him, which they construed as resistance.  The video footage creates a disputed issue of fact as to whether Plaintiff was resisting because Defendant Jones continued to strike Plaintiff in the face even after Plaintiff was pinned against the wall and appeared to be immobilized by Defendants Monarrez and Calderon (although this was before Plaintiff went down to the ground).  Moreover, on this record, there is a question of fact whether Defendants were justified in using any force against Plaintiff initially because Plaintiff was unarmed and not trying to flee the scene at

the time force was used (and there is a disputed issue of fact as to the threat, if any, Plaintiff posed).  *See Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) (where there is no need for force, any force used is excessive), *vacated and remanded on other grounds, Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001). This factor weighs in favor of Plaintiff for purposes of denying Defendants' motions summary judgment.

### 3.      Necessity of Force

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854).  As mentioned above, whether the force used was reasonable is judged from the perspective of a reasonable officer on the scene.  *Graham*, 490 U.S. at 396–97.  From this perspective, there is a disputed issue of fact based on the video evidence as to whether the force used against Plaintiff was reasonable.

The Fourth Amendment does not require officers to use the least amount of force necessary when responding to an exigent situation.  *See Bryan*, 630 F.3d at 818 ("Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue"); *Scott v. Heinrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) ("[o]fficers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable'") (quotation omitted). As indicated above, here there is a disputed issue of fact regarding whether the force used against Plaintiff was reasonable.  Specifically, Plaintiff was not under arrest and was merely under investigation.  The video footage shows that when Defendants initiated the use of force, Plaintiff was standing still with his back to the wall and typing on his cell phone.  Plaintiff was unarmed (which was known to the officers after the pat down) and not in the process of assaulting the officers or fleeing.  On these facts, a reasonable jury could find that the force used was greater than reasonable under the circumstances.  *See*

*Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (finding use of force "objectively unreasonable" where officer aggressively handcuffed plaintiff who did not pose a safety risk and made no attempt to flee).   Accordingly, Defendants' Motions for Summary Judgment will be denied as to the merits of Plaintiff's excessive force claim in Count Three.

### C.   Qualified Immunity

Defendants Calderon, Monarrez, and Jones, next argue that they are entitled to qualified immunity.   Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and alterations omitted). Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, — U.S. —, 138 S.Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, (2012)).   Courts may address either prong first, depending on the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235-36 (2009).

For a right to be clearly established, there does not have to be a case directly on point; however, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)).   Accordingly, a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117 (citing *White*, 137 S. Ct. at 551). To determine whether qualified immunity applies, the Court must first identify the federal or constitutional right at issue; then it must attempt to "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right.

*Id.*  If there is no such case, then the right was not clearly established, and the officer is protected from suit.  *See id.* at 1117-18.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

The Court has determined that there are disputed issues of fact such that a reasonable jury could find that each Defendants' use of force was excessive and in violation of Plaintiff's Fourth Amendment rights.  Therefore, the Court will move on to the second step of the qualified immunity analysis and consider whether Plaintiff's right was clearly established at the time Defendants used force.

It was clearly established at the time of Defendants' use of force that excessive force is prohibited under the Fourth Amendment. *See e.g. De Contreras v. City of Rialto,* 894 F. Supp. 2d 1238, 1249 (C.D. Cal. 2012).  The Court is aware that the clearly established prong of qualified immunity must be looked at in the context of the particular facts of the case and not at a high level of generality. *White*, 137 S. Ct. at 552.  However, the totality of Defendant Calderon's motion regarding whether the law was clearly established is: "Moreover, the alleged right claimed by Plaintiff was not clearly established at the time of the incident." (Doc. 174 at 7).  The totality of Defendant Monarrez's argument on whether the law was clearly established was to incorporate Defendant Jones' argument.  (Doc. 181 at 4-5).  Thus, only Defendant Jones makes a particularized qualified immunity argument as to whether Plaintiff's rights were clearly established, and thus the Court will analyze all Defendants' conduct together for purposes of the clearly established analysis.  (Doc. 176 at 18-21).

Thus, Defendants argue: "There is no case, from the Ninth Circuit or Supreme Court, addressing facts analogous to those faced by these responding officers: potential domestic violence/home invasion, at midnight, involving a confrontational subject on a third-floor balcony, who engages in vigorous physical resistance in response to an extremely minimal use of force." (Doc. 176 at 18).  However, these "facts" are mostly in

dispute.  There was no allegation that Plaintiff engaged in domestic violence, and at this point it is disputed as to what Plaintiff's role was in attempting to enter the home.  Next, it is disputed by the video evidence and Plaintiff's statement of the events whether Plaintiff was "confrontational".  Next, it is disputed by the video evidence and Plaintiff's statement of the events whether Plaintiff engaged in any physical resistance, much less "vigorous" physical resistance.

Thus, although Defendants argue that they are entitled to qualified immunity because there is no clearly established law on "these" particular facts, Defendants' argument is based on their version of the disputed facts and the Court cannot make credibility determinations during the summary judgment stage. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the nonmoving party, summary judgment is not appropriate").  Viewing the facts as supported by the video evidence and in the light most favorable to the nonmoving party, Defendants struck Plaintiff—who was leaning with his back against the wall typing on his cell phone at the time—in the face and upper body several times even though he was not under arrest, was unarmed, was not attempting to flee, and was not assaulting Defendants. *See generally Scott*, 550 U.S. at 380–81.  Further, Plaintiff alleges that he did not pose a threat to the officers and that he complied with some of their commands.  If the facts are proven at trial to be as Plaintiff has alleged them, then the law was clearly established that Defendants used excessive force.  *Meredith*, 342 F.3d at 1061 (finding that it was clearly established that violently handcuffing a non-threatening, non-fleeing individual was unreasonable); *Wilenchik v. Ryan*, No. CIV 10-541 TUC DCB (GEE), 2010 WL 5644812 at *4 (D. Ariz. 2010) (denying qualified immunity where plaintiff, who posed no threat and did not resist, alleged that she was violently and painfully handcuffed).

…

…

…

1 **V.      *Monell* Claim against the City**

2     **A.      Legal Standard**

3     To maintain a claim against a municipality, a plaintiff must meet the test articulated

4 in *Monell v. Department of Social Services.*, 436 U.S. 658, 690-94 (1978).  Accordingly, a

5 municipality can only be held liable under § 1983 for its employees' civil rights

6 deprivations if the plaintiff can show that an official policy or custom caused the

7 constitutional violation.  *Id.* at 694.  To make this showing, a plaintiff must demonstrate

8 that (1) he was deprived of a constitutional right; (2) the government agency had a policy

9 or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's

10 constitutional right; and (4) the policy or custom was the moving force behind the

11 constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237

12 F.3d 1101, 1110−11 (9th Cir. 2001).

13     Further, if the policy or custom in question is an unwritten one, the plaintiff must

14 show that it is so "persistent and widespread" that it constitutes a "permanent and well

15 settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S.

16 144, 167-68 (1970)).  "Liability for improper custom may not be predicated on isolated or

17 sporadic incidents; it must be founded upon practices of sufficient duration, frequency and

18 consistency that the conduct has become a traditional method of carrying out policy."

19 *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

20     "[A] local government's decision not to train certain employees about their legal

21 duty to avoid violating citizens' rights may rise to the level of an official government policy

22 for purposes of § 1983."  *Connick*, 563 U.S. at 60.  To support a *Monell* claim for failure

23 to train under § 1983, a plaintiff must allege facts demonstrating that the local

24 government's failure to train amounts to "deliberate indifference to the rights of persons

25 with whom the [untrained employees] come into contact."  *Connick*, 563 U.S. at 61 (citing

26 *Canton*, 489 U.S. at 388).  This deliberate indifference standard is an objective standard,

27 and it is satisfied only when "a § 1983 plaintiff can establish that the facts available to . . .

28 policymakers put them on actual or constructive notice that the particular omission [or act]

is substantially certain to result in the violation of the constitutional rights of their citizens." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 676 (9th Cir. 2015).  Thus, to maintain a failure to train claim, a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference and that the governmental entity had actual or constructive notice of those violations.  *Connick*, 563 U.S. at 72.

A *Monell* claim generally must be based on more than "a single constitutional deprivation, a random act, or an isolated event." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015).  Similarly, to properly allege a claim for failure to supervise, a plaintiff must allege facts demonstrating that the supervision was "sufficiently inadequate" to amount to "deliberate indifference." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

"A municipality also can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999).  "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Id.* at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  But, "[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).  The policymaker must have knowledge of the constitutional violation and must make a "conscious, affirmative choice" to ratify the conduct at issue. *Id.*  "In other words, in order for there to be ratification, there must be 'something more' than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, 2010 WL 3911457 at *10 (S.D. Cal 2010); *see also Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) (finding a plaintiff must "present 'something more' than a failure to discipline" to survive summary judgment).

It is well-settled in this circuit that without "something more," a City's failure to discipline an officer, or its finding that an officer's conduct did not violate policy, does not

1   amount to ratification. *Id.*; *Lytle*, 382 F.3d at 987; *Sheehan v. City & Cty. of San Francisco*,

2   743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 1765 (2015)

3   ("Ratification, however, generally requires more than acquiescence"); *see Gillette v.*

4   *Delmore*, 979 F.3d 1342, 1348 (9th Cir. 1992) ("To hold cities liable under section 1983

5   whenever policymakers fail to overrule the unconstitutional discretionary acts of

6   subordinates would simply smuggle respondeat superior liability into section 1983 law

7   [creating an] end run around *Monell*"); *see also Santiago v. Fenton*, 891 F.2d 373, 382 (1st

8   Cir. 1989) ("[W]e cannot hold that the failure of a police department to discipline in a

9   specific instance is an adequate basis for municipal liability under *Monell*").

10          **B.      Discussion**

11          With respect to the first element of the *Monell* analysis—that a constitutional

12   deprivation occurred—as previously discussed, there is a genuine issue of material fact as

13   to whether Defendants Monarrez, Calderon, and Jones violated Plaintiff's Fourth

14   Amendment rights.  Thus, there is also a genuine issue as to the first *Monell* requirement.

15          Next, Plaintiff must show that the City had a policy or custom that amounted to

16   deliberate indifference.  A policy is "a deliberate choice to follow a course of action" made

17   by the officials or entity "responsible for establishing final policy with respect to the subject

18   matter in question."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A "custom"

19   is a "widespread practice that, although not authorized by written law or express municipal

20   policy, is so permanent and well-settled as to constitute a custom or usage with the force

21   of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Here, there is evidence in the

22   record that at the time of Plaintiff's May 2018 arrest, MPD policy did not clearly prohibit

23   face, head, and neck strikes absent active aggression/aggravated active aggression by the

24   suspect.  (*See* Doc. 192-1 at 84 (PERF Report p. 15).)   Thus, there is a triable issue of fact

25   as to whether at the time of Plaintiff's arrest, there was a policy or custom of allowing MPD

26   officers to strike non-aggressive individuals in the face, head, and neck.  Further, there is a

27   disputed issue of fact as to whether Plaintiff was non-aggressive.

28

1    The Court must therefore address whether the City's policy or custom amounts to

2    deliberate indifference.  *See Mabe*, 237 F.3d at 1110–11.  A policy or custom is deliberately

3    indifferent when its inadequacy is obvious and likely to result in the violation of a

4    constitutional right.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Whether an entity

5    has a policy of deliberate indifference is generally a jury question.  *Gibson v. Cnty. of*

6    *Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002).  A policy that did not expressly prohibit

7    officers from striking individuals in the face, head, and neck who were not displaying

8    active aggression/aggravated active aggression could be likely to result in officers using

9    force in situations where it is not warranted.  Thus, a reasonable jury could find that such

10   a policy was obviously inadequate to protect the Fourth Amendment rights of those who

11   came into contact with police officers and that this policy resulted in the violation of

12   citizens' constitutional rights.  Accordingly, there exists a triable issue of fact on this

13   element.

14   Finally, to demonstrate that a policy was the moving force, a plaintiff must show

15   that the defendant's policy was "closely related to the ultimate injury."  *City of Canton*,

16   489 U.S. at 391.  Here, a reasonable jury could find that a policy that did not expressly

17   prohibit MPD officers from striking non-active-aggressive individuals in the face, head,

18   and neck was closely related to Plaintiff being struck in the face several times by officers;

19   further, there is a question of fact as to whether Plaintiff was being aggressive.  Thus, there

20   is a question of fact whether a City policy or custom led to a violation of Plaintiff's Fourth

21   Amendment rights and was the "moving force" behind his ultimate injury.

22   Accordingly, with respect to Plaintiff's § 1983 claim against the City, summary

23   judgment will be denied.

24   **VI.    State Law Assault and Battery Claims**

25   Defendants rely on Arizona Revised Statutes § 13–409 as a basis for immunity from

26   Plaintiff's state law assault and battery claims.  Section 13–409 provides:

27             A person is justified in ... using physical force against another
28             if in making ... an arrest or detention or in preventing the escape

after arrest or detention of that other person, such person uses or threatens to use physical force and all of the following exist:

1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.

2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.

3. A reasonable person would believe the arrest or detention to be lawful.

Ariz. Rev. Stat. § 13–409.  In conjunction with the above provision, Arizona Revised Statutes § 13–413 states that "[n]o person in this state shall be subject to civil liability for engaging in conduct otherwise justified ...."

Summary judgment on this issue is not warranted for the same reasons discussed with respect to federal qualified immunity on the § 1983 excessive force claim.  As discussed above, construing the evidence in Plaintiff's favor and viewing the facts as depicted in the video footage, a reasonable jury could find that no force was necessary at the time that Defendants Calderon, Monarrez, and Jones struck Plaintiff repeatedly.  On this record, Defendants fail to show that under no set of facts and inferences could Plaintiff prove that they used excessive force.  In light of the material issue of fact over whether Defendants' use of force was reasonable under the circumstances, it cannot be said that a "reasonable person would believe that such force [was] immediately necessary to effect the arrest" or that a "reasonable person would believe the arrest ... to be lawful."  A determination of immunity under § 13–409 therefore requires the resolution of genuine issues of material fact.  Therefore, summary judgment in favor of Defendants on the issue of immunity under § 13–409 is denied.  Accordingly, the motion for summary judgment will be denied as to the state-law assault and battery claims against Defendants Monarrez, Calderon, and Jones and vicarious liability claim against the City in Count One.

## VII.   State Law Negligence Claim

In Count Three, Plaintiff alleges that the City negligently failed to train and

supervise its officers, including Defendant Monarrez, Calderon, and Jones and that this breach of duty caused Plaintiff's injuries.  (Doc. 41 ¶¶ 61–65.)

Arizona law holds employers accountable for the tortious conduct of their employees "if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee." *Hernandez v. Singh*, No. CV-17-08091-PCT-DWL; 2019 WL 367994, at *6 (D. Ariz. Jan. 30, 2019).  For negligent hiring, supervision, and training claims, "Arizona follows the Restatement (Second) of Agency § 213." *Id.* (internal quotation marks and citation omitted). According to Section 213:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders of [sic] in failing to make proper regulations; or
>
> (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[;]
>
> (c) in the supervision of the activity; or
>
> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958).

"For an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort." *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004).  If the threshold tort finding is satisfied, the employer may be liable "not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment." *Quinonez for & on Behalf of Quinonez v. Andersen*, 696 P.2d 1342, 1346 (Ariz. Ct. App. 1984).

To succeed on a negligent supervision claim, "the plaintiff must show the employer knew or should have known the employee was incompetent and that the employer

subsequently failed to supervise the employee, ultimately causing the harm at issue." *Hernandez*, 2019 WL 367994 at *7. To prove negligent training, "a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries." *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct. App. 2014), *vacated on other grounds in Guerra v. State,* 348 P.3d 423 (Ariz. 2015). Importantly, "[a] showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Id.* at 772-73.

As discussed above, there is a question of fact whether Defendants Monarrez, Calderon, and Jones committed the tort of assault and battery. Thus, there is a disputed issue of fact as to whether the officers were "competent". However, the record does not support a negligent supervision claim because the available facts do not support a finding that the City should have known these officers were "incompetent" prior to this incident. The Concise Employee Histories for Defendants Calderon and Jones only show that they were involved in multiple use-of-force incidents over the course of their long careers with the MPD. Absent additional details regarding these prior incidents involving force, the mere fact that Defendants Calderon and Jones used force in the past is not sufficient to create a genuine issue of fact that the City knew or should have known that these officers were incompetent. Further, Monarrez was not previously involved in any such incidents. Therefore, summary judgment will be granted to the City on the negligent supervision claim.

With respect to the negligent training claim, Plaintiff must do more than show Defendants were incompetent, he "must also present evidence showing what training should have been provided, and that its omission proximately caused the [his] injuries." *Guerra*, 323 P.3d at 772-73. It is undisputed that Defendants Calderon, Monarrez, and Jones completed MPD Police Academy and are AZPOST-certified. Further, the record shows that MPD began implementing de-escalation training in 2016. However, the record also shows that prior to Plaintiff's arrest, MPD policy did not clearly prohibit officers from

implementing face, head, and neck strikes against individuals who were not actively aggressive.  As previously discussed, a reasonable juror could find that such a policy could be likely to lead to the use of force against individuals who were not actively aggressive and that such a policy was therefore negligent.  Because there is a question of fact as to whether Plaintiff was actively resisting when Defendants struck him in the face, a reasonable juror could also determine that the allegedly negligent policy was the proximate cause of Plaintiff's injuries.  Accordingly, summary judgment will be denied to the City as to Plaintiff's negligent training claim.

**VIII.  Punitive Damages**

Defendants contend that the record does not support Plaintiff's claim for punitive damages.  Frequently, whether punitive damages are warranted is an issue reserved for the jury.  See *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  A jury may assess punitive damages in a § 1983 action when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56.  Here, a reasonable jury could conclude that Defendants exhibited reckless or callous indifference to Plaintiff's right to free from the use of excessive force.  Thus, Defendants' request for summary judgment on Plaintiff's punitive damages request will be denied.

**IX.   Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for summary judgment as to Defendants' affirmative defenses of federal qualified immunity; the state law justification defense under Arizona Revised Statutes § 13-402; the state law intoxication and criminal defense acts defenses under Arizona Revised Statutes §§ 12-711, 12-712, and 12-716; and state-law qualified immunity under Arizona Revised Statutes § 12-820.02 or the common law.  (Doc. 177.)

**A.     Federal Qualified Immunity**

Although the Court denied Defendants' motion for summary judgment on qualified immunity, the Court did so due to disputed issues of fact.  Those disputed issues of fact similarly preclude a grant of summary judgment to Plaintiff on Defendants' qualified

immunity defense.

**B.     Intoxication and Criminal Defense**

The Court will deny Plaintiff's motion with the respect to the intoxication and criminal acts defenses.  Section 12-711 provides that:

> In any civil action, the finder of fact may find the defendant not liable if the defendant proves that the claimant . . . was under the influence of an intoxicating liquor or a drug and as a result of that influence the claimant . . . was at least fifty per cent responsible for the accident or event that caused the claimant's . . . harm.

Section 12-712 states that:

> A. In any civil action, the finder of fact may find the defendant not liable if the defendant proves that the claimant . . . was attempting to commit, committing or immediately fleeing from a felony criminal act and as a result of that act, attempted act or flight the claimant or decedent was at least fifty per cent responsible for the accident or event that caused the claimant's or decedent's harm.
>
> B. In any civil action, the finder of fact may find the defendant not liable if the defendant proves that the defendant did not act intentionally and that the claimant . . . was attempting to commit, committing or immediately fleeing from a misdemeanor criminal act and as a result of that act, attempted act or flight the claimant . . . was at least fifty per cent responsible for the accident or event that caused the claimant's . . . harm.
>
> C. Notwithstanding subsection A or B of this section, in any civil action, the finder of fact may find the defendant not liable if the defendant proves that the defendant did not act intentionally and that the claimant . . . was attempting to commit, committing or immediately fleeing from an act [of theft of ferrous metal] and, as a result of that act, attempted act or flight, the claimant or decedent was in any way responsible for the accident or event that caused the claimant's or decedent's harm.

Finally, Section 12-716 provides that:

- 33 -

A. If the court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act or if a person intentionally or knowingly caused temporary but substantial disfigurement or temporary but substantial impairment of any body organ or part or a fracture of any body part of another person, the following presumptions apply to any civil liability action or claim:

1. A victim or peace officer is presumed to be acting reasonably if the victim or peace officer threatens to use or uses physical force or deadly physical force or a police tool product to either:

(a) Protect himself or another person against another person's use or attempted use of physical force or deadly physical force.

(b) Effect an arrest or prevent or assist in preventing a plaintiff's escape.

With respect to sections 12-712 and 12-716, the Court has already determined that there are material facts at issue regarding the events of Plaintiff's ultimate arrest.  Notably, the Court determined that a reasonable juror, upon viewing the video footage, could find that the amount of force used during Plaintiff's arrest was not reasonable under the circumstances.  But a reasonable juror could also determine that the force used was warranted.  Thus, for the same reasons, reasonable jurors could differ on whether the affirmative defenses listed in sections 12-712 and 12-716 apply in this case.  Therefore, Plaintiff's motion will be denied as to these affirmative defenses.

With respect to the intoxication defense, the Court also finds a disputed issue of fact.  At Plaintiff's deposition, defense counsel asked Plaintiff if he was under the influence of alcohol, drugs, or medication at the time of the arrest, and Plaintiff testified under oath that he was not.  In response to this evidence, Defendants argue that:

Plaintiff's self-serving statement that he was not under the influence of alcohol or drugs, thereby negating the applicability of A.R.S. § 12-711, is not conclusive.  The video evidences belligerent behavior that is completely abnormal, particularly in the tirade following Johnson's handcuffing. Defendants do not have the luxury of a blood draw in this case,

but do have Plaintiff's testimony and records regarding his history of drug and alcohol abuse.

(Doc. 187 at 17.)   Construing the facts in the light most favorable to Defendants as the nonmovants on this motion, as supported by the video footage, the Court finds a disputed issue of fact as to whether Plaintiff was acting in a way that would be consistent with some form of intoxication. At this time, the Court makes no advance ruling on the admissibility of Plaintiff's history of drug and alcohol use at trial.  Because there is a disputed issue of fact, summary judgment will be denied on this affirmative defense under A.R.S. § 12-711.

**C.     State Law Qualified Immunity**

The Court will deny Plaintiff's motion to the extent he seeks partial summary judgment on the issue of qualified immunity under Arizona Revised Statutes § 12-820.02. Section 12-820.02 provides a list of 11 specific instances in which a public entity or employee is entitled to qualified immunity.  None of those situations exist in this case.  *See* Ariz. Rev. Stat. § 12-820.02.  Therefore, this portion of Plaintiff's motion will be denied as moot.

However, under the common law, "public officials, including police officers, [enjoy] limited protection from liability when 'performing an act that inherently requires judgment or discretion.'"  *Spooner v. City of Phoenix*, 435 P.3d 462, 466 (Ariz. App. 2018) (quoting *Chamberlain v. Mathis*, 729 P.2d 905, 909, 912 (Ariz. 1986)); *see Portonova v. Wilkinson*, 627 P.2d 232, 234 (Ariz. 1981) ("It has been recognized that in Arizona a police officer acting within the scope of his authority has at least a conditional immunity from civil liability.").  If qualified immunity applies, a public official performing a discretionary act "within the scope of [her] public duties" may be liable only if he "knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights."  *Chamberlain*, 729 P.2d at 912.

Here, the record shows that Defendants were performing a discretionary act within the scope of their duties, i.e. investigating a potential crime and ultimately conducting an

arrest.   To the extent Defendants' conduct in carrying out these discretionary duties violated clearly established law or reflected a reckless disregard of Plaintiff's rights, they are not entitled to state-law, common-law immunity.   Plaintiff argues that Defendants struck Plaintiff in the face and upper body several times, even though he was not under arrest, was unarmed, and was not fleeing or assaulting them.   As discussed above, if a jury finds these disputed facts in Plaintiff's favor, a jury could find that Defendants acted in reckless disregard of Plaintiff's Fourth Amendment rights.

However, construing the facts in the light most favorable to Defendants, the nonmovants on this motion, as supported by the video footage, Plaintiff refused to obey some of the officers' commands in a way that potentially benefitted Plaintiff strategically and Plaintiff made a statement and engaged in other behaviors that could be construed as threats to the officers.   Further, the officers were investigating an attempted home invasion. Thus, because there are disputed issues of fact as to whether there was a reckless disregard of Plaintiff's rights, Plaintiff's motion will be denied as to the state law qualified immunity defense.

**X.    Conclusion**

Based on the foregoing, **IT IS ORDERED:**

(1)    The reference to Magistrate Judge Boyle is withdrawn as to Defendants' Motions for Summary Judgment (Doc. 174, 176, 181, 182) and Plaintiff's Motion for Partial Summary Judgment (Doc. 177).

(2)    Defendant Calderon's Motion for Summary Judgment (Doc. 174) is **denied**.

(3)    Defendant Jones' Motion for Summary Judgment (Doc. 176) is **denied**.

(4)    Defendant Monarrez's Motion for Summary Judgment (Doc. 181) is **denied**.

(5)    Defendant City of Mesa's Motion for Summary Judgment (Doc. 182) is **granted in part and denied in part** as follows: (a) the Motion is **granted** as to Plaintiff's negligent supervision claim, and the Motion is **denied** as to all other claims against the City.

(6)    Plaintiff's Motion for Partial Summary Judgment (Doc. 177) is **denied**.

(7)     The remaining claims are: Plaintiff's Fourth Amendment excessive force against Defendants Jones, Calderon, and Monarrez, Plaintiff's and state law assault and battery claim against Defendants Jones, Calderon, Monarrez and the City, Plaintiff's *Monell* claim against the City, and Plaintiff's state law negligent training claim against the City.

(8)     This action is referred to Magistrate Judge Burns to conduct a settlement conference on Plaintiff's remaining claims.

(9)     Counsel shall arrange for the relevant parties to jointly call Magistrate Judge Burns' chambers (602) 322-7610 **within fourteen (14) days** to schedule a date for the settlement conference.

Dated this 8th day of September, 2021.

James A. Teilborg
Senior United States District Judge